No. 23-2644

IN THE UNITED STATES COURT OF
APPEALS FOR THE SEVENTH CIRCUIT

————————————

MICHAEL J. BOST, ET AL.,

*Plaintiffs-Appellants*,

v.

ILLINOIS STATE BOARD OF ELECTIONS AND
BERNADETTE MATTHEWS, IN HER OFFICIAL
CAPACITY AS THE EXECUTIVE DIRECTOR OF THE
ILLINOIS STATE BOARD OF ELECTIONS,

*Defendants-Appellees*,

————————————

On Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division
Case No. 1:22-cv-02754
The Honorable Judge John F. Kness

————————————

**BRIEF AND SHORT APPENDIX OF PLAINTIFFS-APPELLANTS**

————————————

Christine Svenson, Esq.
**SVENSON LAW OFFICES**
345 N. Eric Drive
Palatine, IL 60067
(312) 467-2900
christine@svensonlawoffices.com

T. Russell Nobile
  *Counsel of Record*
**JUDICIAL WATCH, INC**
P.O. Box 6592
Gulfport, MS 39506
(202) 527-9866
Rnobile@judicialwatch.org

Eric W. Lee
**JUDICIAL WATCH, INC.**
425 Third Street SW
Suite 800
Washington, D.C. 20024

October 2, 2023

*Counsel for Plaintiffs-Appellants*

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 23-2644

Short Caption: Michael Bost, et al. v. Illinois State Board of Elections, et al.

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
    Plaintiffs Michael J. Bost, Susan Sweeney, and Laura Pollastrini

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
    Judicial Watch, Inc. and Svenson Law Offices

(3)    If the party, amicus or intervenor is a corporation:

    i)    Identify all its parent corporations, if any; and

        N/A

    ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

        N/A

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

    N/A

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

    N/A

Attorney's Signature: s/ T. Russell Nobile          Date: 10/02/2023

Attorney's Printed Name: T. Russell Nobile

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    Yes ☑    No ☐

Address: P.O. Box 6592

    Gulfport, MS 39506

Phone Number: 202-527-9866          Fax Number: 202-646-5199

E-Mail Address: rnobile@judicialwatch.org

rev. 12/19 AK

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 23-2644

Short Caption: Michael Bost, et al. v. Illinois State Board of Elections, et al.

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

    ☐    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

    Plaintiffs Michael J. Bost, Susan Sweeney, and Laura Pollastrini

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

    Judicial Watch, Inc. and Svenson Law Offices

(3)    If the party, amicus or intervenor is a corporation:

    i)    Identify all its parent corporations, if any; and

        N/A

    ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

        N/A

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

    N/A

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

    N/A

Attorney's Signature: s/ Eric W. Lee    Date: 10/02/2023

Attorney's Printed Name: Eric W. Lee

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    Yes ☐    No ☑

Address: 425 Third Street, S.W., Suite 800, Washington, DC 20024

Phone Number: 202-646-0008    Fax Number: 202-646-5199

E-Mail Address: elee@judicialwatch.org

rev. 12/19 AK

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................. iv

JURISDICTIONAL STATEMENT ....................................................................... 1

STATEMENT OF THE ISSUES ........................................................................... 1

STATEMENT OF THE CASE ............................................................................... 2

I.     Illinois' Extended Ballot Receipt Deadline for Absentee
      and Vote-By-Mail Ballots .......................................................................... 2

II.    Plaintiffs' Claims ......................................................................................... 3

III.   The Factual Bases of Plaintiffs' Standing ................................................. 4

      A.    Candidate Standing ......................................................................... 4

      B.    Standing Based on Vote Dilution .................................................... 6

IV.   The Course of Proceedings ........................................................................ 7

V.    The District Court's Opinion Granting the Motion to Dismiss ................. 8

SUMMARY OF THE ARGUMENT ...................................................................... 9

STANDARD OF REVIEW .................................................................................. 12

ARGUMENT ....................................................................................................... 12

I.     Plaintiffs Adequately Alleged Article III Injuries as Candidates and Voters ... 12

      A.    The District Court Incorrectly Applied the Governing Standard
           By Failing to Accept Plaintiffs' Merits Argument ........................ 14

      B.    Plaintiffs Have Standing as Federal Candidates ........................... 15

           1.    Plaintiffs' Tangible Injuries ............................................... 16

           2.    Plaintiffs' Intangible Injuries ............................................. 20

      C.    Plaintiffs Have Standing Based on an Injury to Their Right to Vote ... 21

II.    The District Court's Eleventh Amendment Ruling Is Clearly Erroneous ......... 27

A.      The State of Illinois Waived Sovereign Immunity for Alleged Violations of Federal Elections Clause Statutes .......................................................................... 27

B.      Defendant Matthews is Not Immune Against Appellants' Prospective Relief Under *Ex parte Young* ............................................................................................ 29

III.    The Plaintiffs' Claims Are Facially Plausible Under Fed. R. Civ. P. 12(b)(6) ................. 30

A.      Plaintiffs Plausibly Alleged That the Ballot Receipt Deadline Conflicts with Election Day Statutes ..................................................................................... 30

1.      The "Final Act of Selection" Under *Foster* Is Receipt of All Ballots, Based on the Original Public Meaning of "The Election." ........................ 32

2.      Save One Recently Created Exception, Congress Has Repeatedly Rejected Efforts to Extend Ballot Receipt Deadlines ............................... 35

B.      Plaintiffs Plausibly Alleged Claims Under 42 U.S.C. § 1983 ............................. 37

1.      Plaintiffs Plausibly Alleged That the Receipt Deadline Infringes on Their Right to Stand for Office ............................................... 39

2.      Plaintiffs Plausibly Alleged That the Receipt Deadline Violates Their Right to Vote Under *Foster* ................................................. 40

CONCLUSION ...................................................................................................................... 41

## TABLE OF AUTHORITIES

**CASES**                                                                              **PAGE**

*ACORN v. Edgar*, 56 F.3d 791 (7th Cir. 1995)..................................................................29

*Am. Civil Rights Union v. Martinez-Rivera*, 166 F. Supp. 3d. 779 (W.D. Tex. 2015).................25

*Anderson v. Celebrezze*, 460 U.S. 780 (1983) ........................................................16, 18

*Anderson v. United States*, 417 U.S. 211 (1974) ........................................................22

*Arizona v. Inter Tribal Council of Ariz.*, 570 U.S. 1 (2013) ....................................28

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ....................................................................12

*Baker v. Carr*, 369 U.S. 186 (1962)....................................................................21, 26

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) ................................................12

*Bennett v. Spear*, 520 U.S. 154 (1997) ....................................................................13

*Bloome v. Hograeff*, 61 N.E. 1071 (Ill. 1901)..........................................................31

*Bob Jones University v. United States*, 461 U.S. 574 (1982) ....................................36

*Bognet v. Sec'y of Pa.*, 980 F.3d 336 (3d Cir. 2020) ................................................17

*Bost v. Ill. State Bd. of Elections*, 75 F.4th 682 (7th Cir. 2023) ................................7

*Bostock v. Clayton Cty.*, 140 S. Ct. 1731 (2020) ....................................................32

*Bovee v. Broom*, 732 F.3d 743 (7th Cir. 2013) ..........................................................1

*Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341 (2001)..................................28

*Burson v. Freeman*, 504 U.S. 191 (1992) ................................................................34

*Bush v. Gore*, 531 U.S. 98 (2000)....................................................................16, 19, 25

*Bush v. Palm Beach Cty. Canvassing Bd.*, 531 U.S. 70 (2000)..................................16

*California Democratic Party v. Jones*, 530 U.S. 567 (2000) ....................................18

*Carson v. Simon*, 978 F.3d 1051 (8th Cir. 2020)..................................................10, 20, 21

iv

*Cent. Virginia Cmty. Coll. v. Katz*, 546 U.S. 356 (2006) ............................................................27

*Church of Lukumi Babalu Aye, Inc. v. Hialeah*, 508 U.S. 520 (1993) ..........................................26

*Clapper v. Amnesty Int'l USA*, 568 U.S. 398 (2013) ....................................................................18

*Craftwood II, Inc. v. Generac Power Sys. Inc.*, 920 F.3d 479 (7th Cir. 2019) ..........................8, 13

*Dep't of Homeland Security v. New York*, 140 S. Ct. 599 (2020) .................................................24

*Doe v. County of Montgomery, Ill.*, 41 F.3d 1156 (7th Cir. 1994) ................................................12

*Doe v. Reed*, 561 U.S. 186 (2010) ................................................................................................34

*Donald J. Trump for President, Inc. v. Cegavske*, 488 F. Supp. 3d 993 (D. Nev. 2020) .............25

*Erickson v. Pardus*, 551 U.S. 89 (2007) .......................................................................................40

*Ex parte Levitt*, 302 U.S. 633 (1937) ............................................................................................17

*Ex parte Siebold*, 100 U.S. 371 (1880) .........................................................................................38

*Ex parte Young*, 209 U.S. 123 (1908).................................................................................7, 11, 29

*Feehan v. Wis. Elections Comm'n*, 506 F. Supp. 3d 596 (E.D. Wis. 2020) ................................24

*FEC v. Akins*, 524 U.S. 11 (1998)............................................................................................ 17-18

*FEC v. Ted Cruz for Senate*, 142 S. Ct. 1638 (2022) ......................................................10, 14, 15

*Fin Fiduciaries, LLC v. Gannett Co.*, 46 F.4th 654 (7th Cir. 2022)..............................................12

*Foster v. Love*, 522 U.S. 67 (1997)........................................................................................ *passim*

*Geinosky v. City of Chi.*, 675 F.3d 743 (7th Cir. 2012) ................................................................12

*Gill v. Whitford*, 138 S. Ct. 1916 (2018).......................................................................................22

*Gomez v. Toledo*, 446 U.S. 635 (1980).........................................................................................37

*Hanson v. LeVan*, 967 F.3d 584 (7th Cir. 2020)......................................................................37, 38

*Harkless v. Brunner*, 545 F.3d 445 (6th Cir. 2008) ................................................................ 28-29

*Hotze v. Hudspeth*, 16 F.4th 1121 (5th Cir. 2021)........................................................................16

*Hrubec v. Amtrak*, 981 F.2d 962 (7th Cir. 1992) ................................................8

*Hunter v. Mueske*, 73 F.4th 561 (7th Cir. 2023) .............................................40

*Ill. State Bd. of Elec. v. Socialist Workers Party*, 440 U.S. 173 (1979)....................15

*Johnson v. City of Shelby*, 574 U.S. 10 (2014) ...............................................38

*Judge v. Quinn*, 612 F.3d 537 (7th Cir. 2010) ...........................................25, 26

*Krislov v. Rednour*, 226 F.3d 851 (7th Cir. 2000) ....................................16-17, 18, 39

*Leatherman v. Tarrant Cty. Narcotics Intelligence & Coordination Unit*,
    507 U.S. 163 (1993)................................................................38

*Lee v. Keith*, 463 F.3d 763 (7th Cir. 2006) ..................................................39

*Libertarian Party of Ill. v. Scholz*, 872 F.3d 518 (7th Cir. 2017) .....................17, 19, 39

*Love v. Foster*, 90 F.3d. 1026 (5th Cir. 1996) ..............................................40

*Lujan v. Defs. of Wildlife*, 504 U.S. 555 (1992) ........................................13, 17

*Lynch v. Malley*, 74 N.E. 723 (Ill. 1905) ....................................................33

*Mack v. Resurgent Cap. Servs., L.P.*, 70 F.4th 395 (7th Cir. 2023) ....................13, 17

*Maddox v. Bd. of State Canvassers*, 149 P.2d 112 (Mont. 1944) ........................30, 34

*Martel v. Condos*, 487 F. Supp. 3d 247 (D. Vt. 2020)......................................25

*McPherson v. Blacker*, 146 U.S. 1 (1892) ....................................................15

*Michel v. Anderson*, 14 F.3d 623 (D.C. Cir. 1994)..........................................22

*Millsaps v. Thompson*, 259 F.3d. 535 (6th Cir. 2001) ...................................26, 31

*Moore v. Circosta*, 494 F. Supp. 3d 289 (M.D.N.C. 2020) ...............................24, 25

*Moore v. Ogilvie*, 394 U.S. 814 (1969)......................................................16

*Munro v. Socialist Workers Party*, 479 U.S. 189 (1986) ....................................15

*Nader v. Keith*, 385 F.3d 729 (7th Cir. 2004) ...........................................15, 39

*Nelson v. Warner*, 472 F. Supp. 3d 297 (S.D. W. Va. 2020)................................20

*New Prime Inc. v. Oliveira*, 139 S. Ct. 532 (2019)........................................................32

*N.Y. State Bd. of Elections v. Lopez Torres*, 552 U.S. 196 (2008) ..........................16, 18

*Paher v. Cegavske*, 457 F. Supp. 3d 919 (D. Nev. 2020)............................................25

*PennEast Pipeline Co., LLC v. New Jersey*, 141 S. Ct. 2244 (2021) ...............11, 27, 28

*Pension Benefit Guar. Corp. v. LTV Corp.*, 496 U.S. 633 (1990)................................36

*Persinger v. Southwest Credit Sys., L.P.*, 20 F.4th 1184 (7th Cir. 2021) ....................13

*Pleasant Grove City v. Summum*, 555 U.S. 460 (2009)...............................................26

*Principality of Monaco v. Mississippi*, 292 U.S. 313 (1934)................................11, 27

*Pub. Citizen v. U.S. Dep't of Justice*, 491 U.S. 440 (1989)........................................22

*Purcell v. Gonzalez*, 549 U.S. 1 (2006) ..........................................................11, 26, 39

*Retired Chicago Police Assoc. v. City of Chicago*, 76 F.3d 856 (7th Cir. 1996) ..........12

*Reynolds v. Sims*, 377 U.S. 533 (1964)......................................................................22

*Roe v. Alabama ex rel. Evans*, 43 F.3d 574 (11th Cir. 1995) ......................................22

*Runnion v. Girl Scouts of Greater Chi. & Nw. Ind.*, 786 F.3d 510 (7th Cir. 2015)......38

*Sandifer v. U.S. Steel Corp.*, 571 U.S. 220 (2014).....................................................32

*Spokeo, Inc. v. Robins*, 578 U.S. 330 (2016) ........................................................13, 26

*Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83 (1998)........................................26

*Storer v. Brown*, 415 U.S. 724 (1974) .......................................................................18

*Tashjian v. Republican Party*, 479 U.S. 208 (1986)..................................................16

*Timmons v. Twin Cities Area New Party*, 520 U.S. 351 (1997) .................................34

*Torres v. Tex. Dep't of Pub. Safety*, 142 S. Ct. 2455 (2022) ..........................27, 28, 29

*TransUnion LLC v. Ramirez*, 141 S. Ct. 2190 (2021) ................................................13

*Trump v. Wis. Elections Comm'n*, 983 F.3d 919 (7th Cir. 2020) ......................10, 16, 20

*U.S. v. Love*, 706 F.3d 832 (7th Cir. 2013) ................................................17

*U.S. v. Munsingwear, Inc*., 340 U.S. 36 (1950) ......................................17

*U.S. ex rel. Hanna v. City of Chicago*, 834 F.3d 775 (7th Cir. 2016)............................8

*U.S. v. Saylor*, 322 U.S. 385 (1944)....................................................22, 40

*U.S. v. West Virginia*, 2014 WL 7338867 (S.D. W. Va. Dec. 22, 2014)......................................37

*U.S. Term Limits v. Thornton*, 514 U.S. 779 (1995) ......................................28

*Voting Integrity Project, Inc. v. Bomer*, 199 F.3d 773 (5th Cir. 2000)..................................26, 31

*Voting Integrity Project, Inc. v. Keisling*, 259 F.3d. 1169 (9th Cir. 2001) .................26, 31, 32, 36

*Warth v Seldin*, 422 U.S. 490 (1975) ..............................................12, 17

*Wesberry v. Sanders*, 376 U.S. 1 (1964)................................................41

*Will v. Michigan Dept. of State Police*, 491 U.S. 58 (1989)..................................11, 29

## CONSTITUTIONAL PROVISIONS

U.S. Const. art. I, Sec. 4 ......................................................1, 9, 27, 28, 29

U.S. Const. art. II, Sec. 1 ..........................................................9, 21

U.S. Const. amend. I ........................................................ *passim*

U.S. Const. amend. X ..............................................................28

U.S. Const. amend. XI ........................................................ *passim*

U.S. Const. amend. XIV ........................................................ *passim*

## FEDERAL STATUTES

2 U.S.C. § 1 ..........................................................................2

2 U.S.C. § 7 ........................................................................ *passim*

3 U.S.C. § 1 ........................................................................ *passim*

3 U.S.C. § 21 ........................................................................36

26 U.S.C. § 7502 ................................................................................................35

28 U.S.C. § 1291 ..................................................................................................1

28 U.S.C. § 1331 ..................................................................................................1

42 U.S.C. § 1983 ......................................................................................... *passim*

52 U.S.C. § 20302 ..............................................................................................37

**FEDERAL RULES**

Fed. R. App. P. 4(a)(1)(A) ...................................................................................1

Fed. R. Civ. P. 12(b)(1)..............................................................................1, 7, 12

Fed. R. Civ. P. 12(b)(6)..................................................................1, 7, 9, 12, 30

**STATE STATUTES**

10 Ill. Comp. Stat. Ann. § 5/1A-7 ....................................................................38

10 Ill. Comp. Stat. Ann. § 5/1A-8 ....................................................................38

10 Ill. Comp. Stat. Ann. § 5/17-23 .....................................................................5

10 Ill. Comp. Stat. Ann. § 5/18A-15 ..................................................................2

10 Ill. Comp. Stat. Ann. § 5/19-8 .......................................................................1

10 Ill. Comp. Stat. Ann. § 5/21-1 .......................................................................3

10 Ill. Comp. Stat. Ann. § 5/25-8 .....................................................................25

26 Ill. Adm. Code § 216.100..............................................................................38

**OTHER**

Cong. Globe, 42 Cong., 2d Sess. 676 (1872).....................................................35

Cortland F. Bishop, History of Elections in the American Colonies (1893) .................................33

Donald A. Debats, How America Voted: By Voice,
    Univ. of Virg. Inst. For Advanced Tech. in Humanities (2016)........................................34

E. Evans, A History of the Australian Ballot System in the United States (1917) .......................34

Federalist No. 81 ..........................................................................................................11, 27

George W. McCrary, A Treatise on the American Law of Elections
    (Henry L. McCune eds. 4th ed. 1897) ................................................................33

J. Harris, Election Administration in the United States (1934) ........................................34

Kirk H. Porter, Ph.D., History of Suffrage in the United States (1918) .........................33

Noah Webster, An American Dictionary of the English Language,
    (Joseph E. Worcester, *et al*. eds. 1st ed. 1830) ................................................32

Noah Webster, An American Dictionary of the English Language,
    (Joseph E. Worcester, *et al*. eds. 2nd ed. 1860) .......................................... 32-33

*The Overseas Citizens Voting Rights Act of 1975 and S. 703*
    *Before S. Comm. on Rules and Admin.*, 95th Cong. (1977) ..................................35, 36, 37

Robert T. Reagan, Fed. Jud. Ctr., *Overseas Voting: The Uniformed and Overseas*
    *Citizens Absentee Voting Act* (2016) ................................................................37

# JURISDICTIONAL STATEMENT

Plaintiffs' complaint alleged constitutional and federal statutory claims that arise under 42 U.S.C. § 1983 as well as 2 U.S.C. § 7 and 3 U.S.C. § 1. Dkt. 1, A.1-11.[1] The district court had subject matter jurisdiction over this action under 28 U.S.C. § 1331. This appeal is from the district court's memorandum opinion and order ("order") granting Defendants' motion and dismissing Plaintiffs' claims without prejudice. Dkt. 81, A.12-42. This Court has jurisdiction under 28 U.S.C. § 1291. *See Bovee v. Broom*, 732 F.3d 743, 744 (7th Cir. 2013). The district court entered its order on July 26, 2023. Dkt. 81, A.42. Plaintiffs timely filed their notice of appeal on August 18, 2023. Dkt. 83; Fed. R. App. 4(a)(1)(A).

# STATEMENT OF THE ISSUES

1.      Whether Plaintiffs, as federal candidates and voters, have alleged sufficient injuries for purposes of standing under Article III of the U.S. Constitution to have their constitutional and statutory claims heard. Fed. R. Civ. P. 12(b)(1).

2.      Whether Illinois waived sovereign immunity when it adopted the U.S. Constitution's Elections Clause as part of the plan of the Convention, and whether Defendant Bernadette Matthews, sued for prospective injunctive relief in her official capacity, is immune from suit pursuant to the Eleventh Amendment of the U.S. Constitution.

3.      Whether Plaintiffs' allegations that 10 Ill. Comp. Stat. Ann. § 5/19-8(c) (the "Receipt Deadline") violates 2 U.S.C. § 7 and 3 U.S.C. § 1 state a claim upon which relief can be granted under Federal Rule of Civil Procedure 12(b)(6).[2]

---

[1]      Citations to "Dkt._" are to the district court docket below, No. 1:22-cv-2754 (N.D. Ill.); citations to "A._" are to the required appendix attached to this brief.
[2]      "Election Day" and "Election Day statutes" used herein refer to "election day" as used in 2 U.S.C. § 7 and 3 U.S.C. § 1.

## STATEMENT OF THE CASE

I.    **Illinois' Extended Ballot Receipt Deadline for Absentee and Vote-By-Mail Ballots**

More than 175 years ago, Congress established the Tuesday after the first Monday in November of every even-numbered year as the uniform national election day in the United States.[3] At that time, the ordinary public meaning of "Election Day" was the day by which all cast ballots must be *received* by state election officials. In accordance with that longstanding national practice, until 2005, Illinois required that absentee ballots must be postmarked by the day preceding Election Day and received by state election officials on or before Election Day to be timely cast. 2005 Ill. Laws 557 (P.A. 94-557); *see also* Dkt. 33 at 9.

In 2005, Illinois amended its Receipt Deadline to hold receipt of votes open for 14 days after Election Day. Illinois' Receipt Deadline allows an absentee ballot "that is received by the election authority after the polls close on election day and before the close of the period for counting provisional ballots" to be counted as if it were cast and received on or before Election Day, regardless of postmark. 10 Ill. Comp. Stat. Ann. § 5/19-8(c). Election officials are directed to complete the "the validation and counting of provisional ballots within 14 calendar days of the day of the election." 10 Ill. Comp. Stat. Ann. § 5/18A-15(a). Read together, these two provisions mean that any ballot received up to 14 calendar days after Election Day shall be counted as if it were cast and received by election officials on or before Election Day. Dkt. 1 ¶ 16, A.4. Later, in 2013, the Illinois General Assembly materially increased the number of voters who could avail themselves of this extended deadline by including vote-by-mail ballots within the category of acceptable absentee ballots under 10 Ill. Comp. Stat. Ann. § 5/19-8(c).

---

[3]    In 1845, Congress passed the "Presidential Election Day Act," which is now codified as 3 U.S.C. § 1. 28 Cong. Ch. 1, 5 Stat. 721. Twenty-seven years later, Congress passed what is now 2 U.S.C § 7, establishing the same day for congressional elections. In 1914, Congress enacted 2 U.S.C. § 1, which aligned Senate elections with Election Day; that statute is not at issue in this suit.

## II.     Plaintiffs' Claims

Plaintiffs-Appellants Congressman Michael J. Bost, Laura Pollastrini, and Susan Sweeney (collectively "Plaintiffs") filed their complaint for declaratory and injunctive relief related to the 2022 and 2024 federal elections. Dkt. 1, A.1-11. Plaintiffs are registered voters who voted and were federal candidates in Illinois in 2020; Pollastrini and Sweeney were federal electors for president and vice president, and Bost was an incumbent running for re-election for U.S. Congress.[4] Congressman Bost was also a candidate for U.S. Congress in 2022, and all Plaintiffs will be candidates again in Illinois in 2024. Dkt. 1 ¶¶ 9-11, A.3-4; and Dkt. 31-4, 31-5, and 31-6.

Plaintiffs sued Defendants Illinois State Board of Elections ("ISBE") and its Executive Director Bernadette Matthews, in her official capacity, (together "Defendants") seeking to enjoin the Receipt Deadline on the grounds that it permits the receipt of ballots after Election Day. The gravamen of Plaintiffs' claims is that the casting of ballots—*viz.*, the "combined actions of voters and officials meant to make a final selection of an officeholder" (*Foster v. Love*, 522 U.S. 67, 71 (1997))—must include the receipt of all qualified ballots by election officials. This receipt, accordingly, must occur on or before Election Day. Dkt. 1 ¶ 57, A.10 ("A qualified ballot for federal office is not a legal vote unless it is received by Election Day."). To be clear, Plaintiffs do not allege voter fraud; nor do they allege that ballots were *mailed* after Election Day contrary to Illinois law. Rather, Plaintiffs allege that all ballots *received* after Election Day pursuant to the Illinois Receipt Deadline are illegal and invalid. These ballots are as invalid as if they were received one year after Election Day, because they violate the federal Election Day statutes. *Id*. ¶ 40, A.8 ("ballots received after Election Day … are untimely and therefore illegal").

---

[4]     *See* 10 Ill. Comp. Stat. Ann. § 5/21-1 (describing the manner of choosing and electing electors).

Plaintiffs allege three claims. First, they claim Defendants' receipt and counting of late, illegal ballots dilutes the value of Plaintiffs' lawfully cast votes, thereby infringing on their right to vote under the First and Fourteenth Amendments in violation of 42 U.S.C. § 1983. Dkt. 1 ¶¶ 38-43, A.7-8 (Count I). Second, Plaintiffs claim the Receipt Deadline injures them as federal candidates, infringing on their right to stand for office under the First and Fourteenth Amendments in violation of 42 U.S.C. § 1983. *Id*. ¶¶ 44-48, A.8-9 (Count II). Third, Plaintiffs claim the Receipt Deadline violates their federal statutory rights under 2 U.S.C. § 7 and 3 U.S.C. § 1. *Id*. ¶¶ 49-60, A.9-10 (Count III).

### III.    The Factual Bases of Plaintiffs' Standing

Plaintiffs' unrebutted allegations of candidate-based and voter-based injuries, both tangible and intangible, are set forth in the complaint and in their individual declarations. Dkt. 1, A.1-11; Dkt. 31-4, 31-5, and 31-6; *see also* Dkt. 74 at 25-26 (describing Congressman Bost's ballot chase program).

### A.    Candidate Standing

The complaint alleges Defendants "are depriving Plaintiffs of rights protected under the First and Fourteenth Amendment to the U.S. Constitution" by "forcing Plaintiffs to spend money, devote time, and otherwise injuriously rely on unlawful provisions of state law in organizing, funding, and running their campaigns." Dkt. 1 ¶ 46, A.8. Plaintiffs submitted declarations to the district court that amply support their allegation of injury related to their status as candidates.

Congressman Bost was first elected to represent House District 12 almost nine years ago, in 2014. Dkt. 31-4 ¶ 4. Before that, he served as a member of the Illinois House of Representatives for 20 years, beginning in 1994. *Id.* ¶ 7. He averred that "[s]ince Illinois amended its election code…I have had to organize, fundraise, and run my campaign for fourteen additional days in

order to monitor and respond as needed to ballots received after the national Election Day."[5] *Id.* ¶ 13. It is "significantly more difficult" to find volunteers willing to work after Election Day. *Id.* ¶ 14. Further, in the wake of the 2013 Illinois law allowing voting by mail, the number of ballots received after Election Day has "substantially increased almost every year." *Id.* ¶ 15. The resources expended as a result are "even greater because many of these late-arriving ballots have discrepancies (e.g., insufficient information, missing signatures, dates, or postmarks) that need to be resolved." *Id*. Congressman Bost's campaign "needs to both monitor and evaluate whether to object to the counting of deficient ballots. This costs … time, money, volunteers and other resources." *Id.* ¶ 16. He "organizes and sends poll watchers to each county courthouse" in each of the 34 counties in his district; it naturally costs more money to do this for two more weeks. *Id.* ¶ 17; ¶ 5. "If an irregularity is observed by a poll watcher," the campaign then needs "to consult with campaign staff or lawyers to determine the appropriate action, if any." *Id*. His campaign also runs a "ballot chase program" to evaluate its "get-out-the-vote efforts and other concerns." *Id.* ¶ 20. Illinois' Receipt Deadline compels him to keep that particular program active for 14 additional days. *Id*. All of these considerations inflict real, out-of-pocket monetary losses and otherwise deplete campaign resources.

Congressman Bost also alleged competitive injuries based on the prospect that illegal votes could diminish his margin of victory. Dkt. 31-4 ¶ 24. He testifies that this "will lead to the public perception that my constituents have concerns about my job performance," which in turn "influence[s] numerous third parties, such as future voters, Congressional leadership, donors, and potential political opponents." *Id*.

---

[5]     Under Illinois law, candidates have a right to monitor their elections. 10 Ill. Comp. Stat. Ann. § 5/17-23.

Plaintiffs Pollastrini and Sweeney were Republican nominees in 2020 for presidential and vice-presidential electors at-large for Illinois. Dkt. 31-5 ¶ 4; and 31-6 ¶ 4. In 2020, Pollastrini was "a Precinct Committeeman and active member of the Kane County Republican Central Committee." Dkt. 31-5 ¶ 6. In 2022, Sweeney was "a Precinct Captain for the Republican Party of Maine Township, Illinois." Dkt. 31-6 ¶ 6. Both attest to the need to expend additional resources to deal with ballots arriving after Election Day. Dkt. 31-5 ¶¶ 10-13, 17; and 31-6 ¶¶ 9-10, 12-13. Both intend to be candidates for electors again in 2024. Dkt. 31-5 ¶ 21; and Dkt. 1 ¶¶ 10-11, A.3-4.

### B.    Standing Based on Vote Dilution

The complaint alleges, and the undisputed record shows, that Illinois received as many as 266,417 ballots during the period between November 3, 2020 (Election Day) and November 17, 2020 (Receipt Deadline). Dkt. 1 ¶¶ 19-22, A.5-6; *see also* Dkt. 31-2 and 31-3. This tranche of ballots totaled as much as 4.4% of the total ballots cast in the 2020 election. *Id.* The record includes unrebutted, contemporaneous statements by Defendants that this tranche could change electoral outcomes after Election Day. *Id.*

Plaintiffs all averred that by "counting untimely votes and those received in violation of the federal Election Day deadline," Defendants "substantially increase[] the pool of total votes cast and dilute[] the weight of my timely cast vote. More votes will be counted than the law allows to be counted, resulting in dilution of my vote." Dkt. 31-4 ¶ 25; 31-5 ¶ 18; 31-6 ¶ 25; *see* Dkt. 1 ¶ 34, A.7.

## IV.    The Course of Proceedings

Plaintiffs filed their complaint on May 25, 2022. Dkt. 1, A.1-11.[6] The parties promptly filed cross dispositive motions, beginning with Defendants' motion to dismiss under Fed. R. Civ. P. 12(b)(1) and 12(b)(6). Dkt. 25 and 26. Defendants claimed Plaintiffs lacked Article III standing. Dkt. 26 at 9-15. Defendants also argued that Plaintiffs' claims *against the State Board of Elections* were barred by the Eleventh Amendment. Dkt. 26 at 15. Significantly, Defendants did *not* move under the Eleventh Amendment to dismiss claims against Defendant Matthews, implicitly acknowledging that she could be sued in her official capacity for injunctive relief. *See Ex parte Young*, 209 U.S. 123 (1908). Defendants' counsel explicitly conceded the point at oral argument:

> THE COURT:        Can the plaintiffs still sue Ms. Matthews even if suing against the State Board is barred under the 11th Amendment?
>
> MS. JOHNSTON:     Seeking prospective injunctive relief, yes, in her official capacity as the Director of the State Board of Education, Your Honor.

Dkt. 74 at 6:1-6. Defendants further moved to dismiss Plaintiffs' complaint under Fed. R. Civ. P. 12(b)(6), claiming Plaintiffs failed to adequately allege: (1) violations of 2 U.S.C. § 7 and 3 U.S.C. § 1; (2) violations of their right to vote; and (3) violations of their right to stand for office. *Id.* at 15-22.

Plaintiffs moved for partial summary judgment under Fed. R. Civ. P. 56 on Counts I and II (*i.e.*, violations of their right to vote and stand for office) with respect to the 2022 federal election. Dkt. 31, 32, and 33. Plaintiffs sought a declaratory judgment that the Illinois Receipt Deadline violated Congressman Bost's right to stand for office in 2022 as well as all Plaintiffs' right to vote. Dkt. 32. Attached to Plaintiffs' motion were copies of two official press releases from Defendants

---

[6]     The Democratic Party of Illinois ("DPI") moved to intervene shortly after these proceedings began. This Court affirmed the trial court's decision to deny DPI's motion to intervene. *Bost v. Ill. State Bd. of Elections*, 75 F.4th 682 (7th Cir. 2023).

regarding the 2020 federal election that were referenced in the complaint, as well as a sworn declaration from each Plaintiff. Dkt. 31-2, 31-3, 31-4, 31-5, and 31-6.[7]

The motions were fully briefed and submitted for consideration on September 14, 2022. The district court heard arguments on the Motion to Dismiss on December 7, 2022, during which it indicated it was "going to issue a ruling soon." Dkt. 74 at 4.

On July 26, 2023, the district court filed the memorandum opinion and order granting Defendants' motion to dismiss. Dkt. 81, A.12-42. Plaintiffs timely appealed.

## V.     The District Court's Opinion Granting the Motion to Dismiss

As the district court ultimately characterized its opinion, the "principal basis for dismissal is a lack of jurisdiction based on standing," and therefore it ruled that "this dismissal is without prejudice." Dkt. 81, A.12-42. The court addressed the counts in Plaintiffs' complaint in reverse order. The court rejected standing based on a conflict between Illinois' Receipt Deadline and federal law, which it called "a 'general grievance about governance.'" Dkt. 81 at 11, A.22 (citing Dkt. 1 at 9-10, containing Count III). The court rejected Plaintiffs' vote dilution injuries in Count II on the basis that that these were too speculative and generalized to constitute an injury in fact. *Id*. at 11, A.22. Finally, with respect to Plaintiffs' candidate-based standing alleged in Count I, the court characterized Congressman Bost's injuries as "financial injuries" that were "not concrete and particularized" and speculative. *Id*. at 20, A.31. The court did not address his competitive injuries; nor did it even mention the candidate injuries alleged by Plaintiffs Pollastrini and Sweeney.

Although lack of standing was its "principal basis for dismissal" (Dkt. 81 at 31, A.42), the court proceeded to opine about the defense of sovereign immunity and the sufficiency of Plaintiffs'

---

[7]     It is appropriate to consider these declarations in determining the motion to dismiss. *Craftwood II, Inc. v. Generac Power Sys. Inc.*, 920 F.3d 479, 481 (7th Cir. 2019); *see also U.S. ex rel. Hanna v. City of Chicago*, 834 F.3d 775, 779 (7th Cir. 2016); *Hrubec v. Amtrak*, 981 F.2d 962, 963-964 (7th Cir. 1992).

claims. The court ruled that the Eleventh Amendment bars all of Plaintiffs' claims. *Id*. at 23, A.34. It rejected Plaintiffs' arguments that, because Congress enacted 2 U.S.C. § 7 and 3 U.S.C. § 1 pursuant to the Elections and Electors Clauses, the ISBE was not immune under the plan of the Convention doctrine. *Id*. at 21-22, A.32-33. While the court acknowledged that Defendants only raised sovereign immunity with respect to one Defendant, "the Illinois State Board of Elections because it is an arm of the State" (Dkt. 81 at 21), the court's expansive language seemed to apply Eleventh Amendment immunity to *all* claims against *both* Defendants. *See id*. at 23, A.34 ("apart from the issue of standing, the Eleventh Amendment independently bars Plaintiffs' suit"); *see id*. ("assuming *Defendants* were not immune under the Eleventh Amendment") (emphases added).

Finally, the court held that all three claims should be dismissed for failure to state a claim under Fed. R. Civ. P. 12(b)(6). The court found that Plaintiffs' statutory claims (Count III) failed because the Receipt Deadline does not conflict with 2 U.S.C. § 7 and 3 U.S.C. § 1 and otherwise "operates harmoniously" with federal law. Dkt. 81 at 23-26, A.34-37. The court found Plaintiffs failed to plausibly allege a violation of their right to vote under the Equal Protection Clause (Count II). *Id.* at 27-29, A.38-39. With respect to the right to stand for office (Count I), the court found that "Plaintiffs failed explain why the Statute constitutes an invalid regulation of…federal elections. Instead, Plaintiffs merely set forth their reasons why the Statute could make standing for federal office in Illinois more challenging." *Id.* at 30, A.41.

## SUMMARY OF ARGUMENT

When federal Election Day statutes speak of 'the election', "they plainly refer to the combined actions of voters and officials meant to make a final selection of an officeholder." *Foster*, 522 U.S. at 71. State regulations concerning the time, place, and manner of holding federal elec-

tions cannot allow this "final act of selection" to conclude *prior* to Election Day since "the combined actions of voters and officials meant to make a final selection of an officeholder" must occur at the time set by Congress. *Id.* at 71-72. Likewise, state regulations, such as those at issue here, cannot allow this final act to conclude *after* the time set by Congress, since "the combined actions of voters and officials meant to make a final selection of an officeholder" will not be completed by that time.

The district court below dismissed this action, finding Plaintiffs lacked Article III standing, both Defendants were immune under the Eleventh Amendment, and Plaintiffs failed to plausibly allege a claim for relief. The judgment below should be reversed for three main reasons.

First, Plaintiffs have adequately alleged injury in fact to establish Article III standing both as candidates and voters. As a preliminary matter, the district court incorrectly analyzed Plaintiffs' theory that late-received ballots are categorically invalid. In this Rule 12 context, it must be assumed that "counting ballots received after Election Day violates 2 U.S.C. § 7 and 3 U.S.C. § 1, any such ballots are untimely and therefore illegal under 2 U.S.C. § 7 and 3 U.S.C. § 1." Dkt. 1 at ¶40; *FEC v. Ted Cruz for Senate*, 142 S. Ct. 1638, 1647-48 (2022) (citations omitted). The district court's failure to accept as valid these legal claims is, without more, clear error and sufficient grounds to reverse.

Notwithstanding this error, Plaintiffs have standing as candidates under *Trump v. Wis. Elections Comm'n*, 983 F.3d 919, 924-25 (7th Cir. 2020) and *Carson v. Simon*, 978 F.3d 1051, 1058 (8th Cir. 2020). For over 130 years, the Supreme Court has reached the merits on candidate claims regarding state time, place, or manner regulations affecting their candidacies, implicitly finding Article III standing. There is no authority in either the Supreme Court or this Circuit that says otherwise.

With respect to Plaintiffs' standing as voters, an individual's right to vote can be denied by a debasement or dilution just as effectively as being wholly denied. *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006). The unrebutted record from the 2020 federal election is that Plaintiffs' votes may be diminished as much as 4.4% by the disputed late-arriving ballots, which Defendants publicly admitted were sufficiently material to change electoral outcomes after Election Day. Acceptance of unlawful votes post-Election Day dilutes the influence of timely cast legal votes.

Second, the Defendants are not immune under the Eleventh Amendment. With respect to Defendant ISBE, under the plan of the Convention doctrine, no immunity exists where it was surrendered under the plan of the convention. *Principality of Monaco v. Mississippi*, 292 U.S. 313, 322-23 (1934) (quoting Federalist No. 81 (Alexander Hamilton)). In such a case, no congressional abrogation is needed. *PennEast Pipeline Co., LLC v. New Jersey*, 141 S. Ct. 2244, 2259 (2021) (citations and quotations omitted). Because states consented to congressional authority over federal elections in the plan of Convention, no immunity exists. With respect to Defendant Matthews, Eleventh Amendment immunity does not exist in 42 U.S.C. § 1983 actions seeking prospective relief to remedy constitutional violations under *Ex parte Young*, 209 U.S. at 156; and *Will v. Michigan Dept. of State Police*, 491 U.S. 58 (1989).

Finally, a ballot is neither "cast" nor a "vote" when it is deposited in the mail. A qualified ballot has no effect until received by election officials, who will later ascertain and make effective the will of the voter. Plaintiffs have plausibly claimed that Illinois' Ballot Receipt Deadline conflicts with the statutory text of the Election Day statutes as set by Congress and interpreted by the Supreme Court in *Foster*. A state time, place, and manner regulation that conflicts with a federal time regulation is preempted by it. The unrebutted historical analysis shows that the original public meaning of "the election" meant the day by which all ballots must be received, and Congress'

recent amendments in the Electoral Count Reform Act ("ECRA") confirm *Foster*'s command that the "final act of selection" must occur no later than Election Day.

## STANDARD OF REVIEW

This court reviews the decision to grant a Rule 12(b)(1) motion to dismiss for lack of standing *de novo*. *Doe v. County of Montgomery, Ill.*, 41 F.3d 1156, 1158 (7th Cir. 1994). In ruling on a motion to dismiss for want of standing, courts must accept as true all material allegations of the complaint, drawing all reasonable inferences therefrom in the Plaintiffs' favor. *Retired Chicago Police Assoc. v. City of Chicago*, 76 F.3d 856, 862 (7th Cir. 1996). At this stage, courts must assume Plaintiffs have stated valid legal claims. *See Warth v Seldin*, 422 U.S. 490, 500 (1975).

The review of a dismissal for failure to state a claim is *de novo*, presuming the truth of the facts alleged in a complaint and drawing all reasonable inferences in the plaintiff's favor. *Geinosky v. City of Chi.*, 675 F.3d 743, 747 (7th Cir. 2012). A complaint survives a Rule 12(b)(6) motion to dismiss if it contains "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id.* at 679. A court can consider a document outside the complaint if it is "(1) referenced in the plaintiff's complaint, (2) concededly authentic, and (3) central to the plaintiff's claim." *Fin Fiduciaries, LLC v. Gannett Co.*, 46 F.4th 654, 663 (7th Cir. 2022) (citations omitted).

## ARGUMENT

**I.     Plaintiffs Adequately Alleged Article III Injuries as Candidates and Voters.**

To establish standing, a plaintiff bears the burden of proving that he (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely

to be redressed by a favorable judicial decision. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992) (citations omitted). An injury in fact is one in which plaintiff claims to have "suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016) (citing *Lujan*, 504 U.S. at 560). An injury may be "fairly traceable" even if it is not the "the very last step in the chain of causation." *Bennett v. Spear*, 520 U.S. 154, 168-69 (1997).

"By particularized, we mean that the injury must affect the plaintiff in a personal and individual way." *Lujan*, 504 U.S. at 560 n.1. "The Supreme Court has described a 'concrete' injury as an injury in fact, one that is real and not abstract, although it need not necessarily be tangible." *Mack v. Resurgent Cap. Servs., L.P.*, 70 F.4th 395, 403 (7th Cir. 2023) (quoting *Spokeo*, 578 U.S. at 339-40). "Tangible harms, like physical or monetary harms, 'readily qualify as concrete injuries.'" *Persinger v. Southwest Credit Sys., L.P.*, 20 F.4th 1184, 1190 (7th Cir. 2021) (quoting *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2204 (2021)). Indeed, "money damages are almost always found to be concrete harm." *Mack*, 70 F.4th at 406 (citing *Persinger*, 20 F.4th at 1190); *see Craftwood II, Inc.*, 920 F.3d at 481 (even where losses are "slight … an 'identifiable trifle' suffices" for standing (citation omitted)). In assessing *intangible* injuries, "it is instructive to consider whether an alleged intangible harm has a close relationship to a harm that has traditionally been regarded as providing a basis for a lawsuit in English or American courts." *Spokeo*, 578 U.S. at 341 (citation omitted).

The district court clearly erred when it ruled that Plaintiffs lacked standing.

13

A.    **The District Court Incorrectly Applied the Governing Standard By Failing to Accept Plaintiffs' Merits Argument.**

When evaluating standing at the motion to dismiss stage, federal courts must "accept as valid the merits of [Plaintiffs'] legal claims." *Ted Cruz for Senate*, 142 S. Ct. at 1647 (citations omitted).

In this case, the district court should have assumed the merits of Plaintiffs' legal theory that, because "counting ballots received after Election Day violates 2 U.S.C. § 7 and 3 U.S.C. § 1, [and] any such ballots are untimely and therefore illegal under 2 U.S.C. § 7 and 3 U.S.C. § 1." Dkt. 1 ¶ 40, A.8. To be clear, Plaintiffs argue that, under the governing federal law, ballots received after Election Day are *categorically* invalid, in that they cannot lawfully be used to determine the outcome of a federal election. In this regard, Plaintiffs contend that these late ballots are no more valid than ballots received from non-citizens, or ballots received one year after Election Day, or ballots received from 14-year-old voters. They have no legal force because they are invalid under federal law.

The record shows that the district court fundamentally misapprehended Plaintiffs' claims. The court focused on the absence of allegations relating to voter fraud in evaluating Plaintiffs' standing, despite the irrelevance of voter fraud to Plaintiffs' claims and allegations.  For example, when it addressed Plaintiffs' hypothetical about standing in a case in which foreign voters were allowed to vote in American elections (Dkt. 43 at 6 n.1), the district court stated, "Plaintiffs' hypothetical depends on evidence of illegal votes actually being cast. … But Plaintiffs do not allege that any illegal ballots were cast in any election—they merely suggest the possibility of such votes being counted." Dkt. 81 at 17, A.28. This is simply incorrect. Under Plaintiffs' theory, ballots received post-Election Day are *per se* illegal and invalid. No additional third-party fraud, malfeasance, or negligence is necessary. The court made a similar mistake when it distinguished another

case by noting that its plaintiffs "did not allege any sort of vote fraud. … [They] were challenging the outright denial of their right to vote, rather than bringing a claim that their votes were diluted by the allegedly fraudulent votes of others." *Id.* at 13, A.24. To the extent that it believed that Plaintiffs are alleging fraud, or that allegations of fraud have any bearing on Plaintiffs' claims, the court simply erred. The word "fraud" and its variations do not appear in the complaint; nor are they relevant to Plaintiffs' actual claim, which is that ballots must be received by Election Day in order to be counted under federal law. A ballot can be illegal for reasons other than fraud.

When it determined the issue of standing, the court incorrectly characterized Plaintiffs' theory that late-received ballots are categorically invalid. As a result, the court failed to "accept as valid the merits of [Plaintiffs'] legal claims." *Ted Cruz for Senate*, 142 S. Ct. at 1647. The fact that the court misapplied the governing standard is, without more, clear error and sufficient grounds to reverse.

### B.      Plaintiffs Have Standing as Federal Candidates.

The right to stand for office is a legally protected interest that arises under the First and Fourteenth Amendments. *See Nader v. Keith*, 385 F.3d 729, 737 (7th Cir. 2004) (citing *Munro v. Socialist Workers Party*, 479 U.S. 189, 193 (1986)). "[It] is derivative from the right of the people to express their opinions by voting." *Id.*; *see also Ill. State Bd. of Elec. v. Socialist Workers Party*, 440 U.S. 173, 184 (1979) (burdening a candidate's rights also burdens voter's right to freely associate and express political preferences). "The First Amendment has its fullest and most urgent application precisely to the conduct of campaigns for political office." *Ted Cruz for Senate*, 142 S. Ct. at 1650 (citations and quotations omitted). Thus, for at least 130 years the Supreme Court has allowed aggrieved federal candidates to bring claims regarding state time, place, or manner regulations affecting their candidacies. *See, e.g.*, *McPherson v. Blacker*, 146 U.S. 1, 23-24 (1892);

*Moore v. Ogilvie*, 394 U.S. 814 (1969); *Anderson v. Celebrezze*, 460 U.S. 780 (1983); *Bush v. Gore*, 531 U.S. 98 (2000); *Bush v. Palm Beach Cty. Canvassing Bd.*, 531 U.S. 70 (2000); and *N.Y. State Bd. of Elections v. Lopez Torres*, 552 U.S. 196 (2008); *see Trump*, 983 F.3d at 924 (candidate injuries in a challenge to a state manner regulation by a federal candidate were concrete and particularized affecting him "in a personal and individual way." (citation omitted)). The Supreme Court has also recognized political parties' associational rights to sue on behalf of their candidates. *See Tashjian v. Republican Party*, 479 U.S. 208 (1986). "[T]he only non-vacated circuit authorities to confront the question have held that candidates *do* have standing to contest violations of election law." *Hotze v. Hudspeth*, 16 F.4th 1121, 1126 (5th Cir. 2021) (Oldham, J., dissenting). "[I]t's hard to imagine anyone who has a more particularized injury than the candidate has." *Id.*

As set forth below, Plaintiffs have alleged both tangible and intangible injuries as candidates. The district court's determination in this case that they lack standing to challenge an election law is erroneous and contrary to long-established precedent.

### 1.    Plaintiffs' Tangible Injuries

Plaintiffs unquestionably have alleged particular, concrete, tangible injuries that establish candidate standing under controlling law. Congressman Bost described in detail the additional expenditures his campaign must incur because the time to receive ballots has been extended—unlawfully in Plaintiffs' view—by Illinois' Receipt Deadline. Dkt. 31-4. His district contains all or part of 34 counties, and his campaign must "organize[] and send[] poll watchers to each county courthouse." *Id.* ¶¶ 5, 17. It stands to reason that running that operation for two additional weeks costs more money, and these added expenditures are directly attributable to the state law authorizing the collection and counting of ballots that he alleges are invalid under federal law. Dkt. 31 ¶¶ 11-21. This constitutes rock-solid standing under the law of this Circuit. *See Krislov v. Rednour*,

226 F.3d 851, 857 (7th Cir. 2000) (candidates forced to "allocate additional campaign resources to gather signatures" had standing to challenge law requiring gatherers to be district residents); *Libertarian Party of Ill. v. Scholz*, 872 F.3d 518, 523 (7th Cir. 2017) (party had standing to challenge "full-slate" requirement that "raises the cost of ballot access to minor parties"); *Mack*, 70 F.4th at 406 ("money damages are almost always found to be concrete harm" (citation omitted)).

The district court's approach to the candidates' tangible injuries contained numerous errors. First, the court stated that, because "[a]ll candidates in Illinois" are "subject to the same Illinois election rules," the financial cost is not "particularized to Congressman Bost." Dkt. 81 at 18, A.29.[8] But all that "particularized" means in this context is that an injury "affects the plaintiff in a personal and individual way." *Lujan*, 504 U.S. at 560 n.1. Congressman Bost's campaign had to spend money and resources to monitor for an extra two extra weeks. That makes those costs "particular" to his campaign, and he is affected in an individual way.

It is striking that, while candidates for office constitute only a tiny fraction of the general public, the district court nonetheless characterized these injuries as too generalized. Dkt. 81 at 18, A.29. In contrast, the Supreme Court has referred to a much larger class of citizens when discussing "generalized" grievances. *See Warth*, 422 U.S. at 499 (a "grievance shared . . . by all or a large class of citizens"); *Ex parte Levitt*, 302 U.S. 633, 634 (1937) (a "general interest common to all members of the public"); *Lujan*, 504 U.S. at 573–74) ("relief that no more directly and tangibly benefits" a plaintiff "than it does the public at large"). Even where a great many persons experience an injury, that alone does not make it a generalized grievance. *See FEC v. Akins*, 524 U.S. 11, 24

---

[8]    In this discussion and elsewhere the district court relied on a Third Circuit ruling without acknowledging that it had been vacated by the U.S. Supreme Court. Dkt. 81 at 18, 19, and 24, A.29, 30, and 35, citing *Bognet v. Sec'y of Pa.*, 980 F.3d 336 (3d Cir. 2020), *vacated and remanded with instructions to dismiss as moot sub nom. Bognet v. Degraffenreid*, 141 S. Ct. 2508 (2021). An unreviewable vacated judgment is of no precedential value and spawns no legal consequences. *United States v. Munsingwear, Inc.*, 340 U.S. 36, 40-41 (1950); *United States v. Love*, 706 F.3d 832, 840 (7th Cir. 2013).

(1998) ("where a harm is concrete, though widely shared, the Court has found 'injury in fact'" (citation omitted)). Note that the New York convention system affected all candidates for office in *Lopez Torres*, 552 U.S. at 198; similarly, the California blanket primary affected all political parties and candidates in *California Democratic Party v. Jones*, 530 U.S. 567 (2000); and the Ohio deadline to appear on the ballot affected all independent candidates the same way in *Anderson*, 460 U.S. at 782. The plaintiffs had standing in each of these cases. Indeed, the district court here has it backwards. The fact that other candidates also incurred expenses for two extra weeks does not mean that Congressman Bost does *not* have standing to challenge the state law. Rather, it means those other candidates *do* have standing to challenge it.

The district court further erred when it found that Congressman Bost's additional expenditures were "speculative." Dkt. 81 at 18, A.29. The court noted that an injury must be "actual or imminent" and "a plaintiff cannot 'manufacture standing by choosing to make expenditures based on hypothetical future harm that is not certainly impending." *Id*. at 18-19 (citing *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409, 416 (2013)). But Congressman Bost testified to actual expenditures he has already incurred and will continue to have, noting that the "number of ballots arriving after Election Day," many with "discrepancies … that need to be resolved," has "substantially increased every year" due to the 2013 Illinois law allowing voting by mail. Dkt. 31-4 ¶ 15. None of this is hypothetical. These good faith expenses have been incurred in past elections, and will be incurred in future elections, and they are getting larger. *Cf. Krislov*, 226 F.3d at 858 (case was not moot where election law was still in effect because "the challenged situation is likely to recur and the same complaining party would be subjected to the same adversity" (citation omitted)); *Storer v. Brown*, 415 U.S. 724, 737 n.8 (1974) (issues "will persist as the … statutes are applied in future elections").

The district court also mischaracterized Congressman Bost's claim of injury as that "he will be forced to spend money to avoid the alleged speculative harm that more ballots will be cast for his opponents." Dkt. 81 at 19, A.30. Similarly, the court called it "mere conjecture that, if Congressman Bost does not spend the time and resources to confer with his staff and watch the results roll in, his risk of losing the election will increase," and opined that "resources he expends" after Election Day will not change the outcome. *Id*. As a factual matter, the court is incorrect: lodging appropriate objections to the "many … late-arriving ballots [with] discrepancies (e.g., insufficient information, missing signatures, dates, or postmarks)" (Dkt. 31-4 ¶ 15) could indeed affect the outcome of an election. *See, e.g.*, *Bush*, 531 U.S. at 109-110. But more importantly, the court's recasting of the injury analysis to *require* a showing of a greater "risk of losing" is misguided. Congressman Bost's stated injury is not based on a risk of losing the election, as the court misconstrued it; rather, his injury is the fact that he is forced to spend scarce campaign funds because of a state law authorizing the late receipt of ballots that are invalid under federal law. Neither a change to his electoral fortunes nor any other effect is necessary to afford him standing. *See, e.g., Libertarian Party*, 872 F.3d at 522 (argument that party lacked standing to challenge a full-slate requirement because "it would have been barred from the 2012 ballot" anyway "misconceives" the injury: "It isn't simply that the Party couldn't run its candidate … It's that Illinois law imposes a burdensome condition" on its "right of political association").

The district court's implicit questioning of whether Congressman Bost spends his funds effectively after Election Day, and the suggestion that he is "choosing to make expenditures based on hypothetical future harm" (*id*. at 19, A.30), are misplaced; moreover, its trivializing characterization of his additional expenses as "confer[ring] with his staff and watch[ing] the results roll in" fails to recognize the evidence in the record. The examples Congressman Bost gives are focused

and practical, *viz.*, reviewing discrepancies and determining whether to make legal challenges to the significant and growing number of post-Election Day ballots that are deficient; and extending the activities of a "ballot chase" program that evaluates the campaign's get-out-the vote efforts cost resources. Dkt. 31-4 ¶¶ 14-18, 20; Dkt. 74 at 25-26. Remember too that Congressman Bost served in the Illinois House of Representatives for 20 years and has been in Congress for nine years. He has not lost an election in over 30 years. With respect to the district court, Congressman Bost understands better than anyone how to effectively use his campaign resources.

Plaintiffs, as candidates for federal office, clearly have standing based on the tangible, out-of-pocket campaign expenses incurred as a result of the state law they contend is invalid. *See Trump*, 983 F.3d 919.

### 2.    Plaintiffs' Intangible Injuries

Plaintiffs also allege that they have endured intangible injuries that establish their standing as federal candidates to challenge Illinois' Receipt Deadline.

Congressman Bost points out that his margin of victory may be reduced by the late-arriving and (he contends) invalid ballots authorized by Illinois' Receipt Deadline. Dkt. 31-4 ¶ 24. As he explains, "[e]lection results are the best measure for my constituents and me to evaluate the public's opinion about my effectiveness as Congressman." *Id*. A lower margin of victory "will lead to the public perception that my constituents have concerns about my job performance," and "influence numerous third parties, such as future voters, Congressional leadership, donors, and potential political opponents." *Id*. This is a species of what has been termed a candidate's "competitive injury." *See Nelson v. Warner*, 472 F. Supp. 3d 297, 304-05 (S.D. W. Va. 2020) (collecting cases of candidate standing based on competitive injuries). The district court order did not address this injury.

Plaintiffs also have an intangible "interest in ensuring that the final vote tally accurately reflects the legally valid votes cast," pursuant to *Carson*, 978 F.3d at 1058. *Carson* arose after Minnesota's Secretary of State entered a consent decree extending the state's ballot receipt deadline until after Election Day. *Id.* at 1057-58. Two elector nominees subsequently sued on the ground that such an action required legislative approval under the "legislature thereof" provision in the Electors Clause. *Id.* The Eighth Circuit agreed, holding that "the extension of the deadline" for ballot receipt "likely violates Article II, Section 1 of the Constitution because the Secretary" acted "without legislative authorization." *Id*. at 1054. In the course of its ruling, the court held that "[a]n inaccurate vote tally is a concrete and particularized injury to candidates such as the Electors." *Id.* at 1058.

While the particular claims differed, the *Carson* candidates' injuries arose, as here, from a legal conflict between a state time, place, and manner regulation (the consent decree) and federal law (Electors Clause and 3 U.S.C. § 1). *Id*. at 1057. The district court found *Carson* distinguishable because the consent decree there was in conflict with state law, while in this case there is no comparable legal conflict (Dkt. 81 at 20, A. 31)—unless one counts federal law, which Plaintiffs do count. In any event, this distinction is hollow, because it is irrelevant to the Eighth Circuit's ruling that an inaccurate vote tally is a concrete and particular injury to candidates.

### C.     Plaintiffs Have Standing Based on an Injury to Their Right to Vote.

The district court also erred when it determined that Plaintiffs' vote dilution claim does "not allege an injury beyond the general grievance that all Illinois voters would share." Dkt. 81 at 16, A.27.

Since at least *Baker v. Carr*, 369 U.S. 186, 207-09 (1962), the Supreme Court has recognized that plausible allegations of vote dilution confer standing. "A citizen's right to a vote free of

arbitrary impairment by state action has been judicially recognized as a right secured by the Constitution, when such impairment resulted from dilution by a false tally … refusal to count votes … [or] stuffing of the ballot box." *Id.* at 208 (citations omitted); *Reynolds v. Sims*, 377 U.S. 533, 555 (1964) ("the right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise" (citation omitted)); *see also U.S. v. Saylor*, 322 U.S. 385, 386, 389-90 (1944) (upholding a charge that stuffing a ballot box injured citizens "in the free exercise" of their "rights and privileges," which included the right "to have their votes … given full value," unimpaired by unlawful votes)). "[N]o matter how small or great" the number of unlawful votes, it "dilutes the influence of honest votes in an election." *Anderson v. United States*, 417 U.S. 211, 226 (1974). That is a concrete injury. *See Roe v. Alabama ex rel. Evans*, 43 F.3d 574, 581 (11th Cir. 1995) (per curiam) ("[C]ounting ballots that were not previously counted would dilute the votes of those voters who met the requirements of section 17–10–7 as well as those voters who actually went to the polls on election day.").

Standing in these cases was "premised on the understanding that the injuries giving rise to those claims were 'individual and personal in nature.'" *Gill v. Whitford*, 138 S. Ct. 1916, 1930 (2018) (quoting *Reynolds*, 377 U.S. at 561). "The fact that other citizens or groups of citizens might make the same complaint … does not lessen [the] asserted injury." *Pub. Citizen v. U.S. Dep't of Justice*, 491 U.S. 440, 449–50 (1989). Indeed, the D.C. Circuit upheld voters' standing to challenge a congressional rule change that diluted the votes of all voters in all states. *Michel v. Anderson*, 14 F.3d 623, 626 (D.C. Cir. 1994). "That all voters in the states suffer this injury, along with the appellants, does not make it an 'abstract' one." *Id.*

In this case, Illinois received as many as 266,417 ballots (or 4.4%) of the total vote during the 14-day period after Election Day in 2020. Dkt. 1 ¶¶ 19-22, A.5-6. The claim of vote dilution is

intuitively clear. Plaintiffs' ballots were cast and received before Election Day. The electoral impact of Plaintiffs' timely cast ballots—literally, the extent to which those ballots helped to choose the winner—was diminished because 266,417 ballots that were received after Election Day and that were, as a result, invalid under federal law, were accepted and counted. To deny that this is an injury is to take a remarkably narrow view of standing. This point was driven home by a hypothetical posed by Plaintiffs at the district court level that was never satisfactorily answered. *See* Dkt. 43 at 13-14 n.6. That was: suppose that Illinois officials granted citizens of France the right to vote in its federal elections. Suppose further that those officials conceded that their action was contrary to federal law but promised to receive and count those ballots anyway. According to Defendants and, it seems, the district court, no one—no candidate, no voter—has standing to object to that practice. That cannot be correct. Both candidates and voters are injured by those unlawful votes, in the same way that Plaintiffs are injured in this case by the 266,417 invalid ballots accepted in Illinois.

The district court erroneously maintained that Plaintiffs failed to "suggest[] that our hypothetical, carpetbagging French voters diluted the votes of another identifiable group of legitimate voters." Dkt. 81 at 17, A.28. This is simply incorrect. Plaintiffs are such a "group of legitimate voters" who cast lawful votes in a timely fashion. *See* Dkt. 1 ¶¶ 31 ("All Plaintiffs intend to vote … in accordance with federal law"); 41 ("Untimely and illegal ballots received and counted after Election Day … dilute the value of … Plaintiffs' timely cast and received ballots."); 42 ("By counting untimely and illegal ballots received after Election Day and diluting Plaintiffs' timely cast and received ballots, Defendants … are depriving Plaintiffs of rights protected under the First Amendment and 14th Amendment" and 42 U.S.C. § 1983). The district court also asserted that "Plaintiffs' hypothetical depends on evidence of illegal votes actually being cast. … But Plaintiffs

do not allege that any illegal ballots were cast in any election—they merely suggest the possibility of such votes being counted." Dkt. 81 at 17, A.28. Again, the court has misapprehended Plaintiffs' claims. Plaintiffs allege that *all* of those 266,417 ballots constitute "illegal votes actually being cast," because they were received after Election Day contrary to federal law. Their illegality does not depend on any fraudulent intent or intervening wrongful acts by third parties.

In rejecting Plaintiffs' standing, the district court not only ignored the century of longstanding precedents noted above, but relied on decisions made in the hothouse atmosphere that prevailed in the aftermath of the contentious 2020 election. *Feehan v. Wis. Elections Comm'n*, 506 F. Supp. 3d 596 (E.D. Wis. 2020); *Moore v. Circosta*, 494 F. Supp. 3d 289 (M.D.N.C. 2020). Both are trial court rulings from truncated proceedings involving emergency relief in what was a politically supercharged environment. *See Feehan*, 506 F. Supp. 3d at 600 (characterizing the 2020 election as "emotional" and "divisive" and the resulting litigation as "passionate and urgent" and arousing "strong, deep feelings"). Neither went to trial on the merits, and both were voluntarily dismissed after injunctive relief was denied. Plaintiffs respectfully submit that consideration should be given to the unusual context in which those cases arose. *See Dep't of Homeland Security v. New York*, 140 S. Ct. 599, 600 (2020) (Gorsuch, J., concurring) (such proceedings "based on expedited briefing and little opportunity for the adversarial testing of evidence" force courts to make "rushed, high-stakes, low information decisions").

In any event, the facts and claims in these cases are readily distinguishable. The complaint in *Feehan* alleged, among other things, "'massive election fraud' ... based on 'dozens of eyewitnesses and the statistical anomalies and mathematical impossibilities detailed in the affidavits of expert witnesses.'" 506 F. Supp. 3d at 600. *See id.* at 601-02 (The emergency relief sought by the plaintiffs in that case include an order certifying "that President Donald Trump is the winner of

the election."). Among the many differences between that case and this one, the most legally relevant is that, as explained above, Plaintiffs' claims do not depend on speculative, intervening, wrongful actions by third parties, such as "massive fraud." Similarly, in *Moore*, the court cited a number of "lower courts which have addressed standing in vote dilution cases"—all of which concerned allegations of dilution on account of real or potential fraud, which is not at issue here. 494 F. Supp. 3d at 312 (citing *Donald J. Trump for President, Inc. v. Cegavske*, 488 F. Supp. 3d 993, 997-98 (D. Nev. 2020) ("fraud and other illegitimate voting practices" will dilute lawful votes (internal quotes omitted)); *Martel v. Condos*, 487 F. Supp. 3d 247, 253 (D. Vt. 2020) (risk of "some third-party's fraudulent vote"); *Paher v. Cegavske*, 457 F. Supp. 3d 919, 926 (D. Nev. 2020) (risk of having "votes diluted due to ostensible election fraud"); *Am. Civil Rights Union v. Martinez-Rivera*, 166 F. Supp. 3d. 779, 793 (W.D. Tex. 2015) ("risk of voter fraud and vote dilution").[9]

Moreover, the district court declined to follow this Court's ruling in *Judge v. Quinn*, 612 F.3d 537 (7th Cir. 2010)*. Dkt. 81 at 13-14; A.24-25. *Judge* involved timing questions related to filling President Obama's unexpired Senate term after he assumed the presidency. 612 F.3d at 540-42. Specifically, plaintiff voters alleged that an Illinois time, place, and manner regulation (10 Ill. Comp. Stat. Ann. § 5/25-8) conflicted with federal law (Seventeenth Amendment) infringing on their voting rights. *Id.* This Court affirmed the trial court's acknowledgment that plaintiff voters had standing. 623 F. Supp. 2d 933, 934 n.3 (N.D. Ill. 2009), *aff'd*, 612 F.3d at 545-46. Though it should control, the district court in this case declined to follow *Judge* because the injury in fact

---

[9]　　The court did find that the plaintiffs had standing to sue under the 14th Amendment on the ground that "they have been subjected to arbitrary and disparate treatment because they voted under one set of rules, and other voters … will be permitted to vote invalidly under a different and unequal set of rules." *Id.* (citing *Bush*, 531 U.S. at 104-05).

there involved allegations of vote denial rather than dilution, as alleged here.[10] Dkt. 81 at 13, A.24. This is a distinction without a difference. It is settled law that "'the right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise.'" *Purcell*, 549 U.S. at 4.

A review of "historical practices", per *Spokeo*, 578 U.S. at 340-41, show that vote dilution has "traditionally been regarded as providing a basis for a lawsuits" over Election Day statutes under 42 U.S.C. § 1983. In addition to the historical precedent since *Baker*, cited *supra*, the Supreme Court, Ninth, Sixth, and Fifth Circuits have all exercised jurisdiction and reached the merits in § 1983 suits brought by voters and advocacy groups alleging that state time, place, and manner regulations conflict with the Election Day statutes. *See Foster*, 522 U.S. at 71; *Voting Integrity Project, Inc. v. Keisling*, 259 F.3d. 1169, 1176 (9th Cir. 2001); *Millsaps v. Thompson*, 259 F.3d. 535, 549 (6th Cir. 2001); and *Voting Integrity Project, Inc. v. Bomer*, 199 F.3d. 773, 776-777 (5th Cir. 2000).[11]

Based on this longstanding precedent, Plaintiffs have standing as voters to challenge the Receipt Deadline as diluting the value of their timely cast votes.

---

[10]      The district court found that cases such as *Foster* and *Judge* that reached the merits without affirmatively deciding Article III standing were "drive-by jurisdictional" rulings with no precedential effect. *See* Dkt. 81 at 12, fn 2 (citing *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 91 (1998)). Plaintiffs respectfully submit that the multitude of Supreme Court decisions involving candidate challenges to state or federal regulations over more than 130 years means candidates do have Article III standing. Indeed, the Supreme Court has often relied on prior merits-based ruling as evidence that the Court did have Article III jurisdiction. *See Spokeo*, 578 U.S. at 340 (finding two First Amendment cases that reached the merits to have implicitly confirmed an intangible injury for purposes of standing (citing *Pleasant Grove City v. Summum*, 555 U.S. 460 (2009) and *Church of Lukumi Babalu Aye, Inc. v. Hialeah*, 508 U.S. 520 (1993))).

[11]      In at least two of these cases, the plaintiffs' alleged injury in fact was dilution. *See Millsaps*, 259 F.3d at 536; and *Voting Integrity Project, Inc. v. Bomer*, 61 F. Supp. 2d 600, 602 (S.D. Tex. 1999).

## II.     The District Court's Eleventh Amendment Ruling Is Clearly Erroneous.

### A.     The State of Illinois Waived Sovereign Immunity for Alleged Violations of Federal Elections Clause Statutes.

Plaintiffs have plausibly alleged facts sufficient to show a violation of the Election Day statutes by the State of Illinois and the ISBE. While all states possess "attributes of sovereignty" and "shall be immune from suits," such immunity shall not extend to circumstances "where there has been a 'surrender of this immunity in the plan of the convention.'" *Principality of Monaco*, 292 U.S. at 322-23 (quoting Federalist No. 81 (Alexander Hamilton)). "[W]here the States agreed in the plan of the Convention not to assert any sovereign immunity defense, no congressional abrogation [is] needed." *PennEast*, 141 S. Ct. at 2256.

The "test for structural waiver [of sovereign immunity is] whether the federal power at issue is 'complete in itself, and the States consented to the exercise of that power—in its entirety— in the plan of the Convention.'" *Torres v. Tex. Dep't of Pub. Safety*, 142 S. Ct. 2455, 2463 (2022) (quoting *PennEast*, 141 S. Ct. at 2263 (internal quotation marks and citation omitted))). Where so, "the States implicitly agreed that their sovereignty would yield to that of the Federal Government so far as is necessary to the enjoyment of the powers conferred upon it by the Constitution." *Id.* (internal quotations omitted). "By committing not to 'thwart' or frustrate federal policy, the States accepted upon ratification that their 'consent,' including to suit, could 'never be a condition precedent to' Congress' chosen exercise of its authority." *Id.* (citation omitted). Under these provisions of the Constitution, the "States simply 'have no immunity left to waive.'" *Id.*

The Supreme Court has recognized the sovereign immunity waiver under the "plan of the Convention" doctrine when Congress exercises its express constitutional powers. *See Cent. Virginia Cmty. Coll. v. Katz*, 546 U.S. 356, 363 (2006) (Article I Bankruptcy Clause); *Torres*, 142 S. Ct. at 2466 (Article I military powers); and *PennEast*, 141 S. Ct. at 2263 (eminent domain).

The state's authority in regulating federal elections is similar to that in the bankruptcy, military, and eminent domain context: it "has always existed subject to the express qualification that it 'terminates according to federal law.'" *Arizona v. Inter Tribal Council of Ariz.*, 570 U.S. 1, 14-15 (2013) (quoting *Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 347 (2001)). That is because state responsibilities for conducting federal elections arise from powers delegated to it by Congress, and not a power reserved to the states by the Constitution. *See U.S. Term Limits*, 514 U.S. at 800-05.[12]

The district court erred when it engaged in a preemption-type analysis of whether sovereign immunity was waived. According to the court, because the Illinois Ballot Receipt Deadline statute "does not conflict with a constitutional provision, it does not fall under the plan of the Convention doctrine." Dkt. 81 at 22, A.33. But the test for structural waiver is "whether the federal power at issue is 'complete in itself, and the States consented to the exercise of that power—in its entirety— in the plan of the Convention.'" *Torres*, 142 S. Ct. at 2463 (quoting *PennEast*, 141 S. Ct. at 2263). If the states did consent, then there is no Eleventh Amendment immunity irrespective of whether the federal law conflicts with the state.

When Congress exercised its time, place, and manner authority and passed the federal Election Day statutes to set the uniform "time" of federal elections, the State of Illinois and the ISBE waived any immunity it had under the plan of the Convention. *See Harkless v. Brunner*, 545 F.3d

---

[12] Though the Supreme Court has never applied the "plan of the Convention" doctrine in the Elections Clause context to the Eleventh Amendment immunity, it did previously apply it in *U.S. Term Limits* under the Tenth Amendment. *See* 514 U.S. at 801-06. There it explained that as part of the plan of the Convention the Tenth Amendment drew a "basic distinction between the powers of the newly created Federal Government and the powers retained by the pre-existing sovereign States." *Id.* at 801. "[S]tates can exercise no powers whatsoever, which exclusively spring out of the existence of the national government." *Id.* at 802 (citations and quotations omitted). Thus, "in certain limited contexts, the power to regulate the incidents of the federal system is not a reserved power of the States, but rather is delegated by the Constitution." *Id.* at 805. "In short, as the Framers recognized, electing representatives to the National Legislature was a new right, arising from the Constitution itself." *Id.*

445, 454–55 (6th Cir. 2008) ("In ratifying Article I, Section 4, the states . . . gave Congress plenary authority over federal elections."). The "authority of Article I section 4 is the fixing of a uniform date for federal elections," which Congress exercised in 1845 and 1872. *ACORN v. Edgar*, 56 F.3d 791, 794 (7th Cir. 1995) (citing 2 U.S.C. § 7). "Congress can, as in the law fixing a uniform date for federal elections, regulate federal elections *and* force the state to bear the expense of the regulation." *Id.* The "fatal compromise" of "state sovereignty" in administering the times, places, and manner of federal elections "is built into the Constitution, precisely in [the Elections Clause], the first sentence of which places the burden of administering federal elections on the states." *Id.* at 796. In other words, in adopting the Constitution, "the States consented to the exercise of that power—in its entirety—in the plan of the Convention," *Torres*, 142 S. Ct. at 2463, and waived any sovereignty they had with respect to time, place, and manner challenges of federal elections.

## B. Defendant Matthews is Not Immune Against Plaintiffs' Prospective Relief Under *Ex parte Young*.

The district court's immunity ruling extended the dismissal to Defendant Matthews. This was possibly inadvertent, since (1) Defendant Matthews never moved for such dismissal, and (2) the defense is not available to officials sued in their official capacity for prospective relief. Dkt. 26 at 11; *see Ex parte Young*, 209 U.S. at 154. However, the court's opinion does seem to apply sovereign immunity to claims against Defendant Matthews. Dkt. 81 at 20-23, A.31-34; *see id*. at 23, A.33 ("assuming *Defendants* were not immune under the Eleventh Amendment") (emphases added). This is error. Defendant Matthews is not immune here, as Defendants flatly conceded at oral argument. Dkt. 74 at 6:1-6. Section 1983 claims seeking prospective relief against a state official in her official capacity are not barred by the Eleventh Amendment. *Ex parte Young*, 209 U.S. at 154; and *Will*, 491 U.S. at 71, n.10. Plaintiffs seek prospective relief and sued Defendant

Matthews in her official capacity and that relief is directly related to remedying the alleged constitutional violation. Dkt. 1 at ¶¶12-13 and p. 11, A.4 and 11.

## III.    Plaintiffs' Claims Are Facially Plausible Under Fed. R. Civ. P. 12(b)(6).

### A.    Plaintiffs Plausibly Alleged That the Ballot Receipt Deadline Conflicts with Election Day Statutes.

The Supreme Court has held that when federal statutes speak of 'the election', "they plainly refer to the combined actions of voters and officials meant to make a final selection of an officeholder." *Foster*, 522 U.S. at 71-72. State time, place, and manner regulations cannot provide that the election conclude *prior* to Election Day since "the combined actions of voters and officials meant to make a final selection of an officeholder" must occur at the time set by Congress. *Id*. at 71-72. Similarly, therefore, state regulations cannot allow the "final act of selection" to conclude *after* Election Day, since "the combined actions of voters and officials meant to make a final selection of an officeholder" will not be complete *by* the time set by Congress.

Plaintiffs here raised plausible claims that the Receipt Deadline conflicts with the text of the Election Day statutes as interpreted by the Supreme Court in *Foster*. Yet, the district court found that Plaintiffs did not plausibly allege that the Receipt Deadline conflicts with the Election Day statutes. Dkt. 81 at 23-26, A.34-37. In doing so, the district court misapprehended Plaintiffs' claims, observing that Plaintiffs wrongly "conflate 'voting' with 'counting votes.'" The court never engaged in the type of analysis that *Foster* demands, namely whether receipt of ballots after Election Day constitutes the "final act" of "the combined actions of voters and officials" to make a selection of an officeholder. Dkt. 81 at 29, A.40.

A ballot is neither "cast" nor a "vote" when it is deposited in the mail. A ballot has "no effect until it is deposited with the election officials, by whom the will of the voters must be ascertained and made effective." *Maddox v. Bd. of State Canvassers*, 149 P.2d 112, 115 (Mont. 1944)

(citation omitted); and *Bloome v. Hograeff*, 61 N.E. 1071, 1071-72 (Ill. 1901) (allowing ballots received by state election officials on Election Day, but not physically deposited into a ballot box, to be counted). This concept is illustrated by reviewing the status of a mail-in ballot once it is received by a voter. The ballot sitting on a voter's kitchen table waiting to be completed has not been "cast" and is not a "vote." Even after it has been filled out, its status does not change. Nor does it change once it is handed to a third party (e.g., postman or ballot harvester) for delivery. Likewise, a ballot in transit or sitting in a mail distribution center is not a vote. A qualified ballot has not been cast and is not a vote until it is properly marked *and received* by election officials. At receipt, a qualified ballot becomes a vote that is later counted during canvassing, giving effect to the voter's will.

The Fifth, Sixth, and Ninth Circuits have all considered the meaning of "Election Day," but only in evaluating whether state early voting practices complied with federal law. In those cases, courts ruled that that practice did not violate federal law because it did not consummate the election before Election Day, unlike that in *Foster*. S*ee Keisling*, 259 F.3d at 1175-76; *Bomer*, 199 F.3d at 775-77; *Millsaps*, 259 F.3d at 543-46. Early voting merely complements other "voting," which includes the "residual ritual" that "still takes place on" Election Day, which is the day of the "final selection of an officeholder." *Keisling*, 259 F.3d at 1175, 1176 (quoting *Foster*, 522 U.S. at 71).

Defendants argued below that there is a "long history of congressional tolerance … of absentee balloting." Dkt. 40 at 6. Plaintiffs agree, but all of that "long history" required receipt *on or before* Election Day as the unrebutted historical record here shows. [13] This case involves whether

---

[13]     Plaintiffs previously surveyed the history of absentee voting, all of which required Election Day receipt. Dkt. 33 at 19-22; and Dkt. 53 at 6-10.

ballot receipt can occur *after* Election Day, not *before*. There is no historical analog or "long his-tory" of state regulations allowing post-election ballot receipt.[14] In fact, as discussed below, for more than 145 years, Congress repeatedly rejected requests to extend Election Day until the recent very narrow exception that Congress included as part of the Electoral Count Reform Act ("ECRA").

        **1.**        **The "Final Act of Selection" Under *Foster* Is Receipt of All Ballots, Based on the Original Public Meaning of "The Election."**

A fundamental canon of statutory construction is that, unless otherwise defined, words will be interpreted as taking their ordinary, common public meaning at the time of enactment. *See Bostock v. Clayton Cty.*, 140 S. Ct. 1731, 1738 (2020). In determining public meaning, courts often look to the development and evolution of the common-law definition, *New Prime Inc. v. Oliveira*, 139 S. Ct. 532, 539 (2019) (citation omitted), or refers to dictionaries contemporaneous with the enactment. *Sandifer v. U.S. Steel Corp.*, 571 U.S. 220, 228 (2014). Plaintiffs submitted extensive analysis to the district court showing that the text, structure, history, and precedent regarding the ordinary public meaning of "the election."[15]

Dictionaries published before and after 1845 define "election" as "[t]he *day* of a public choice of officers," emphasizing the temporal nature of this regulation. Noah Webster, An Amer-ican Dictionary of the English Language, 288, (Joseph E. Worcester, *et al*. eds. 1st ed. 1830),

---

[14]    *Keisling* was a "difficult case" for the Ninth Circuit, which ultimately upheld early voting based on the history of absentee ballots being received *before* Election Day. *Keisling*, l259 F.3d at 1175. Addition-ally, it noted that, unlike *Foster*, there was still the "residual ritual of in person voting at central election offices still to take place on [Election Day]." *Id.* at 1174. That residual ritual, of course, was the receipt of ballots by government officials on Election Day. *Id.* In Illinois, that residual ritual concludes as many as fourteen days before the last ballot is received.

[15]    A more complete historical analysis of U.S. electoral practices is set forth in Plaintiffs' Memoran-dum in Support of their Motion for Partial Summary Judgment. Dkt. 33 at 10-22. Plaintiffs' Reply in Sup-port of their Motion for Partial Summary Judgment includes additional analysis and authorities. Dkt. 53 at 4-12.

available at https://bit.ly/3lNC9nG; and Noah Webster, An American Dictionary of the English Language, 383, (Joseph E. Worcester, *et al*. eds. 2nd ed. 1860), available at https://bit.ly/3LK7ZMF (emphasis added). This emphasis on time and electoral practices before and after 1845 speak to the ordinary public meaning of "election." A historical survey of these practices leaves little doubt that the "final act of selection" means ballot receipt. From 1845 until circa 2002, the historical practice was that Election Day was the day of final action and that final action was the act of state election officials receiving ballots.[16]

Plaintiffs described electoral practices under the common law and during Colonial, Early Republic, Civil War, and Reconstruction eras, none of which allowed post-election receipt, in briefing to the district court. Dkt. 33 at 14-21. Many of these practices originated during the Colonial era and lasted through the American Revolution and early republic.[17] *See* Kirk H. Porter, Ph.D., History of Suffrage in the United States, 1-3 (1918), available at https://bit.ly/3RsJ9ES (explaining that colonies were essentially corporations and the right to vote was "much the same" as a stockholder's right to vote); and *see generally* Cortland F. Bishop, History of Elections in the American Colonies, 1-45 (1893), available at https://bit.ly/3yso7xC. While some colonial corporations later enacted rules allowing limited proxy voting, it was unknown under the common law and all votes needed to be "personally given" at poll sites.[18] George W. McCrary, A Treatise on

---

[16]     Plaintiffs previously explained that, for the most part, state post-election receipt deadlines are a recent phenomenon that can be traced to the federal requirement that states adopt provisional ballot procedures. *See* Dkt. 53 at 5-10 (discussing the aftermath of the 2000 presidential election and § 302 of the Help America Vote Act of 2002). But even provisional ballots under HAVA must be received by Election Day. *Id.*

[17]     "A ballot originally consisted of a little ball, a bean or a grain of corn, a coin, or any other small article [.]" *Lynch v. Malley*, 74 N.E. 723, 725 (Ill. 1905).

[18]     In its basic form, proxy voting allowed eligible voters to assign their vote to a qualified proxy who was required to appear in person on Election Day to cast the assigned vote. *See* Bishop, at 127-40.

the American Law of Elections, 132 (Henry L. McCune eds. 4th ed. 1897) available at https://bit.ly/3PlGMCa.

"During the colonial period, many government officials were elected by the *viva voce* method or by the showing of hands, as was the custom in most parts of Europe." *Burson v. Freeman*, 504 U.S. 191, 200 (1992); *see also Doe v. Reed*, 561 U.S. 186, 224-27 (2010) (Scalia, J., concurring in judgment) (describing historic voting practices). In the 18th and early part of the 19th century, some states began adopting paper ballots, which quickly became the majority practice. E. Evans, A History of the Australian Ballot System in the United States, 11 (1917) (Evans); *Burson*, 504 U.S. at 200. *Viva voce* and handwritten ballots remained the majority practices until one voter crafted his own preprinted "ticket" ballot in 1829. Evans at 11-12. Ticket voting grew in popularity immediately as newspapers, political parties, unions, and other private groups printed tickets with advertisements or political messages. *Id.* at 12; and *Burson*, 504 U.S. at 201-03. Many states abandoned *viva voce* voting as tickets grew in popularity.[19] *See also* Donald A. Debats, How America Voted: By Voice, 5, Univ. of Virg. Inst. For Advanced Tech. in Humanities, (2016), available at https://bit.ly/3sVOMRu. Like handwritten ballots, tickets were simply privately created paper of no legal consequence until deposited (i.e., cast) into a ballot box on Election Day. *See Maddox*, 149 P.2d at 115. Following "the 1888 presidential election, which was widely regarded as having been plagued by fraud, many States moved to the Australian ballot system." *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 356 (1997); *see also* J. Harris, Election Administration in the United States, 153-54 (1934), available at https://bit.ly/3cdio7z. By 1896, almost 90 percent of States had adopted it. *Burson*, 504 U.S. at 203-205.

---

[19]     *See* Evans, at 17.

Neither Congress nor the general public contemplated extending ballot receipt deadlines beyond Election Day in 1845 or 1872. Voting practices in use then, such as dropping beans in a bowl, voting *viva voce*, or ticket ballots, by their nature required Election Day receipt. As there was no common law right to vote absentee, there was no common law mailbox rule applicable to elections.[20] Election practices at the time required all "ballots," whether bean, voice, or ticket, to be received by Election Day in order to be counted. The public at the time would have affirmatively understood "the election" as deadline by which all qualified votes must be received by local election officials.

By emphasizing "the day for the election" in 2 U.S.C. § 7 and 3 U.S.C. § 1, Congress made the conscious decision to limit voting beyond Election Day. The Nineteenth Century saw substantial changes in voting methods, from beans, to viva voce voting, to paper ballots, to ticket ballots, and eventually to the Australian ballot. The public and Congress would have been well aware of the evolving nature of voting practices. But by specifying "the day for the election," Congress put a hard brake on when ballots of any kind might be cast. In other words, Congress foreclosed the possibility of using future, unforeseen election practices to circumvent its time regulation. Instead, Congress determined that whatever manner of voting states used, all votes needed to be received by election officials on Election Day.

### 2. Save One Recently Created Exception, Congress Has Repeatedly Rejected Efforts to Extend Ballot Receipt Deadlines.

Since 1845, Congress has repeatedly rejected requests to make Election Day a multiday event or extend it beyond the first Tuesday after the first Monday in November. *See* Cong. Globe, 42 Cong., 2d Sess. 676 (1872); *The Overseas Citizens Voting Rights Act of 1975 and S. 703 Before*

---

[20]     Because there was no common law right to proxy voting and absentee voting was yet to be invented, the common law's mailbox rule for contracts would not have applied to voting. There is no existing voting equivalent to the federal mailbox statute applicable to IRS filings. *See* 26 U.S.C. § 7502.

*S. Comm. on Rules and Admin.*, 95th Cong. pp. 13, 34, 59, 67, 84, and 94 (1977) ((rejecting requests to extend ballot receipt deadlines for overseas voters) available at https://bit.ly/38z9zU9; *see also Keisling*, 259 F.3d at 1172-74.[21]

During the pendency of these proceedings, Congress enacted the Electoral Count Reform Act ("ECRA"). 136 Stat. 5233, 525 (enacted as Div. P., Title I, § 102(b) of the Consolidated Appropriations Act, 2023, 117 Pub. L. No. 328, Dec. 29, 2022). Applicable here, ECRA revised Title 3 dealing with the Presidential election process, adding new 3 U.S.C. § 21, explaining that with respect to those elections:

> (1) "election day" means the Tuesday next after the first Monday in November, in every fourth year succeeding every election of a President and Vice President held in each State, except, in the case of a State that appoints electors by popular vote, if the State modifies the period of voting, as necessitated by force majeure events that are extraordinary and catastrophic, as provided under laws of the State enacted prior to such day, "election day" shall include the modified period of voting.

*Id.* Thus, Congress for the first time in its history allowed a narrow carveout that allows states to extend receipt deadlines in "force majeure events that are extraordinary and catastrophic." This new *force majeure* exception underscores that in all ordinary circumstances *Foster*'s "final act of selection" that must occur no later than Election Day. The ECRA made no other changes to 3 U.S.C. § 1.

In finding that "federal law governing elections allows ballots received after Election Day" the district court below misconstrued the remedial provisions in the Uniformed and Overseas Citizens Absentee Voting Act of 1986 ("UOCAVA").[22] Dkt. 81 at 26, A.37. UOCAVA provides

---

[21]     In general, the Supreme Court has cautioned against drawing inferences from failed attempts to pass legislation. *See Pension Benefit Guar. Corp. v. LTV Corp.*, 496 U.S. 633, 650 (1990). Notwithstanding this general rule, the Court has on occasion drawn inferences from the failure to enact a bill where the sheer number of legislative attempts to pass it and the clarity of the issue presented make such inferences reasonable. *Bob Jones University v. United States*, 461 U.S. 574 (1982).

[22]     52 U.S.C. §§ 20301 to 20311, as amended by the Military and Overseas Voter Empowerment Act of 2009, Pub L. No. 111 84, Subtitle H, §§ 575 589, 123 Stat. 2190, 2318 2335 ("MOVE Act").

military and overseas voters the right to vote by absentee ballot in federal elections. 52 U.S.C. §
20302(a)(1); *see generally* Robert T. Reagan, Fed. Jud. Ctr., *Overseas Voting: The Uniformed and
Overseas Citizens Absentee Voting Act*, (2016) (available at https://bit.ly/3QapF67). It sets forth
federal and state obligations, such as deadlines for state transmission of absentee ballot if timely
requested.[23] 52 U.S.C. § 20302(a)(8). Although the text of UOCAVA does not extend ballot re-
ceipt deadlines, or allow states to do so, extensions of receipt deadlines have been employed by
federal courts as a *remedy* for demonstrated UOCAVA violations. *See generally United States v.
West Virginia*, Civ. No. 2:14-27456, 2014 WL 7338867 (S.D. W. Va. Dec. 22, 2014). It does not
change the deadline for *Foster*'s "final act of selection." The fact that courts can order extensions
of receipt deadlines to remedy injuries caused by late ballot transmission does not change any of
the claims or arguments raised by Plaintiffs here. As explained, UOCAVA does not expressly
authorize post-election receipt of UOCAVA ballots. But even if it did, no one disputes that Con-
gress can amend the Election Day statutes at will and otherwise make specific carveouts—as Con-
gress recently did with ECRA.[24] States cannot do this. Plaintiffs' claims involve a question of *state*
authority (not Congressional or judicial) to extend *Foster*'s "final act" until after Election Day.

### B.    Plaintiffs Plausibly Alleged Claims Under 42 U.S.C. § 1983.

Section 1983 only requires two allegations to state a cause of action: "First, the plaintiff
must allege that some person has deprived him of a federal right. Second, he must allege that the
person who has deprived him of that right acted under color of state or territorial law." *Gomez v.
Toledo*, 446 U.S. 635, 640 (1980) (citations omitted); *see also Hanson v. LeVan*, 967 F.3d 584,

---

[23]      *See* Dkt. 53 at 10-13.

[24]      Indeed, Congress considered and rejected recommendations that it extend ballot receipt deadlines
for overseas voters. *The Overseas Citizens Voting Rights Act of 1975 and S. 703 Before S. Comm. on Rules
and Admin.*, 95th Cong. pp. 13, 34, 59, 67, 84, and 94 (1977) available at https://bit.ly/38z9zU9; *see gen-
erally* Reagan at pp. 1-3 (summarizing federal legislation regarding military and overseas voters from 1942-
2014).

597 (7th Cir. 2020). There is no particularity requirement or heightened pleading standard for claims under § 1983. *See Hanson*, 967 F.3d at 597 (citing *Leatherman v. Tarrant Cty. Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 168 (1993)). "Under the modern regime of the Federal Rules, the complaint need contain only factual allegations that give the defendant fair notice of the claim for relief and show the claim has 'substantive plausibility.'" *Runnion v. Girl Scouts of Greater Chi. & Nw. Ind.*, 786 F.3d 510, 517 (7th Cir. 2015) (citing *Johnson v. City of Shelby*, 574 U.S. 10, 12 (2014) (per curiam)).

Plaintiffs adequately alleged causes of action under 42 U.S.C. § 1983. Specifically, they alleged that Defendants deprived them of their federal rights to vote and stand for office, which are individual rights under the First and Fourteenth Amendment. Dkt. 1 at ¶¶38-48, A.7-9. Plaintiffs further alleged that Defendant ISBE and Defendant Matthews, in her official capacity as the Chief State Election Official, are state actors acting under color of law. *Id.*; and s*ee also* 26 Ill. Adm. Code § 216.100(b)-(c); 10 Ill. Comp. Stat. Ann. § 5/1A-7; and 10 Ill. Comp. Stat. Ann. § 5/1A-8.

Despite this showing, the district court dismissed their claims, finding that neither the right to stand for office nor the right to vote were infringed. Dkt. 81 at 26-30, A.37-41. Note that Plaintiffs did not allege that a facially valid regulation burdened their rights to vote or run for office. Rather, Plaintiffs alleged that a state time, place, and manner regulation conflicts with a federal time regulation and, therefore, violates federal law. "The regulations made by Congress are paramount to those made by the State legislature; and if they conflict therewith, the latter, so far as the conflict extends, ceases to be operative." *Foster*, 522 U.S. at 69 (quoting *Ex parte Siebold*, 100 U.S. 371, 384 (1880)). There is never a circumstance where unlawful ballots are acceptable and, thus, no reason to weigh the burdens imposed.

1.    **Plaintiffs Plausibly Alleged That the Receipt Deadline Infringes on Their Right to Stand for Office.**

The district court dismissed Count II, finding Plaintiffs have not "explain[ed] why the [Receipt Deadline] constitutes an invalid regulation of the times, places, and manner of federal elections. Dkt. 81 at 29-30, A.40-41. As set forth above, and throughout this brief, Illinois' Receipt Deadline violates the Election Day statutes and conflicts with the original public meaning of "the election" and with the ruling in *Foster*.

The court also found that Plaintiffs failed to state a claim because "spending time and money on campaigning is an inevitable feature of running for office, and Plaintiffs do not contend that the extra time and money they might have to spend due to the Statute prevents them from standing for office at all." Dkt. 33 at 30, A.41. This appears to have more to do with the extent to which Plaintiffs are injured than with whether they state a claim. In any event, this finding is misguided. It is established law that regulations that require candidates to spend additional or reallocate resources burden their individual rights. *See Libertarian Party*, 872 F.3d at 523; *see also Krislov*, 226 F.3d at 857 (holding that being "required to allocate additional campaign resources ... in itself can be an injury to First Amendment rights"); *Nader*, 385 F.3d at 736 (observing that a candidate could challenge certain ballot access restrictions before attempting to comply with them because "it was certain that *it would cost him more* to [comply with the restrictions] than if the challenged provisions were invalidated") (emphasis added); *Lee v. Keith*, 463 F.3d 763, 767 (7th Cir. 2006) (asserting jurisdiction over an independent candidate's suit because the challenged statutes "continue to restrict potential independent candidacies"). And as a matter of pleading, Plaintiffs do not need to allege that they were *wholly* prohibited from exercising their rights to state a plausible claim. *See generally Purcell*, 549 U.S. at 4.

Plaintiffs clearly alleged that the Receipt Deadline is costing them additional resources that are not "inevitable." Dkt. 31-4 at ¶¶8-20; 31-5 at ¶¶10-17; 31-6 at ¶¶10-15. To the extent the district court was concerned about causation or other considerations related to these additional costs and resources, these are questions of fact that should have been resolved in Plaintiffs' favor at this stage. *See generally Erickson v. Pardus*, 551 U.S. 89, 93-94 (2007); and *Hunter v. Mueske*, 73 F.4th 561, 567-68 (7th Cir. 2023).

### 2.    Plaintiffs Plausibly Alleged That the Receipt Deadline Violates Their Right to Vote Under *Foster*.

Plaintiffs have plausibly claimed that their right to vote is burdened in a way that violates rights under the First and Fourteenth Amendments. The most instructive case is *Foster*. There, the Supreme Court struck down a state time, place, and manner regulation, declaring that it violated the Election Day statutes. 522 U.S. at 71-74. The Plaintiffs were four Louisiana voters. *Love v. Foster*, 90 F.3d. 1026, 1027 (5th Cir. 1996). The *Foster* Court explained "the combined actions of voters and officials meant to make a final selection of an officeholder" cannot occur *prior* to Election Day. 522 U.S. at 71. Plaintiffs here allege that the Receipt Deadline allows the "combined actions of voters and officials meant to make a final selection of an officeholder" to occur *after* Election Day. *See id.* As a result, their ballots are diluted by untimely and illegal ballots cast and received after Election Day. Dkt. 1 at ¶40-41, A.8.

Plaintiffs contend that these late ballots are, like ballots received from non-citizens, inherently invalid. As explained above, vote dilution does not require allegations of fraud, and Plaintiffs did not allege fraud. Plaintiffs alleged the Receipt Deadline allows election officials to illegally count invalid votes in violation of federal law. Dkt. 81 at 28-29, A.39-40. *See Saylor*, 322 U.S. at 386, 389-90 (upholding a charge that stuffing a ballot box injured citizens "in the free exercise" of their "rights and privileges," which included the right "to have their votes … given full value,"

unimpaired by unlawful votes); *Wesberry v. Sanders*, 376 U.S. 1, 7-8 (1964) (voters' constitutional rights violated if congressional districts have unequal populations, diluting the weight of the voters' lawfully cast votes in districts with greater population counts). This allegation states a claim for relief under federal law, and the district court's decision to dismiss it constitutes reversible error.

## CONCLUSION

For the foregoing reasons, the district court's decision granting Defendants' motion to dismiss should be reversed.

October 2, 2023                                    Respectfully submitted,

Christine Svenson, Esq.                 *s/ Russ Nobile*
**SVENSON LAW OFFICES**                 T. Russell Nobile
345 N. Eric Drive                          *Counsel of Record*
Palatine, IL 60067                      **JUDICIAL WATCH, INC**
(312) 467-2900                          P.O. Box 6592
                                        Gulfport, MS 39506
                                        (202) 527-9866
                                        Rnobile@judicialwatch.org

                                        Eric W. Lee
                                        **JUDICIAL WATCH, INC.**
                                        425 Third Street SW
                                        Suite 800
                                        Washington, D.C. 20024

**CERTIFICATE OF COMPLIANCE**

Pursuant to Federal Rule of Appellate Procedure 32(a)(7)(B), I hereby certify that this brief is proportionally spaced, 12-point Times New Roman font. Pursuant to Federal Rule of Appellate Procedure 32(g)(1) and per Microsoft Word count, the brief is within the word limit at 13,847 words excluding tables and certificates.

October 2, 2023                                         *s/ Russ Nobile*

**CERTIFICATE OF SERVICE**

I hereby certify, pursuant to Fed. R. App. P. 25(d)(2), ECF Procedure Rule (h)(2), and Circuit Rule 31(b), that I electronically filed the foregoing with the Clerk of the United States Court of Appeals for the Seventh Circuit using the appellate CM/ECF system. Upon notice of this Court's acceptance of the electronic brief for filing, I certify I will cause fifteen (15) copies of the above cited brief to be transmitted to the Court via overnight delivery by a third-party carrier, delivery charge prepaid, within seven (7) days of that notice date. I also certify that the parties in the case are registered CM/ECF users and that service upon the parties will be accomplished by the appellate CM/ECF service.

October 2, 2023                                             *s/ Russ Nobile*

**No. 23-2644**

IN THE UNITED STATES COURT OF
APPEALS FOR THE SEVENTH CIRCUIT

———————————————

MICHAEL J. BOST, ET AL.,

*Plaintiffs-Appellants*,

v.

ILLINOIS STATE BOARD OF ELECTIONS AND
BERNADETTE MATTHEWS, IN HER OFFICIAL
CAPACITY AS THE EXECUTIVE DIRECTOR OF THE
ILLINOIS STATE BOARD OF ELECTIONS,

*Defendants-Appellees,*

———————————————

On Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division
Case No. 1:22-cv-02754
The Honorable Judge John F. Kness

———————————————

**REQUIRED SHORT APPENDIX OF PLAINTIFFS-APPELLANTS**

———————————————

Christine Svenson, Esq.
**SVENSON LAW OFFICES**
345 N. Eric Drive
Palatine, IL 60067
(312) 467-2900
christine@svensonlawoffices.com

T. Russell Nobile
  *Counsel of Record*
**JUDICIAL WATCH, INC**
P.O. Box 6592
Gulfport, MS 39506
(202) 527-9866
Rnobile@judicialwatch.org

Eric W. Lee
**JUDICIAL WATCH, INC.**
425 Third Street SW
Suite 800
Washington, D.C. 20024

October 2, 2023

*Counsel for Plaintiffs-Appellants*

## INDEX OF REQUIRED SHORT APPENDIX

Complaint
    (May 25, 2022) (Dkt No. 1) .................................................................................. A1

Memorandum Opinion & Order
    (July 26, 2023) (Dkt No. 81) ............................................................................. A12

Certificate of Rule 30(d) Compliance ........................................................................ A43

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

| | |
|---|---|
| MICHAEL J. BOST; LAURA POLLASTRINI; and SUSAN SWEENEY, | |
| Plaintiffs, | |
| v. | Civil Action No. _____ |
| THE ILLINOIS STATE BOARD OF ELECTIONS; and BERNADETTE MATTHEWS, in her capacity as the Executive Director of the Illinois State Board of Elections | |
| Defendants. | |

**<u>COMPLAINT</u>**

Plaintiffs Congressman Michael J. Bost, Laura Pollastrini, and Susan Sweeney ("Plaintiffs"), by and through counsel, file this Complaint against the Illinois State Board of Elections and its Executive Director Bernadette Matthews, and allege as follows:

1.      Plaintiffs are former and prospective federal candidates and registered Illinois voters, all of whom seek declaratory and injunctive relief to enjoin parts of the Illinois election code.

2.      The United States Congress is authorized under Art. I, § 4 cl. 1 and Art. II, § 1 cl. 4 to establish the Time for conducting federal elections.  Congress exercised this authority in 1845

when it enacted the first of a trio of statutes that established a uniform national election day for all federal elections.

3.       Under federal law, the first Tuesday after the first Monday in November of every even-numbered year is election day ("Election Day") for federal elections.  *See* 2 U.S.C. § 1; 2 U.S.C. § 7; and 3 U.S.C. § 1.

4.       Despite Congress' clear statement regarding a single national Election Day, Illinois has expanded Election Day by extending by 14 days the date for receipt and counting of vote-by-mail ballots.  *See* 10 Ill. Comp. Stat. Ann. §§ 5/18A-15(a) & 5/19-8(c).

5.       Plaintiffs allege that Illinois' extension of Election Day violates federal law and their rights.

6.       Plaintiffs seek a judgment declaring Illinois' extension of Election Day to be unlawful and seek an injunction enjoining the extension.

## JURISDICTION AND VENUE

7.       This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1343, and 2201, because the matters in controversy arise under the Constitution and laws of the United States, because they concern the deprivation, under color of State law, of rights secured to Plaintiffs by the Constitution of the United States and by Acts of Congress, and because they are proper subjects for a declaratory judgment.

8.       Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because one or more Defendants resides in this district and all Defendants are residents of Illinois, and because a substantial part of the events and omissions giving rise to the claims herein occurred in this district; or, in the alternative, because one or more Defendants is subject to the Court's personal jurisdiction in this district with respect to this action.

## PARTIES

9.      Plaintiff Michael J. Bost is a resident of Jackson County, Illinois and a registered Illinois voter who voted in the 2020 congressional and presidential elections.  He intends to vote in the 2022 congressional election as well as the 2024 presidential and congressional elections. He also is a multi-term member of the United States House of Representatives and represents Illinois' 12th Congressional District.  Congressman Bost successfully ran for re-election in the November 3, 2020 federal election and currently is a candidate for United States Representative for Illinois' 12th Congressional District during the November 8, 2022 federal election.

10.     Plaintiff Laura Pollastrini is a resident of Kane County, Illinois, and a registered Illinois voter who voted in the 2020 congressional and presidential elections.  She intends to vote in the 2022 congressional election as well as the 2024 presidential and congressional elections. Ms. Pollastrini is currently the Illinois Republican State Central Committeeperson for the 14th Congressional District.  Ms. Pollastrini was appointed by the Illinois State Republican Chairman both as Chairwoman for the Illinois Republican's Presidential Electors Committee and as Republican presidential and vice-presidential elector at-large for Illinois during the 2020 presidential election.  As the Illinois Republican State Central Committeeperson for the 14th Congressional District during the 2020 general election, Ms. Pollastrini herself appointed a Republican presidential and vice-presidential elector for the 14th Congressional District. Following redistricting, Ms. Pollastrini intends to seek election as the Illinois Republican State Central Committeeperson for the new 11th Congressional District.  Ms. Pollastrini also intends to seek reappointment as the Chairwoman for the Illinois Republican's Presidential Electors Committee in 2024.  Ms. Pollastrini further intends to seek reappointment as an at-large presidential and vice-presidential elector for the November 5, 2024, presidential election.

- 3 -

A3

11.    Plaintiff Susan Sweeney is a resident of Cook County, Illinois, and a registered Illinois voter who voted in the 2020 congressional and presidential elections.  She intends to vote in the 2022 congressional election as well as the 2024 presidential and congressional elections.  Ms. Sweeney was a Republican presidential elector during the 2020 presidential election.  Ms. Sweeney intends to seek reappointment as an Illinois presidential elector for the November 5, 2024, presidential election.

12.    Defendant Illinois State Board of Elections (the "State Board") is an independent state agency created under the laws of the State of Illinois.  Defendant State Board is responsible for supervising the administration of election laws throughout Illinois.

13.    Defendant Bernadette Matthews is the Executive Director of the Illinois State Board of Elections and the Chief State Election Official of the State of Illinois.  26 Ill. Adm. Code § 216.100(b)-(c); 52 U.S.C. § 20509.  She is sued in her official capacity.

## FACTS

14.    The Illinois election code authorizes voting by mail and further provides that vote-by-mail ballots received "after the polls close on election day" but before "the close of the period for counting provisional ballots" shall be counted as if cast and received on or before Election Day. *See* 10 Ill. Comp. Stat. Ann. § 5/19-8(c).

15.    In Illinois, election officials shall complete "the validation and counting of provisional ballots within 14 calendar days of the day of the election."  10 Ill. Comp. Stat. Ann. § 5/18A-15(a).

16.    Read together, these two provisions mean that vote-by-mail ballots received up to 14 calendar days after the day of the election shall be counted as if cast and received on or before Election Day.

- 4 -

A4

17.     Even vote-by-mail ballots without postmarks shall be counted if received up to 14 calendar days after Election Day if the ballots are dated on or before election day.  *See* 10 Ill. Comp. Stat. Ann. § 5/19-8(c).

18.     For example, although Election Day for the 2020 federal elections was November 3, 2020, Illinois law authorized the counting of vote-by-mail ballots received on or before November 17, 2020, even if those ballots were not postmarked by Election Day.

19.     On November 2, 2020, the State Board of Elections issued a media advisory stating it had received approximately 1,759,245 mailed ballots prior to Election Day.[1]  The Board further advised that the number of ballots received after Election Day through November 17, 2020, could materially affect the unofficial election results.  Specifically, the State Board explained:

> As mail ballots arrive in the days after Nov. 3, it is likely that close races may see leads change as results are reported. Reporters should check with local election authorities for updated vote counts and make readers, viewers and listeners aware of why these numbers are changing.

*Id*.

20.     In its December 4, 2020, press release announcing certified results from the November 3, 2020 election, the State Board announced that there had been a total of 6,098,729 votes in the 2020 election, of which 2,025,662 were vote-by-mail ballots.[2]

21.     Read together, the November 2nd and December 4th press releases indicate that Illinois received 266,417 vote-by-mail ballots statewide during the period from November 3rd through November 17th.

---

[1]     "*Media Advisory: Heavy Mail Voting Could Affect Unofficial Elections Results*," Illinois State Board of Elections, Nov. 2, 2020, https://bit.ly/3y9qCWU, (last visited May 24, 2022).

[2]     "*Record Number of Votes Cast, Turnout tops 2016 as Board of Elections Certifies 2020 General Election Results*," Illinois State Board of Elections, Dec. 4, 2020, https://bit.ly/3y9tumE (last visited May 24,2022).

22.     Upon information and belief, most of the 266,417 vote-by-mail ballots were received after Election Day, which would mean that as many as 4.4% of votes cast in 2020 were received *after* Election Day.

23.     Illinois is not allowed to hold open voting for congressional and presidential beyond the single Election Day.

24.     One editorialist recently satirized the abandonment of a single national Election Day as follows:



25.     The next federal election in Illinois will be held on Tuesday, November 8, 2022, at which time Illinois will elect a new Congressional delegation.  Under Illinois law's extended ballot receipt deadline, vote-by-mail ballots shall be counted if received on or before November 22, 2022.

26.     Accordingly, Illinois will illegally hold voting open beyond Election Day on November 8, 2022.

27.     Another federal election will be held in Illinois on Tuesday, November 5, 2024, at which time Illinois will elect its next slate of presidential and vice-presidential electors as well as a new Congressional delegation.  Under Illinois law's extended ballot receipt deadline, vote-by-mail ballots shall be counted if received on or before November 19, 2024.

- 6 -

A6

28.    Accordingly, Illinois will hold voting open beyond Election Day on November 5, 2024.

29.    Counting ballots received after Election Day harms Plaintiffs.

30.    Among other harms, Plaintiffs votes will be diluted by illegal ballots received in violation of the federal Election Day statutes.

31.    All Plaintiffs intend to vote and conduct their prospective campaigns in accordance with federal law.

32.    Plaintiffs are entitled to have their elections results certified with votes received in compliance with the federal Election Day statutes.

33.    Plaintiffs rely on provisions of federal and state law in conducting their campaigns including, in particular, resources allocated to the post-election certification process.

34.    Counting untimely votes and those received in violation of federal law substantially increases the pool of total votes cast and dilutes the weight of Plaintiffs' votes.  More votes will be counted than the law allows to be counted, resulting in dilution.

35.    Likewise, untimely votes will be counted after the federal Election Day deadline, defined as "the combined actions of voters and officials meant to make a final selection of an officeholder."

36.    Plaintiffs will be subject to harms beyond even these above-stated harms.

37.    These harms are severe and irreparable.

### COUNT I
### Violation of the Right to Vote (42 U.S.C. § 1983)

38.    Plaintiffs incorporate all their prior allegations.

39.    10 Ill. Comp. Stat. Ann. § 5/19-8 requires counties to hold open voting and count ballots received after Election Day, in violation of 2 U.S.C. § 7 and 3 U.S.C. § 1.

40.     Because counting ballots received after Election Day violates 2 U.S.C. § 7 and 3 U.S.C. § 1, any such ballots are untimely and therefore illegal under 2 U.S.C. § 7 and 3 U.S.C. § 1.

41.     Untimely and illegal ballots received and counted after Election Day pursuant to 10 Ill. Comp. Stat. Ann. § 5/19-8 dilute the value of timely ballots cast and received on or before Election Day, including Plaintiffs' timely cast and received ballots.

42.     By counting untimely and illegal ballots received after Election Day and diluting Plaintiffs' timely cast and received ballots, Defendants, acting under color of Illinois law, have deprived and are depriving Plaintiffs of rights protected under the First Amendment and 14th Amendment to the U.S. Constitution in violation of 42 U.S.C. § 1983.

43.     Plaintiffs have no adequate remedy at law and will suffer serious and irreparable harm to their constitutional rights unless Defendants are enjoined from implementing and enforcing 10 Ill. Comp. Stat. Ann. § 5/19-8.

## COUNT II
### Violation of the Right to Stand for Office (42 U.S.C. § 1983)

44.     Plaintiffs incorporate all their prior allegations.

45.     10 Ill. Comp. Stat. Ann. § 5/19-8 requires counties to hold open voting and count ballots received after Election Day, including those without postmarks.

46.     Defendants, acting under color of Illinois law, have deprived and are depriving Plaintiffs of rights protected under the First and Fourteenth Amendment to the U.S. Constitution in violation of 42 U.S.C. § 1983 by, inter alia, forcing Plaintiffs to spend money, devote time, and otherwise injuriously rely on unlawful provisions of state law in organizing, funding, and running their campaigns.

47.    Defendants, acting under color of Illinois law, have deprived and are depriving Plaintiffs of rights protected under the First Amendment and 14th Amendment to the U.S. Constitution in violation of 42 U.S.C. § 1983.

48.    Plaintiffs have no adequate remedy at law and will suffer serious and irreparable harm to their constitutional rights unless Defendants are enjoined from implementing and enforcing 10 Ill. Comp. Stat. Ann. § 5/19-8.

**COUNT III**
**Violation of 2 U.S.C. § 7 and 3 U.S.C. §1**

49.    Plaintiffs incorporate all their prior allegations.

50.    2 U.S.C. §7 provides that "[t]he Tuesday next after the 1st Monday in November, in every even numbered year, is established as the day for the election, in each of the States and Territories of the United States, of Representatives and Delegates to the Congress commencing on the 3d day of January next thereafter."

51.    3 U.S.C. §1 provides that "[t]he electors of President and Vice President shall be appointed, in each State, on the Tuesday next after the first Monday in November, in every fourth year succeeding every election of a President and Vice President."

52.    By its terms 2 U.S.C. § 7 requires that the 2022 general election for Representatives to the Congress be consummated on Election Day, November 8, 2022 and Election Day, November 5, 2024.

53.    Under Illinois law's extended ballot receipt deadline, vote-by-mail ballots shall be counted if received on or before November 22, 2022, in violation of 2 U.S.C. § 7's Election Day mandate.

54.    By its terms 3 U.S.C. § 1 requires that the 2024 general election for Presidential electors be consummated on Election Day, November 5, 2024.

55.     Under Illinois law's extended ballot receipt deadline, vote-by-mail ballots shall be counted if received on or before November 19, 2024, in violation of 3 U.S.C. § 1's Election Day mandate.

56.     Illinois law permitting vote-by-mail ballots, including those without postmarks, to be counted if they are received fourteen days after Election Day violates 2 U.S.C. § 7 and 3 U.S.C. § 1.

57.     A qualified ballot for federal office is not a legal vote unless it is received by Election Day.

58.     State law or practice that holds open voting 14 after Election Day is invalid  and void as superseded under 2 U.S.C. § 7 and 3 U.S.C. § 1.

59.     Defendants have acted and will continue to act under color of state law to violate 2 U.S.C. § 7 and 3 U.S.C. § 1.

60.     Plaintiffs have no adequate remedy at law and will suffer serious and irreparable harm to their constitutional rights unless Defendants are enjoined from implementing and enforcing 10 Ill. Comp. Stat. Ann. § 5/19-8.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for entry of a judgment granting:

a.    A declaratory judgment that the relevant parts of 10 Ill. Comp. Stat. Ann. § 5/19-8 identified herein deprive Plaintiffs, under color of State law, of rights secured by the Constitution of the United States and by Acts of Congress;

b.    A permanent injunction prohibiting Defendants from enforcing the relevant parts of Illinois law, including 10 Ill. Comp. Stat. Ann. § 5/19-8, as identified herein;

c.    Plaintiffs' reasonable costs and expenses, including attorneys' fees; and

d.    All other relief that Plaintiffs are entitled to, and that the Court deems just and proper.

May 25, 2022

_____ s/ Christine Svenson _____
Christine Svenson, Esq.
(IL Bar No. 6230370)
SVENSON LAW OFFICES
345 N. Eric Drive
Palatine IL 60067
T: 312.467.2900
christine@svensonlawoffices.com

*  Application for admission pro hac vice
forthcoming

T. Russell Nobile*
JUDICIAL WATCH, INC.
Post Office Box 6592
Gulfport, Mississippi 39506
Phone: (202) 527-9866
rnobile@judicialwatch.org

Paul J. Orfanedes (IL Bar No. 6205255)
Robert D. Popper*
Eric W. Lee*
JUDICIAL WATCH, INC.
425 Third Street SW, Suite 800
Washington, DC 20024
Phone: (202) 646-5172
porfanedes@judicialwatch.org
rpopper@judicialwatch.org
elee@judicialwatch.org

**A11**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| MICHAEL J. BOST *et al.*, | | |
| Plaintiffs, | | No. 22-cv-02754 |
| v. | | |
| THE ILLINOIS STATE BOARD OF ELECTIONS *et al.*, | | Judge John F. Kness |
| Defendants. | | |

## MEMORANDUM OPINION & ORDER

This case challenges an Illinois election statute that governs the time for counting ballots received after the nationally-uniform day set for federal elections ("Election Day"). That Illinois law (the "Ballot Receipt Deadline Statute" or "Statute") allows ballots to be received and counted for up to 14 days after Election Day. Plaintiffs are former and prospective candidates for federal office (and registered voters) who allege that the Ballot Receipt Deadline Statute, contrary to federal law, dilutes their votes and forces them to spend money and time campaigning after Election Day. To realize their claims, Plaintiffs have sued the Illinois State Board of Elections, which supervises the administration of Illinois's election laws, and its director, Bernadette Matthews. Plaintiffs seek a declaratory judgment that the Statute deprives them of their constitutional and statutory rights; they also seek a permanent injunction prohibiting Defendants from enforcing the Statute.

As explained more fully below, because Plaintiffs fail to plead sufficiently concrete, particularized, and imminent injuries sufficient to meet the requirement of standing under Article III of the United States Constitution, the Court lacks the power to hear this case. And even if standing existed, the Eleventh Amendment serves as an independent bar to this suit. In any event, Plaintiffs have not plausibly alleged that the Ballot Receipt Deadline Statute conflicts with federal law. As a result, and on the motion of Defendants, the case is dismissed without prejudice.

## I.     BACKGROUND

Since the founding of our country, the law governing voting in federal elections has been a peculiarly federated affair. Under the United States Constitution, it is up to the legislatures of the states to prescribe the "Times, Places and Manner" of holding elections for U.S. senators and representatives. U.S. Const. art. I, § 4, cl. 1. But the Congress may also "at any time by Law make or alter such Regulations . . . ." U.S. Const. art. I, § 1, cl. 1. For choosing the Electors who actually elect the President, the Constitution states that "Congress may determine the Time of ch[oo]sing the Electors, and the Day on which they shall give their Votes; which Day shall be the same throughout the United States." U.S. Const. art. II, § 1, cl. 4. But the power to appoint electors and the mode of their appointment belongs exclusively to the states. *McPherson v. Blacker*, 146 U.S. 1, 27 (1892).

Congress has since exercised its Constitutionally-conferred legislative power to set what has become one "Election Day" for the entire country. 3 U.S.C. §§ 1, 21(1); 2 U.S.C. §§ 1, 7. But despite that national standard, the states retain significant

discretion—frequently exercised—to prescribe the times, places, and manner of conducting elections. For better or worse, with the advent of technology and changing voter habits and preferences, gone are the days in which all votes were cast (and counted) on one Election Day. Numerous states now allow votes to be cast by mail; those ballots are often transmitted to election authorities (by mail or other means) before or on Election Day. And to accommodate the potential for delayed deliveries of otherwise-timely votes, a substantial number of states that permit voting by mail now also allow mailed votes to be counted for some time past Election Day.

This evolution in voting habits has, perhaps predictably, led to occasional uncertainty in the administration of elections. Under the power conferred by Congress, state legislatures are permitted to set rules for ballots received by mail. Because of the possibility that validly cast ballots will not be received or counted by election officials before Election Day is over, many state legislatures have ballot receipt statutes that set a timeframe within which a mail-in ballot may be received post-Election Day yet still counted toward the final tally. Illinois is one of those states, and that choice has led to the dispute currently before this Court.

In Illinois, the time for counting ballots received after the date of a federal election is governed by statute (10 Ill. Comp. Stat. Ann. § 5/19-8(c)). (Dkt. 1 ¶ 14.) That law allows ballots cast in federal elections to be received and counted for up to 14 days after Election Day, so long as the ballot was postmarked or certified on or before Election Day. (*Id.* ¶ 15.) Under this statutory scheme, these mail-in ballots

3

have the same weight and force that a ballot cast at the polls on Election Day would have. (*Id.* ¶ 16.)

Plaintiffs in this case are registered voters, as well as former and prospective candidates for both federal office and appointment as Presidential Electors. Plaintiffs allege that the Ballot Receipt Deadline Statute violates the Constitution and federal statutory law, including 2 U.S.C. § 1, 2 U.S.C. § 7, and 3 U.S.C. § 1. (Dkt. 1.) More specifically, Plaintiffs allege that the Statute violates 2 U.S.C. § 7 and 3 U.S.C. § 1 by authorizing Illinois election officials to count untimely votes, thus diluting the value of their timely ballots. Plaintiffs also allege that the Statute deprives them of their rights as candidates under the First and Fourteenth Amendments by forcing them to spend time and money to organize, fund, and run their campaign after Election Day. Plaintiffs say that, because ballots are being counted up to two weeks after Election Day, they must continue to campaign and to incur inevitable campaign-related expenses. Plaintiffs allege that the Statute violates 2 U.S.C. § 7 and 3 U.S.C. § 1 and is thus facially invalid.

In an effort to realize these Constitutional and statutory claims, Plaintiffs have sued the Illinois State Board of Elections ("State Board")—which is responsible for supervising the administration of election laws in Illinois—and its Executive Director, Bernadette Matthews (in her official capacity). Plaintiffs seek a declaratory judgment that the Ballot Receipt Deadline Statute deprives them of their Constitutional rights and injunctive relief to permanently enjoin enforcement of the Statute. (Dkt. 1 at 11.)

Now before the Court is Defendants' motion to dismiss for lack of jurisdiction and for failure to state a claim upon which relief can be granted.[1] (Dkt. 25.) In their motion, Defendants contend that the Court lacks jurisdiction because the Plaintiffs, having suffered no particularized or concrete injury, do not have standing to bring this suit. Defendants also argue that Plaintiffs' claims are barred by the Eleventh Amendment to the United States Constitution. Defendants assert finally that Plaintiffs' suit should be dismissed because Plaintiffs fail to allege plausible claims under 2 U.S.C. § 7, 3 U.S.C. § 1, and the First and Fourteenth Amendments to the Constitution. (Dkt. 25 at 11; 14.)

Plaintiffs disagree and contend that, because state laws in conflict with federal election laws inflict the judicially-cognizable injury of endangering the right to vote, they do indeed have standing. (Dkt. 43 at 4.) Plaintiffs also argue that their candidacy-related injuries are independently sufficient to confer Article III standing,

---

[1] On November 8, 2022, the Democratic Party of Illinois ("DPI") filed a notice of appeal of the Court's order denying DPI's motion to intervene. (Dkt. 59.) At first glance, that pending appeal might suggest that this Court must wait for the Court of Appeals to resolve the appeal before adjudicating Defendants' motions. But a notice of appeal does not completely divest this Court of its jurisdiction over the case. As the Supreme Court held in *Griggs v. Provident Consumer Disc. Co.*, the filing of a notice of appeal "divests the district court of its control over those aspects of the case involved in the appeal." 459 U.S. 56, 58 (1982). If the appeal does not concern the underlying merits of the case, the district court is not divested of its jurisdiction over the merits. *See Kilty v. Weyerhaeuser Co.*, 758 F. App'x 530, 532–533 (7th Cir. 2019). DPI's interlocutory appeal concerned only its effort to intervene, not the underlying merits. Accordingly, this Court retains jurisdiction to address the motion to dismiss. To be sure, the Court presumes it possesses the discretion to await resolution of the pending appeal before proceeding to the merits. But imposing an ersatz stay would be imprudent for several reasons: *first*, no party has asked for a stay; *second*, the relief set forth in this ruling is aligned with the stated interests of DPI as amicus curiae and putative intervenor (*see, e.g.,* Dkt. 13, 56); *third*, the Court is now prepared to issue this substantive ruling and to enter a judgment of dismissal; and *fourth*, the parties' substantive motions have already been pending for a substantial period. Accordingly, the Court will proceed to the merits despite the pending appeal of nonparty DPI.

as the unnecessary expenditure of campaign money is both concrete and particularized. As for the Eleventh Amendment, Plaintiffs maintain that the "plan of the Convention" doctrine renders the Eleventh Amendment inapplicable. Finally, Plaintiffs insist that they have pleaded a viable claim based on Illinois law permitting voting beyond Election Day in violation of federal election law. These arguments are addressed in turn.

## II.    STANDARD OF REVIEW

### A.    Standing

It is a truism that Article III of the Constitution requires an actual case or controversy between the parties. *Deveraux v. City of Chicago*, 14 F.3d 328, 331 (7th Cir. 1994). As part of that requirement, plaintiffs seeking to have a case heard in federal court must demonstrate that they have standing to sue. In particular, plaintiffs must show (1) that they suffered a concrete and particularized injury in fact; (2) a causal connection between the injury and the challenged conduct of the defendant; and (3) that the injury will be likely redressed by a favorable judicial decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992). Because "[s]tanding is an essential component of Article III's case-or-controversy requirement," defendants may seek the dismissal of nonjusticiable claims through a Rule 12(b)(1) motion for lack of subject matter jurisdiction. *Apex Digital, Inc. v. Sears, Roebuck & Co.*, 572 F.3d 440, 443 (7th Cir. 2009) (quoting *Lujan*, 504 U.S. at 561).

A Rule 12(b)(1) motion challenges the Court's subject matter jurisdiction over the case. Fed. R. Civ. P. 12(b)(1); *Meyer v. St. John's Hosp. of the Hosp. Sisters of the*

*Third Order of Sta. Francis*, 164 F. Supp. 3d 1083, 1085 (C.D. Ill. 2016). Rule 12(b)(1) "provides for dismissal of a claim based on lack of subject matter jurisdiction, including lack of standing." *Stubenfield v. Chicago Housing Authority*, 6 F. Supp. 3d 779, 782 (N.D. Ill. 2013) (citing *Retired Chicago Police Ass'n v. City of Chicago*, 76 F.3d 856 (7th Cir. 1996)).

### B.    The Eleventh Amendment

Under the Eleventh Amendment to the Constitution, states (and their officers) are generally protected from suit. As a "general rule," private individuals "are unable to sue a state in federal court absent the state's consent." *McDonough Assocs., Inc. v. Grunloh*, 722 F.3d 1043, 1049 (7th Cir. 2013). That protection extends to state agencies and state officials acting in their official capacities. *Indiana Prot. & Advocacy Servs. v. Indiana Family & Soc. Servs. Admin.*, 603 F.3d 365, 370 (7th Cir. 2010).

An exception to the Eleventh Amendment's general bar on suits against states and their agencies can be found under the "plan of the Convention" doctrine. *Alden v. Maine*, 527 U.S. 706, 729–30 (1999) (quoting *Principality of Monaco v. State of Mississippi*, 292 U.S. 313, 323–24 (1934)). Under that doctrine, the sovereign immunity afforded to States by the Eleventh Amendment will cease where a "fundamental postulate[] implicit in the constitutional design" begins. *PennEast Pipeline Co. v. New Jersey*, 141 S. Ct. 2244, 2258 (2021). Because the Eleventh Amendment confirmed, rather than established, sovereign immunity, the scope of the States' immunity from suit is not demarcated by the text of the Eleventh Amendment

itself but rather by fundamental postulates implicit in the design of the Constitution. *Alden*, 527 U.S. at 729–30. In other words, the federal government "is invested with full and complete power to execute and carry out [the Constitution's] purposes," and if a state interferes with that power, that state may not assert sovereign immunity from suit in federal court. *PennEast*, 141 S. Ct. at 2259.

### C.    Motion to Dismiss for Failure to State a Claim

A motion under Rule 12(b)(6) "challenges the sufficiency of the complaint to state a claim upon which relief may be granted." *Hallinan v. Fraternal Ord. of Police of Chi. Lodge No. 7*, 570 F.3d 811, 820 (7th Cir. 2009). Each complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). These allegations "must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. Put another way, the complaint must present a "short, plain, and plausible factual narrative that conveys a story that holds together." *Kaminski v. Elite Staffing, Inc.*, 23 F.4th 774, 777 (7th Cir. 2022) (cleaned up). In evaluating a motion to dismiss, the Court must accept as true the complaint's factual allegations and draw reasonable inferences in the plaintiff's favor. *Iqbal*, 556 U.S. at 678. But even though factual allegations are entitled to the assumption of truth, mere legal conclusions are not. *Id.* at 678–79.

## III.    DISCUSSION

### A.    Plaintiffs Lack Standing to Bring This Suit

To bring a suit in federal court, the party suing must establish that it has

standing. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). To establish standing, a plaintiff must prove that he has "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992). Of these three elements, injury in fact is often the most significant hurdle for a plaintiff to clear in the standing analysis. To show injury in fact, Plaintiffs must establish three sub-elements: first, the "invasion of a legally protected interest"; second, that the injury is both "concrete and particularized"; and third, that the injury is "actual or imminent, not conjectural or hypothetical." *Spokeo*, 578 U.S. at 339. The first sub-element—invasion of a legally protected interest—is largely self-explanatory. The second and third, however, require more discussion. For an injury in fact to be "concrete and particularized," it must affect the plaintiff in a personal and individual way. *Lujan*, 504 U.S. at 560 n.1. For an injury in fact to be actual or imminent, a plaintiff must show that an alleged future injury is "certainly impending," not merely possible. *Clapper v. Amnesty Int'l. USA*, 568 U.S. 398, 409 (2013).

Plaintiffs present three harms that they allege are sufficient to confer standing: the Ballot Receipt Deadline Statute's alleged facial conflict with federal law, vote dilution, and Congressman Bost's injuries as a candidate. Each of these alleged harms and whether they are sufficient to confer Article III standing are addressed in turn.

1.    <u>Alleging Conflict with the Elections Clause Is not a Concrete and Particularized Injury.</u>

Defendants first argue that Plaintiffs do not have standing because the asserted injuries are not sufficiently concrete and particularized. (Dkt. 26 at 5.) Defendants state that Plaintiffs merely assert a disagreement with the Ballot Receipt Deadline Statute and fail to explain why it harms them specifically in a way that differs from Illinois voters generally. (Dkt. 26 at 5, 7.) Plaintiffs respond that their alleged vote dilution injury is sufficiently concrete and particularized. (Dkt. 43 at 5–8.) Plaintiffs also assert that, even if the Plaintiffs' facial challenge to the statute and vote dilution injuries are insufficiently concrete and particularized, they still have standing based on the Congressman Bost's injury. Congressman Bost's campaign-resource injury is, they argue, concrete and particularized because it is specific to Congressman Bost as a candidate. (*Id.* at 8–9.)

To adequately plead an injury in fact sufficient for Article III standing, the alleged injury must be "concrete and particularized." A "generalized grievance" is insufficient to confer standing. If a party's injury is a "grievance shared . . . by all or a large class of citizens," it is generalized and insufficient for standing. *Warth v. Seldin*, 422 U.S. 490, 499 (1975).

A plaintiff cannot show a concrete and particularized injury sufficient for standing by showing a mere "general interest common to all members of the public." *Ex parte Levitt*, 302 U.S. 633, 634 (1937). As the Supreme Court explained nearly 50 years ago, an allegation relating to the general conduct of government is not generally concrete and particularized enough to satisfy the injury in fact requirement. *United*

*States v. Richardson*, 418 U.S. 166, 174 (1974); *see also Bognet v. Sec'y Commonwealth of Pa.*, 980 F.3d 336, 349 (3d Cir. 2020) ("[P]rivate plaintiffs lack standing to sue for alleged injuries attributable to a state government's violations of the Elections Clause."). If a plaintiff offers only a generally available grievance about government, claiming only "harm to his and every citizen's interest in proper application of the Constitution and laws, and seeking relief that no more directly and tangibly benefits him than it does the public at large—[the plaintiff] does not state an Article III case or controversy." *Lujan*, 504 U.S. at 573–74.

One component of Plaintiffs' standing theory is that the Ballot Receipt Deadline Statute conflicts with 2 U.S.C. § 7 and 3 U.S.C. § 1. Plaintiffs' allegations on this score amount to a "general grievance about governance" that is insufficient to confer standing. Plaintiffs do not specify how they, individually, are or will be harmed in a concrete and particularized way by the Statute's alleged facial conflict with the Elections Clause. Instead, they generally allege that the Statute violates the Elections Clause. (Dkt. 1 at 9–10.) Rather than plead specific, personal harms, Plaintiffs merely state that they "have no adequate remedy at law and will suffer serious and irreparable harm to their constitutional rights unless Defendants are enjoined from implementing and enforcing 10 Ill. Comp. Stat. Ann. § 5/19-8." (Dkt. 1 at 10.)

Courts faced with similar allegations have rejected plaintiffs' claims that they possessed standing. This type of injury is the kind of generalized grievance that is insufficient to confer standing. In *Lance v. Coffman*, for example, the Supreme Court

considered the challenge of four Colorado voters to the redistricting provision of the Colorado Constitution. Those Plaintiffs alleged that the provision conflicted with the Elections Clause of the United States Constitution. 549 U.S. 437, 441–42 (2007). But the Supreme Court disagreed and explained that a bare allegation that the Elections Clause has not been followed is "precisely the kind of undifferentiated, generalized grievance about the conduct of government that we have refused to countenance in the past[;] . . . plaintiffs assert no particularized stake in the litigation." *Id.* at 442.

Plaintiffs' complaint echoes the allegations in *Lance*. Plaintiffs' Elections Clause claims allege a general interest that every citizen shares in the proper application of the Constitution and the laws of the United States. *Lujan*, 504 U.S. at 560–61. Seeking relief for this grievance no more "directly and tangibly benefits [Plaintiffs] than it does the public at large" and thus "does not state an Article III case or controversy." *Id.* at 573–74. Put differently, were Plaintiffs (acting as voters) to succeed in making Illinois voting laws comply with federal law, that benefit would redound benefit equally to all voters—not merely to Plaintiffs specifically.

Plaintiffs cite a variety of cases in support of their standing argument (Dkt. 43), but those cases do not squarely address the issue of standing. *See, e.g., Foster v. Love*, 533 U.S. 67 (1997).[2] In particular, Plaintiffs cite *Judge v. Quinn*, which Plaintiffs contend is analogous to this case. Plaintiffs assert that the injuries they allege are "consistent with the injuries that led this Court in 2009 to find that

---

[2] Although those courts reached the merits, thus implying standing to sue in those cases, the Supreme Court has "often said that drive-by jurisdictional rulings of this sort . . . have no precedential effect." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 91 (1998).

different voters had standing to challenge a special election date chosen to fill the Senate seat vacated by then-President-elect Obama." (Dkt. 43 at 6) (citing *Judge v. Quinn*, 623 F. Supp. 2d 933, 934 n.3 (N.D. Ill. 2009)). But the court in *Judge* did not undergo an extensive standing analysis—standing was instead relegated to a single footnote in which the court said it "concur[red] with the parties' apparent agreement that plaintiffs have standing." *Id.* This brief acknowledgment of standing is the exact kind of drive-by jurisdictional ruling that the Supreme Court has cautioned courts to avoid treating as precedential. *Citizens for a Better Env't*, 523 U.S. at 91. Accordingly, *Judge* does not show that Plaintiffs have standing.

Plaintiffs' claims are, in any event, distinguishable from those in *Judge*. Those plaintiffs challenged then-Governor Quinn's decision to allow Roland Burris, who was specially appointed to fill a vacancy in the United States Senate, to remain in office until the next regular election rather than conducting a special election to elect a replacement senator. *Id.* at 934. As *Judge* reflects, the plaintiffs were concerned about being denied entirely the right to vote for their representative in the Senate—not that their votes in a federal election were being diluted. Further, the plaintiffs did not allege any sort of vote fraud. Because the *Judge* plaintiffs were challenging the outright denial of their right to vote, rather than bringing a claim that their votes were diluted by the allegedly fraudulent votes of others, *Judge* is distinguishable.

Plaintiffs' contention that the Ballot Receipt Deadline Statute inflicts an injury sufficient to confer Article III standing fails because it is not specific to Plaintiffs. The alleged conflict with the Elections Clause is same kind of injury that the Supreme

A24

Court found too undifferentiated to confer standing in *Lance*. Further, the cases Plaintiffs cite to support a finding of standing do not engage in a standing analysis and are factually distinguishable. For all of these reasons, therefore Plaintiffs fail to allege a particularized injury.

   2. <u>Plaintiffs' Vote Dilution Claim is Insufficient to Confer Standing.</u>

  Plaintiffs also allege that the Ballot Receipt Deadline Statue dilutes their votes and state that this alleged harm is sufficient to confer standing. Plaintiffs contend that by counting ballots received after Election Day, their ballots, presumably cast on or before Election Day and received on or before Election Day, are diluted. In contrast, Defendants state that the vote dilution claim is not concrete and particularized enough to meet Article III's requirements.

  Plaintiffs' vote dilution claim is similar to the vote dilution claim at issue in *Feehan v. Wisconsin Election Commission*. 506 F. Supp. 3d 596 (E.D. Wis. 2020). In *Feehan*, the Plaintiff alleged that Wisconsin's election policies diluted his vote in violation of the Constitution. More specifically, the plaintiff alleged "massive election fraud" in violation of the Election, Electors, and Equal Protection Clauses of the Constitution. *Id.* at 601. The plaintiffs sought a declaratory judgment that Wisconsin's signature verification violated the Constitution and that mail-in and absentee ballot fraud occurred in the 2020 election. *Id.* at 602. They also sought a permanent injunction prohibiting the Wisconsin governor and secretary of state from transmitting the certified election results to the Electoral College. *Id. Feehan*'s plaintiffs thus maintained that their alleged vote dilution injury was sufficient for

Article III standing. But the *Feehan* court disagreed and held that the injuries claimed were "too speculative and generalized" because they were "injuries that any Wisconsin voter suffers." *Id.* at 609.

Courts outside this Circuit have agreed that claims of vote dilution based on the existence of unlawful ballots fail to establish standing. For example, the district court for the Middle District of North Carolina held that in "vote dilution cases arising out of the possibility of unlawful or invalid ballots being counted," the harm alleged "is unduly speculative and impermissibly generalized because all voters in a state are affected." *Moore v. Circosta*, 949 F. Supp. 3d 289, 312–13 (M.D.N.C. 2020). Although *Moore* did not go so far as to say that no statewide election law could ever be challenged "simply because it affects all voters," *Moore* explained that "the notion that a single person's vote will be less valuable as a result of unlawful or invalid ballots being cast is not the concrete and particularized injury [that is] necessary for Article III standing." *Id.* Unlike gerrymandering claims, "in which the injury is specific to a group of voters based on their racial identity or the district in which they live," all voters would suffer from the vote dilution injury alleged. *Id.* As a result, *Moore* found that the plaintiff had no standing to bring the vote dilution claim.

Plaintiffs' vote dilution claim is effectively the same as the vote dilution claims in *Feehan* and *Moore*. In Count I of the complaint, Plaintiffs allege that "[u]ntimely and illegal ballots received and counted after Election Day pursuant to 10 Ill. Comp. Stat. Ann. § 5/19-8 dilute the value of timely ballots cast and received on or before Election Day, including Plaintiffs' timely cast and received ballots." (Dkt. 1 ¶ 41.)

Plaintiffs suggest the dilution posed by the Ballot Receipt Deadline Statute violates the Elections Clause, but, as in *Moore* and *Feehan*, Plaintiffs do not allege an injury beyond the general grievance that all Illinois voters would share if that were the case.

To be sure, the plaintiffs in *Feehan*, unlike here, sought to decertify election results, and thus Plaintiffs argue that their claim is distinct from the underlying claim in *Feehan*. (Dkt. 43 at 11–12). But that is a distinction without a difference, as both the claims here and in *Feehan* are the same on a legal level: they both allege that the election process is "riddled with illegality," thus diluting their right to vote. *Feehan*, 506 F. Supp. 3d at 609.

More broadly, Plaintiffs assert that a ruling for Defendants on the standing issue would give rise to an untenable situation in which voters will never have standing to challenge gross abuses of state power. Plaintiffs compare this case to a situation in which "Illinois granted citizens of France the right to vote in its federal elections." (Dkt. 43 at n.6.) In Plaintiffs' example, were Defendants' reasoning to prevail, the result would be that "no private citizen would have standing to challenge the French ballots." (*Id.*)

Although Plaintiffs' hypothetical concerning illegitimate French voters raises a sincere question about the limits of the doctrine of standing, it ultimately strays too far from the context of this case to be genuinely illustrative. Contrary to Plaintiffs' conceptualization, a vote dilution claim under the Equal Protection Clause is about votes being weighted differently to the disadvantage of an identifiable group. *Bognet*, 980 F.3d at 355. That is, a vote dilution claim is about certain votes being given less

value than others, and such claims typically arise in the context of redistricting disputes. Federal courts have thus declined to apply the doctrine of vote dilution to voter fraud allegations, *e.g., Bowyer v. Ducey*, 506 F. Supp. 3d 699, 711 (D. Ariz. Dec. 9, 2020), because an increase in the pool of voters generally does not constitute vote dilution. Absent any suggestion that our hypothetical, carpetbagging French voters diluted the votes of another identifiable group of legitimate voters, current standing doctrine does not support Plaintiffs' claims. Further, Plaintiffs' hypothetical depends on evidence of illegal votes actually being cast. (Dkt. 43 at 6 n.1.) But Plaintiffs do not allege that any illegal ballots were cast in any election—they merely suggest the possibility of such votes being counted. The lack of any such allegation distinguishes Plaintiffs' allegations from the French voter hypothetical. Put another way, to the extent there is an outer boundary at which the counting of wholly illegal ballots cast by noncitizens amounts to a cognizable claim of vote dilution for which standing would exist, Plaintiffs' claims here do not come close to reaching it.

As in *Feehan* and *Moore*, Plaintiffs' claims here are too speculative and generalized to constitute an injury in fact for the purposes of Article III standing. Accordingly, Plaintiffs lack standing based on their vote dilution theory.

> 3.     Congressman Bost's Stated Financial Injuries Are Too Speculative to Confer Standing.

In addition to Plaintiffs' vote dilution claims, Congressman Bost alleges that Defendants are depriving him of his right to stand for office by enforcing the Ballot Receipt Deadline Statute. (Dkt. 1 ¶¶ 44–48.) Congressman Bost argues that because he is forced to spend significant resources running his campaign for an additional two

weeks after Election Day, his injury, unlike the other injuries alleged in the complaint, is necessarily concrete and particularized. (Dkt. 43 at 8.) Defendants counter that Congressman Bost's injury, although perhaps concrete, is not particularized because all federal candidates in Illinois are affected by the Statute in the same way. (Dkt. 26 at 9.) Defendants also argue that Congressman Bost's claim is speculative because the claimed effect of the Statute on his ability to win re-election is based on a "chain of possibilities." (*Id.* at 10.)

By its terms, the Ballot Receipt Deadline Statute affects all federal candidates equally. All candidates in Illinois, including Congressman Bost's opponent, are subject to the same Illinois election rules. *See Bognet*, 980 F.3d at 351 (candidate-plaintiff did not have standing when his objection to state election rules applied to all candidates). Congressman Bost does not allege how his right to stand for office is particularly affected compared to his opponents. *Id.* For example, Congressman Bost does not allege that the ballots cast after Election Day are more likely to be cast for his opponent. Because the alleged injury is not particularized to Congressman Bost, it is insufficient to confer standing.

But even if Congressman Bost's financial injury is concrete and particularized, his claim is still speculative. An injury in fact, in addition to being concrete and particularized, must be "actual or imminent." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013). In practice, that means that a threatened injury must be "certainly impending" to constitute an injury in fact, not merely "possible." *Id.* For example, a

18

**A29**

plaintiff cannot "manufacture standing by choosing to make expenditures based on hypothetical future harm that is not certainly impending." *Id.* at 416.

Congressman Bost's harm—spending more resources on the election—is not certainly impending. Congressman Bost asserts that he will be forced to spend money to avoid the alleged speculative harm that more ballots will be cast for his opponents. There is, however, no reason to believe that these alleged future expenditures are anything but speculative. *See Bognet*, 980 F. 3d at 352. ("The same can be said for Bognet's alleged wrongfully incurred expenditures and future expenditures. Any harm Bognet sought to avoid in making those expenditures was not 'certainly impending'—he spent the money to avoid a speculative harm."); *see also Donald J. Trump for Pres., Inc. v. Boockvar*, 493 F. Supp. 3d 331, 380–81 (W.D. Pa. 2020). It is mere conjecture that, if Congressman Bost does not spend the time and resources to confer with his staff and watch the results roll in, his risk of losing the election will increase. Under the letter of Illinois law, all votes must be cast by Election Day, so Congressman Bost's electoral fate is sealed at midnight on Election Day, regardless of the resources he expends after the fact.

Plaintiffs cite to *Carson v. Simon* to support their argument that Congressman Bost has standing. (Dkt. 43 at 9) (citing *Carson v. Simon*, 978 F.3d 1051 (8th Cir. 2020)). In *Carson*, Minnesota presidential electors challenged a decree issued by the Minnesota Secretary of State that unilaterally rendered the statutorily-mandated absentee ballot receipt deadline inoperative. *Carson*, 978 F.3d at 1054. The district

A30

court found that the electors lacked standing, but the Eighth Circuit reversed. *Id.* at 1059.

*Carson* is distinguishable. Its elector-plaintiffs challenged a consent decree that contradicted state law; they did not (as Plaintiffs do here) seek to challenge a statute passed by the state legislature and signed into law by the governor. *Carson*'s electors were concerned that ballots cast in direct conflict with state law would be counted as legitimate votes. Plaintiffs here acknowledge that ballots received up to fourteen days after Election Day are valid under Illinois state law. In any event, Carson was decided over a dissent, which argued the plaintiffs' claims concerning an "'inaccurate vote tally' . . . appear[ed] to be precisely the kind of undifferentiated, generalized grievance about the conduct of government that the Supreme Court has long considered inadequate for standing." *Carson*, 978 F.3d at 1063 (Kelly, J., dissenting) (cleaned up). That concern over an undifferentiated grievance based on an inaccurate vote tally rings true here as well. Accordingly, the Court declines to follow *Carson*.

In short, Congressman Bost's alleged financial injury is not concrete and particularized and is speculative. Accordingly, it insufficient to demonstrate standing under Article III.

### B.     The Eleventh Amendment Separately Bars Plaintiffs' Suit

Apart from standing, Defendants also argue that the Eleventh Amendment bars Plaintiffs' various claims. (Dkt. 26 at 11.) Under the Eleventh Amendment, a state that does not consent to suit in federal court is immune from most claims, unless

Congress has abrogated its immunity. *Carmody v. Bd. of Trs. of Univ. of Ill.*, 893 F. 3d 397, 403 (7th Cir. 2018). Such immunity, however, does not exist if "the State consents to the suit or Congress has abrogated their immunity." *Tucker v. Williams*, 682 F. 3d 654, 658 (7th Cir. 2017). Eleventh Amendment immunity from suit in federal court extends to "arms of the state"—meaning state agencies. *Joseph v. Bd. of Regents of Univ. of Wis. Sys.*, 432 F.3d 746, 748 (7th Cir. 2005). Under this broad immunity, states and their arms are not generally "persons" subject to suit under 42 U.S.C. § 1983. Defendants thus argue that Plaintiffs cannot sue the Illinois State Board of Elections because it is an arm of the State of Illinois (Dkt. 26 at 11.)

Plaintiffs respond that courts in this District have previously rejected immunity arguments in Elections Clause suits because the Elections Clause falls under the "plan of Convention" exception to Eleventh Amendment immunity. (Dkt. 43 at 13.) Under the "plan of Convention" doctrine, Eleventh Amendment immunity ceases where a "fundamental postulate implicit in the constitutional design" is at issue. *PennEast Pipeline Company, LLC v. New Jersey*, 141 S. Ct. 2244, 2258 (2021). In practice, this means that the federal government has "full and complete power" to carry out the Constitution, and when a state interferes with the exercise of that power, the sovereign immunity defense is not available. *Id.* at 2259.

Plaintiff argues that the Ballot Receipt Deadline Statute directly contradicts Article I, Section 4 of the Constitution. That section establishes that "[t]he Times, Places, and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof." Nothing on the face of the

Statute runs afoul of this constitutional provision. By implementing the Statute, Illinois is following the constitutional command that states determine the time, place, and manner of elections. In addition, the Statute further does not conflict with the federal mandate that Election Day be held on the Tuesday after the first Monday in November. By counting only mail-in ballots postmarked on or before Election Day, the Statute does not extend the day for casting votes in a federal election. Because the Statute does not conflict with a constitutional provision, it does not fall under the plan of Convention doctrine.

Plaintiffs' cited authority applying the plan of Convention doctrine is distinguishable. *Public Interest Legal Found. v. Matthews*, No. 20-3190, 2022 U.S. Dist. LEXIS 40640 (C.D. Ill. March 8, 2022) and *Illinois Conservative Union et al. v. Illinois et al.,* No. 20-cv-05542, 2021 WL 2206159 (N.D. Ill. Sept. 28, 2021) both center on the National Voter Registration Act (NVRA). In those cases, the courts found that the plan of Convention doctrine applied because, by passing the NVRA, Congress "act[ed] pursuant to its power under the Elections Clause." *Public Interest Legal Found.*, 2022 U.S. Dist. LEXIS 40640 at *4; *see also Ill. Conservative Union et al.*, 2021 WL 2206159, at *6. By acting under this power, Congress superseded all conflicting state laws. Unlike those cases, though, here there is no intervening federal law showing that the Ballot Receipt Deadline Statute conflicts with the Elections Clause. Those cases, therefore, do not govern the outcome here.

Because the Ballot Receipt Deadline Statute does not fall under the plan of Convention doctrine, Plaintiffs' argument that their claims are exempted from

Eleventh Amendment immunity fail. Plaintiffs do not contest that the Illinois State Board of Elections is an arm of the state covered by the Eleventh Amendment and do not argue that any other Eleventh Amendment exception applies. Accordingly, and apart from the issue of standing, the Eleventh Amendment independently bars Plaintiffs' suit.

### C. Plaintiffs Separately Fail to State a Claim Upon Which Relief Can Be Granted

1. Plaintiffs Do not Allege Plausible Claims Under 2 U.S.C. § 7 or 3 U.S.C. § 1.

Assuming Plaintiffs had standing to bring their 2 U.S.C. § 7 and 3 U.S.C. § 1 claims, and further assuming Defendants were not immune under the Eleventh Amendment, Plaintiffs still must state a claim upon which relief can be granted. In their motion to dismiss, Defendants argue that Plaintiffs have failed to do so. Specifically, Defendants contend that, because the Ballot Receipt Deadline Statute does not conflict with either 2 U.S.C. § 7 or 3 U.S.C. § 1, Plaintiffs have not brought a claim upon which this Court can grant relief.

States have wide discretion to establish the time, place, and manner of electing their federal representatives. *United States v. Classic*, 313 U.S. 219, 311 (1941). This broad discretion is subject only to one limitation: the state's system for electing its federal representatives cannot directly conflict with federal election laws on the subject. *Voting Integrity Project, Inc. v. Bomer*, 199 F. 3d 773, 775 (5th Cir. 2000). Under 2 U.S.C. § 7, the date for the election of federal representatives is "[t]he Tuesday next after the 1st Monday in November, in every even numbered year . . . ."

Under 3 U.S.C. § 1, the date for appointing electors is "the Tuesday next after the first Monday in November." Together, these statutes create the federal parameters for state ballot receipt deadlines in federal elections.

Plaintiffs allege that the Ballot Receipt Deadline Statute violates 2 U.S.C. § 7 and 3 U.S.C. § 1 by allowing the state to count votes that are received after Election Day, even if they are postmarked on or before the date of the election or certified before Election Day. (Dkt. 1 at 10.) But the Statute does not contradict 2 U.S.C. § 7 and 3 U.S.C. § 1. As the statute says, all mail-in ballots must be "postmarked no later than election day." 10 Ill. Comp. Stat. Ann. § 5/19-8(c). If a ballot is not postmarked, it must be certified on or before Election Day to be counted. *Id.* Nowhere in the text does the Statute allow ballots postmarked or certified after Election Day to be counted. The question, then, is whether ballots that are postmarked or certified on or before Election Day, but are not received by Election Day, should be disregarded as untimely under federal law.

There is a notable lack of federal law governing the timeliness of mail-in ballots. *See Bognet*, 980 F.3d at 353. In general, the Elections Clause delegates the authority to prescribe procedural rules for federal elections to the states. *See U.S. Terms Limits, Inc. v. Thorton*, 514 U.S. 779, 832–35 (1995). If the states' regulations operate harmoniously with federal statutes, Congress typically does not exercise its power to alter state election regulations. *Bognet*, 980 F. 3d at 353.

In this Court's view, and with due respect to Plaintiffs' contrary view, the Ballot Receipt Deadline Statute operates harmoniously with the federal statutes that

24

**A35**

set the timing for federal elections. Many states have post-Election Day absentee ballot receipt deadlines, and at least two states other than Illinois allow mail-in ballots postmarked on or before Election Day to be counted if they are received within two weeks of Election Day. *See* West's RCWA 29A.40.091 (Washington–no receipt deadline for ballots postmarked on or before Election Day); *see also* Utah Code Ann. § 20A-3a-204 (seven to 14 days after the election if postmarked the day before the election). Other states will accept mail-in ballots received seven to 10 days after Election Day. *See* AS § 15.20.081(e) & (h) (Alaska–10 days after Election Day if postmarked on or before Election Day); DC ST § 1-1001.05(a)(10A) (District of Columbia–seven days after the election if postmarked on or before Election Day); NV Rev Stat § 293.317 (Nevada–by 5:00 P.M. on the seventh day after Election Day if postmarked by Election Day); R.C. § 3509.05 (Ohio–10 days after the election if postmarked by the day before Election Day). Despite these ballot receipt deadline statutes being in place for many years in many states, Congress has never stepped in and altered the rules. *Arizona v. Inter Tribal Council of Arizona, Inc.*, 570 U.S. 1, 14 (2013) ("There is good reason for treating Elections Clause legislation differently: The assumption that Congress is reluctant to pre-empt does not hold when Congress acts under that constitutional provision, which empowers Congress to 'make or alter' state election regulations.").

Moreover, the Ballot Receipt Deadline Statute is facially compatible with the relevant federal statutes. By counting only these ballots that are postmarked no later than Election Day, the Statute complies with federal law that set the date for Election

Day. As the United States notes in its statement of interest in this case (Dkt. 47), even federal laws governing elections allow ballots received after Election Day to be counted. (Dkt. 47 at 1.) For example, the Uniformed and Overseas Citizens Absentee Voting Act of 1986 ("UOCAVA"), 52 U.S.C. §§ 20301–20311, sets out various requirements for states to ensure that military voters overseas can cast ballots in federal elections. And the United States Attorney General often seeks court-ordered extensions of ballot receipt deadlines to ensure that military voters are not disenfranchised. (*Id.* at 12.) These longstanding efforts by Congress and the executive branch to ensure that ballots cast by Americans living overseas are counted, so long as they are cast by Election Day, strongly suggest that statutes like the one at issue here are compatible with the Elections Clause. (*Id.* at 10.) Because the Statute does not facially conflict with the federal election law, Plaintiffs have failed to state a viable facial challenge to the Statute based on federal law.

　　　　2.　　Plaintiffs Do Not Allege a Plausible Violation of Their First or Fourteenth Amendment Rights

　　　Plaintiffs also allege that their First Amendment right to vote and right to stand for office is violated by the Ballot Receipt Deadline Statute. (Dkt. 1 at 8–9.) Even accepting all of Plaintiffs' allegations as true, which the Court must do, Plaintiffs fail to allege a plausible claim that the Statute affects their rights to vote and stand for office.[3]

---

[3] Both parties dedicate significant argument to discussing whether the *Anderson-Burdick* standard should apply to this case, and if so, what the outcome should be under that test. *Anderson-Burdick* applies when a facially valid law placing restrictions on voting impermissibly burdens the right to vote. *Serv. Emps. Int'l Union, Loc. 1 v. Husted*, 906 F. Supp. 2d 745, 750 (S.D. Ohio 2012) ("[W]hen the state places a 'substantial' burden on the

A37

        a.     *Plaintiffs fail to state a vote dilution claim upon which relief can be granted.*

As explained above, Plaintiffs' vote dilution claim rests on a theory that, if mail-in ballots received after Election Day are counted, then Plaintiffs' votes, presumably cast on or before Election Day, are diluted by the late and invalid votes. (Dkt. 43 at 20.) Counting the votes of others, however, does not infringe on Plaintiffs' right to vote.

Under the Equal Protection Clause of the Constitution, the right to vote is protected in two ways. First, a state violates the Equal Protection Clause when it, having "once granted the right to vote on equal terms," through "later arbitrary and disparate treatment, value[s] one person's vote over that of another." *Bush v. Gore*, 531 U.S. 98, 104–05 (2000). Second, the Equal Protection Clause requires states to ensure that no class of voters receives preferential treatment. *Gray v. Sanders*, 372 U.S. 368, 379–80 (1963). To prove a violation of the Equal Protection Clause under the second theory, a plaintiff must show that there is "arbitrary and disparate treatment." *Bush*, 531 U.S. at 105.

Plaintiffs do not plausibly allege an Equal Protection Clause violation under either theory. If ballots cast by mail and postmarked by Election Day are counted, no single voter "is specifically disadvantaged," even if the votes counted in compliance with the Ballot Receipt Deadline Statute have a "mathematical impact on the final

---

right to vote—one that is greater than a 'reasonable, nondiscriminatory restriction' but less than a 'severe burden'—courts apply the Anderson/Burdick test."). Because the Ballot Receipt Deadline Statute does not restrict the right to vote, the *Anderson-Burdick* test does not apply here.

**A38**

tally and thus on the proportional effect of every vote." *Wood v. Raffensperger*, 981 F.3d 1307, 1314 (11th Cir. 2020). Plaintiffs' votes are no more diluted than they would be if "get-out-the-vote" efforts were particularly successful and more people than anticipated voted in person at the polls. Another voter exercising his or her constitutional right to vote does not affect the value of a different voter's ballot. A voter is not guaranteed to have their vote be decisive or to have their vote be for the ultimate winner of an election. On the contrary, a voter has a right to cast a lawful ballot and have that lawfully cast ballot counted. Nothing in the Statute infringes on that right, and Plaintiffs do not allege any facts that suggest their ability to cast a lawful ballot is negatively affected by the Statute. Unlike the facts in other vote dilution cases in which plaintiffs were harmed because the voting process was marred by overt fraudulent practices like ballot stuffing, Plaintiffs' votes here are not diluted by other valid, lawfully cast votes. *See, e.g., United States v. Saylor*, 322 U.S. 385, 386 (1944).

Plaintiffs also do not allege the presence of arbitrary and disparate treatment. Plaintiffs bring only a facial challenge to the Ballot Receipt Deadline Statute. Put differently, for Plaintiffs' as-pleaded theory to be plausible, it would have to be possible for the statute, as it is written, to allow Illinois election officials to count mail-in ballots that are cast after Election Day. But the text of the Statute does not permit that result. All ballots cast by Election Day are treated the same under the Statute's plain text. Untimely ballots, *i.e.*, those not cast on or by Election Day, are not counted.

More broadly, Plaintiffs consistently—and wrongly—conflate "voting" with "counting votes." The word "voting" as used in this case is a gerund; that is, a word derived from a verb that functions as a noun. As a derivative of the verb "to vote," "voting" refers to a specific act: casting a vote. Under the Ballot Receipt Deadline Statute, the voting deadline is unambiguous: the act of voting must take place on or before Election Day. 10 ILCS § 5/19-8(c). *Counting* those votes, however, may take place up to 14 days after Election Day. *Id*. Voting (as an act) and counting votes (as a separate act) are not the same thing, and the Statute allows counting alone—not voting—to continue after Election Day.

It is, of course, possible that election officials could be improperly applying the Ballot Receipt Deadline Statute and improperly counting late votes. But Plaintiffs do not allege this in their complaint. If Plaintiffs came to believe that election officials, in applying the Statute, were illegally counting invalid votes, then Plaintiffs might have a separate claim (and one that could likely be presented to an Illinois state court). But Plaintiffs do not allege fraudulent vote counting; they allege only that the Statute facially allows "late votes" to be counted. As explained above, nothing in the text of the Statute supports that conclusion. Plaintiffs thus fail to state a vote dilution claim upon which relief can be granted.

        b.    *Plaintiffs do not plausibly allege that the Ballot Receipt Deadline Statute impinges on the right to stand for office.*

Finally, Plaintiffs allege that the Ballot Receipt Deadline Statute impinges on the right to stand for office. As the Seventh Circuit has explained, the right to stand for office "is to some extent derivative of the right of the people to express their

A40

opinions by voting." *Nader v. Keith*, 385 F.3d 729, 737 (7th Cir. 2004). But the right to stand for office is not absolute, and the Constitution gives states the "broad authority to regulate the conduct of elections." *Griffin v. Roupas*, 385 F.3d 1128, 1130 (7th Cir. 1997). If a state is regulating the "Times, Places, and Manner of holding Elections for Senators and Representatives" under Article I, Section 4, clause 1 of the Constitution, that regulation cannot be said to infringe on the right to stand for office. *See generally Tripp v. Scholz*, 872 F.3d 857, 862–863 (7th Cir. 2017).

Plaintiffs allege that the Ballot Receipt Deadline Statute forces Congressman Bost and other candidates "to spend money, devote time, and otherwise injuriously rely on unlawful provisions of state law in organizing, funding, and running their campaigns." (Dkt. 1 ¶ 46.) Plaintiffs do not, in connection with their right to stand for office claim, explain why the Statute constitutes an invalid regulation of the times, places, and manner of federal elections. Instead, Plaintiffs merely set forth their reasons why the Statute could make standing for federal office in Illinois more challenging.

These allegations do not assert a plausible claim that the Ballot Receipt Deadline Statute impairs the right to stand for office. Spending time and money on campaigning is an inevitable feature of running for office, and Plaintiffs do not contend that the extra time and money they might have to spend due to the Statute prevents them from standing for office at all. For these reasons, Plaintiffs' "right to stand for office" claim is unavailing.

## IV.    CONCLUSION

Plaintiffs lack standing to sue, the Eleventh Amendment is a bar to suit, and the Complaint fails to state a claim upon which relief can be granted. Defendants' motion to dismiss is therefore granted, and the case is dismissed. Because the principal basis for dismissal is a lack of jurisdiction based on standing, this dismissal is without prejudice. *See McHugh v. Ill. Dep't of Transp.*, 55 F.4th 529, 533 (7th Cir. 2022) (dismissals based on lack of subject matter jurisdiction and Eleventh Amendment immunity must be without prejudice).

SO ORDERED in No. 22-cv-02754.

Date: July 26, 2023

_____

JOHN F. KNESS
United States District Judge

## CERTIFICATE OF RULE 30(d) COMPLIANCE

Pursuant to Circuit Rule 30(d), I, T. Russell Nobile, an attorney, certify that all materials required by Circuit Rule 30(a) and 30(b) are included in Plaintiffs-Appellants' Required Short Appendix.


October 2, 2023                                                 *s/ Russ Nobile*


**A43**