No. 23-2644

IN THE
UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

| | | |
|---|---|---|
| MICHAEL J. BOST, LAURA POLLASTRINI, and SUSAN SWEENEY, | ) ) ) | Appeal from the United States District Court for the Northern District of Illinois, Eastern Division |
| | ) | |
| Plaintiffs-Appellants, | ) | |
| | ) | |
| v. | ) | |
| | ) | No. 1:22-cv-02754 |
| ILLINOIS STATE BOARD OF ELECTIONS and BERNADETTE MATTHEWS, in her official capacity as Executive Director, Illinois State Board of Elections, | ) ) ) ) ) | |
| | ) | The Honorable |
| | ) | JOHN F. KNESS, |
| Defendants-Appellees. | ) | Judge Presiding. |

**BRIEF OF DEFENDANTS-APPELLEES**

**KWAME RAOUL**
Attorney General
State of Illinois

**JANE ELINOR NOTZ**
Solicitor General

**ALEX HEMMER**
Deputy Solicitor General
100 West Randolph Street
12th Floor
Chicago, Illinois 60601
(312) 814-5526
Alex.Hemmer@ilag.gov

100 West Randolph Street
12th Floor
Chicago, Illinois 60601
(312) 814-3312

Attorneys for Defendants-Appellees

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES................................................................iii

JURISDICTIONAL STATEMENT.....................................................1

ISSUES PRESENTED.........................................................................3

STATEMENT OF THE CASE .............................................................4

    Legal background .........................................................................4

    Procedural history.........................................................................5

SUMMARY OF ARGUMENT .............................................................8

ARGUMENT .......................................................................................10

I.     This court reviews the district court's dismissal of the complaint *de novo*......10

II.    The district court correctly held that plaintiffs lack standing as voters and political candidates...............................................11

    A.    Plaintiffs lack standing as voters............................................12

    B.    Plaintiffs lack standing as political candidates.......................18

        1.    Use of campaign resources ............................................19

        2.    Compliance with the law ...............................................22

III.   The district court correctly held that plaintiffs' claims fail on the merits. ......24

    A.    The deadline statute is not preempted by federal law. ...........25

        1.    The federal Election Day statutes do not prohibit States from counting ballots that arrive after Election Day...........................25

        2.    Plaintiffs' counterarguments lack merit.......................30

    B.    The deadline statute does not violate plaintiffs' constitutional rights. . 38

IV.   The district court correctly held that plaintiffs' claims against the Board of Elections are barred by sovereign immunity. ......................................40

CONCLUSION ................................................................................................... 46

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF FILING AND SERVICE

# TABLE OF AUTHORITIES

Page(s)

## Cases

*Ass'n of Community Organizations for Reform Now (ACORN) v. Edgar*,
 56 F.3d 791 (7th Cir. 1995) ..................................................................... 44

*Alden v. Maine*,
 527 U.S. 706 (1999) .............................................................................. 41

*Allen v. Cooper*,
 140 S. Ct. 994 (2020) ............................................................................ 41

*Anderson v. Celebrezze*,
 460 U.S. 780 (1983) .............................................................................. 40

*Arizona v. Inter Tribal Council of Arizona, Inc.*,
 570 U.S. 1 (2013) ..............................................................4, 26, 27, 30, 42, 44

*Armstrong v. Exceptional Child Center, Inc.*,
 575 U.S. 320 (2015) .............................................................................. 43

*Ashcroft v. Iqbal*,
 556 U.S. 662 (2009) .......................................................................... 39, 40

*Baker v. Carr*,
 369 U.S. 186 (1962) .......................................................................... 15, 16

*Blatchford v. Native Village of Noatak*,
 501 U.S. 775 (1991) .............................................................................. 45

*Bognet v. Secretary of the Commonwealth of Pennsylvania*,
 980 F.3d 336 (3d Cir. 2020) ...........................................................*passim*

*Bost v. Ill. State Bd. of Elections*,
 75 F.4th 682 (7th Cir. 2023) ................................................................... 6

*Bostock v. Clayton County*,
 140 S. Ct. 1731, 1738 (2020) ................................................................. 35

*Brown v. Davenport*,
 596 U.S. 118 (2022) .............................................................................. 32

*Burdick v. Takushi*,
    504 U.S. 428 (1992) ........................................................................... 40

*California Democratic Party v. Jones*,
    530 U.S. 567 (2000) ........................................................................... 34

*Carmody v. Board of Trustees of the University of Illinois*,
    893 F.3d 397 (7th Cir. 2018) .............................................................. 40

*Carson v. Simon*,
    978 F.3d 1051 (8th Cir. 2020) (*per curiam*) .................................. 19, 23

*Central Virginia Community College v. Katz*,
    546 U.S. 356 (2006) ............................................................... 41, 42, 43

*Chiafalo v. Washington*,
    140 S. Ct. 2316 (2020) ....................................................................... 26

*Clapper v. Amnesty Int'l USA*,
    568 U.S. 398 (2013) ..................................................................... 21, 22

*Clark Equipment Co. v. Lift Parts Manufacturing Co.*,
    972 F.2d 817 (7th Cir. 1992) .............................................................. 12

*Culp v. Raoul*,
    921 F.3d 646 (7th Cir. 2019) .............................................................. 39

*Donald J. Trump for President, Inc. v. Way*,
    492 F. Supp. 3d 354 (D.N.J. 2020) .................................................... 27

*Ex parte Siebold*,
    100 U.S. 371 (1879) ..................................................................... 42, 44

*Ex parte Yarbrough*,
    110 U.S. 651 (1884) ........................................................................... 29

*Ex parte Young*,
    209 U.S. 123 (1908) ..................................................................... 40, 43

*Feehan v. Wisconsin Elections Commission*,
    506 F. Supp. 3d 596 (E.D. Wis. 2020) .................................... 13, 14, 17

*Foster v. Love*,
    522 U.S. 67 (1997) .................................................27, 28, 29, 30, 31, 32, 33

*FW/PBS, Inc. v. City of Dallas*,
    493 U.S. 215 (1990) ........................................................................ 19

*Gill v. Whitford*,
    138 S. Ct. 1916 (2018) ............................................................. 16, 17

*Harkless v. Brunner*,
    545 F.3d 445 (6th Cir. 2008) ......................................................... 44

*Harrisburg-Raleigh Airport Authority v. Department of Revenue*,
    126 Ill. 2d 326 (1989) ..................................................................... 32

*Illinois State Board of Elections v. Socialist Workers Party*,
    440 U.S. 173 (1979) ........................................................................ 18

*Judge v. Quinn*,
    612 F.3d 537 (7th Cir. 2010) ......................................................... 18

*Krislov v. Rednour*,
    226 F.3d 851 (7th Cir. 2000) ......................................................... 21

*Kroll v. Board of Trustees of the University of Illinois*,
    934 F.2d 904 (7th Cir. 1991) ......................................................... 40

*Kubiak v. City of Chicago*,
    810 F.3d 476 (7th Cir. 2016) ......................................................... 10

*Lance v. Coffman*,
    549 U.S. 437 (2007) (*per curiam*) ....................................... 12, 14, 22

*Libertarian Party of Illinois v. Scholz*,
    872 F.3d 518 (7th Cir. 2017) ......................................................... 21

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992) ........................................................... 11, 13, 23

*McHugh v. Ill. Dep't of Transportation*,
    55 F.4th 529 (7th Cir. 2022) ....................................................... 1, 25

*Miller v. Herman*,
    600 F.3d 726 (7th Cir. 2010) ......................................................... 20

*Millsaps v. Thompson*,
    259 F.3d 535 (6th Cir. 2001)................................................................. 33

*Moore v. Circosta*,
    494 F. Supp. 3d 289 (M.D.N.C. 2020) ..................................... 13, 14, 17

*Moore v. Harper*,
    143 S. Ct. 2065 (2023) ............................................................................. 4

*Nelson v. Warner*,
    472 F. Supp. 3d 297 (S.D. W. Va. 2020) .............................................. 24

*Omosegbon v. Wells*,
    335 F.3d 668 (7th Cir. 2003)................................................................. 25

*Parke v. Raley*,
    506 U.S. 20 (1992) ................................................................................. 17

*PennEast Pipeline Co. v. New Jersey*,
    141 S. Ct. 2244 (2021) ....................................................... 41, 42, 43, 44

*Pension Benefit Guaranty Corp. v. LTV Corp.*,
    496 U.S. 633 (1990) ............................................................................... 37

*Reynolds v. Sims*,
    377 U.S. 533 (1964) ......................................................................... 15, 16

*Rocha v. Rudd*,
    826 F.3d 905 (7th Cir. 2016)................................................................. 11

*Santiago v. Walls*,
    599 F.3d 749 (7th Cir. 2010)................................................................. 10

*Spokeo, Inc. v. Robins*,
    578 U.S. 330 (2016)............................................... 11, 13, 19, 20, 23

*Students for Fair Admissions, Inc. v. President & Fellows of Harvard College*,
    600 U.S. 181 (2023)............................................................................... 24

*Sweeney v. Raoul*,
    990 F.3d 555 (7th Cir. 2021)................................................................. 11

*Toeller v. Wisconsin Department of Corrections*,
    461 F.3d 871 (7th Cir. 2006)................................................................. 41

*Torres v. Texas Department of Public Safety*,
 142 S. Ct. 2455 (2022) ........................................................ 41, 42, 43, 44

*Trump v. Wisconsin Elections Commission*,
 983 F.3d 919 (7th Cir. 2020) ............................................................ 22, 24

*United States v. Dunkel*,
 927 F.2d 955 (7th Cir. 1991) (*per curiam*) ........................................... 35

*U.S. Term Limits v. Thornton*,
 514 U.S. 779 (1995) ................................................................................ 44

*Virginia Uranium, Inc. v. Warren*,
 139 S. Ct. 1894 (2019) ........................................................................... 26

*Voting Integrity Project v. Bomer*,
 199 F.3d 773 (5th Cir. 2000) ................................................................. 26

*Warth v. Seldin*,
 422 U.S. 490 (1975) ................................................................................ 19

*Webster v. Fall*,
 266 U.S. 507 (1925) ................................................................................ 18

*Wisconsin Department of Corrections v. Schacht*,
 524 U.S. 381 (1998) .................................................................................. 1

*Wood v. Raffensperger*,
 981 F.3d 1307 (11th Cir. 2020)............................... 12, 13, 14, 15, 17, 22

## Constitutional Provisions, Statutes, and Rules

U.S. Const.
 art. I, § 4 ........................................................................................... 4, 25
 art. II, § 1 ..................................................................................... 4, 26, 43

2 U.S.C. § 7 ............................................................................ 6, 25, 27, 28, 38

3 U.S.C.
 § 1 ........................................................................... 6, 25, 26, 27, 28, 38
 § 21 .............................................................................................. 27, 38

28 U.S.C.
    § 1291 ............................................................................................ 2
    § 1331 ............................................................................................ 2
    § 2107 ............................................................................................ 2

42 U.S.C. § 1983 ...................................................................................... 1

52 U.S.C.
    § 20301 ................................................................................ 30, 33
    § 20302 ...................................................................................... 30

5 Stat. 721 (1845) ................................................................................. 28

17 Stat. 28 (1872) ................................................................................. 28

Electoral Count Reform and Presidential Transition Improvement Act of 2022,
    Pub. L. No. 117-328, div. P, tit. I, 136 Stat. 4459 (2022) ................... 29

Ala. Code § 17-11-18 .............................................................................. 5

Alaska Stat. § 15.20.081 ......................................................................... 5

Ark. Code. Ann. § 7-5-411 ...................................................................... 5

Cal. Elec. Code. § 3020 ........................................................................... 5

D.C. Code § 1-10001.05 .......................................................................... 5

Fla. Stat. § 101.6952 ............................................................................... 5

Ga. Code Ann. § 21-2-386 ....................................................................... 5

10 ILCS
    5/1-1 ............................................................................................. 4
    5/18A-15 ................................................................................. 5, 32
    5/19-2 ........................................................................................... 4
    5/19-5 ..................................................................................... 4, 32
    5/19-6 ..................................................................................... 4, 32
    5/19-8 ................................................................................. 4, 5, 32
    5/21-1 ......................................................................................... 19

Ind. Code § 3-12-1-17 ............................................................................. 5

Kan. Stat. Ann. § 25-1132 ....................................................................... 5

Mass. Gen. Laws ch. 54, § 93 .................................................................. 5

Mich. Comp. Laws § 168.759a .................................................................. 5

Miss. Code. Ann. § 23-15-637 .................................................................. 5

Mo. Rev. Stat. § 115.920 .......................................................................... 5

N.D. Cent. Code § 16.1-07-09 .................................................................. 5

Nev. Rev. Stat. § 293.269921 .................................................................... 5

N.J. Stat. Ann. § 19:63-22 ........................................................................ 5

N.Y. Elec. Law § 8-412 ............................................................................ 5

Ohio Rev. Code Ann. § 3509.05 ............................................................... 5

Or. Rev. Stat. § 253.070 ........................................................................... 5

25 Pa. Cons. Stat. § 3511 .......................................................................... 5

R.I. Gen. Laws § 17-20-16 ........................................................................ 5

S.C. Code Ann.
    § 7-15-700 ........................................................................................... 5
    § 7-17-10 ............................................................................................. 5

Tex. Elec. Code Ann. § 86.007 ................................................................. 5

Utah Code Ann. § 20A-3a-204 ................................................................. 5

Va. Code Ann. § 24.2-709 ........................................................................ 5

Wash. Rev. Code § 29A.40.091 ................................................................ 5

W. Va. Code
    § 3-3-5 ................................................................................................. 5
    § 3-3-17 ............................................................................................... 5

Md. Code Regs. 33.11.03.08 ..................................................................... 5

Federal Rule of Appellate Procedure 4 ..................................................... 2

Federal Rule of Civil Procedure 58 .................................................................. 2

Seventh Circuit Rule 28 .................................................................................... 1

**Other Authorities**

Benton, Josiah Henry, *Voting in the Field* (1915),
    https://bit.ly/40Aku6p ....................................................................... 36, 37

Cong. Globe
    28th Cong., 1st Sess. (1844) .................................................................. 29
    42d Cong., 2d Sess. (1871) .................................................................... 29

Martin, John J., *Mail-In Ballots and Constraints on Federal Power Under the
    Electors Clause*, 107 Va. L. Rev. Online 84 (2021), https://bit.ly/3QNI8cu ....... 26

Stephanopoulos, Nicholas O., *The New Vote Dilution*,
    96 N.Y.U. L. Rev. 1179 (2021) ............................................................. 15

Stonecash, Jeffrey M., *et al.*, *Congressional Intrusion to Specify State Voting Dates for
    National Offices*, 38 Publius 137 (2008) ............................................... 28

## JURISDICTIONAL STATEMENT

Plaintiffs-Appellants' jurisdictional statement is not complete and correct. Defendants-Appellees the Illinois State Board of Elections ("Board") and Bernadette Matthews, in her official capacity as the executive director of the Board, provide this statement under Seventh Circuit Rule 28(b).

Plaintiffs, two Illinois voters and a sitting member of Congress, brought this action in the district court under 42 U.S.C. § 1983, alleging that the operation of a state statute permitting local election authorities to count ballots cast by Election Day but received up to 14 days after Election Day violated the Supremacy Clause, as well as the First and Fourteenth Amendments to the United States Constitution. *See* SA7-10.[1]  As discussed below, *infra* pp. 11-24, the district court lacked subject-matter jurisdiction over the action because plaintiffs failed to allege Article III standing.  To the extent that the Eleventh Amendment to the United States Constitution affects subject-matter jurisdiction, the district court also lacked jurisdiction over plaintiffs' claims against the Board because those claims are barred by sovereign immunity. *Infra* pp. 40-45; *McHugh v. Ill. Dep't of Transp.*, 55 F.4th 529, 532-34 (7th Cir. 2022) (Eleventh Amendment immunity is jurisdictional but can be waived); *see also Wis. Dep't of Corrs. v. Schacht*, 524 U.S. 381, 391 (1998) (Supreme Court has "not decided" whether Eleventh Amendment immunity "is a matter of subject-matter

---

[1]  Entries on the district court's docket are cited "Doc.," plaintiffs' opening brief is cited "AT Br.," and the short appendix is cited "SA."

jurisdiction").  Otherwise, the district court had subject-matter jurisdiction over plaintiffs' action pursuant to 28 U.S.C. § 1331.

On July 26, 2023, the district court granted defendants' motion to dismiss the action, SA12, disposing of all claims against all parties, and on the same day entered a separate judgment on the docket pursuant to Federal Rule of Civil Procedure 58, *see* Doc. 82.  No motion to alter or amend the judgment was filed.  Plaintiffs filed a notice of appeal on August 18, 2023, Doc. 83, which was within 30 days of the Rule 58 judgment and thus timely.  *See* 28 U.S.C. § 2107(a); Fed. R. App. P. 4(a)(1)(A).  This court has jurisdiction over this appeal from a final judgment pursuant to 28 U.S.C. § 1291.

**ISSUES PRESENTED**

1.     Whether the district court correctly held that plaintiffs lack standing as voters and political candidates to challenge a state law directing local election boards to count mail-in ballots cast by Election Day but received up to 14 days after Election Day (the "ballot receipt deadline statute" or the "deadline statute").

2.     Whether the district court correctly held that plaintiffs' challenges to the ballot receipt deadline statute failed on the merits, in that the statute (a) does not conflict with federal law setting "Election Day" as the Tuesday after the first Monday in November and (b) does not violate plaintiffs' First or Fourteenth Amendment rights as voters and candidates.

3.     Whether the district court correctly held that plaintiffs' claims against the Board are barred by sovereign immunity.

## STATEMENT OF THE CASE

**Legal background**

The United States Constitution "'imposes' on state legislatures the 'duty' to prescribe rules governing federal elections," while simultaneously permitting Congress to alter the rules that States enact. *Moore v. Harper*, 143 S. Ct. 2065, 2074 (2023) (quoting *Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 8 (2013)); *see* U.S. Const. art. I, § 4, cl. 1; *id.* art. II, § 1, cl. 2. Pursuant to the authority granted them by the Constitution's Elections and Electors Clauses, the States have exercised sweeping "responsibility for the mechanics" of federal elections, *Arizona*, 570 U.S. at 9, in areas ranging from voter registration to ballot access to mail-in voting.

Illinois has enacted a comprehensive statutory scheme governing federal and state elections. *See* 10 ILCS 5/1-1 *et seq.* Among other things, Illinois, like many States, has chosen to permit any voter to cast a ballot by mail in any election held in the State. *See id.* § 5/19-2. An Illinois voter who chooses to vote by mail must sign and date a certification on the ballot itself attesting under penalty of perjury that he or she is eligible to vote in the election. *Id.* §§ 5/19-5, 5/19-6. A vote-by-mail ballot will be counted only if it is postmarked on or before Election Day, or, where there is no postmark, if the voter's ballot certification is dated on or before Election Day. *Id.* § 5/19-8(c). Because a ballot that is cast by mail on or just before Election Day may not arrive at the local election authority until after Election Day, Illinois law provides that such ballots must be counted by the election authorities as long as they arrive "before the close of the period for counting provisional ballots" — *i.e.*, within 14

calendar days of Election Day. *Id.* § 5/19-8(c); *see id.* § 5/18A-15(a) (local election authorities must count provisional ballots within 14 days after Election Day). Over half of the States have made a similar decision, counting at least some ballots that arrive after Election Day.[2] Plaintiffs allege that, in 2020, as many as 266,417 Illinois voters cast vote-by-mail ballots that were sent on or before Election Day but were received by local election authorities after Election Day. SA5-6 (¶¶ 19-22).

**Procedural history**

Plaintiffs are Michael Bost, who has served since 2015 in the United States House of Representatives, and Laura Pollastrini and Susan Sweeney, who are Illinois voters and Republican political activists. SA3-4 (¶¶ 9-11). They disagree with the choice Illinois has made to count mail-in ballots that are cast by Election Day but are received by local election authorities up to two weeks after Election Day. SA6-7.

Plaintiffs filed this suit in May 2022 against the Board and Matthews (who are the sole defendants in this action) to challenge the ballot receipt deadline statute.

---

[2] Nineteen States and the District of Columbia generally count mail-in ballots received after Election Day if those ballots were postmarked or certified on or before Election Day, although the receipt deadlines established by these statutes vary. *See* Alaska Stat. § 15.20.081(e), (h); Cal. Elec. Code. § 3020; D.C. Code § 1-10001.05(a)(10A); 10 ILCS 5/18A-15, 5/19-8; Kan. Stat. Ann. § 25-1132; Md. Code Regs. 33.11.03.08; Mass. Gen. Laws ch. 54, § 93; Miss. Code. Ann. § 23-15-637; Nev. Rev. Stat. § 293.269921; N.J. Stat. Ann. § 19:63-22; N.Y. Elec. Law § 8-412; N.D. Cent. Code § 16.1-07-09; Ohio Rev. Code Ann. § 3509.05(D)(2)(a); Or. Rev. Stat. § 253.070(3); Tex. Elec. Code Ann. § 86.007; Utah Code Ann. § 20A-3a-204; Va. Code Ann. § 24.2-709(B); Wash. Rev. Code § 29A.40.091; W. Va. Code §§ 3-3-5(g)(2), 3-5-17. Ten other States count such ballots if cast by some or all individuals residing outside of the United States. *See* Ala. Code § 17-11-18(b); Ark. Code. Ann. § 7-5-411(a)(1)(A); Ind. Code § 3-12-1-17(b); Fla. Stat. § 101.6952(5); Ga. Code Ann. § 21-2-386(a)(1)(G); Mich. Comp. Laws § 168.759a; Mo. Rev. Stat. § 115.920(1); 25 Pa. Cons. Stat. § 3511(a); R.I. Gen Laws § 17-20-16; S.C. Code Ann. §§ 7-15-700(a), 7-17-10.

SA11.  They argue principally that the statute is preempted by two federal statutes setting the Tuesday after the first Monday in November of even-numbered years as Election Day.  *See* SA9-10; 2 U.S.C. § 7; 3 U.S.C. § 1.  Plaintiffs say that Illinois has "expanded Election Day" by directing election authorities to count mail-in ballots that are cast on or before Election Day but are received after Election Day.  SA2 (¶ 4).  Plaintiffs also contend that, by directing election authorities to count such ballots, Illinois has violated their First and Fourteenth Amendment rights to vote and to stand for office.  SA7-9 (¶¶ 38-48).

Defendants moved to dismiss the complaint, explaining that (1) plaintiffs lacked standing as voters and political candidates, (2) plaintiffs' claims against the Board were barred by sovereign immunity, and (3) plaintiffs' claims failed on the merits, in that the state statute neither is preempted by federal law nor violates plaintiffs' constitutional rights.  Doc. 25.  Plaintiffs cross-moved for partial summary judgment, arguing that they were entitled to judgment as a matter of law on their constitutional claims.  Doc. 32.[3]

The district court granted defendants' motion to dismiss.  SA12.  It reasoned that plaintiffs lacked standing as voters and as political candidates, in that their allegations that (a) their votes had been "diluted" by the ballots received after Election Day and (b) the deadline statute would impact their campaigns for public

---

[3]  While the parties were litigating plaintiffs' claims on the merits, the Democratic Party of Illinois filed a motion to intervene in defense of the law.  *See* Doc. 13.  The district court denied the motion, and this court affirmed that decision.  *See Bost v. Ill. State Bd. of Elections*, 75 F.4th 682, 685 (7th Cir. 2023).  That dispute has no bearing on the merits of the case.

office were "too speculative and generalized" to give rise to Article III standing. SA25-31.  The district court held that, in any event, plaintiffs' claims failed on the merits, in that the deadline statute was "facially compatible with the relevant federal statutes," in that it empowered local election officials to count "only th[o]se ballots that are postmarked no later than Election Day," SA36, and that, as a result, plaintiffs' constitutional claims, which were premised on their statutory claim, also failed, SA37-41.  Finally, the district court held, the Board was immune from suit under the Eleventh Amendment, rejecting plaintiffs' argument that the federal Constitution implicitly authorized suits against state election authorities for violations of federal law.  SA31-34.

## SUMMARY OF ARGUMENT

The district court correctly held that plaintiffs' complaint fails on multiple independent grounds, and its decision should be affirmed.

First, plaintiffs lack standing as voters and candidates for public office. An individual cannot challenge a governmental policy that does not personally affect her, seeking only to vindicate a general interest in having the government comply with the law, but that is exactly what plaintiffs attempt to do here. Plaintiffs are not injured as voters because the deadline statute does not impair their ability to cast ballots, nor does it dilute the weight of their votes in a manner cognizable under Article III. No court has recognized a vote-dilution theory of standing in a case like this, and this court should not be the first to do so. The deadline statute likewise does not harm plaintiffs as candidates for public office. Plaintiffs do not contend that the deadline statute will somehow affect their electoral prospects; rather, they argue mainly that they are entitled to have their elections certified "in compliance with the law." But that is just another effort to press a generalized grievance not cognizable under Article III. And plaintiffs' attempt to argue on appeal that they have standing because the statute forces them to expend campaign resources monitoring the State's canvassing of late-arriving ballots likewise fails, including because plaintiffs did not clearly plead it in the complaint.

Second, plaintiffs' claims fail on the merits. Plaintiffs' principal claim is that the deadline statute is preempted by two federal statutes setting Election Day as the Tuesday after the first Monday in November. But those statutes, fairly read, do not

prohibit States from counting ballots that are mailed on or before Election Day but received after Election Day; indeed, those courts that have considered the question agree that these statutes do not address ballot timeliness at all.  Plaintiffs' contrary argument turns primarily on what they characterize as the original public meaning of the Election Day statutes.  But plaintiffs identify no historical evidence to support the claim that these statutes address the timeliness of mail-in ballots — a practice plaintiffs agree essentially did not exist at the time the statutes were enacted.  At its essence, plaintiffs' claim is that the federal Election Day statutes froze in place state law at the time of their enactment — a radical interpretation of those statutes that cannot seriously be squared with their text or Supreme Court precedent.  Plaintiffs' constitutional claims likewise fail, because — as plaintiffs concede on appeal — they rest entirely on plaintiffs' preemption claim, and so fall for the same reasons.

Finally, the Eleventh Amendment bars plaintiffs' claims against the Board of Elections.  Plaintiffs agree that the Board is an arm of the State and that Congress has not abrogated its immunity; they argue only that the States waived sovereign immunity in this context by ratifying the United States Constitution.  But the so-called "plan-of-the-Convention doctrine" applies only in rare circumstances, and this case is a poor fit:  The Electors and Elections Clauses, on which plaintiffs rely, create state power rather than limit it, and it would not thwart or impede federal policy to permit a State to invoke sovereign immunity, given that plaintiffs can — and, here, did — always seek injunctive relief against an appropriate state officer if they believe that a state law is preempted by a federal statute regulating elections.

## ARGUMENT

Plaintiffs — two Illinois voters and a sitting member of Congress — ask this court to hold unlawful a state law on which hundreds of thousands of Illinois voters relied to cast ballots in the 2020 election and that is consistent with the way that over half of the States regulate elections. Plaintiffs seek that extraordinary result on the thinnest of reeds: that the state law directing local election officials to count mail-in ballots that were cast *by* Election Day but received *after* Election Day is preempted by federal statutes setting Election Day as the first Tuesday in November.

The district court correctly turned back plaintiffs' novel and far-reaching challenge, holding that it fails on multiple levels. Plaintiffs' complaint does not plausibly allege that the state laws they oppose injure them as voters or as candidates for public office; instead, it alleges only the paradigmatic sort of "generalized grievance" that the federal courts properly decline to resolve. And even if plaintiffs had standing, their claims fail on the merits, because the statutes they challenge are consistent with both federal statutes and the federal Constitution. The district court correctly dismissed their complaint, and this court should affirm that decision.

## I.   This court reviews the district court's dismissal of the complaint *de novo*.

This court reviews *de novo* a district court's order granting a motion to dismiss under Rule 12(b) for failure to state a claim. *Kubiak v. City of Chicago*, 810 F.3d 476, 480 (7th Cir. 2016). On *de novo* review, this court applies the same legal and procedural standards that the district court would, *Santiago v. Walls*, 599 F.3d 749,

756 (7th Cir. 2010), and may affirm the judgment on any ground supported by the record and the law, *Rocha v. Rudd*, 826 F.3d 905, 909 (7th Cir. 2016).

## II.  The district court correctly held that plaintiffs lack standing as voters and political candidates.

To start, plaintiffs lack Article III standing to challenge the ballot receipt deadline statute in federal court, as the district court correctly held.  SA19-31.  To satisfy "the irreducible constitutional minimum of standing," a plaintiff must, at the pleading stage, allege that he or she has suffered an injury in fact that is traceable to the defendant and is capable of being redressed through a favorable judicial ruling. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992); *Sweeney v. Raoul*, 990 F.3d 555, 559 (7th Cir. 2021).  The plaintiff's alleged injury must be "concrete and particularized" and "actual or imminent, not conjectural or hypothetical," to give rise to standing.  *Lujan*, 504 U.S. at 560 (quotation marks omitted).  A "particularized" injury is one that "affect[s] the plaintiff in a personal and individual way."  *Id.* at 560 n.1.  A concrete injury is one that is "real," not "abstract."  *Spokeo, Inc. v. Robins*, 578 U.S. 330, 340 (2016).  A "generally available grievance about government — claiming only harm to . . . every citizen's interest in proper application of the Constitution and laws" — is not an injury cognizable under Article III.  *Lujan*, 504 U.S. at 573.

Plaintiffs' standing allegations fail to meet this bar.  Plaintiffs contend that they are injured in two ways by the operation of the ballot deadline receipt statute: their votes are "diluted" when local election authorities count ballots received after Election Day in accordance with the deadline statute, and their campaigns for public

office are affected by the statute's operation. AT Br. 15-26. As the district court held, neither theory gives rise to Article III standing.

### A.     Plaintiffs lack standing as voters.

To start, plaintiffs lack Article III standing as voters. Plaintiffs say that they are injured because their votes are "diluted" by ballots counted pursuant to the ballot receipt deadline statute, which they say are invalid. SA7 (¶ 30); AT Br. 21-26. But courts have repeatedly and correctly rejected vote-dilution allegations of this sort as sufficient for Article III standing in analogous contexts, reasoning that the injuries alleged are no more than "generalized grievances" that are shared by all members of the public. *See, e.g.*, *Wood v. Raffensperger*, 981 F.3d 1307, 1313-16 (11th Cir. 2020); *Bognet v. Sec'y of the Commonwealth of Pa.*, 980 F.3d 336, 356 (3d Cir. 2020), *vacated as moot sub nom. Bognet v. Degraffenreid*, 141 S. Ct. 2508 (2021).[4] This court should follow the same path.

The Supreme Court has "consistently held that a plaintiff raising only a generally available grievance about government — claiming only harm to his and every citizen's interest in proper application of the Constitution and laws . . . — does not state an Article III case or controversy." *Lance v. Coffman*, 549 U.S. 437, 439

---

[4] Plaintiffs criticize the district court for relying on *Bognet* on the ground that it was "vacated by the U.S. Supreme Court." AT Br. 17 n.8. But *Bognet* was vacated as moot after the 2020 election; no Justice wrote to criticize its reasoning. The district court did not treat *Bognet* as binding; it merely cited its reasoning as persuasive, as it was entitled to do. *Cf. Clark Equip. Co. v. Lift Parts Mfg. Co.*, 972 F.2d 817, 820 (7th Cir. 1992) ("[W]hile not binding on anyone," a court's reasoning in a moot case "may be helpful to other courts to the extent it is persuasive."), *overruled on other grounds by Martinez v. City of Chicago*, 823 F.3d 1050 (7th Cir. 2016).

(2007) (*per curiam*).  A plaintiff must thus allege a "particularized" injury to invoke Article III jurisdiction, one that "affect[s] [him or her] in a personal and individual way." *Spokeo*, 578 U.S. at 339.  By contrast, an injury that is "undifferentiated" and "common to all members of the public," *Lujan*, 504 U.S. at 575, is no more than a generalized grievance that cannot support Article III standing.

Applying that basic principle, courts have consistently held that voters lack standing to challenge election regulations that do not directly impair their ability to vote.  *See, e.g.*, *Wood*, 981 F.3d at 1313-16; *Bognet*, 980 F.3d at 356; *Feehan v. Wis. Elections Comm'n*, 506 F. Supp. 3d 596, 608 (E.D. Wis. 2020); *Moore v. Circosta*, 494 F. Supp. 3d 289, 312 (M.D.N.C. 2020).  Of most immediate relevance here, in *Bognet*, four Pennsylvania voters challenged that State's decision to direct elections officials to count mail-in ballots cast on or before Election Day as long as they were received up to three days after Election Day.  *See* 980 F.3d at 344-46.  As here, the plaintiffs argued that the State's decision to count such ballots "diluted" the "influence of their votes," which had been cast in person on Election Day.  *Id.* at 352.  The Third Circuit rejected the plaintiffs' vote-dilution theory and held that they lacked standing.  *Id.* at 356.  Even if the State's decision was unlawful, the court reasoned, counting the ballots in question did not affect the plaintiffs themselves in any *particularized* manner; rather, it explained, doing so at most "'dilute[d]' the influence of all voters in Pennsylvania equally and in an 'undifferentiated' manner." *Id.*  "Such an alleged 'dilution,'" the court held, "is not 'particularized' for standing purposes" and so did not give rise to Article III standing.  *Id.*  The Eleventh Circuit, confronted with an

analogous assertion of voter standing in a case challenging a State's procedures for reviewing absentee ballots, rejected standing on identical grounds, explaining that "[v]ote dilution in this context is a 'paradigmatic generalized grievance that cannot support standing.'"  *Wood*, 981 F.3d at 1314-15; *accord Feehan*, 506 F. Supp. 3d at 608 (challenge to absentee ballot review procedures); *Moore*, 494 F. Supp. 3d at 312 (same).

The district court correctly concluded that the same principle requires the same result here.  *See* SA25-28.  Plaintiffs do not argue that any Illinois election law impaired their ability to cast ballots in the 2020 election or will impair their ability to cast ballots in a future election.  Rather, plaintiffs' allegation is that, by permitting *other* voters to vote by mail in the days immediately prior to Election Day, the State has "diluted" the weight of their own votes.  SA7 (¶ 30).  But the same logic would permit a challenge by any voter to virtually any election rule that makes it easier to vote.  *Cf.*, *e.g.*, *Wood*, 981 F.3d at 1314 ("Indeed, [plaintiff] admits that any Georgia voter could bring an identical suit.").  That would turn the rule against generalized grievances on its head, expanding Article III standing to all voters who objected to generally applicable time, place, and manner regulations (on the theory that such voters' votes, too, had been "diluted" by the resulting expansion of the franchise).  Plaintiffs' claim, in other words, is exactly "the kind of undifferentiated, generalized grievance about the conduct of government that [courts] have refused to countenance in the past."  *Lance*, 549 U.S. at 442; *accord Wood*, 981 F.3d at 1314-15 (vote-dilution

claims are "paradigmatic" generalized grievances).  They therefore lack standing as voters.

Plaintiffs' counterarguments, AT Br. 21-26, lack merit.  Plaintiffs contend primarily that the Supreme Court has recognized vote-dilution standing in a set of constitutional challenges to redistricting plans, and that their supposed injury is indistinguishable from the injuries accepted in those cases.  AT Br. 21-22 (citing *Reynolds v. Sims*, 377 U.S. 533 (1964); and *Baker v. Carr*, 369 U.S. 186 (1962)).  As the Third Circuit explained in *Bognet*, though, a voter in such a case is harmed in a *differentiated* manner, in that he or she is "part of a group of voters whose votes have been weighed differently compared to another group."  980 F.3d at 358; *accord Wood*, 981 F.3d at 1314 (vote-dilution injury "requires a point of comparison" to give rise to Article III standing).  Here, by contrast, there is no differentiated treatment, and so no cognizable harm; in the Third Circuit's words, "no [Illinois] voter's vote will count for less than that of any other voter as a result of the [deadline statute]."  *Bognet*, 980 F.3d at 358.  Plaintiffs attempt to shoehorn their claim into this line by casting themselves as one "group of . . . voters" (*i.e.*, voters whose ballots were received on or before Election Day) whose votes have been "diluted" by a second group (*i.e.*, voters whose ballots were received after Election Day), AT Br. 23, but that analogy fails because even on plaintiffs' own terms, their votes are not worth any less than those of other Illinois voters.  *See Bognet*, 980 F.3d at 359 (rejecting this argument because "a vote cast by a voter in the so-called 'favored' group counts not one bit more than the same vote cast by the 'disfavored' group"); *cf.* Stephanopoulos, *The New Vote*

15

*Dilution*, 96 N.Y.U. L. Rev. 1179, 1200 (2021) (vote-dilution standing is appropriate only when challenged conduct operates on candidates or groups in a "nonrandom" manner).[5]

The Supreme Court's decision in *Gill v. Whitford*, 138 S. Ct. 1916 (2018), confirms that vote-dilution standing is limited to those contexts in which a group of voters is harmed in a differentiated manner — generally, claims brought under the Equal Protection Clause and the Voting Rights Act challenging the composition of a specific legislative district. The plaintiffs in *Gill*, too, invoked *Baker* and *Reynolds* to support their allegation that their votes had been "diluted" by a statewide legislative map that was (they said) drawn to maximize partisan representation. *Id.* at 1931. But the Supreme Court held that the plaintiffs lacked standing, refusing to extend *Reynolds* and its progeny to cases involving claims of "statewide injury." *Id.* at 1930. The caselaw on which the *Gill* plaintiffs relied, the Court explained, permits only "district-by-district" challenges that rest on evidence of "particularized burden[s]" borne by those who are specifically disadvantaged by a challenged statute. *Id.* at 1930-31. Because the plaintiffs there had not alleged that the legislative map had harmed them in a differentiated manner, the Court held, they lacked the kind of injury sufficient to give rise to Article III standing. *Id.* at 1931-32. The same is true

---

[5] Plaintiffs are also wrong to insist that this case is indistinguishable from one in which a State allowed "citizens of France" to vote in federal elections, AT Br. 23: To the extent voters might have standing in *that* case to challenge such a law, it would be because such a law would not be merely a time, place, and manner regulation (like the ballot receipt deadline statute) but an expansion of the franchise itself. To reject vote-dilution standing in this case says nothing about that (fanciful) hypothetical.

here:  Plaintiffs here do not contend that the deadline statute dilutes their votes in a specific or differentiated manner; rather, they assert only a "statewide injury," *id.* at 1930, that is shared by all Illinois voters.  That does not give rise to Article III standing.

Plaintiffs also attempt to distinguish *Wood*, *Bognet*, and the other cases rejecting vote-dilution standing in this context, AT Br. 24-25, but their efforts fall short.  Plaintiffs point out that several of these cases concerned allegations of voter fraud, and so can be read to rest on those courts' skepticism of supposed "speculative, intervening, wrongful actions by third parties*." Id.* at 25 (citing *Feehan*, 506 F. Supp. 3d at 601-02; *Moore*, 494 F. Supp. 3d at 312).  But the plaintiffs in *Wood* and *Bognet* raised purely legal claims:  Plaintiffs in *Bognet* argued that state officials had violated state law in counting mail-in ballots received after Election Day, 980 F.3d at 344-46, and the plaintiff in *Wood* alleged, among other things, that state officials had violated state law in applying certain safeguards to ensure the accurate counting of absentee ballots, 981 F.3d at 1311-12.  Neither claim concerned an allegation of third-party conduct, and so these courts' standing analyses cannot be dismissed on that ground.  Perhaps for that reason, plaintiffs offer no serious discussion of *Bognet* or *Wood* at all (beyond incorrectly criticizing the district court's reliance on *Bognet*, *see supra* p. 12 n.4).  Plaintiffs also suggest that *all* of these opinions should be dismissed as arising from "the hothouse atmosphere that prevailed in the aftermath of the contention 2020 election."  AT Br. 24.  But that unusual critique ignores not only the "presumption of regularity" that attaches to judicial opinions, *Parke v. Raley*, 506

U.S. 20, 29 (1992), but the care and attention that the opinions themselves reflect, *see, e.g.*, *Bognet*, 908 F.3d at 348-63 (15-page standing analysis).

Plaintiffs' remaining arguments also lack merit. Plaintiffs seek to align this case with this court's opinion in *Judge v. Quinn*, 612 F.3d 537 (7th Cir. 2010), but *Judge* was not a vote-dilution case, as plaintiffs concede, AT Br. 25; it concerned a law that entirely "den[ied]" the plaintiffs "their right to vote" for a specific public office, 612 F.3d at 545. The court's conclusion that such an injury was sufficiently "concrete" and individualized, *id.*, thus says nothing about this case. Plaintiffs also cite four cases in which other courts "exercised jurisdiction and reached the merits" in challenges brought by voters to generally applicable state election regulations, AT Br. 26, but plaintiffs fail to mention that none of these courts discussed Article III standing at all. "Questions which 'merely lurk in the record,'" the Supreme Court has admonished, "are not resolved, and no resolution of them may be inferred." *Ill. State Bd. Of Elections v. Socialist Workers Party*, 440 U.S. 173, 183 (1979) (quoting *Webster v. Fall*, 266 U.S. 507, 511 (1925)). These opinions are thus of no use to plaintiffs here. Plaintiffs lack Article III standing as voters.

### B. Plaintiffs lack standing as political candidates.

Plaintiffs also contend that they have standing to challenge the deadline statute on the ground that it injures them as candidates for public office. AT Br. 15-21.[6] Plaintiffs assert that they are injured as candidates in two distinct ways: Their

---

[6] Bost is seeking re-election to the House of Representatives, *see* SA3 (¶ 9), and the other two plaintiffs intend to seek their parties' nomination as presidential electors,

campaigns for public office (and, in particular, their use of campaign resources) are affected by the deadline statute's operation, SA7 (¶ 33), AT Br. 16-20; and the statute interferes with their entitlement "to have their elections results certified with votes received in compliance" with the law, SA7 (¶ 32), AT Br. 20-21. Both arguments fail.

### 1. Use of campaign resources

To start, plaintiffs have not "alleged particular, concrete, tangible injuries" with respect to their use of campaign resources, as they assert. AT Br. 16. It is black-letter law that, "at the pleading stage, the plaintiff must 'clearly . . . allege facts demonstrating'" standing in the complaint. *Spokeo*, 578 U.S. at 338 (quoting *Warth v. Seldin*, 422 U.S. 490, 518 (1975)). Indeed, the Supreme Court has emphasized that "standing cannot be inferred argumentatively from averments in the pleadings, but rather must affirmatively appear in the record." *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 231 (1990) (citations and quotation marks omitted). Plaintiffs' resource-allocation standing theory is largely a creature of litigation; it is not "clearly" alleged in the complaint. *Spokeo*, 578 U.S. at 338. The complaint alleges only that plaintiffs "rely on provisions of federal and state law in conducting their campaigns including, in particular, resources allocated to the post-election certification process." SA7 (¶ 33); *see also* SA8 (¶ 46) (plaintiffs "rely on unlawful provisions of state law in

---

*see* SA3-4 (¶¶ 10-11). Although plaintiffs Pollastrini and Sweeney do not genuinely contend that they oversee campaigns for public office that could give rise to a campaign-resource theory of standing, *see infra* p. 20 n.7, defendants agree that, as a matter of Illinois law, they are candidates for public office. *See, e.g.*, 10 ILCS 5/21-1(b) (electors are "candidates"); *cf. Carson v. Simon*, 978 F.3d 1051, 1057 (8th Cir. 2020) (*per curiam*) ("Minnesota law treats prospective presidential electors as candidates").

organizing, funding, and running their campaigns"). That is not enough to allege a resource-diversion injury sufficient for Article III purposes.

On appeal, plaintiffs do not cite or acknowledge the complaint; rather, they rely primarily on a declaration submitted by Bost in support of plaintiffs' motion for partial summary judgment. *See* AT Br. 16, 18, 19, 20. But this appeal arises from the district court's resolution of defendants' motion to dismiss, not its resolution of plaintiffs' motion for partial summary judgment. Such a motion "must be decided solely on the face of the complaint," *Miller v. Herman*, 600 F.3d 726, 733 (7th Cir. 2010), which is presumably why the district court did not consider Bost's declaration in resolving it. *See* SA28 (citing only the allegations in the complaint); *see also* SA28-31 (not citing the declaration). To be sure, after defendants moved to dismiss the complaint under Rule 12(b), plaintiffs would have been entitled to amend the complaint to expressly plead a resource-allocation injury of the kind identified in Bost's declaration. But plaintiffs did not do so, and they are not entitled to amend the complaint on appeal to add the kind of "particular, concrete, tangible injuries," AT Br. 16, that they failed to plead below. Because plaintiffs failed to "clearly" allege a resource-allocation injury in their complaint, *Spokeo*, 578 U.S. at 338, they cannot rely on that injury now for standing purposes.

In any event, even if the court could consider Bost's declaration, it still would not give rise to Article III standing.[7] The thrust of Bost's declaration is that Illinois's

---

[7] At minimum, the declaration would not give rise to Article III standing — at least not on a resource-allocation theory — for Sweeney or Pollastrini, whose declarations

ballot receipt deadline statute has forced him to "organize, fundraise, and run [his] campaign for fourteen additional days in order to monitor and respond as needed to ballots received" after Election Day.  Doc. 31-4 at 3 (¶ 13).  Specifically, Bost attests that he expends resources overseeing the canvassing process during the two-week period in which election authorities continue to accept and count ballots, resources that he would not have otherwise spent.  *Id.* at 3-4 (¶¶ 17-18).  As the district court observed, though, SA30, a plaintiff "cannot manufacture standing by choosing to make expenditures based on hypothetical future harm," *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 402 (2013).  Under Bost's theory, for instance, a candidate for public office could challenge virtually any statute that has the effect of making it easier to vote, on the theory that such statutes increase the cost of overseeing the ballot-counting process.  That cannot be right.

Plaintiffs also cite a handful of cases for the proposition that this court has recognized resource-diversion standing in the past, AT Br. 16-17, but those cases are readily distinguishable:  Each involved a statute that directly imposed "burdensome condition[s]" on one's ability to stand for office, and thus itself directly "raise[d] the cost" of doing so.  *See Libertarian Party of Illinois v. Scholz*, 872 F.3d 518, 522 (7th Cir. 2017) (rule requiring a political party to nominate a "full slate" of candidates); *Krislov v. Rednour*, 226 F.3d 851, 857 (7th Cir. 2000) (rule requiring candidates to use registered, resident voters to solicit ballot signatures).  Here, by contrast, the

---

did not "describe[] in detail the additional expenditures" their campaigns "must incur," AT Br. 16, and on which plaintiffs' opening brief does not otherwise rely.

ballot receipt deadline statute *itself* imposes no requirements on plaintiffs at all; they are "choosing to make expenditures" on monitoring ballot counting of their own free will. *Clapper*, 568 U.S. at 402. Plaintiffs can certainly choose how to "spend [their] funds effectively," AT Br. 19, but their decision to do so in the manner described in Bost's declaration is not an injury that can give rise to Article III standing.

### 2. Compliance with the law

Plaintiffs also argue that the ballot receipt deadline statute interferes with their interest in "hav[ing] their elections results certified with votes received in compliance" with law. SA7 (¶ 32); AT Br. 20-21. But no one — not even a candidate for public office — can invoke Article III jurisdiction on the basis of an interest in having "the Government . . . administered according to law." *Lance*, 549 U.S. at 440. Plaintiffs' asserted interest in ensuring that election officials "compl[y] with" the law, SA7 (¶ 32), is "precisely the kind of undifferentiated, generalized grievance about the conduct of government" that courts refuse to "countenance," *Lance*, 549 U.S. at 442. Were it otherwise, a candidate for public office would have standing to challenge *any* election regulation, even one that did not impact him or her adversely, on the ground that he or she is entitled to have the government act "in compliance" with the law. That is not consistent with the limited jurisdiction of federal courts.

To be sure, a candidate for public office may — and, indeed, often will — have standing to challenge a law that affects his or her electoral prospects. *See Trump v. Wis. Elections Comm'n*, 983 F.3d 919, 924 (7th Cir. 2020); *Wood*, 981 F.3d at 1314. That was the basis of standing in *Trump*, on which plaintiffs rely (AT Br. 10, 16, 21):

The candidate there alleged that a State had unlawfully appointed its slate of presidential electors, thus depriving him of the votes in the Electoral College necessary to become President. 983 F.3d at 922-25. It is hard to envision a more "concrete" stake in the outcome of a case, *Lujan*, 504 U.S. at 560, than that.[8] But plaintiffs do not allege that the ballot receipt deadline statute in some way affects their electoral prospects; they simply argue that they are entitled to a vote tally that is "complian[t]" with the law, SA7 (¶ 32). Their failure to make such an argument makes sense, given that the deadline statute does not affect *who* can vote; it simply governs *how* eligible voters can vote. Absent the statute, that is, the same universe of voters would presumably cast ballots; they would simply do so in a different way, or at a different time. For that reason, the statute does not affect plaintiffs' electoral prospects, meaning that they lack Article III standing.

Plaintiffs alternatively suggest that the deadline statute injures them (or, at least, Bost) in that "his margin of victory may be reduced by the late-arriving ballots" counted pursuant to the statute, thus "lead[ing] to the public perception that [his] constituents have concerns about [his] job performance." AT Br. 20. That theory cannot support Bost's standing. For one, it is not alleged in the complaint, and so is not before the court. *Supra* pp. 19-20; *Spokeo*, 578 U.S. at 338. For another, it is

---

[8] Even *Carson*, 978 F.3d 1051, on which plaintiffs rely (AT Br. 21), is arguably consistent with this rule: The plaintiffs in *Carson*, who were putative presidential electors, argued that their "participation" as electors was placed "in jeopardy" by Minnesota's decision to count ballots arriving up to one week after Election Day. Compl. ¶ 63, *Carson v. Simon*, No. 20-cv-02030 (D. Minn.) (ECF No. 1). Plaintiffs there thus arguably alleged a concrete injury, not merely an abstract one.

implausible, given that — as just discussed — if voters could not rely on the deadline statute in future elections, they would presumably cast ballots in a different manner rather than not at all, meaning that Bost's margin of victory would be unchanged. In any event, this theory, even if clearly alleged and plausible, would fail on the merits, because it is simply a way of repackaging plaintiffs' main "intangible" injury — their desire to police the State's "compliance," SA7 (¶ 32), with federal law — into a more tangible form. But plaintiffs cannot evade Article III by artful pleading. *Cf. Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 230 (2023) ("[W]hat cannot be done directly cannot be done indirectly."). Indeed, the single authority plaintiffs cite in support of their argument, *Nelson v. Warner*, 472 F. Supp. 3d 297 (S.D. W. Va. 2020), proves the point: *Nelson* observes that a candidate for public office can allege a "competitive" injury "if the defendant's actions harm the candidate's *chances of winning*," *id.* at 304 (emphasis added) — the injury on which *Trump* rests, but which plaintiffs do not plead. The district court correctly held that plaintiffs lack Article III standing as candidates for public office.

## III.   **The district court correctly held that plaintiffs' claims fail on the merits.**

If the court reaches the merits, it should affirm. Plaintiffs' argument is that Illinois — and twenty or more other States — are violating federal law by directing election officials to count ballots that are *cast* on or before Election Day but *received* after Election Day. The district court correctly rejected that extraordinary claim,

SA35-41, as should this court.  The ballot receipt deadline statute neither conflicts with federal law nor violates plaintiffs' constitutional rights in any other manner.[9]

### A.    The deadline statute is not preempted by federal law.

Plaintiffs' principal claim is that the ballot receipt deadline statute is preempted by two federal statutes that set Election Day as the Tuesday after the first Monday in November.  AT Br. 30-37; *see* 2 U.S.C. § 7; 3 U.S.C. § 1.  In plaintiffs' view, Illinois (and the many other States that count mail-in ballots that are cast on or before Election Day but are received after Election Day) have improperly "expanded Election Day" in violation of federal law.  SA2 (¶ 2).  That argument finds no support in the text of the Election Day statutes or any other source, and the court should reject it.

### B.    The federal Election Day statutes do not prohibit States from counting ballots that arrive after Election Day.

The Elections Clause grants to the States the authority to set the "Times, Places and Manner of holding Elections for Senators and Representatives," subject to Congress's power to "by Law make or alter such regulations."  U.S. Const. art. I, § 4.  "Thus, a state's discretion and flexibility in establishing the time, place and manner of electing its federal representatives has only one limitation:  the state system cannot directly conflict with federal election laws on the subject."  *Voting Integrity*

---

[9]  The district court dismissed plaintiffs' complaint without prejudice on the ground that plaintiffs lacked standing.  A42; *see McHugh*, 55 F.4th at 533.  If the court finds that plaintiffs have standing but that their claims fail on the merits, it should modify the dismissal to be with prejudice.  *See Omosegbon v. Wells*, 335 F.3d 668, 678 (7th Cir. 2003).

*Project v. Bomer*, 199 F.3d 773, 775 (5th Cir. 2000). When considering a preemption question arising under the Elections Clause, "the reasonable assumption is that the statutory text accurately communicates the scope of Congress's pre-emptive intent." *Arizona*, 570 U.S. at 14. Courts considering such questions should "read Elections Clause legislation simply to mean what it says," asking whether, under the "fairest reading" of the federal statute at issue, *id.* at 15, there is a "direct[] conflict" between Congress's regulation of a federal election and the State's, *Bomer*, 199 F.3d at 775; *accord, e.g.*, *Va. Uranium, Inc. v. Warren*, 139 S. Ct. 1894, 1901 (2019) (lead opinion of Gorsuch, J.) (courts consider preemption cases "as [they] would any other about statutory meaning, looking to the text and context of the law in question and guided by the traditional tools of statutory interpretation").[10]

Here, plaintiffs argue that the federal Election Day statutes prohibit States from counting ballots that arrive after Election Day, and that Illinois's ballot receipt deadline statute is accordingly preempted. AT Br. 30-31. That novel argument finds no support in the text of the federal Election Day statutes, the precedent interpreting those statutes, or any other source.

---

[10] One of the statutes on which plaintiffs rely, 3 U.S.C. § 1, governs the timing of States' appointment of presential electors — a power given to States by the Electors Clause, *see* U.S. Const. art. II, § 1, cl. 2. But defendants focus on the Elections Clause and the federal statute passed pursuant to it, because, presuming that statute does not preempt Illinois's deadline statute, it necessarily follows that the federal statute passed pursuant to the Electors Clause — a context in which the States arguably have *more* regulatory power, *see Chiafalo v. Washington*, 140 S. Ct. 2316, 2324 (2020) (describing State's authority under the Electors Clause as "far-reaching"); Martin, *Mail-In Ballots and Constraints on Federal Power Under the Electors Clause*, 107 Va. L. Rev. Online 84, 90 (2021) (describing it as "exclusive") — also does not preempt Illinois's statute.

To start, the text of the federal Election Day statutes contains no hint of the rule plaintiffs ask the court to announce. In a preemption case, as discussed, courts must look first to the "statutory text," giving it its "fairest reading" and then asking whether the federal statute conflicts with state law. *Arizona*, 570 U.S. at 14-15. But the text of the federal Election Day statutes is silent as to whether States may count ballots that arrive after Election Day. Section 7 states simply that the Tuesday after the first Monday in November is "the day for the election" of representatives to Congress, 2 U.S.C. § 7, and section 1 provides that presidential electors "shall be appointed . . . on election day," 3 U.S.C. § 1, a term defined elsewhere in the statute as the Tuesday after the first Monday in November, *id.* § 21(1). These provisions say nothing about a State's power to count ballots received after Election Day. Indeed, those courts that have considered the question agree that "[f]ederal law does not provide for *when* or *how* ballot counting occurs." *Bognet*, 980 F.3d at 353 (emphasis in original); *accord Donald J. Trump for President, Inc. v. Way*, 492 F. Supp. 3d 354, 372 (D.N.J. 2020) ("the Federal Election Day Statutes are silent on methods of determining timeliness of ballots"). As these opinions reflect, the federal Election Day statutes cannot be "fair[ly]" read, *Arizona*, 570 U.S. at 15, to prohibit States from counting ballots received after Election Day.

The sole Supreme Court opinion interpreting the federal Election Day statutes likewise does not read them to bar States from counting ballots received after Election Day. In *Foster v. Love*, 522 U.S. 67 (1997), the Court held invalid a Louisiana law establishing an "open primary" in October that, as a practical matter,

operated to elect public officials in over 80% of cases, with "no further act . . . done on federal election day to fill the office in question*." Id.* at 70. The Court explained that the law violated the federal Election Day statutes. *Id.* at 71-72. Looking to the text and legislative history of those statutes, the Court reasoned that they at a minimum prohibited a State from allowing "a contested selection of candidates" to conclude "as a matter of law before the federal election day." *Id.* at 72. But the Court emphasized that its opinion was a "narrow one," *id.* at 71, addressing only whether a State could hold an election for federal office that was "consummated prior to federal election day," *id.* at 72 n.4. *Foster* thus holds only that the federal Election Day statutes bar a State from concluding an election *before* Election Day, not that they prohibit a State from counting ballots cast on or before Election Day and received *after* Election Day.

The legislative history of both federal statutes also contains no trace of any intent to regulate state practices with respect to ballot counting. Congress first enacted each provision in the mid-1800s, at a time when States provided for both the selection of presidential electors and the election of federal representatives on wildly divergent dates — some as early as April of the election year. *See* Stonecash *et al.*, *Congressional Intrusion to Specify State Voting Dates for National Offices*, 38 Publius 137, 137 (2007).[11] That approach created multiple problems. For one, it was believed to have led to "considerable" election fraud, in which voters traveled "from one part

---

[11] Congress enacted the predecessor to 3 U.S.C. § 1, which sets a single date for the appointment of presidential electors, in 1845. *See* 5 Stat. 721 (1845). It enacted the predecessor to 2 U.S.C. § 7, which sets a single date for the election of members of Congress, in 1872. *See* 17 Stat. 28 (1872).

of the Union to another[] in order to vote" in multiple States.  Cong. Globe, 28th

Cong., 1st Sess. 679 (1844); *see also* Cong. Globe, 42d Cong., 2d Sess. 112 (1871)

(similar).  It likewise permitted those States that held elections earlier in the cycle to

exercise "undue advantage" over those States that held elections later in the cycle.

Cong. Globe, 42d Cong., 2d Sess. 141 (1871).  And — during the period in which there

was a nationwide Election Day for the presidency but not for members of Congress —

it put voters to the "trouble of having a double election."  *Id.*; *see Foster*, 522 U.S. at

73-74 (describing the latter two problems).  Congress thus acted "to remedy more

than one evil" that arose from having multiple Election Days across the country, *Ex

parte Yarbrough*, 110 U.S. 651, 661 (1884), but none of its purposes related in any

way to the counting of ballots.

Finally, the broader statutory context likewise counsels against reading the

federal Election Day statutes to prohibit States from counting ballots received after

Election Day.  The Election Day statutes have been amended multiple times since

their enactment, most recently in December 2022.  *See* Electoral Count Reform and

Presidential Transition Improvement Act of 2022, Pub. L. No. 117-328, div. P, tit. I,

136 Stat. 4459, 5233 (2022).  At that time, roughly half of the States directed election

authorities to count ballots received after Election Day, and many such statutes had

been enacted for decades.  *See supra* p. 5 & n.2.  Federal law likewise contemplates

that individuals living overseas (including members of the United States armed

forces) may cast mail-in ballots that are received after Election Day:  As the federal

government explained below, Doc. 47, the Uniformed and Overseas Citizens Absentee

Voting Act of 1986 ("UOCAVA"), 52 U.S.C. §§ 20301 *et seq.*, guarantees United States citizens living overseas the right to vote by absentee ballot, *id.* § 20302(a)(1), and the primary remedial measure taken in cases alleging UOCAVA violations is to require States to count ballots received after Election Day, irrespective of state law on the issue, Doc. 47 at 10-11. Congress was aware when it amended the Election Day statutes of the wide range of practices on this issue, yet it declined to amend those statutes to impose uniform requirements on States regarding ballot timeliness.

In sum, text, history, and precedent point in the same direction: The federal Election Day statutes do not bar States from counting ballots mailed by Election Day and received after Election Day.

## 2. Plaintiffs' counterarguments lack merit.

Plaintiffs' arguments to the contrary lack merit. To start, plaintiffs advance no argument that the *text* of the Election Day statutes prohibit States from counting ballots received after Election Day. Given *Arizona*'s instruction to look to the "statutory text" to determine "the scope of Congress's pre-emptive intent," 570 U.S. at 14, that failure alone counsels strongly against reading the statutes in the manner that plaintiffs suggest. Plaintiffs instead appear to advance two related arguments in support of their preemption claim: (1) that *Foster* reads the Election Day statutes to prohibit States from conducting certain election-related activities after Election Day; and (2) that States did not count ballots received after Election Day at the time these statutes were first enacted (and accordingly cannot do so now). AT Br. 30-41. Both arguments fail.

First, plaintiffs overread *Foster*.  As discussed, *supra* pp. 27-28, *Foster* holds only that a State may not conclude an election *prior* to Election Day, not that there is a limit on the activities a State may conduct *after* Election Day.  Plaintiffs' contrary view, AT Br. 30-31, hinges on language that the Supreme Court used in emphasizing the narrowness of its opinion — specifically, its observation that it did not intend to resolve "just what [could] constitute the *final act of selection* within the meaning of the law."  522 U.S. at 72 (emphasis added).  Plaintiffs seize on this language, contending that the *Foster* Court meant to suggest that there is some "final act of selection" that must occur *on or before* Election Day and asserting that that "final act" must be the receipt of ballots by state election authorities (such that the deadline statute is invalid).  AT Br. 30-31.  Plaintiffs are incorrect.  First, the Court in *Foster* did not hold — or even suggest — that States must ensure some "final act of selection" occurs *on or before* Election Day.  Rather, this language reflects the Court's tacit acknowledgement that States might establish regulatory regimes under which many aspects of the electoral process might occur *before* Election Day, leaving only some "final act of selection" — some isolated "act in law or fact" — to occur *on* Election Day.  *See* 522 U.S. at 72; *see also id.* ("[O]ur decision does not turn on isolating precisely what acts a State must cause to be done on federal election day (and not before it) in order to satisfy the statute.").  The *Foster* Court, that is, was concerned only with regimes in which the entire electoral process *predated* Election Day, not with those in which some aspect of the electoral process *postdated* Election Day.  The Supreme Court often cautions litigants not to "parse[]" its opinions as if

"dealing with [the] language of a statute," *Brown v. Davenport*, 596 U.S. 118, 141 (2022), but plaintiffs' argument elevates stray language in just this manner.

Even if *Foster* could be read to suggest that the federal Election Day statutes require States to provide for a "final act of selection" of officeholders *by* Election Day (*i.e.*, a "final act" that could not be performed *after* Election Day), the deadline statute complies with that rule. The Illinois General Assembly has concluded that, because a ballot that is cast by mail on or just before Election Day may not arrive at the local election authority until after Election Day, it will count any such ballots for up to 14 days as long as they are postmarked on or before Election Day. *See* 10 ILCS 5/19-8(c), 5/18A-15(a).[12] That rule complies with even plaintiffs' reading of *Foster* by providing for a "final act of selection" of officeholders by Election Day — namely, the certification and transmission of vote-by-mail ballots to election officials. Illinois has, in other words, provided by law that a ballot is validly "cast" when it is transmitted to local election officials, including by mail, by Election Day. *Cf. Harrisburg-Raleigh Airport Auth. v. Dep't of Revenue*, 126 Ill. 2d 326, 341 (1989) (describing Illinois's "policy of equating time of mailing with actual receipt"). Nothing in the federal Election Day statutes or *Foster* prohibits a State from making that decision.

Plaintiffs' contrary argument would require this court to construe the phrase "final act of selection" to refer to the *receipt* of ballots by state election authorities,

---

[12] Illinois also deems a mail-in ballot to have been cast on or before Election Day if it has no postmark but the ballot's eligibility certification — signed by the voter under penalty of perjury — is dated on or before Election Day. 10 ILCS 5/19-8(c); *see id.* §§ 5/19-5, -6. Plaintiffs have not specifically challenged this aspect of Illinois's regulatory regime.

32

rather than the *transmission* of ballots to those authorities. AT Br. 30-31. But plaintiffs offer little to require that approach beyond their say-so. As discussed, *supra* pp. 27-28, nothing in the text of the Election Day statutes or *Foster* supports it. And, contrary to plaintiffs' assertion, *see* AT Br. 31 (stating without support that a "qualified ballot has not been cast and is not a vote until it is properly marked *and received* by election officials" (emphasis in original)), it does not comport with a basic understanding of how elections work. As the Sixth Circuit explains, "[a] candidate is not 'selected for office' at the time a voter deposits a completed ballot in the ballot box, regardless of whether the ballot is deposited at a polling place on election day, in the mailbox, or at an official site for ballot deposit on or before the designated day." *Millsaps v. Thompson*, 259 F.3d 535, 545 (6th Cir. 2001). "Providing various options for the time and place of depositing a completed ballot does not change 'the day for the election.'" *Id.* And plaintiffs' novel reading of the Election Day statutes would, as discussed, *supra* pp. 29-30, call into question not only the regulatory regimes of half of the States but the remedies issued as a matter of course in UOCAVA cases.[13] That alone is reason to reject it.

---

[13] Plaintiffs object that federal practice under UOCAVA is irrelevant because courts can order remedies that are not specifically contemplated by federal law. *See* AT Br. 36-37. But the courts' decades-long history of requiring States to accept and count ballots received after Election Day as a remedy for UOCAVA violations without even considering whether such a remedy might conflict with other provisions of federal law, *supra* pp. 29-30; Doc. 47 at 11, at minimum reflects the settled understanding that the federal Election Day statutes do not address States' authority to count ballots received after Election Day.

Plaintiffs' main argument appears to be that the "original public meaning" of the Election Day statutes, AT Br. 32, requires the court to adopt the restrictive view of those statutes that plaintiffs put forward. But plaintiffs' original-meaning argument fails for multiple reasons. Most basically, plaintiffs identify no *affirmative* historical evidence that the drafters of the Election Day statutes intended to prohibit States from counting ballots received after Election Day. As discussed, *supra* pp. 28-29, the legislative history accompanying the original Election Day statutes establishes that Congress had multiple goals in establishing a single nationwide Election Day, but it does not reflect any congressional intent to regulate state practice with respect to mail-in ballots — perhaps because, as plaintiffs observed below, Doc. 33 at 13, States did not broadly authorize absentee voting until the twentieth century. Plaintiffs advance no contrary argument. Instead, they appear to contend that, because States did not affirmatively employ regulatory regimes like the deadline statute in the 1800s, States are prohibited from employing them now. *See* AT Br. 35 (arguing that, in passing the federal Election Day statutes, Congress "foreclosed the possibility of using future, unforeseen election practices" in certain respects). That remarkable position finds no support in text or history. In our constitutional order, "States have a major role to play in structuring and regulating the election process," *Cal. Democratic Party v. Jones*, 530 U.S. 567, 572 (2000), but on plaintiffs' reading, Congress froze in time those electoral systems in place in the mid-1800s simply by using the phrase "the day for the election." That cannot be right.

In any event, plaintiffs' historical argument lacks merit for other reasons. Plaintiffs largely rely on an "extensive analysis" they filed in "the district court" as to "the ordinary public meaning of 'the election.'"  AT Br. 32; *see also id.* at 31 n.13 (explaining that plaintiffs "previously surveyed the history of absentee voting" in district-court filings); *id.* at 32 n.15 (describing district-court filings as containing a "more complete historical analysis of U.S. electoral practices"); *id.* at 33 ("Plaintiffs described [historical] electoral practices . . . in briefing to the district court.").  But plaintiffs cannot simply incorporate their district-court papers by reference; they must identify with specificity on appeal which aspects of the historical record they believe favor their position.  *Cf. United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991) (*per curiam*) ("Judges are not like pigs, hunting for truffles buried in briefs."). It thus is not enough to simply assert, as plaintiffs do, that "electoral practices under the common law and during Colonial, Early Republic, Civil War, and Reconstruction eras" did not "allow[] post-election receipt."  AT Br. 33.  Historical claims cannot be made with such a broad brush.

Those historical arguments plaintiffs do make with specificity are irrelevant, overstated, or both.  Plaintiffs devote two paragraphs to "historic voting practices" in the Colonial Era and the early Republic, *id.* at 33-34, but those practices (a) are not relevant to interpreting statutes first passed in 1845 and 1872, *see Bostock v. Clayton Cnty.*, 140 S. Ct. 1731, 1738 (2020) ("ordinary public meaning" turns on the meaning of statutory terms "at the time of [a statute's] enactment"); and (b) establish only that States did not generally permit absentee voting during this era — a point that is

undisputed, but says nothing about the original public meaning of the Election Day statutes, *supra* p. 34.  Many of plaintiffs' other historical claims lack support entirely, *see, e.g.*, AT Br. 35 (asserting without support that "[t]he public at the time would have affirmatively understood 'the election' as deadline by which all qualified votes must be received by local election officials"), and can be disregarded on that basis.

To the extent the court does consult the historical practices of mid-1800s — when the Election Day statutes were passed, *supra* p. 28 n.11 — they do not support plaintiffs' understanding of those statutes.  As plaintiffs observed below, Doc. 33 at 13-15, States first authorized large-scale absentee voting during the Civil War, when it was thought unjust to disenfranchise soldiers who were unable to cast ballots in person.  States generally employed one of two methods in doing so, either permitting soldiers to send marked ballots home to proxies to be cast or permitting them to cast ballots "in the field."  *See* Benton, *Voting in the Field* 15 (1915).[14]  But plaintiffs are wrong to assert that both methods "involved ballots being received by state election officials on Election Day."  Doc. 33 at 13; *accord* AT Br. 33 (electoral practices during Civil War did not "allow[] post-election receipt").  To the contrary, only a few States expressly required ballot receipt by state or local election authorities on Election Day, and several expressly authorized receipt after Election Day.  *See, e.g.*, Benton, *supra*, at 30-31 (North Carolina law required ballots to be counted if they reached election authorities "within twenty days" of the election); *id.* at 240-41 (Maryland permitted ballots to be cast within "five days" of Election Day and returned within "fifteen

---

[14]  *Available at* https://bit.ly/40Aku6p.

days"); *id.* at 317-318 (describing the States' general practice of allowing an "extension of time for canvassing the votes" to permit ballot receipt). Plaintiffs' contrary characterization of the historical record stems primarily from their view that those States that authorized soldiers to vote "in the field" did so by "appointing servicemen as state election officials to receive ballots on Election Day." Doc. 33 at 14. But that is a legal fiction; the States that permitted wartime balloting still had to send completed ballots back to state election authorities for receipt. *See* Benton, *supra*, at 317-18. Even if these States could be understood to have deemed ballots "received" upon their deposit to military officials in the field, one could in the same manner understand Illinois to deem ballots "received" upon their transmission to a postal carrier. Regardless, at minimum it overstates the historical record to assert that the States' Civil War-era regulations of absentee ballots uniformly required the receipt of ballots by Election Day; instead, during this era the States established diverse rules in this area, as they continue to do today, *supra* p. 5 n.2.

Plaintiffs' remaining arguments similarly lack merit. Plaintiffs observe that Congress has rejected proposals in the past to "extend" Election Day "beyond the first Tuesday after the first Monday in November." AT Br. 35-36. But Illinois law does not extend federal elections beyond Election Day; it counts mail-in ballots only if they were cast on or before Election Day. *Supra* p. 32. Whatever inference the court might draw from Congress's inaction on this issue, *see Pension Benefit Guar. Corp. v. LTV Corp.*, 496 U.S. 633, 650 (1990) ("[c]ongressional inaction" generally lacks "persuasive significance"), is thus irrelevant here. Plaintiffs also rely, AT Br. 36, on

Congress's decision in December 2022 to amend the term "election day" (at least in the context of presidential electors) to include any "modified period of voting" a State may authorize in the event of "force majeure events." 3 U.S.C. § 21(1). But, again, Illinois's law does not create a "modified period of voting"; it counts ballots received after Election Day only if they were cast on or before Election Day. So any inference the court could draw about state authority to "modify" Election Day under federal law is likewise irrelevant. The ballot receipt deadline statute does not conflict with the federal Election Day statutes, and plaintiffs' preemption claim accordingly fails.

### B.    The deadline statute does not violate plaintiffs' constitutional rights.

Plaintiffs also brought two additional claims premised on the notion that the deadline statute violates their constitutional rights to vote and stand for public office. SA8-10. As the district court correctly held, however, SA37-41, these claims lack merit.

To start, as the complaint reflects, and as plaintiffs appear to concede on appeal, their constitutional claims are wholly derivative of their statutory claim, in that each rests on the premise that the ballot receipt deadline statute violates the federal Election Day statutes. Plaintiffs alleged in count I that the deadline violated their First and Fourteenth Amendment right to vote by "counting ballots received after Election Day," a practice they maintained was "illegal under 2 U.S.C. § 7 and 3 U.S.C. § 1." SA8 (¶¶ 40-42). And they alleged in count II that the deadline violated their constitutional right to stand for public office, again, by "requir[ing] counties to hold open voting and count ballots after Election Day." SA8 (¶¶ 45-46). On appeal,

plaintiffs confirm that their constitutional claims are dependent on their statutory claim, explaining that each claim rests on the premise "that a state time, place, and manner regulation conflicts with a federal time regulation and, therefore, violates federal law."  AT Br. 38; *accord id.* at 39-41 (contending that deadline statute violates the First and Fourteenth Amendments *because* it violates the federal Election Day statutes).  As explained, however, *supra* pp. 25-38, plaintiffs' statutory claim fails, and their constitutional claims therefore fail, too.  If the court holds that the deadline statute does not violate the federal Election Day statutes, it need go no further.

But plaintiffs' constitutional claims fail irrespective of the statutory claim's merits.  To survive a motion to dismiss under Rule 12(b)(6), a plaintiff's complaint must offer more than "[t]hreadbare recitals of the elements of the cause of action, supported by mere conclusory statements."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  But that is all plaintiffs pled in the complaint, and all they offer on appeal: They offered no theory in either count I or count II of *why* the deadline statute violates their constitutional rights beyond their view that it permits the State to count ballots that are "illegal" under the federal Election Day statutes, *see* SA7-9, and they now advance no argument on appeal as to why the statute violates their constitutional rights beyond their view that it is preempted, AT Br. 39-41.  But while plaintiffs' preemption theory might support their preemption claim, SA9-10 (¶¶ 50-60), it does not give rise to separate First and Fourteenth Amendment claims.  *Cf., e.g.*, *Culp v. Raoul*, 921 F.3d 646, 658 (7th Cir. 2019) (litigants cannot "repackag[e] claims . . . more appropriately brought under a different constitutional provision").

Indeed, plaintiffs have repeatedly suggested that they do not believe the court needs to consider the traditional test for First and Fourteenth Amendment challenges, *see Anderson v. Celebrezze*, 460 U.S. 780 (1983); *Burdick v. Takushi*, 504 U.S. 428 (1992), in order to resolve their constitutional challenges, insofar as it can simply perform a preemption analysis and decide whether the state statute is invalid. *See* Doc. 43 at 18 ("[T]he *Anderson-Burdick* test does not apply to plaintiffs' claims"); *see also* Doc. 33 at 17 n.23 (similar); AT Br. 38 (similar). That makes sense, because plaintiffs have not pled the substance of a constitutional claim, beyond "conclusory statements" that their rights have been violated. *Iqbal*, 556 U.S. at 678. For that reason, the district court properly dismissed plaintiffs' First and Fourteenth Amendment claims.

IV.    **The district court correctly held that plaintiffs' claims against the Board of Elections are barred by sovereign immunity.**

Finally, the district court also correctly held that plaintiffs' claims against the Board are barred by sovereign immunity. SA31-34.[15] "The Eleventh Amendment bars most claims in federal court against a state that does not consent to the suit." *Carmody v. Bd. of Trustees of Univ. of Ill.*, 893 F.3d 397, 403 (7th Cir. 2018). It applies with equal force to state agencies, such as the Board. *See Kroll v. Bd. of Trustees of Univ. of Ill.*, 934 F.2d 904, 907 (7th Cir. 1991). Although Congress "may abrogate the States' Eleventh Amendment immunity . . . pursuant to a valid grant of

---

[15] Defendants agree that the Eleventh Amendment does not bar plaintiffs' claims for injunctive and declaratory relief against Matthews. AT Br. 29-30; *Ex parte Young*, 209 U.S. 123, 156 (1908). If the court concludes that plaintiffs alleged standing and that the district court erred in dismissing plaintiffs' claims under Rule 12(b)(6), it should therefore remand for further proceedings against Matthews.

constitutional authority," *Toeller v. Wis. Dep't of Corr.*, 461 F.3d 871, 874 (7th Cir. 2006), the Supreme Court has repeatedly held that Congress cannot "abrogate state sovereign immunity" pursuant to Article I of the Constitution, under which the Elections Clause resides. *See Allen v. Cooper*, 140 S. Ct. 994, 1001-02 (2020).

Plaintiffs do not dispute that the Board is an arm of the State entitled to invoke the Eleventh Amendment, nor do they argue that Congress has expressly abrogated the State's sovereign immunity against suits by private parties in the Elections Clause context. AT Br. 27-29. Instead, plaintiffs invoke the so-called "plan of the Convention doctrine," under which the Supreme Court has concluded — in a suite of unusual cases — that the States "agreed in the plan of the Convention not to assert any sovereign immunity defense." *PennEast Pipeline Co. v. New Jersey*, 141 S. Ct. 2244, 2259 (2021); *see also Torres v. Tex. Dep't of Pub. Safety*, 142 S. Ct. 2455, 2466 (2022); *Cent. Va. Cmty. Coll. v. Katz*, 546 U.S. 356, 373 (2006). But those cases have no bearing here.

As the Supreme Court has explained, the plan-of-the-Convention doctrine permits suit only in those unusual circumstances in which the States "agreed their sovereignty would yield as part of the 'plan of the Convention,'" *Torres*, 142 S. Ct. at 2462 (quoting *PennEast*, 141 S. Ct. at 2259) — "that is, if 'the structure of the original Constitution itself' reflects a waiver of States' sovereign immunity," *id.* (quoting *Alden v. Maine*, 527 U.S. 706, 728 (1999)). An implicit waiver of this kind will be found only where "the federal power at issue is 'complete in itself,'" and a State's assertion of sovereign immunity would "'thwart' or frustrate federal policy."

41

*Id.* (quoting *PennEast*, 141 S. Ct. at 2259).  The Court has found only three such implicit waivers in the last century:  in bankruptcy proceedings in which States are creditors, *Katz*, 546 U.S. at 359; from condemnation proceedings pursuant to the federal government's eminent domain power, *PennEast*, 141 S. Ct. at 2251-52; and from damages actions brought pursuant to statutes implementing Congress's war powers, *Torres*, 142 S. Ct. at 2460.

Plaintiffs identify no reason to extend this unusual line of caselaw to an ordinary preemption lawsuit against a State, even one that arises in the context of regulating federal elections.  To start, neither the Elections Clause nor the Electors Clause establishes a regime in which the federal government exercises power that is "complete in itself."  *PennEast*, 141 S. Ct. at 2259.  To the contrary, as the Supreme Court has explained, the Elections Clause envisions a system of *dual* regulation, directing the States to "prescribe the time, place, and manner of electing" federal representatives, while permitting "Congress . . . to alter those regulations or supplant them."  *Arizona*, 570 U.S. at 8; *see also Ex parte Siebold*, 100 U.S. 371, 384 (1879) (describing the "concurrent authority of the two sovereignties, State and National").  The Elections Clause's dual-sovereignty model thus is unlike the federal eminent domain power and the war powers, each of which is, as the Court explained in *PennEast* and in *Torres*, "complete in itself," in that they leave *no* room for states to regulate.  *See Torres*, 142 S. Ct. at 2465 (the Constitution confers "all" war powers on the federal government, and "leave[s] none to the States"); *PennEast*, 141 S. Ct. at 2260 (similar).  And the Electors Clause, for its part, does not refer to Congress at all

in authorizing States to regulate the manner of appointing electors. *See* U.S. Const. art. II, § 1, cl. 2; *supra* p. 26 n.10. Neither clause can be said to establish a federal power "complete in itself." *PennEast*, 141 S. Ct. at 2259.

Nor would the State's assertion of sovereign immunity in an ordinary preemption action brought by a private party — even one purporting to vindicate federal election statutes — "'thwart' or frustrate federal policy." *Torres*, 142 S. Ct. at 2462 (quoting *PennEast*, 141 S. Ct. at 2259). To the contrary, as the Supreme Court has elsewhere explained, equitable principles generally allow federal courts to "grant injunctive relief against state officers who are violating, or planning to violate, federal law," including by enjoining the enforcement of a state law that is preempted. *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326 (2015). And under *Ex parte Young*, a State's sovereign immunity is no bar to such an action. *See* 209 U.S. at 150-51. Thus, to the extent a private party seeks to enjoin a State from enforcing a state statute that he or she believes is preempted, *Ex parte Young* is sufficient — as it was here. *Supra* p. 40 n.15. By contrast, the structural waivers recognized in *Katz*, *PennEast*, and *Torres* each permitted private parties to seek some *other* form of relief from States that was not available under traditional equitable principles. *See Katz*, 546 U.S. at 372 (recovery of funds transferred to States in bankruptcy); *PennEast*, 141 S. Ct. at 2253-54 (condemnation of state property); *Torres*, 142 S. Ct. at 2461 (damages). Plaintiffs identify no persuasive reason to extend those holdings to an ordinary preemption suit like theirs.

Plaintiffs' arguments on this point, AT Br. 28-29, are unavailing. They assert that, at least in the context of the Elections Clause, States' authority "is similar to" the three contexts in which the Supreme Court has found an implicit structural waiver, in that it exists "'subject to the express qualification that it terminates according to federal law.'" *Id.* at 28 (quoting *Arizona*, 570 U.S. at 14-15). But that argument proves too much: Under the Supremacy Clause, state statutes *always* yield to federal law, so it cannot be that federal power is "complete in itself," *PennEast*, 141 S. Ct. at 2259, anytime it has preemptive force. *See Siebold*, 100 U.S. at 384-85 (analogizing the Elections Clause to the Commerce Clause). The same is true for plaintiffs' argument that state authority in this context was not reserved to the States by the Tenth Amendment but instead granted to them specifically by the Framers, AT Br. 28; that has no bearing on whether the federal power at issue is "complete in itself," *PennEast*, 141 S. Ct. at 2259, such that sovereign immunity must yield. And plaintiffs offer no other support for their plan-of-the-Convention argument: no precedent, *see* AT Br. 28 n.12 (conceding that the Supreme Court has "never applied" this doctrine in this context), no textual or historical support, *see, e.g.*, *Torres*, 142 S. Ct. 2463-66 (conducting lengthy review of text and history), and no argumentation beyond the points discussed above.[16] That falls far short of the

---

[16] Plaintiffs cite three additional cases to support their plan-of-the-Convention argument, *see* AT Br. 28-29 & n.12 (citing *U.S. Term Limits v. Thornton*, 514 U.S. 779 (1995); *Harkless v. Brunner*, 545 F.3d 445 (6th Cir. 2008); and *Ass'n of Cmty. Organizations for Reform Now (ACORN) v. Edgar*, 56 F.3d 791 (7th Cir. 1995)), but none has anything to say about sovereign immunity; each just discusses the nature of Congress's authority under the Elections Clause or, in the case of *U.S. Term Limits*, under other constitutional provisions altogether.

"compelling evidence" needed to show that "the Founders thought such a surrender inherent in the constitutional compact." *Blatchford v. Native Vill. of Noatak*, 501 U.S. 775, 781 (1991). The district court thus correctly held that plaintiffs' claims against the Board are barred by sovereign immunity.

## CONCLUSION

For these reasons, this court should affirm the district court's judgment.

Respectfully submitted,

**KWAME RAOUL**
Attorney General
State of Illinois

**JANE ELINOR NOTZ**
Solicitor General

/s/ Alex Hemmer
**ALEX HEMMER**
Deputy Solicitor General
100 West Randolph Street
12th Floor
Chicago, Illinois 60601
(312) 814-5526
Alex.Hemmer@ilag.gov

100 West Randolph Street
12th Floor
Chicago, Illinois 60601
(312) 814-3312

Attorneys for Defendants-Appellees

December 1, 2023

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the type-volume limitations of Federal Rule of Appellate Procedure 32(a)(7)(A) and Circuit Rule 32(c) because it contains 12,535 words (excluding the parts exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii)).  This brief also complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and Circuit Rule 32(a) because it has been prepared in a proportionally spaced typeface (12-point Century Schoolbook) using Microsoft Word.

<u>/s/ Alex Hemmer</u>
ALEX HEMMER

December 1, 2023

## CERTIFICATE OF FILING AND SERVICE

I hereby certify that on December 1, 2023, I electronically filed this brief with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit using the CM/ECF system.

All participants in the case are registered CM/ECF users and service will be accomplished by the CM/ECF system.

/s/ Alex Hemmer
ALEX HEMMER