No. 23-2644

IN THE UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

———————————

MICHAEL J. BOST, et al.,

Plaintiffs-Appellants

v.

ILLINOIS STATE BOARD OF ELECTIONS, et al.,

Defendants-Appellees

———————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
Case No. 1:22-cv-02754
The Honorable Judge John F. Kness

———————————

BRIEF FOR THE UNITED STATES AS AMICUS CURIAE IN SUPPORT OF
DEFENDANTS-APPELLEES AND SUPPORTING AFFIRMANCE

———————————

KRISTEN CLARKE
  Assistant Attorney General

ELIZABETH PARR HECKER
NOAH B. BOKAT-LINDELL
  Attorneys
  U.S. Department of Justice
  Civil Rights Division
  Appellate Section
  Ben Franklin Station
  P.O. Box 14403
  Washington, D.C.  20044-4403
  (202) 598-0243

## TABLE OF CONTENTS

**PAGE**

INTEREST OF THE UNITED STATES ..................................................................1

STATEMENT OF THE ISSUE.............................................................................1

STATEMENT OF THE CASE...............................................................................2

    A.    Legal Background ........................................................................2

    B.    Factual Background.......................................................................4

SUMMARY OF ARGUMENT...............................................................................6

ARGUMENT

    I.    State laws that extend receipt deadlines for mail-in ballots postmarked by Election Day comport with the Federal Election Day Statutes. ............................................................7

        A.    The text of the Federal Election Day Statutes does not prohibit Illinois's ballot receipt deadline. ...........................7

        B.    Many election activities occur after Election Day, confirming that post-Election-Day ballot receipt deadlines do not change the date of the election. .....................11

        C.    Congress has never repudiated or expressed disapproval of post-Election-Day ballot receipt deadlines....................................................................19

        D.    Applying Illinois's ballot receipt deadline does not conflict with Congress's purposes in enacting the Federal Election Day Statutes.................................................22

    II.    Illinois's ballot receipt deadline protects military and overseas voters. ...............................................................23

**TABLE OF CONTENTS (continued):**    **PAGE**

CONCLUSION ..................................................................................................29

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**CASES:**                                                                                          **PAGE**

*Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1 (2013)............................22

*Bloome v. Hograeff*, 61 N.E. 1071 (Ill. 1901) ........................................................16

*Bognet v. Secretary Commonwealth of Pa.*, 980 F.3d 336 (3d Cir. 2020),
    *vacated as moot sub nom. Bognet v. Degraffenreid*,
    141 S. Ct. 2508 (2021)...............................................................................7, 20

*Bourland v. Hildreth*, 26 Cal. 161 (1864)...................................................... 17-18

*Bush v. Hillsborough Cnty. Canvassing Bd.*,
    123 F. Supp. 2d 1305 (N.D. Fla. 2000) ............................................................24

*Chase v. Miller*, 41 Pa. 403 (1862), *abrogated by McLinko v.*
    *Department of State*, 279 A.3d 539 (Pa. 2022) ........................................ 17-18

*Donald J. Trump for President, Inc. v. Way*,
    492 F. Supp. 3d 354 (D.N.J. 2020)....................................................................14

*Elliott v. Hogan*, 315 S.W.2d 840 (Mo. Ct. App. 1958)............................................20

*Ex Parte Yarbrough (The Ku Klux Cases)*, 110 U.S. 651 (1884).............................2

*Foster v. Love*, 522 U.S. 67 (1997)................................................................. *passim*

*Hammond v. Hickel*, 588 P.2d 256 (Alaska 1978)......................................................20

*Harris v. Florida Elections Comm'n*, 235 F.3d 578 (11th Cir. 2000),
    *aff'g Harris v. Florida Elections Canvassing Comm'n*,
    122 F. Supp. 2d 1317 (N.D. Fla. 2000) .......................................................7, 12

*In re "An Act Providing for Soldiers Voting,"* 37 Vt. 665 (1865) .................... 18-19

*In re Opinion of Justs.*, 30 Conn. 591 (1862) ................................................... 17-18

*In re Opinions of Justs.*, 45 N.H. 595 (1864)...................................................... 17, 19

**CASES (continued):**                                                                    **PAGE**

*INTL FCStone Fin. Inc. v. Jacobson*, 950 F.3d 491 (7th Cir. 2020) ......................22

*Lehman v. McBride*, 15 Ohio St. 573 (1863).........................................................17

*Maddox v. Board of State Canvassers*, 149 P.2d 112 (Mont. 1944) ......................16

*Millsaps v. Thompson*, 259 F.3d 535 (6th Cir. 2001) ..................................... *passim*

*Morrison v. Springer*, 15 Iowa 304 (1863).............................................................17

*People ex rel. Twitchell v. Blodgett*, 13 Mich. 127 (1865).....................................18

*Republican Nat'l Comm. v. Democratic Nat'l Comm.*,
        140 S. Ct. 1205 (2020) (per curiam)..............................................................14

*State ex rel. Chandler v. Main*, 16 Wis. 398 (1863)...............................................17

*United States v. Alabama*, 857 F. Supp. 2d. 1236 (M.D. Ala. 2012) .....................26

*United States v. New York*, No. 1:10-cv-1214,
        2012 WL 254263 (N.D.N.Y. Jan. 27, 2012) .................................................26

*Voting Integrity Project, Inc. v. Bomer*, 199 F.3d 773 (5th Cir. 2000) ..............8, 10

*Voting Integrity Project, Inc. v. Keisling*,
        259 F.3d 1169 (9th Cir. 2001) ........................................................ 10, 19, 21

**CONSTITUTION AND STATUTES:**

U.S. Const. Art. I, § 4, Cl. 1.................................................................................. 2

U.S. Const. Art. II, § 1, Cl. 4 ..................................................................................2

Act of Feb. 2, 1872, § 3, 42d Cong., 2d Sess., 17 Stat. 28 ......................................2

Act of Jan. 23, 1845, 28th Cong., 2d Sess., 5 Stat. 721..........................................2

Act of June 4, 1914, 63d Cong., 2d Sess., § 1, 38 Stat. 384.................................... 3

**STATUTES (continued):**                                                    **PAGE**

Electoral Count Reform Act
    117 Pub. L. No. 328, Div. P, Tit. I, § 102(b), 136 Stat. 5233-5234 ............. 22

Help America Vote Act of 2002
    52 U.S.C. 21082(a)(1)-(3) ...................................................................... 12
    52 U.S.C. 21082(a)(4) ........................................................................... 12
    52 U.S.C. 21083(b)(2)(B)(ii) .................................................................. 21

Military and Overseas Voter Empowerment Act of 2009
    Pub L. No. 111-84, Div. A, Tit. V, Subtit. H, §§ 575-589,
    123 Stat. 2318-2335 ...............................................................................1, 3
    Pub. L. No. 111-84, Div. A, Tit. V, Subtit. H, § 579(a),
    123 Stat. 2322 ........................................................................................ 24
    Pub. L. No. 111-84, Div. A, Tit. V, Subtit. H, § 580(a),
    Sec. 103A(b), 123 Stat. 2324 ............................................................. 25-26

Uniformed and Overseas Citizens Absentee Voting Act of 1986
    52 U.S.C. 20301-20311 ........................................................................... 1
    52 U.S.C. 20302(a)(1) .............................................................................. 3
    52 U.S.C. 20302(a)(8) .............................................................................. 4
    52 U.S.C. 20302(g)(1)(A) ......................................................................... 4
    52 U.S.C. 20307 ....................................................................................... 1
    Pub. L. No. 99-410, 100 Stat. 924 ...................................................... 3, 25
    Pub. L. No. 99-410, § 102, 100 Stat. 925 ................................................ 25
    Pub. L. No. 99-410, § 103(b), 100 Stat. 925 ........................................... 25
    Pub. L. No. 99-410, § 103(b)(3), 100 Stat. 925 ...................................... 25

Voting Accessibility for the Elderly and Handicapped Act
    52 U.S.C. 20102(b)(2)(B)(ii) .................................................................. 21

Voting Rights Act
    52 U.S.C. 10502 ..................................................................................... 21
    52 U.S.C. 10502(a)(1) ............................................................................ 21
    52 U.S.C. 10502(d) ................................................................................ 21
    52 U.S.C. 10502(g) ................................................................................ 21

2 U.S.C. 1 ................................................................................................ 1, 2, 8

**STATUTES (continued):**                                                **PAGE**

2 U.S.C. 7 ............................................................................................... *passim*

3 U.S.C. 1 ............................................................................................... *passim*

3 U.S.C. 21(1) ................................................................................................ 2, 8

Fla. Stat. § 101.6952(5) (2023) ...........................................................................20

10 Ill. Comp. Stat. § 5/2A-1.1(a) (2023) ................................................... 23

10 Ill. Comp. Stat. § 5/2A-2 (2023) ........................................................... 23

10 Ill. Comp. Stat. § 5/2A-3 (2023) ........................................................... 23

10 Ill. Comp. Stat. § 5/2A-4 (2023) ........................................................... 23

10 Ill. Comp. Stat. § 5/18A-15(a) (2023) ................................................... 4

10 Ill. Comp. Stat. § 5/19-8(c) (2023) ...................................... 4, 13, 16, 23

N.D. Cent. Code § 16.1-07-09 (2023) .................................................... 20

N.D. Cent. Code § 16.1-07-26 (2023) .................................................... 20

N.D. Cent. Code § 16.1-15-17 (2023) .................................................... 20

2023 N.C. Sess. Laws 140, § 35 ............................................................ 20

Ohio Rev. Code Ann. § 3509.05(D)(2)(a) (West 2023) ......................................... 20

25 Pa. Stat. and Cons. Stat. § 3511 (2023) ........................................................ 20

**LEGISLATIVE HISTORY:**

116 Cong. Rec. 6996 (1970) .............................................................................. 22

156 Cong. Rec. 9762 (2010) .............................................................................. 4

**LEGISLATIVE HISTORY (continued):**           **PAGE**

156 Cong. Rec. 9767 (2010) .................................................................. 4, 24

H.R. Conf. Rep. No. 288, 111th Cong., 1st Sess. (2009) ....................................... 24

H.R. Rep. No. 765, 99th Cong., 2d Sess. (1986) ........................................... 3, 24-25

**MISCELLANEOUS:**

Alexander Keyssar, *The Right to Vote: The Contested History of Democracy in the United States* (rev. ed. 2009) ................................................................ 18

John Fritze et al., *Biden Wins:  Democrat Who Vowed Return to 'Normalcy' Defeats Trump in Cliffhanger Election*, USA Today (updated Nov. 9, 2020, 8:25 a.m.), https://perma.cc/5QFG-KGG6 .............. 11

Josiah Henry Benton, *Voting in the Field: A Forgotten Chapter of the Civil War* (1915), https://perma.cc/5HGD-K5JC .................................... 16-18

*Military and Overseas Voters Act*, Unif. L. Comm'n, https://perma.cc/5AVP-QP7X ..................................................................... 26

Nat'l Conf. of State Legislatures, *Report: Canvass, Certification and Contested Election Deadlines and Voter Intent Laws*, https://perma.cc/RVQ2-59XC ...................................................................... 13

Nat'l Conf. of State Legislatures, *Table 11:  Receipt and Postmark Deadlines for Absentee/Mail Ballots*, https://perma.cc/NX5Y-2ETA .... 19-20

Nat'l Conf. of State Legislatures, *What Time Is Allotted to Determine the Status of Provisional Ballots?*, *Report:  Provisional Ballots*, https://perma.cc/R3MM-64UZ ..................................................................... 12

*New Dictionary of the English Language* (Charles Richardson, ed. 1846)............ 15

Noah Webster, *Election*, *An American Dictionary of the English Language* (1828) ............................................................................ 15

**MISCELLANOUS (continued):** **PAGE**

Noah Webster, *Election*, *An American Dictionary of the English Language*
(rev. ed., Chauncey A. Goodrich, ed. 1860).................................................. 15

*Suspense!*, Nat'l Republican, Nov. 8, 1876, https://perma.cc/R44U-TDBH ......... 11

*The Universal English Dictionary* (John Craig, ed. 1861) ................................ 14-15

U.S. Dep't of Just., *Cases Raising Claims Under the Uniformed and
Overseas Citizen Absentee Voting Act*, https://perma.cc/5AVP-QP7X .. 26-27

*Victory Everywhere*, Knoxville Weekly Chron., Nov. 6, 1872,
https://perma.cc/7ZEE-K4JU ........................................................................ 11

## INTEREST OF THE UNITED STATES

This case presents an important question about the interpretation of the federal statutes setting a uniform national Election Day, 2 U.S.C. 1, 7; 3 U.S.C. 1 (the Federal Election Day Statutes). Resolution of this question may affect the United States' enforcement of the Uniformed and Overseas Citizens Absentee Voting Act of 1986, 52 U.S.C. 20301-20311 (UOCAVA), as amended by the Military and Overseas Voter Empowerment Act of 2009, Pub. L. No. 111-84, Div. A, Tit. V, Subtit. H, §§ 575-589, 123 Stat. 2318-2335 (MOVE Act). The Attorney General enforces UOCAVA. 52 U.S.C. 20307. The United States thus has an interest in making clear that state laws that extend receipt deadlines for mail-in ballots postmarked by Election Day comport with federal law. This brief is filed under Federal Rule of Appellate Procedure 29(a).

## STATEMENT OF THE ISSUE

The United States addresses the following question:

Whether Illinois's law allowing mail-in ballots postmarked by Election Day to be counted if received within 14 days of Election Day comports with federal statutes setting a uniform election date for federal elections.

**STATEMENT OF THE CASE**

**A.      Legal Background**

1.  The Constitution's Elections Clause grants States the power to determine "[t]he Times, Places and Manner of holding Elections for Senators and Representatives," but provides Congress the ability to "make or alter such Regulations."  U.S. Const. Art. I, § 4, Cl. 1.  The Elections Clause thus "invests the States with responsibility for the mechanics of congressional elections . . . so far as Congress declines to preempt state legislative choices."  *Foster v. Love*, 522 U.S. 67, 69 (1997) (citation omitted).  The Constitution also grants Congress the power to "determine the Time of chusing the Electors" for President and Vice President. U.S. Const. Art. II, § 1, Cl. 4.

Exercising these powers, Congress has designated "[t]he Tuesday next after the 1st Monday in November" as the "day for the election" of Members of Congress and the appointment of presidential electors, 2 U.S.C. 7 (House of Representatives); *accord* 2 U.S.C. 1 (Senate); 3 U.S.C. 1, 21(1) (electors).  These dates are longstanding:  Congress first set this uniform Election Day for presidential elections in 1845, Act of Jan. 23, 1845, 28th Cong., 2d Sess., 5 Stat. 721, and set the same election date for the House of Representatives in 1872, Act of Feb. 2, 1872, § 3, 42d Cong., 2d Sess., 17 Stat. 28; *Ex parte Yarbrough (The Ku Klux Cases)*, 110 U.S. 651, 661 (1884).  As States began to elect senators,

- 2 -

Congress tied their Election Day to that for representatives. *See* Act of June 4, 1914, 63d Cong., 2d Sess., § 1, 38 Stat. 384. Consistent with Article II, Section 1, Congress has provided that presidential electors are to be appointed "in accordance with the laws of the State enacted prior to election day." 3 U.S.C. 1.

2. In 1986, Congress passed and President Reagan signed UOCAVA. Pub. L. No. 99-410, 100 Stat. 924 (as amended, 52 U.S.C. 20301-20311). UOCAVA guarantees the right "to vote by absentee ballot in general, special, primary, and runoff elections for Federal office" to three categories of voters: members of the uniformed services absent from their place of residence due to service on active duty, their spouses and dependents who are also absent due to the servicemembers' active service, and United States citizens residing overseas. 52 U.S.C. 20302(a)(1). UOCAVA reflects Congress's longstanding determination that "protect[ing] the voting rights of all eligible citizens living, working or serving their country in uniform and overseas" is an important national interest, and that "the job of the Federal Government is to provide a mechanism so that a person can participate in elections." H.R. Rep. No. 765, 99th Cong., 2d Sess. 7, 13 (1986) (UOCAVA House Report).

In 2009, Congress went further by passing the MOVE Act, which President Obama signed into law. Pub. L. No. 111-84, Div. A, Tit. V, Subtit. H, §§ 575-589, 123 Stat. 2318-2335 (10 U.S.C. 1566a; 52 U.S.C. 20301, 20302-20308, 20311).

The MOVE Act amended UOCAVA in several ways, reaffirming Congress's commitment to providing military and overseas voters sufficient time to receive, mark, and return their ballots. *See* 156 Cong. Rec. 9762, 9767 (2010) (statement of Sen. Schumer). To "allow absent uniformed services voters and overseas voters enough time to vote," 52 U.S.C. 20302(g)(1)(A), the MOVE Act requires States to transmit validly requested ballots to UOCAVA voters at least 45 days before elections for federal office when the requests are received by that date, 52 U.S.C. 20302(a)(8).

### B.     Factual Background

The Illinois election code authorizes voting by mail and provides that vote-by-mail ballots received "after the polls close on election day" and before "the close of the [14-day] period for counting provisional ballots" shall be counted. 10 Ill. Comp. Stat. § 5/19-8(c) (2023); *see id.* § 5/18A-15(a) (setting provisional-ballot counting deadline). To be counted, however, such ballots must be "postmarked no later than election day." *Id.* § 5/19-8(c). If a ballot has no postmark or trackable bar code, it must have a certification date of Election Day or earlier, provided by the voter at the time of completing the ballot. *Ibid.*

On May 25, 2022, plaintiffs Michael J. Bost, Laura Pollastrini, and Susan Sweeney (collectively, Bost) filed a complaint against the Illinois State Board of Elections and its Executive Director, Bernadette Matthews (collectively, the

Board), challenging Illinois's post-Election-Day receipt deadline for mail-in ballots. Doc. 1.[1] As relevant here, the complaint alleges that the 14-day receipt deadline violates the Federal Election Day Statutes because ballots can be considered timely cast only if they are both sent and received by Election Day. *Id.* at 9-10. Bost sought a judgment declaring Illinois's ballot receipt deadline unlawful and an injunction prohibiting counting any ballots received after Election Day. *Id.* at 11.

The Board moved to dismiss Plaintiffs' complaint (Doc. 25), while Bost moved for summary judgment on his statutory claim (Docs. 32, 33). The district court granted the Board's motion and denied Bost's as moot. Doc. 80. As relevant here, the court held that Bost could not plausibly plead his statutory claim. Doc. 81, at 23-26.[2] It determined that Illinois's ballot receipt deadline "is facially compatible with" the Federal Election Day Statutes, because it "count[s] only th[o]se ballots that are postmarked no later than Election Day." *Id.* at 25-26. And it noted that Congress has not stepped in to alter the many state statutes that impose post-Election-Day deadlines for receiving mail-in ballots. *Id.* at 24-25.

---

[1] "Doc. _" refers to the docket number of documents filed in the district court. "Br. _" refers to Bost's opening brief on appeal.

[2] The Court also held that Bost lacked standing and that the Eleventh Amendment barred Bost's claims against the Illinois State Board of Elections. Doc. 81, at 8-23. The United States takes no position on these issues.

## SUMMARY OF ARGUMENT

Counting ballots after Election Day fully complies with the Federal Election Day Statutes if such ballots were mailed on or before Election Day. While the Supreme Court has held that a federal election may not legally conclude *before* Election Day, nothing in those statutes prevents States from receiving and counting ballots later that were properly cast *by* Election Day. States already must perform many tasks after Election Day to complete the legal process of holding an election, but the election still occurs for purposes of the Federal Election Day Statutes once all voters have made their choice of candidates in compliance with state law. And States may determine for themselves whether a vote is considered cast when it is mailed rather than when election officials receive it. Congress's longtime tolerance for post-Election-Day ballot receipt deadlines, and its purposes in enacting the Federal Election Day Statutes, confirm that such deadlines do not violate federal law.

Later ballot receipt deadlines like Illinois's protect military and overseas voters' right to vote, helping to fulfill Congress's design in passing UOCAVA. UOCAVA, amended by the MOVE Act, recognizes and incorporates States' different absentee ballot receipt deadlines, further indicating that all such deadlines comply with the Federal Election Day Statutes. The United States also routinely

- 6 -

seeks and receives court orders extending ballot receipt deadlines to remedy States'

violations of voters' UOCAVA rights.

## ARGUMENT

I.  **State laws that extend receipt deadlines for mail-in ballots postmarked by Election Day comport with the Federal Election Day Statutes.**

States have the discretion to determine for themselves whether to count

votes cast by Election Day but received after that date.  Such post-Election-Day

ballot receipt deadlines comply with the text of the Federal Election Day Statutes,

as interpreted by the Supreme Court in *Foster v. Love*, 522 U.S. 67 (1997), as well

as with the statutes' purposes.[3]

    A.  **The text of the Federal Election Day Statutes does not prohibit Illinois's ballot receipt deadline.**

Under the Elections Clause, "a state's discretion and flexibility in

establishing the time, place and manner of electing its federal representatives has

---

[3] Two circuits have suggested that post-Election-Day ballot receipt deadlines comply with the Federal Election Day Statutes.  The Third Circuit, in a since-mooted decision, concluded as part of its standing analysis that a state court decision extending the State's ballot receipt deadline "and federal laws setting the date for federal elections can, and indeed do, operate harmoniously." *Bognet v. Secretary Commonwealth of Pa.*, 980 F.3d 336, 354 (3d Cir. 2020), *vacated as moot sub nom. Bognet v. Degraffenreid*, 141 S. Ct. 2508 (2021).  And the Eleventh Circuit affirmed without analysis a decision that upheld Florida's post-Election-Day ballot receipt deadline for military and overseas voters against an argument that it conflicted with 3 U.S.C. 1.  *See Harris v. Florida Elections Comm'n*, 235 F.3d 578, 579 (11th Cir. 2000), *aff'g Harris v. Florida Elections Canvassing Comm'n*, 122 F. Supp. 2d 1317, 1324-1325 (N.D. Fla. 2000).

only one limitation:  the state system cannot directly conflict with federal election laws on the subject."  *Voting Integrity Project, Inc. v. Bomer*, 199 F.3d 773, 775 (5th Cir. 2000).  There is no conflict here.  The Federal Election Day Statutes set the first Tuesday after the first Monday in November as "the day for the election" of Members of Congress, 2 U.S.C. 7; *see* 2 U.S.C. 1 (tying Senate elections to same day of the year), and presidential electors, 3 U.S.C. 1, 21(1).  This language mandates only when the "election" must occur.  The text does not otherwise prohibit States from determining how to run their elections or dictate when a ballot is properly cast or counted.  "Put another way, there is no reason to think that simply because Congress established a federal election day it displaced all State regulation of the times for holding federal elections."  *Millsaps v. Thompson*, 259 F.3d 535, 549 (6th Cir. 2001).

The Supreme Court has embraced a narrow view of what state laws the Federal Election Day Statutes preempt.  In *Foster*, the Court considered Louisiana's practice of holding an "open primary" in October of federal election years.  522 U.S. at 68.  This primary "provide[d] an opportunity to fill" Congressional offices "without any action to be taken on federal election day."  *Id.* at 68-69.  A candidate who received a majority of the votes in the open primary was "elected"; the State held a "runoff" on the federal Election Day only if no

- 8 -

candidate received a majority in the primary. *Id.* at 70.  Over 80% of Louisiana's open primaries elected a candidate outright. *Ibid.*

While holding that Louisiana's practice violated 2 U.S.C. 7, the Court refused to ascribe to the Federal Election Day Statutes a broad preemptive scope, or to "isolat[e] precisely what acts a State must cause to be done on federal election day (and not before it) in order to satisfy the statute[s]." *Foster*, 522 U.S. at 72. Instead, the Court determined only "that a contested selection of candidates for a congressional office that is concluded as a matter of law before the federal election day, with no act in law or in fact to take place on the date chosen by Congress," violates the Federal Election Day Statutes. *Ibid.*

The Illinois ballot receipt deadline complies with *Foster* because it does not permit a federal election to be "concluded as a matter of law before the federal election day." 522 U.S. at 72.  In arguing otherwise, Bost stretches *Foster* far beyond what its holding and reasoning can bear.  He asserts that, because the *Foster* Court struck down a regime in which all the "combined actions" of voters and election officials could finish before Election Day, *Foster* requires that all such actions must also be completed *by* Election Day itself, and not after.  Br. 30 (quoting *Foster*, 522 U.S. at 71-72).  But *Foster* says no such thing.  Rather, *Foster* requires preemption only of laws that leave no "act in law or in fact to take place on" Election Day. 522 U.S. at 72.  Illinois's ballot receipt deadline passes muster

- 9 -

under *Foster* because Illinois sets Election Day itself as the deadline for the most significant act of all: the voter's casting of a vote.

Other courts have rejected similar calls to expand *Foster* beyond its moorings, holding that various early voting regimes comply with the Federal Election Day Statutes. *See Millsaps*, 259 F.3d at 545; *Voting Integrity Project, Inc. v. Keisling*, 259 F.3d 1169, 1176 (9th Cir. 2001); *Bomer*, 199 F.3d at 774. Plaintiffs in those cases made arguments like the one that Bost makes here, albeit on the other side of Election Day. They asserted "that the federal statutes, by establishing '*the* day for the election,' contemplate that the entire election, including all voting, will occur that day," and hence that counting any votes submitted before Election Day is illegal. *Bomer*, 199 F.3d at 775; *accord Keisling*, 259 F.3d at 1172; *Millsaps*, 259 F.3d at 546. As the Sixth Circuit noted, however, such arguments "overlook[] the Supreme Court's silence in *Foster* as to which acts a State must take on federal election day." *Millsaps*, 259 F.3d at 545; *see Bomer*, 199 F.3d at 776 ("[T]he Court in *Foster* recognized that some acts pertaining to the election of federal officials would be performed on days other than the federal election day."). Just as nothing in *Foster* prohibits election officials from receiving ballots *before* Election Day, nothing in *Foster* prohibits state officials from receiving and counting ballots *after* Election Day, as long as voters submit them by the federally prescribed Election Day.

- 10 -

**B.      Many election activities occur after Election Day, confirming that post-Election-Day ballot receipt deadlines do not change the date of the election.**

Bost's interpretation of the Federal Election Day Statutes also ignores the myriad activities that state laws require officials to undertake after Election Day to complete the process of electing federal officeholders.  These universal practices illustrate that federal elections still are deemed to occur on Election Day, even if key actions essential to the election occur after that date.

1.  a.  First, it is unavoidable that States must continue to count ballots after Election Day itself.  Indeed, States often cannot even determine the *unofficial* results of an election on Election Day.  The process of counting votes can run on for hours or days after the polls close on election night.  *See, e.g.*, John Fritze et al., *Biden Wins:  Democrat Who Vowed Return to 'Normalcy' Defeats Trump in Cliffhanger Election*, USA Today (updated Nov. 9, 2020, 8:25 a.m.), https://perma.cc/5QFG-KGG6 (describing the "days of vote-counting" leading to an unofficial call of the 2020 election five days after Election Day).  This was just as true at the time Congress adopted 2 U.S.C. 7.  *See, e.g.*, *Suspense!*, Nat'l Republican, Nov. 8, 1876, at 1, https://perma.cc/R44U-TDBH (detailing partial results from "close" 1876 presidential election the day after Election Day); *Victory Everywhere*, Knoxville Weekly Chron., Nov. 6, 1872, at 1, https://perma.cc/7ZEE-K4JU (same for 1872 presidential election).  "[Y]et votes are not routinely being

- 11 -

thrown out [under the Federal Election Day statutes] because they could not be counted on election day." *Harris v. Florida Elections Canvassing Comm'n*, 122 F. Supp. 2d 1317, 1325 (N.D. Fla.), *aff'd sub nom. Harris v. Florida Elections Comm'n*, 235 F.3d 578 (11th Cir. 2000).

Congress also has ensured that at least some vote-counting will occur after Election Day. As part of the Help America Vote Act of 2002 (HAVA), Congress mandated that nearly all States issue provisional ballots to voters whose eligibility to vote in a jurisdiction is in question and required poll workers to transmit those ballots to an appropriate election official for "prompt" verification. 52 U.S.C. 21082(a)(1)-(3). Only when "the appropriate State or local election official . . . determines that the individual is eligible under State law to vote" does HAVA provide that "the individual's provisional ballot shall be counted as a vote in that election in accordance with State law." 52 U.S.C. 21082(a)(4). This verification process cannot reasonably be finished on Election Day, particularly as provisional ballots often are cast during Election-Day in-person voting. As a result, the District of Columbia and the 48 States that issue provisional ballots *all* set post-Election-Day deadlines for counting them. *See* Nat'l Conf. of State Legislatures, *What Time Is Allotted to Determine the Status of Provisional Ballots?*, *Report: Provisional Ballots*, https://perma.cc/R3MM-64UZ (last updated Nov. 4, 2022). Indeed, Illinois tethered its ballot receipt deadline to its deadline for counting

provisional ballots, assuring that it can finish counting all validly cast ballots by the same date.  *See* 10 Ill. Comp. Stat. § 5/19-8(c) (2023).

b.  Second, the "actions of . . . officials meant to make a final selection of an officeholder" continue after a State completes its unofficial count.  *Foster*, 522 U.S. at 71.  Several other key election activities must by necessity take place after Election Day.  Election officials in all States must canvass the election, preparing final tallies.  *See* Nat'l Conf. of State Legislatures, *Report:  Canvass, Certification and Contested Election Deadlines and Voter Intent Laws*, https://perma.cc/RVQ2-59XC (last updated Oct. 26, 2022).  Local officials then send those results to a statewide entity to conduct a statewide canvass.  *See ibid.*  Candidates may contest the results, and state judges must determine whether certain votes should or should not be counted.  *See ibid.*  Finally, States review the results of the canvass and certify the results.  *See ibid.*  It is only then that States officially determine results and declare a winner.  All these activities take place after Election Day.  *See ibid.*; *see also Millsaps*, 259 F.3d at 546 n.5 (noting that "official action to confirm or verify the results of the election extends well beyond federal election day," and cataloging those post-Election-Day requirements in Tennessee).

2.  a.  Bost agrees that election officials may engage in "post-election canvassing" after Election Day without running afoul of the Federal Election Day Statutes.  Doc. 33, at 7; *see* Br. 31.  But in Bost's view (Br. 30-31, 35), Congress's

- 13 -

decision to set an Election Day means that ballots can be considered timely cast only if they have been *both* sent *and* received by that date.  "[T]he Federal Election Day Statutes," however, "are silent on methods of determining the timeliness of ballots."  *Donald J. Trump for President, Inc. v. Way*, 492 F. Supp. 3d 354, 372 (D.N.J. 2020).  "Providing various options for the time and place of depositing a completed ballot does not change 'the day for the election.'"  *Millsaps*, 259 F.3d at 545 (citation omitted).  As the Supreme Court recently recognized in a mail-in voting case, ballots need not be *received* by election officials to be considered *cast*—and it is the *casting* of the votes that matters for determining when the election takes place.  *See Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 140 S. Ct. 1205, 1207 (2020) (per curiam) ("Extending the date by which ballots may be cast by voters—*not just received by the municipal clerks but cast by voters*—for an additional six days after the scheduled election day fundamentally alters the nature of the election."  (emphasis added)).

Illinois law thus fully complies with *Foster*'s interpretation of "election" in the Federal Election Day Statutes.  522 U.S. at 71 (defining an "election" as the voters' "act of choosing a person to fill an office" (quoting N. Webster, *An American Dictionary of the English Language* 433 (Charles Goodrich & N. Porter eds. 1869))).  Other contemporaneous dictionaries likewise define the statutory term "election" in terms of the time at which voters make their choice.  *See The*

*Universal English Dictionary* 638 (John Craig, ed. 1861) (defining "election" as "the act of choosing a person to fill an office or employment by any manifestation of preference, as by ballot, uplifted hands, or *viva voce*"); *New Dictionary of the English Language* 649 (Charles Richardson, ed. 1846) (defining "elect" as "[t]o choose or pick out").

Bost points (Br. 32-33) to an alternative definition in *Webster's* 1830 and 1860 dictionaries, defining "election" as "[t]he day of a public choice of officers." But Bost's is the eighth of nine definitions of "election" in both *Webster's* editions. The second definition in each edition—and the first specific to the choice of officers—is simply "[t]he act of choosing a person to fill an office or employment, by any manifestation of preference, as by ballot, uplifted hands, or *viva voce*." Noah Webster, *Election*, *An American Dictionary of the English Language* 288 (1828), https://perma.cc/9SVD-48QA; Noah Webster, *Election*, *An American Dictionary of the English Language* 383 (rev. ed., Chauncey A. Goodrich, ed. 1860), https://perma.cc/R8CF-9FAN. The Supreme Court followed this definition, not Bost's, in *Foster*. *See* 522 U.S. at 71. Even Bost's chosen definition, however, does not support his argument that the Federal Election Day Statutes require a ballot to be both cast *and received* on Election Day. Illinois's statute requires that ballots must be cast, and therefore the "public choice" made, on Election Day itself.

- 15 -

Because Illinois's ballot receipt deadline requires ballots to be postmarked or certified by Election Day, 10 Ill. Comp. Stat. § 5/19-8(c) (2023), "the combined actions of voters and officials meant to make a final selection of an officeholder" become "complete by the time set by Congress" (Br. 30).[4]

b.  Contemporaneous practice also belies the notion that the word "election" in the Federal Election Day Statutes referred at the time of their passage solely to the "deadline by which all qualified votes must be received by local election officials."  Br. 35.  During the Civil War, 20 of 25 States, as well as 7 of 11 Confederate States, passed laws allowing soldiers in the field to vote.  Josiah Henry Benton, *Voting in the Field: A Forgotten Chapter of the Civil War* 4, 27-28, 312-313, 315 (1915), https://perma.cc/5HGD-K5JC; *see also id.* at 269-270 (discussing similar New Jersey law implemented from 1815-1819).  In most of these States, military officers were authorized to set up polling places in the field, and soldiers would vote for local, state, or federal offices on the relevant state or

---

[4]  The two state cases Bost cites to support his contrary view both involved questions about where and how voters must cast their ballots *under state law*.  *See Maddox v. Board of State Canvassers*, 149 P.2d 112, 115 (Mont. 1944) (interpreting state law that "provide[d] for voting by ballots deposited with the election officials"); *Bloome v. Hograeff*, 61 N.E. 1071, 1072 (Ill. 1901) (allowing votes to be counted when voters had "proved everything necessary to establish their legality" but election judge had rejected their votes).  Neither holds that States may not choose to consider votes cast when mailed.

federal election day.[5]  Military officers or regular soldiers, rather than local civilian

election officials, usually operated these polling places and collected and counted

ballots from soldiers eligible to vote under state law.[6]

While soldiers cast these votes on the congressionally mandated federal

Election Day for presidential elections, and on their States' chosen election days

for other elections, the soldiers' ballots still had to be sent back to election officials

in their home States so those officials could canvass the votes and add the valid

ones to the totals cast by traditional voters.  This fact meant that soldiers' votes

were not "received by local election officials" (Br. 35) until *after* the dates that 3

U.S.C. 1 or state law set as the relevant election day.[7]  States often gave military

---

[5]  Benton 15, 17, 43, 49, 63-64, 70-71, 74, 87, 100-101, 106, 115, 122, 129, 156, 171-172, 186, 190, 201-202, 217-218, 239; *see, e.g.*, *In re Opinions of Justs.*, 45 N.H. 595, 596-597 (1864); *Bourland v. Hildreth*, 26 Cal. 161, 177 (1864); *Morrison v. Springer*, 15 Iowa 304, 338 (1863); *Lehman v. McBride*, 15 Ohio St. 573, 589 (1863); *State ex rel. Chandler v. Main*, 16 Wis. 398, 411 (1863); *In re Opinion of Justs.*, 30 Conn. 591, 591 n.* (1862); *Chase v. Miller*, 41 Pa. 403, 416 (1862), *abrogated by McLinko v. Department of State*, 279 A.3d 539 (Pa. 2022).

[6]  *See* Benton 17, 43, 49, 64, 74, 87-88, 106, 115-116, 122, 129, 156, 171-172, 186, 201-202, 218, 239-240; *Morrison*, 15 Iowa at 338-339; *State ex rel. Chandler*, 16 Wis. at 422; *In re Opinion of Justs.*, 30 Conn. at 591 n.*.

[7]  *See* Benton 43, 64, 71-72, 74, 89, 100-101, 106, 116-117, 123-124, 129, 156, 171-172, 186-187, 218-219, 240-241; *Lehman*, 15 Ohio St. at 603-604 (noting that Ohio's law "extend[ed] the time for receiving and opening the returns of votes cast under the act"); *In re Opinion of Justs.*, 30 Conn. at 591 n.* ("[A]ll the ballots cast . . . shall be sealed up by the commanding officer, and be by him forthwith transmitted by mail to the secretary of state at Hartford.").

voters until the deadline for canvassing in-state ballots to have their votes delivered to state election officials, and some States even extended their canvassing periods to accommodate the military vote.  Benton 317-318.[8]

Though some state supreme courts struck down these laws—at least as applied to state and local elections—for violating limits on the *places* of election in their state constitutions, none questioned that such votes were properly cast at the *time* of the election, even though soldiers' votes could not be received by election officials in their States on Election Day.[9]  Indeed, the New Hampshire Supreme Court expressly held that its soldier voting law "correspond[ed] . . . with the laws

---

[8]  Some States chose to appoint commissioners to visit each regiment, collect soldiers' ballots, and return them to local election officials, in a manner not dissimilar to absentee voting.  *E.g.*, Benton 71-72, 180; *see also* Alexander Keyssar, *The Right to Vote: The Contested History of Democracy in the United States* 121 (rev. ed. 2009) (noting that, in 17th-century Massachusetts, "men whose homes were vulnerable to Indian attack were permitted to vote without leaving their abodes"); *contra* Br. 35 n.20 (asserting that "absentee voting was yet to be invented" when Congress passed Federal Election Day Statutes).  To say, then, that neither Congress nor the public could have contemplated deeming votes cast when submitted (*see* Br. 35 & n.20) is speculative at best.

[9]  *See, e.g.*, Benton 101; *In re "An Act Providing for Soldiers Voting,"* 37 Vt. 665 (1865), slip op. 22, https://perma.cc/86AQ-QFZ7; *Bourland*, 26 Cal. at 179, 186; *In re Opinion of Justs.*, 30 Conn. at 599, 601, 604; *Chase*, 41 Pa. at 419; *but cf. People ex rel. Twitchell v. Blodgett*, 13 Mich. 127, 143, 146 (1865) (opinion of Campbell, J.) (reading language of state constitution mandating residency "in the township or ward in which he offers to vote" to mean that "[t]he vote must take effect as a vote . . . on the day and at the place where the constitution has fixed the election").

- 18 -

of Congress" with respect to the date for choosing presidential electors, *In re Opinions of Justs.*, 45 N.H. 595, 599 (1864), and the Vermont Supreme Court likewise saw "no ground to question" its soldier voting law under the federal statute, *In re "An Act Providing for Soldiers Voting*," 37 Vt. 665 (1865), slip op. 24, https://perma.cc/XF8C-AZEH.

Congress presumably was aware of the States' widespread practice when, eight years after the Civil War's end, it enacted 2 U.S.C. 7 without requiring votes to be both cast and received by Election Day. Congress also did not amend 3 U.S.C. 1 to disturb States' understanding that ballots could be counted in presidential elections when submitted by voters on Election Day, even when those ballots would not be received by local election officials until a later date.

### C.   Congress has never repudiated or expressed disapproval of post-Election-Day ballot receipt deadlines.

Illinois's law draws additional support from "the long history of congressional tolerance, despite the federal election day statute, of absentee balloting" with post-Election-Day receipt deadlines. *Keisling*, 259 F.3d at 1175. Illinois is one of 18 States (plus the District of Columbia) that accept and count mail-in ballots received after Election Day if they are postmarked on or before Election Day. *See* Nat'l Conf. of State Legislatures, *Table 11: Receipt and Postmark Deadlines for Absentee/Mail Ballots*, https://perma.cc/NX5Y-2ETA (last

updated July 12, 2022).[10]  "And many States also accept absentee ballots mailed by [UOCAVA voters] that are received after Election Day."  *Bognet v. Secretary Commonwealth of Pa.*, 980 F.3d 336, 354 (3d Cir. 2020), *vacated as moot sub nom. Bognet v. Degraffenreid*, 141 S. Ct. 2508 (2021).  For instance, Florida imposes a ten-day extension for some elections, Fla. Stat. § 101.6952(5) (2023), and Pennsylvania a seven-day extension, 25 Pa. Stat. and Cons. Stat. § 3511 (2023).

Many of these statutes have existed for decades.  *See, e.g.*, *Hammond v. Hickel*, 588 P.2d 256, 268 (Alaska 1978); *Elliott v. Hogan*, 315 S.W.2d 840, 848 (Mo. Ct. App. 1958).  Yet Congress has never suggested that these laws violate the Federal Election Day Statutes or amended those statutes to preempt post-Election-Day ballot receipt deadlines.  Congress's continued tolerance of laws like Illinois's illustrates that a "[d]eadline [e]xtension and federal laws setting the date for federal elections can, and indeed do, operate harmoniously."  *Bognet*, 980 F.3d at 354.

---

[10]  North Dakota currently accepts ballots for longer after Election Day, N.D. Cent. Code §§ 16.1-07-09, 16.1-07-26, 16.1-15-17 (2023), and Ohio for less time, Ohio Rev. Code Ann. § 3509.05(D)(2)(a) (West 2023), than listed in this table. And North Carolina eliminated post-Election-Day ballot receipt for many voters in October 2023, though it continues to allow ballots to be received through the post-election canvass date for military and overseas voters.  *See* 2023 N.C. Sess. Laws 140, § 35 (amending N.C. Gen. Stat. § 163-231(b)(2) (2023) but not N.C. Gen. Stat. §§ 163-258.10, 163.258.12 (2023)).

If anything, Congress has expressed a strong preference for *enlarging* access to mail-in voting. Provisions of UOCAVA, pp. 24-26, *infra*, HAVA, 52 U.S.C. 21083(b)(2)(B)(ii), and the Voting Accessibility for the Elderly and Handicapped Act, 52 U.S.C. 20102(b)(2)(B)(ii), for instance, all provide for or reduce barriers to absentee voting.

Section 202 of the Voting Rights Act, 52 U.S.C. 10502, passed in 1970, goes a step further. Congress was concerned that "the lack of sufficient opportunities for absentee registration and absentee balloting in presidential elections . . . denies or abridges the inherent constitutional right of citizens to vote for their President and Vice President." 52 U.S.C. 10502(a)(1). It therefore required all States to allow absentee voting for those who apply seven days before the election "and have returned such ballots to the appropriate election official of such State not later than the time of closing of the polls in such State on the day of such election." 52 U.S.C. 10502(d). While the statute thus *requires* States to count any qualifying absentee ballots for President received by Election Day, Congress also provided that States may "adopt[] less restrictive voting practices than" the statute mandated. 52 U.S.C. 10502(g).

Section 202, which is "of equal force" to the Federal Election Day Statutes, "plainly provides for liberality toward absentee balloting" in presidential elections. *Keisling*, 259 F.3d at 1176. And Congress passed the provision with full

- 21 -

knowledge that some States had post-Election-Day ballot receipt deadlines:  The

provision's sponsor, Senator Barry Goldwater, provided research informing

Congress that 40 States at the time already "expressly permit[ted] absentee ballots

of certain categories of their voters to be returned as late as the day of the election

*or even later*."  116 Cong. Rec. 6996 (1970) (statement of Sen. Goldwater)

(emphasis added).[11]

> **D.**  **Applying Illinois's ballot receipt deadline does not conflict with Congress's purposes in enacting the Federal Election Day Statutes.**

Because the text of the Federal Election Day Statutes does not prohibit

Illinois's ballot receipt deadline, "there is no need to" consider the statutes'

"purpose."  *INTL FCStone Fin. Inc. v. Jacobson*, 950 F.3d 491, 499 (7th Cir. 2020)

(citation omitted); *see also Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S.

1, 15 (2013) (stating that "there is no compelling reason not to read Elections

Clause legislation simply to mean what it says").  However, the legality of

---

[11] Bost's invocation (Br. 36) of the recently enacted Electoral Count Reform Act (ECRA) takes nothing away from Congress's continued tolerance of post-Election-Day ballot receipt deadlines.  The ECRA redefines "election day" to accommodate "force majeure events" if state law so allows.  117 Pub. L. No. 328, Div. P, Tit. I, § 102(b), 136 Stat. 5233-5234 (3 U.S.C. 21(1)).  But the ECRA fully "modifies the period of voting" in such cases, *ibid.*, allowing voters not merely to have their ballots counted if *received* by the new date but also to *cast their ballots* by that date.  The ECRA authorizes a change in the federal Election Day itself, but it says nothing about how long after that date ballots may be *counted*.

Illinois's ballot receipt deadline "is buttressed by an appreciation of Congress's object" in enacting the Federal Election Day Statutes. *Foster*, 522 U.S. at 73.

As the Supreme Court noted in *Foster*, in enacting a uniform Election Day, "Congress was concerned" with two principal problems:  (1) "the distortion of the voting process threatened when the results of an early federal election in one State can influence later voting in other States," and (2) "the burden on citizens forced to turn out on two different election days to make final selections of federal officers in Presidential election years."  522 U.S. at 73.  Illinois's ballot receipt deadline implicates neither concern.  First, Illinois law requires that voters must vote and mail in their ballots by Election Day, before any election results are publicized.  10 Ill. Comp. Stat. § 5/19-8(c) (2023).  And second, the ballot receipt deadline applies equally to all federal elections, which maintain the same, federally prescribed Election Day.  *Ibid.*; *see id.* §§ 5/2A-1.1(a), 5/2A-2 to -4 (following federal-law election date for federal elections).

## II.     Illinois's ballot receipt deadline protects military and overseas voters.

Laws like Illinois's also provide critical protection for UOCAVA voters. The extended deadline ensures that these voters can receive, cast, and return their ballots in time for them to be counted.  The Illinois law at issue here is not dissimilar to the remedies often proposed and ordered in UOCAVA cases the United States routinely brings.

Today, absentee voting laws generally are the only means by which American citizens deployed in the uniformed services or otherwise living overseas can exercise their right to vote.  Despite Congress's repeated efforts, many military and overseas voters have continued to face difficulties exercising their franchise. *See, e.g.*, *Bush v. Hillsborough Cnty. Canvassing Bd.*, 123 F. Supp. 2d 1305, 1310 (N.D. Fla. 2000).  Prior to UOCAVA's adoption, the "single largest reason for disenfranchisement of military and overseas voters [was] State failure to provide adequate ballot transit time."  UOCAVA House Report 10.  After problems persisted with delayed UOCAVA ballots, Congress further addressed the issue through the MOVE Act.  In an effort to "provide[] sufficient time for UOCAVA voters to request, receive and cast their ballots in time [for them] to be counted," 156 Cong. Rec. 9767 (2010) (statement of Sen. Schumer), the Act "require[s] States to transmit a validly requested absentee ballot to an absent uniformed services voter or overseas voter at least 45 days before an election for federal office," H.R. Conf. Rep. No. 288, 111th Cong., 1st Sess. 744 (2009); *see* Pub. L. No. 111-84, Div. A, Tit. V, Subtit. H, § 579(a), 123 Stat. 2322 (52 U.S.C. 20302(a)(8)(A)).  This history of congressional action reflects a strong commitment to ensuring that military service members and overseas citizens enjoy access to the ballot box comparable to that of domestic civilians.

- 24 -

Indeed, UOCAVA recognizes and honors States' varying ballot receipt deadlines. Under UOCAVA, States are required to "permit uniformed services voters and overseas voters to . . . vote by absentee ballot in . . . elections for Federal office." Pub. L. No. 99-410, § 102, 100 Stat. 925 (52 U.S.C. 20302(a)(1)). Should covered voters request state absentee ballots but not receive them by 30 days before a federal election, the voters can submit alternative federal absentee ballots that are "submitted and processed in the manner provided by law for absentee ballots in the State involved." § 103(b), 100 Stat. 925 (as amended 52 U.S.C. 20303(b)). The federal ballots would not be counted, however, if the voters' state absentee ballots ended up being "received by the appropriate State election official not later than the deadline for receipt of the State absentee ballot under State law." § 103(b)(3), 100 Stat. 925 (52 U.S.C. 20303(b)(3)). UOCAVA thus did not assume that all ballots must be received by Election Day; it instead incorporated States' various deadlines. *See* UOCAVA House Report 14.

The MOVE Act continued this deference to States' ballot receipt deadlines. It added a provision that required State-designated officials to ensure that overseas servicemembers' ballots "for regularly scheduled general elections for Federal office" are delivered, not necessarily by the federal Election Day, but rather by whatever "date by which an absentee ballot must be received in order to be counted in the election." Pub. L. No. 111-84, Div. A, Tit. V, Subtit. H, § 580(a),

Sec. 103A(b), 123 Stat. 2324 (52 U.S.C. 20304(b)(1)).  Congress's deference to

States' ballot receipt deadlines further confirms that federal law maintains States'

freedom to decide the point at which a ballot is considered cast.[12]

Since UOCAVA's enactment, the United States repeatedly has enforced the

statute against States that transmitted ballots late, to prevent military and overseas

voters from being disenfranchised in federal elections.  *See, e.g.*, *United States v.*

*Alabama*, 857 F. Supp. 2d. 1236, 1242 (M.D. Ala. 2012); *United States v. New*

*York*, No. 1:10-cv-1214, 2012 WL 254263, at *1 (N.D.N.Y. Jan. 27, 2012).  In

most of these UOCAVA cases, the remedy has involved extending the receipt

deadline beyond Election Day for military and overseas voters' absentee ballots

cast by Election Day.  The United States has secured the extension of UOCAVA

ballot receipt deadlines by court-ordered consent decrees, court orders, or

settlement agreements as a remedy for the late transmission of UOCAVA ballots

since the statute was enacted in 1986.  *See* note 13, *infra*.  Since the year 2000

alone, the United States has secured such ballot receipt extensions in 29 of its cases

and agreements.  *See* U.S. Dep't of Just., *Cases Raising Claims Under the*

---

[12] The Uniform Military and Overseas Voters Act (UMOVA), a model statute drafted by the Uniform Law Commission, contains various measures to protect UOCAVA voters, including an extended post-Election-Day ballot receipt deadline.  *See Military and Overseas Voters Act*, Unif. L. Comm'n, https://perma.cc/5AVP-QP7X (last visited August 30, 2023).  Fifteen States and the District of Columbia have adopted UMOVA.  *See ibid.*

*Uniformed and Overseas Citizen Absentee Voting Act*, https://perma.cc/CQG5-M4PH (last updated Mar. 24, 2022).  Many of the agreements or court orders that the United States has obtained to remedy UOCAVA violations have extended ballot receipt deadlines for UOCAVA voters for a period after Election Day equal to the number of days after the federal-law deadline that the States transmitted the UOCAVA ballots.[13]

In Illinois alone, the United States has sued the State for late ballot transmissions to UOCAVA voters twice in the last 12 years.  The remedies in those cases have included an extension of Illinois's existing ballot receipt deadline, as well as other changes to election calendars, to ensure that UOCAVA voters have

---

[13]  *See, e.g.*, Consent Decree, *United States v. West Virginia*, No. 2:14-cv-27456 (S.D. W. Va. Nov. 3, 2014) (extending ballot receipt deadline by seven days); Consent Decree, *United States v. Wisconsin*, No. 3:12-cv-00197 (W.D. Wis. Mar. 23, 2012) (extending deadline by number of days of late transmission); Consent Decree, *United States v. New York*, No. 1:09-cv-00335 (N.D.N.Y. Mar. 26, 2009) (extending deadline by six days); Order, *United States v. Georgia*, No. 1:04-cv-02040 (N.D. Ga. July 16, 2004) (extending deadline by three business days); Consent Decree, *United States v. Michigan*, No. 1:92-cv-00529 (W.D. Mich. Aug. 3, 1992) (extending deadline by 20 days); Consent Decree, *United States v. New Jersey*, No. 3:92-cv-2403 (D.N.J. June 2, 1992) (extending deadline by 14 days); Consent Decree, *United States v. Colorado*, No. 1:90-cv-01419 (D. Colo. Aug. 10, 1990) (extending deadline by ten days); Consent Decree, *United States v. New Jersey*, No. 3:90-cv-02357 (D.N.J. June 5, 1990) (extending deadline by ten days); Consent Decree, *United States v. Oklahoma*, No. 88-cv-1444 (W.D. Okla. Aug. 22, 1988) (extending deadline by ten days); Consent Decree, *United States v. Michigan*, No. 88-cv-208 (W.D. Mich. July 29, 1988) (extending deadline by ten days); Consent Decree, *United States v. Idaho*, No. 88-cv-1187 (D. Idaho May 21, 1988; entered May 23, 1988) (extending deadline by ten days).

sufficient time to receive, mark, and return their ballots. *See* Consent Decree, *United States v. Illinois*, No. 1:10-cv-06800 (N.D. Ill. Oct. 22, 2010); Consent Decree, *United States v. Illinois*, No. 1:13-cv-00189 (N.D. Ill. Jan. 11, 2013).

The relief the United States seeks in UOCAVA cases provides an adequate opportunity for military and overseas voters to return their ballots, by extending the receipt deadline, while also providing that ballots must be executed and sent by Election Day. Illinois's ballot receipt deadline operates the same way. By requiring ballots to be postmarked or certified by Election Day, Illinois ensures that all valid votes are cast by Election Day, thereby complying with the Federal Election Day Statutes. But by allowing additional time for election officials to receive those cast ballots, the ballot receipt deadline protects the rights of UOCAVA voters to have their valid votes counted.

# CONCLUSION

The Court should affirm on the issue addressed.

Respectfully submitted,

KRISTEN CLARKE
  Assistant Attorney General

s/ Noah B. Bokat-Lindell
ELIZABETH PARR HECKER
NOAH B. BOKAT-LINDELL
  Attorneys
  U.S. Department of Justice
  Civil Rights Division
  Appellate Section
  Ben Franklin Station
  P.O. Box 14403
  Washington, D.C.  20044-4403
  (202) 598-0243

**CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limit of Federal Rules of Appellate Procedure 29(a)(5) and 32(a)(7)(B)(i) and Circuit Rule 29 because it contains 6995 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).  This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5) and (6) and Circuit Rule 32(b) because it was prepared in Times New Roman 14-point font using Microsoft Word for Microsoft 365.

s/ Noah B. Bokat-Lindell
NOAH B. BOKAT-LINDELL
 Attorney

Date:  December 6, 2023