No. 23-2644

IN THE UNITED STATES COURT OF
APPEALS FOR THE SEVENTH CIRCUIT

—————————————

MICHAEL J. BOST, ET AL.,

*Plaintiffs-Appellants*,

v.

ILLINOIS STATE BOARD OF ELECTIONS AND BERNA-
DETTE MATTHEWS, IN HER OFFICIAL CAPACITY AS
THE EXECUTIVE DIRECTOR OF THE ILLINOIS STATE
BOARD OF ELECTIONS,

*Defendants-Appellees.*

—————————————

On Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division
Case No. 1:22-cv-02754
The Honorable Judge John F. Kness

—————————————

**REPLY BRIEF OF PLAINTIFFS-APPELLANTS**
—————————————

Christine Svenson, Esq.
**SVENSON LAW OFFICES**
345 N. Eric Drive
Palatine, IL 60067
(312) 467-2900
christine@svensonlawoffices.com

T. Russell Nobile
   *Counsel of Record*
**JUDICIAL WATCH, INC**
P.O. Box 6592
Gulfport, MS 39506
(202) 527-9866
Rnobile@judicialwatch.org

Eric W. Lee
**JUDICIAL WATCH, INC.**
425 Third Street SW
Suite 800
Washington, D.C. 20024

December 22, 2023

*Counsel for Plaintiffs-Appellees*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ iii

I.  Plaintiffs Have Alleged Multiple Forms of Valid Standing ................................................. 1

    A.  Plaintiffs Have Standing as Candidates ................................................................. 1

        1.  The Unlawful Ballot Receipt Deadline Inflicts Tangible Monetary
        and Resource Costs on Plaintiffs' Campaigns .............................................. 1

        2.  Plaintiffs Have Suffered Intangible Injuries as Candidates ........................ 6

    B.  Plaintiffs Have Plausibly Alleged Concrete and Particularized
    Injuries as Voters ................................................................................................... 8

II.  This Action Is Not Subject to Dismissal on Grounds of Sovereign Immunity ................. 10

III.  Defendants' Merit Arguments Are Fundamentally Flawed ............................................... 12

    A.  Federal Time Regulations Preempt State Manner Regulations ............................ 12

    B.  Plaintiffs' Claims Do Not Impede UOCAVA Compliance or Enforcement ........ 15

    C.  ISBE's New Arguments Do Not Change the Historical Record That Shows
    that *Foster's* Final Act of Selection Is Ballot Receipt ........................................ 16

    D.  Plaintiffs Have Alleged Sufficient Facts to Show a Plausible Constitutional
    Violation Under 42 U.S.C. § 1983 ...................................................................... 20

CONCLUSION ............................................................................................................... 21

# TABLE OF AUTHORITIES

**CASES**                                                               **PAGE**

*Abbott v. Biden*, 70 F.4th 817 (5th Cir. 2023)..................................................18

*ACORN v. Edgar*, 56 F.3d 791 (7th Cir. 1995)..............................................11, 15

*Am. Bottom Conservancy v. United States Army Corps of Eng'rs*,
    650 F.3d 652 (7th Cir. 2011) ....................................................................12

*Anderson v. United States*, 417 U.S. 211 (1974) ...............................................9

*Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n.*, 576 U.S. 787 (2015)...................11

*Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1 (2013) ...........................11, 12

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) ...........................................2

*Bognet v. Sec'y of Pa.*, 980 F.3d 336 (3d Cir. 2020) ........................................8, 9

*Bostock v. Clayton Cnty.*, 140 S. Ct. 1731 (2020) ...........................................16

*Carson v. Simon*, 978 F.3d 1051 (8th Cir. 2020)...........................................6, 7, 8

*Casio, Inc. v. S.M. & R. Co.*, 755 F.2d 528 (7th Cir. 1985)....................................4

*Cherokee Nation v. Southern K.R. Co.*, 135 U.S. 641 (1890)....................................11

*Clapper v. Amnesty Int'l USA*, 568 U.S. 398 (2013) ..........................................5

*Democratic Nat'l Comm. v. Wis. State Legis.*, 141 S. Ct. 28 (2020) ...........................14

*Ex parte Siebold*, 100 U.S. 371 (1880) .......................................................15

*Ex parte Young*, 209 U.S. 123 (1908) .........................................................10

*Foster v. Love*, 522 U.S. 67 (1997) ..................................................... *passim*

*Hrubec v. Amtrak*, 981 F.2d 962 (7th Cir. 1992)..............................................4

*Kohl v. United States*, 91 U.S. 367 (1875)................................................ 10-11

*Krislov v. Rednour*, 226 F.3d 851 (7th Cir. 2000) .............................................8

*Lance v. Coffman*, 549 U.S. 437 (2007) .......................................................7

*Libertarian Party of Ill. v. Scholz*, 872 F.3d 518 (7th Cir. 2017) ....................................................8

*Love v. Foster*, 90 F.3d 1026 (5th Cir. 1996) ...............................................................................20

*Lujan v. Defs. of Wildlife*, 504 U.S. 555 (1992)...........................................................................6

*Mack v. Resurgent Cap. Servs., L.P.*, 70 F.4th 395 (7th Cir. 2023) ..........................................2

*Miller v. FDIC*, 738 F.3d 836 (7th Cir. 2013) .............................................................................4

*Millsaps v. Thompson*, 259 F.3d. 535 (6th Cir. 2001) .............................................................14, 20

*N.Y. State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111 (2022).............................................16

*New Prime Inc. v. Oliveira*, 139 S. Ct. 532 (2019).....................................................................16

*PennEast Pipeline Co., LLC v. New Jersey*, 141 S. Ct. 2244 (2021) ...........................................10

*Persinger v. Southwest Credit Sys., L.P.*, 20 F.4th 1184 (7th Cir. 2021) ...................................1, 2

*Purcell v. Gonzalez*, 549 U.S. 1 (2006) .........................................................................................9

*Republican Party v. Degraffenreid*, 141 S. Ct. 732 (2021) .........................................................9

*Reynolds v. Sims*, 377 U.S. 533 (1964).........................................................................................9

*Roe v. Alabama ex rel. Evans*, 43 F.3d 574 (11th Cir. 1995) ........................................................9

*Rosario v. Rockefeller*, 410 U. S. 752 (1973) .............................................................................14

*Rumsfeld v. Forum for Academic and Institutional Rights, Inc.*, 547 U.S. 47 (2006)...................1

*Silha v. ACT, Inc.*, 807 F.3d 169 (7th Cir. 2015) .........................................................................3

*Spuhler v. State Collection Serv., Inc.*, 983 F.3d 282 (7th Cir. 2020) ...........................................3

*TransUnion LLC v. Ramirez*, 141 S. Ct. 2190 (2021) ..................................................................1

*Trump v. Wis. Elections Comm'n*, 983 F.3d 919 (7th Cir. 2020) .........................................6, 7, 8

*U.S. ex rel. Hanna v. City of Chicago*, 834 F.3d 775 (7th Cir. 2016)............................................4

*U.S. Term Limits v. Thornton*, 514 U.S. 779 (1995)....................................................................10

*United States v. Munsingwear, Inc.*, 340 U.S. 36 (1950) ...............................................................9

*United States v. Saylor*, 322 U.S. 385 (1944) ...............................................................9

*Voter Integrity Project, Inc. v. Bomer*, 61 F. Supp. 2d 600 (S.D. Tex. 1999) ...............20

*Voting Integrity Project, Inc. v. Bomer*, 199 F.3d. 773 (5th Cir. 2000).........................14

*Voting Integrity Project, Inc. v. Keisling*, 259 F.3d 1169 (9th Cir. 2001) .........14, 16, 20

*Wheeler v. Hronopoulos*, 891 F.3d 1072 (7th Cir. 2018) ...............................................4

**CONSTITUTIONAL PROVISIONS**

U.S. Const. art. I, § 4, cl. 1 ......................................................................10, 11, 12, 15

U.S. Const. art. I, § 8, cl. 15 ..........................................................................................18

U.S. Const. art. I, § 8, cl. 16 ..........................................................................................18

U.S. Const. art. II, § 1, cl. 2 ................................................................................6, 11, 12, 15

U.S. Const. art. II, § 1, cl. 4 ...........................................................................................11

U.S. Const. amend. XI.....................................................................................................10

**FEDERAL STATUTES**

2 U.S.C. § 7...............................................................................................................*passim*

3 U.S.C. § 1...............................................................................................................*passim*

3 U.S.C. § 5.....................................................................................................................13

42 U.S.C. § 1983.......................................................................................................20, 21

52 U.S.C. § 20302...........................................................................................................15

52 U.S.C. § 20307...........................................................................................................15

52 U.S.C. § 21082...........................................................................................................19

**FEDERAL RULES**

Fed. R. Civ. P. 8 ...............................................................................................................2

# STATE STATUTES

Ala. Code § 17-11-18.................................................................................18

Ark. Code. Ann. § 7-5-411 ........................................................................18

Cal. Elec. Code. § 3020 .............................................................................18

D.C. Code § 1-10001.05 ...........................................................................18

Fla. Stat. § 101.6952 .................................................................................18

Ga. Code Ann. § 21-2-386 ........................................................................18

Ind. Code § 3-12-1-17 ...............................................................................18

Kan. Stat. Ann. § 25-1132 .........................................................................18

Mass. Gen. Laws ch. 54, § 93 ...................................................................18

Md. Code Regs. 33.11.03.08......................................................................18

Mich. Comp. Laws § 168.759a ..................................................................18

Miss. Code. Ann. § 23-15-637 ...................................................................18

Mo. Rev. Stat. § 115.920 ...........................................................................18

Nev. Rev. Stat. § 293.269921 ....................................................................18

N.J. Stat. Ann. § 19:63-22..........................................................................18

N.Y. Elec. Law § 8-412 .............................................................................18

Or. Rev. Stat. § 253.070(3) ........................................................................18

R.I. Gen Laws § 17-20-16..........................................................................18

S.C. Code Ann. § 7-15-700.........................................................................18

S.C. Code Ann. § 7-17-10...........................................................................18

Tex. Elec. Code Ann. § 86.007....................................................................18

Utah Code Ann. § 20A-3a-204 ...................................................................18

Va. Code Ann. § 24.2-709 ...................................................................................18

W. Va. Code § 3-3-5 .........................................................................................18

W. Va. Code § 3-5-17 .......................................................................................18

10 Ill. Comp. Stat. Ann. § 5/19-8............................................................. *passim*

25 Pa. Cons. Stat. § 3511 .................................................................................18

**OTHER**

Albert Edward McKinley, THE SUFFRAGE FRANCHISE IN THE THIRTEEN
    ENGLISH COLONIES IN AMERICA (1905)...............................................16

Alex Keyssar, *The Right to Vote: The Contested History of Democracy
    in the United States* (2000) ...........................................................16

Charles Stewart III, *How We Voted in 2020: A First Look at the Survey of the
    Performance of American Elections*, MIT Election Data + Science Lab,
    (Dec. 15, 2020) .............................................................................19

Cong. Globe, 42 Cong., 2d Sess. 676 (1872)..............................................16

Cortland F. Bishop, HISTORY OF ELECTIONS IN THE AMERICAN COLONIES (1893) ......................16

DEBATES IN THE SEVERAL STATE CONVENTIONS ON THE ADOPTION
    OF THE FEDERAL CONSTITUTION (Jonathan Elliot ed., 1836)............................11

J. Harris, ELECTION ADMINISTRATION IN THE UNITED STATES (1934) .........................19

James M. McPherson, BATTLE CRY OF FREEDOM: THE CIVIL WAR ERA (1988)..........................17

John C. Fortier & Norman J. Ornstein, *Symposium, Election Reform:
    The Absentee Ballot and the Secret Ballot: Challenges For Election Reform*,
    36 U. MICH. J.L. REFORM 483 (2003) ................................................19

Josiah Henry Benton, VOTING IN THE FIELD (1915) ..............................................17, 18

Robert T. Reagan, Fed. Jud. Ctr., *Overseas Voting: The Uniformed
    and Overseas Citizens Absentee Voting Act* ...................................... 15-16

Tbl. 11: Receipt and Postmark Deadlines for Absentee/Mail Ballots, Nat'l Conf.
    of State Legis. ...............................................................................18

THE FEDERALIST No. 59 (C. Rossiter ed. 1961) (A. Hamilton).....................................11

*The Overseas Citizens Voting Rights Act of 1975 and S. 703*
  *Before S. Comm. on Rules and Admin.*, 95th Cong. (1977).............................................15

Plaintiffs-Appellants Congressman Michael J. Bost, Laura Pollastrini, and Susan Sweeney (collectively "Plaintiffs") respectfully submit this reply memorandum of law in response to the brief of Defendants-Appellees Illinois State Board of Elections ("ISBE") and its Executive Director Bernadette Matthews, in her official capacity, (together "Defendants"), and in further support of Plaintiffs' request that the judgment of the district court be reversed.

## I.     Plaintiffs Have Alleged Multiple Forms of Valid Standing.

### A.     Plaintiffs Have Standing as Candidates.

The clearest reason to conclude that Plaintiffs have standing is that Illinois' Ballot Receipt Deadline has inflicted concrete, particular, tangible and intangible injuries on them as candidates for office. Defendants (and the one *amicus* discussing the issue) seem to tacitly acknowledge the strength of this point in the time-honored way litigants often do, deemphasizing candidate standing by addressing it last. ISBE 18-22.[1] But Plaintiffs' injuries as candidates are wholly sufficient to establish their standing. Accordingly, this case is justiciable, regardless of the outcome of any other arguments concerning standing. *See Rumsfeld v. Forum for Academic and Institutional Rights, Inc.*, 547 U.S. 47, 52 n.2 (2006) ("[T]he presence of one party with standing is sufficient to satisfy Article III's case-or-controversy requirement." (citations omitted)).

### 1.     The Unlawful Ballot Receipt Deadline Inflicts Tangible Monetary and Resource Costs on Plaintiffs' Campaigns.

As set forth in Plaintiffs' opening brief, "[t]angible harms, like physical or monetary harms, 'readily qualify as concrete injuries.'" *Persinger v. Southwest Credit Sys., L.P.*, 20 F.4th 1184, 1190 (7th Cir. 2021) (quoting *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2204 (2021)); *see*

---

[1]       "Dkt." refers to the docket number of the documents filed in the district court docket. "A.\_" refers to the required appendix attached to Plaintiffs' opening brief. "Bost \_" refers to Plaintiffs' opening brief. "ISBE \_" refers to Defendants' brief. "US \_" refers to the United States' *Amicus Curiae* brief. "DPI\_" refers to the Democratic Party of Illinois' ("DPI") *Amicus Curiae* brief. "DC \_" refers to the District of Columbia, et al.'s *Amici Curiae* brief.

*Mack v. Resurgent Cap. Servs., L.P.*, 70 F.4th 395, 406 (7th Cir. 2023) ("money damages are almost always found to be concrete harm" (citing *Persinger*, 20 F.4th at 1190)). As also discussed in the opening brief, Plaintiffs' campaigns have had to spend money and resources after Election Day because of Illinois' unlawful Ballot Receipt Deadline.[2] Bost 4-6 and 16-21.

Defendants argue that "Plaintiffs' resource-allocation standing theory is largely a creature of litigation; it is not 'clearly' alleged in the complaint." ISBE 19. This is not so. The Complaint alleges money damages incurred after Election Day on account of Illinois' unlawful statute. *See* Dkt. 1 ¶ 45, A.8 ("10 Ill. Comp. Stat. Ann. § 5/19-8 requires counties to hold open voting and count ballots received after Election Day"); *id.* ¶ 46, A.8 ("Defendants, acting under color of Illinois law," are "forcing Plaintiffs to spend money, devote time, and otherwise injuriously rely on unlawful provisions of state law in organizing, funding, and running their campaigns"); *id*. ¶ 33, A.7 ("Plaintiffs rely on provisions of federal and state law in conducting their campaigns including, in particular, resources allocated to the post-election certification process.").

These allegations easily satisfy the standards governing notice pleading under Fed. R. Civ. P. 8. It is well-settled that a "complaint does 'not need detailed factual allegations,' but … 'enough to raise a right to relief above the speculative level[.]'" *Mack*, 70 F.4th at 405 (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). "A complaint may meet this standard by pleading enough factual matter (taken as true) 'to raise a reasonable expectation that discovery will reveal evidence of' a necessary element of the claim." *Id*. (quoting *Twombly*, 550 U.S. at 556). In "evaluating whether a complaint adequately pleads the elements of standing, courts … 'must accept as true all material allegations … [and] construe the complaint in favor of the complaining party.'"

---

[2]     "Election Day" and "Election Day statutes" used herein refer to "election day" as used in 2 U.S.C. § 7 and 3 U.S.C. § 1.

*Silha v. ACT, Inc.*, 807 F.3d 169, 173 (7th Cir. 2015) (citations omitted); *Spuhler v. State Collection Serv., Inc.*, 983 F.3d 282, 285 (7th Cir. 2020) ("a plaintiff may demonstrate standing by clearly pleading allegations that 'plausibly suggest' each element of standing when all reasonable inferences are drawn in the plaintiff's favor" (citations omitted)). The allegations in the cited paragraphs, in the context of the rest of the allegations in the complaint, "'plausibly suggest' each element of standing"—in this case, candidate standing—"when all reasonable inferences are drawn in the plaintiff's favor." *Id*. (citations omitted).[3]

But Plaintiffs went beyond the requirements of notice pleading, citing sworn testimony in the record detailing the specific tangible injuries caused by Defendants' conduct. Congressman Bost for instance, described how, since 2005, his campaign has incurred ever-increasing post-election costs because of the Ballot Receipt Deadline. Dkt. 31-4 ¶¶ 11-20. Plaintiffs Pollastrini and Sweeney also testified to resource costs compelled by that law. Dkt. 31-5 ¶¶ 10-13, 17; Dkt. 31-6 ¶¶ 9-10, 12-13.

Defendants further contend, however, that Congressman Bost's declaration cannot be considered in determining standing because a motion to dismiss must be decided solely on the basis of the allegations in the complaint. ISBE 20.[4] They are wrong, for several reasons. First, this is a new argument, so Defendants cannot raise it now. Plaintiffs' opposition to the motion to dismiss

---

[3] Defendants state that "[o]n appeal, plaintiffs do not cite or acknowledge the complaint" regarding candidate standing. ISBE 20. This is demonstrably incorrect. *See* Bost 4. Plaintiffs also relied on the paragraphs cited in the text here in briefing before the district court. Dkt. 43 at 20.

[4] Defendants state that "the district court did not consider Bost's declaration in resolving" the motion to dismiss. ISBE 20. This is demonstrably incorrect. In discussing Congressman Bost's claim to have lost campaign resources, the district court referred to a portion of Plaintiffs' brief opposing dismissal that was devoted to Congressman Bost's declaration (A.29, citing Dkt. 43 at 8) and then discussed the facts he set forth. A.28-30.

expressly relied on Congressman Bost's declaration, which was already in the record.[5] Dkt. 43 at 8-9. Defendants could have argued in their reply brief (Dkt. 52) or at oral argument (Dkt. 74) that the declaration should not be considered in determining the motion to dismiss. They did not. "Failing to bring an argument to the district court means that you waive that argument on appeal." *Wheeler v. Hronopoulos*, 891 F.3d 1072, 1073 (7th Cir. 2018) (citations omitted).

The argument is also wrong as a matter of law. "The party defending the adequacy of a complaint may point to facts in a brief or affidavit 'in order to show that there is a state of facts within the scope of the complaint that if proved … would entitle him to judgment." *U.S. ex rel. Hanna v. City of Chicago*, 834 F.3d 775, 779 (7th Cir. 2016) (citation omitted); *Hrubec v. Amtrak*, 981 F.2d 962, 963-964 (7th Cir. 1992) ("A plaintiff need not put all of the essential facts in the complaint. He may add them by affidavit or brief—even a brief on appeal."). Moreover, "[w]hen subject-matter jurisdiction is disputed, the district court may properly look beyond the jurisdictional allegations of the complaint and view whatever evidence has been submitted on the issue to determine whether in fact subject matter jurisdiction exists." *Miller v. FDIC*, 738 F.3d 836, 840 (7th Cir. 2013) (citations and internal quotations omitted); *see also Casio, Inc. v. S.M. & R. Co.*, 755 F.2d 528, 530 (7th Cir. 1985) (even where a "complaint omitted essential jurisdictional allegations," if there "was enough evidence in the record to support the district judge's rejection of [a] motion to dismiss … the deficiency in the complaint is not fatal" (citation omitted)).

Accordingly, Plaintiffs' declarations may be considered in determining this motion. Congressman Bost explains that post-election activities during the fourteen additional days ballots are received, and in particular the need to resolve the many "late-arriving ballots [with] discrepancies

---

[5]     Congressman Bost's declaration was filed along with Plaintiffs' motion for partial summary judgment (Dkt. 32) only three days after Defendants filed their motion to dismiss (Dkt. 26). The two motions were then briefed contemporaneously.

(e.g., insufficient information, missing signatures, dates, or postmarks)" and to "evaluate whether to object to the counting of deficient ballots," imposes real costs, measured in "time, money, and volunteers." Dkt. 31-4 ¶¶ 15-16; *see* Bost 4-6. These costs are not speculative, they are concrete and real tangible harms. Congressman Bost confirms that *he has already incurred them for the past eighteen years*, since the law was changed in 2005—and that these costs have rapidly increased in the past ten years, since a 2013 law allowed voting by mail. Dkt. 31-4 ¶¶ 14-15. Plaintiffs Pollastrini and Sweeney detailed similar tangible resource cost allocation as a result of the Illinois law. *See* Dkt. 31-5 ¶¶ 10-13, 17; Dkt. 31-6 ¶¶ 9-10, 12-13.

Thus, both the district court and Defendants are wrong to maintain that Plaintiffs and Congressman Bost in particular are "choosing to make expenditures based on hypothetical future harm that is not certainly impending," citing *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 402 (2013). A.29-30; ISBE 21. The challenged federal law in *Clapper* authorized the Attorney General to conduct surveillance of non-citizens residing outside the U.S. The plaintiffs claimed that there was "an objectively reasonable likelihood that their communications" with non-citizens "will be acquired" under the law "at some point in the future," and claimed to have incurred present expenses in order protect themselves against that future risk. *Id*. at 401-02, 410. These claims were held to be speculative. Congressman Bost, by contrast, has incurred additional campaign expenses for eighteen years on account of the extended Ballot Receipt Deadline. He is not speculating when he anticipates these expenses.

The contention that Bost's claimed expenses are speculative is flawed for another reason. As pointed out in Plaintiffs' opening brief, the district court inserted its own unacknowledged factual contentions about the efficacy of spending beyond Election Day into its holding on this issue. A.30 (Congressman Bost can only "watch the results roll in"); *see id*. (his "electoral fate is

sealed … on Election Day, regardless of the resources he expends after the fact"); *see* Bost 19. The district court's statements plainly have no basis in the record, as all sworn testimony in this case was submitted by Plaintiffs. These statements, moreover, are factually incorrect. At trial, Plaintiffs can elicit testimony that it is a practical necessity for campaigns to monitor and object to deficient ballots, that these can change the outcome of an election, and, indeed, that it is professional malpractice for a congressional campaign to close its operations before all ballots are received and counted. But Plaintiffs are not obligated in a complaint to plead rebuttals to factual challenges.

Plaintiffs' tangible injuries as candidates afford them standing.

### 2. Plaintiffs Have Suffered Intangible Injuries as Candidates.

Plaintiffs also allege that they have endured intangible injuries as candidates, citing *Trump v. Wis. Elections Comm'n*, 983 F.3d 919 (7th Cir. 2020), and *Carson v. Simon*, 978 F.3d 1051 (8th Cir. 2020). *Trump* concerned the Wisconsin Election Commission's exercise of powers delegated to it by the state Legislature to administer "laws relating to elections and election campaigns." 983 F.3d at 923 (citation and internal quotations omitted). The former president alleged "that the Commission and municipal officials so misused the power granted to them by the Legislature that they had unconstitutionally altered the 'Manner' by which Wisconsin appointed its electors," thereby violating the Electors Clause, U.S. CONST. art. II, § 1, cl. 2. *Id*. The Court held that "[a]s a candidate for elected office, the President's alleged injury is one that 'affect[s] [him] in a personal and individual way.'" *Id*. at 924 (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 n.1 (1992), and *Carson*, 978 F.3d at 1058).

In *Carson*, an extension to a ballot receipt deadline was adopted by means of a consent decree rather than by the action of the state legislature. 978 F.3d at 1054. Plaintiff presidential electors, who were recognized as "candidates" under Minnesota law, argued that this means of

adopting the change was unlawful. *Id*. at 1057. The Eighth Circuit credited the plaintiffs' argument that "they have a cognizable interest in ensuring that the final vote tally accurately reflects the legally valid votes cast," holding that "[a]n inaccurate vote tally is a concrete and particularized injury to candidates such as the Electors." *Id*. at 1058. The complaint in this action alleges the same injury described in *Trump* and *Carson*. *See* Dkt. 1 ¶ 32 ("Plaintiffs are entitled to have their elections results certified with votes received in compliance with the federal Election Day statutes.").

In a bit of lawyerly spin, Defendants title their section on intangible injuries "Compliance with the Law" (ISBE 22), and cite the admonition in *Lance v. Coffman*, 549 U.S. 437, 439-40 (2007) that the Court is not a "forum for generalized grievances" such as complaining that "the Government [must] be administered according to law." (Citations and internal quotations omitted.) But neither *Trump* nor *Carson* held that there was such a broad right, so they do not conflict with *Lance*. As the Court in *Carson* put it, candidates—not the general public, nor the taxpayers in *Lance*—have standing to complain when a "final vote tally" does not accurately reflect "the legally valid votes cast." 978 F.3d at 1058. This narrow holding is restricted to interests specific to candidates. Indeed, the Eighth Circuit specifically rejected the idea that the standing they describe is a generalized interest in complying with the law: "The Electors here have standing independently as elector candidates. Their standing is not based on Minnesota's ability, or lack of ability, to 'enforce its duly enacted laws.'" *Id*. at 1058 n.1.

Defendants argue that compliance with electoral law can only support candidate standing when a law "affects his or her electoral prospects." ISBE 22. But *Trump* never says this. And

*Trump* cites *Carson* approvingly, in which candidates' "electoral prospects" played no role at all.[6]

Thus, Defendants' proposed principle, with which they hoped to distinguish not just *Trump*, but all of Plaintiffs' other intangible injuries (ISBE 22-24), does not state the law in this circuit. In related contexts, this Court has recognized injuries to the constitutional right to stand for office that did not depend on candidates' practical, electoral prospects. *Cf. Libertarian Party of Ill. v. Scholz*, 872 F.3d 518, 522 (7th Cir. 2017) (party had to standing to challenge "full slate" requirement even though it was barred from the ballot for another reason, *viz.*, failure to meet the signature requirement); *cf. also Krislov v. Rednour*, 226 F.3d 851, 857-58 (7th Cir. 2000) (candidates still had standing to challenge rules for gathering signatures even though they managed to gather the required number).

Plaintiffs' intangible injuries as candidates afford them standing.

### B. Plaintiffs Have Plausibly Alleged Concrete and Particularized Injuries as Voters.

While Plaintiffs' standing as candidates is firmly established under existing law, Plaintiffs also plausibly allege that they have standing as voters to object to the dilution of their votes caused by the receipt and counting of unlawful ballots arriving after Election Day.

In their response, Defendants, like the district court, rely extensively on *Bognet v. Sec'y of Pa.*, 980 F.3d 336 (3d Cir. 2020), *vacated and remanded with instructions to dismiss as moot sub nom. Bognet v. Degraffenreid*, 141 S. Ct. 2508 (2021), which is the only case cited *passim* in their

---

[6]     Defendants argue that the complaint in *Carson* pleads harm to electoral prospects to some extent. ISBE 23 n.8. But it is the Eighth Circuit's ruling, not the complaint, that states the law in that case. In any event, Defendants publicly announced that the tranche of late-arriving ballots would change electoral outcomes. Bost 6; A. 5-6; and Dkt. 1 ¶19-22.

brief. Arguing that the case should be considered "persuasive," Defendants basically treat the vacated ruling in *Bognet* like any other decision by another circuit court. ISBE 12 n.4. This is misguided. As the Supreme Court explained,

> The established practice of the Court in dealing with a civil case … which has become moot while on its way here or pending our decision on the merits is to reverse or vacate the judgment below and remand with a direction to dismiss. … That procedure clears the path for future relitigation of the issues between the parties and eliminates a judgment, review of which was prevented through happenstance. When that procedure is followed, the rights of all parties are preserved; none is prejudiced by a decision which in the statutory scheme was only preliminary.

*United States v. Munsingwear, Inc*., 340 U.S. 36, 39-40 (1950). The whole point of vacating cases like *Bognet* is that the parties stopped litigating the case once it became moot. We will never know how that case would have been resolved on and after appeal, so it is hazardous to rely on it.[7]

In any case, *Bognet* was an outlier on the issue of an injury due to vote dilution. As discussed in Plaintiffs' opening brief, the concept of vote dilution on account of unlawful ballots has long been recognized in American law, in the context of redistricting, but also in other voting contexts. *See* Bost 21-22, (discussing *Reynolds v. Sims*, 377 U.S. 533 (1964); *U.S. v. Saylor*, 322 U.S. 385 (1944); *Anderson v. United States*, 417 U.S. 211 (1974); *Roe v. Alabama ex rel. Evans*, 43 F.3d 574 (11th Cir. 1995)); *see also Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006) (confirming state's interest in voter identification requirement because "the right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote," citing *Reynolds*).

In their latest attempt to distinguish a hypothetical vote dilution challenge where Illinois officials received and counted ballots from citizens of France, Defendants argue that this would be "not be merely a time, place, and manner regulation" but "an expansion of the franchise itself."

---

[7]     Indeed, two months prior to *Bognet*'s vacatur, three justices in a parallel case wrote that plaintiffs' claims that the Pennsylvania Supreme Court decision violated the U.S. Constitution were "sufficiently meritorious to warrant review." *See Republican Party v. Degraffenreid*, 141 S. Ct. 732, 737 (2021) (Thomas, J., dissenting); *see also id.* at 738 (Alito, J., dissenting).

ISBE 16 n.5. This is playing with words. Regardless of how it is characterized, the fundamental *injury* to voters is the same—vote dilution. Defendants' artful wording ("[t]o the the extent voters might have standing") leaves the basic question unanswered: under Defendants' reading of the law, who *would* have standing to challenge that action?

Plaintiffs have alleged claims for standing based on vote dilution.

## II.     This Action Is Not Subject to Dismissal on Grounds of Sovereign Immunity.

Defendants concede, as they must, that "the Eleventh Amendment does not bar plaintiffs' claims for injunctive and declaratory relief against Matthews." ISBE 40 n.15 (citing *Ex parte Young*, 209 U.S. 123, 156 (1908)). Thus, all claims in this action could never be dismissed on that basis. If the district court intended to dismiss the entire action on that ground, it erred. Bost 29-30.

With respect to Defendant ISBE, Illinois has waived sovereign immunity under the "plan of the Convention doctrine." Defendants argue that because the Article I powers of the states and Congress operate concurrently and both the state legislature and Congress have dual powers under the Elections Clause, federal power is not "complete in itself" and the plan of the Convention doctrine for sovereign immunity waiver should not apply.[8] ISBE 42-43. But even if the states have some authority in the area, that does not mean federal power is not "complete in itself." Indeed, in *PennEast*, the Supreme Court recognized that states do have some eminent domain powers in certain circumstances. But when the federal government exercised those powers, the state powers must give way in order for the Congress to exercise its full authority. *PennEast Pipeline Co., LLC v. New Jersey*, 141 S. Ct. 2244, 2259 (2021) ("'The plan of the Convention contemplated that States' eminent domain power would yield to that of the Federal Government.'") (quoting *Kohl v.*

---

[8]     *But see U.S. Term Limits v. Thornton*, 514 U.S. 779, 804 (1995) (recognizing that under the plan of the Convention state "powers over the election of federal officers had to be delegated to, rather than reserved by, the States").

*United States*, 91 U.S. 367, 372 (1875)); *Cherokee Nation v. Southern K.R. Co.*, 135 U.S. 641, 656 (1890).

Likewise, the plan of the Convention contemplated that States' powers would also yield with respect to federal elections. The Elections Clause of the U.S. Constitution "invests the States with responsibility for the mechanics of congressional elections … but only so far as Congress declines to pre-empt state legislative choices." *Foster v. Love*, 522 U.S. 67, 69 (1997) (citations omitted); *see Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n.*, 576 U.S. 787, 814-15 (2015) ("The dominant purpose of the Elections Clause, the historical record bears out, was to empower Congress to override state election rules, not to restrict the way States enact legislation.").[9] Once Congress exercises that authority, as it did here in 2 U.S.C. § 7 establishing the date for the election of representatives to Congress, that authority is "complete in itself" and any state sovereignty must give way. *ACORN v. Edgar*, 56 F.3d 791, 796 (7th Cir. 1995) (the "fatal compromise" of "state sovereignty" is "built into the Constitution, precisely in Article I section 4, the first sentence of which places the burden of administering federal elections on the states"). With respect to the Electors Clause, Congressional power over the state's time for choosing electors is plenary.[10] States retained no authority whatsoever over time regulations in Article II.

---

[9] The grant of complete Congressional power over the timing of federal elections "was the Framers' insurance against the possibility that a State would refuse to provide for the election of representatives to the Federal Congress." *Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 8 (2013); *see also* THE FEDERALIST No. 59, at 362-63 (C. Rossiter ed. 1961) (A. Hamilton) (providing exclusive authority in state legislatures "would leave the existence of the Union entirely at their mercy. They could at any moment annihilate it by neglecting to provide for the choice of persons to administer its affairs"). The solution was the Elections Clause, which "enables Congress to alter such regulations as the states shall have made with respect to elections." DEBATES IN THE SEVERAL STATE CONVENTIONS ON THE ADOPTION OF THE FEDERAL CONSTITUTION 68 (Jonathan Elliot ed., 1836).

[10] Defendants incorrectly claim that "the timing of States' appointment of presential electors" is "a power given to States by the Electors Clause, *see* U.S. Const. art. II, § 1, cl. 2." ISBE 26 n.10. Defendants overlook art. II, § 1, cl. 4, which provides "Congress may determine the Time of chusing the Electors, and the Day on which they shall give their Votes; which Day shall be the same throughout the United States." Thus, Congress has plenary power, if it chooses to exercise it, with respect to Time regulations for presidential electors.

Accordingly, states waived sovereign immunity in the plan of the Convention with respect to time regulations of federal elections when they ratified the Constitution.

## III. Defendants' Merit Arguments Are Fundamentally Flawed.

### A. Federal Time Regulations Preempt State Manner Regulations.

Defendants first argue the Election Day statutes do not preempt Illinois' Ballot Receipt Deadline, relying primarily on *Arizona*, 570 U.S. at 14.[11] (ISBE 25-29). This argument fails to acknowledge the unique constitutional issues involved with federal statutes enacted pursuant to the Elections and Electors Clauses. *See Arizona*, 570 U.S. at 14. "There is good reason for treating Elections Clause legislation differently: The assumption that Congress is reluctant to pre-empt does not hold when Congress acts under that constitutional provision, which empowers Congress to 'make or alter' state election regulations." *Id.* Such legislation "necessarily displaces some element of a pre-existing legal regime erected by the States." *Id.* "Elections Clause legislation is unique precisely because it always falls within an area of concurrent state and federal power." *Id.* at n. 6. "*[A]ll* action under the Elections Clause displaces some element of a pre-existing state regulatory regime, because the text of the Clause confers the power to do exactly (and only) that." *Id.*

Next, Defendants reframe Plaintiffs' claims as an effort to prohibit *counting* ballots after Election Day. ISBE 27-28. The most basic problem with this characterization is that it is untrue. If Plaintiffs prevail, Defendants can still count and canvass ballots as they have been doing. What they cannot do is to continue to accept late-arriving ballots and to treat them as timely "cast" and

---

[11] Defendants ask this court to change the judgment from a dismissal without to a dismissal with prejudice. ISBE 25 n.9. This request to change the judgment is not well taken as Defendants did not file a cross-appeal. *Am. Bottom Conservancy v. United States Army Corps of Eng'rs*, 650 F.3d 652, 660 (7th Cir. 2011) ("An appellee who wants, not that the judgment of the district court be affirmed on an alternative ground, but that the judgment be changed, in this case from a dismissal without to a dismissal with prejudice, must file a cross-appeal[.]" (citations omitted)).

received on or before Election Day. Bost 30-32. Notwithstanding that Plaintiffs do not seek to change how and when counting occurs, Defendants' argument that Election Day statutes do not speak to "when" ballot counting occurs goes too far. ISBE 27. The Election Day statutes are part of a series of statutes, such as the Electoral Count Act ("ECA"), which provide implicit and explicit deadlines by which canvassing and certification need to occur.[12] If the Defendants' arguments were true, then why does Illinois require mailed ballots to be postmarked "no later than election day"? The evident purpose is to ensure counting begins shortly after that day, in order to satisfy the ECA's deadlines. 10 Ill. Comp. Stat. Ann. § 5/19-8.

Defendants argue that *Foster* is too narrow to be applicable here (ISBE 27-28), that Plaintiffs read too much into its holding (ISBE 30-31), and, that, regardless, Illinois' Receipt Deadline complies with *Foster*'s "final act of selection." ISBE 32-33. Plaintiffs agree that *Foster* is narrow in that it only addressed the meaning of "the election" as used in Election Day statutes, but that is one of the two federal statutes at issue here, which means it controls. 522 U.S. at 69. *Foster* explained "the election" "plainly refers to the combined actions of voters and officials meant to make a final selection of an officeholder[.]" *Id.* at 71. The instant case is the natural analog to *Foster* and raises its unanswered question: what constitutes the "final act of selection within the meaning of the law[?]" *Id*. at 72; *see also* Dkt. 43 at 8, and Dkt. 53 at 1.

Defendants further argue, without support, that *Foster*'s interpretation of 2 U.S.C. § 7 was merely a "tacit acknowledgment that States might establish regulatory regimes under which many aspects of the electoral process might occur *before* Election Day, leaving only some 'final act of

---

[12]     *See, e.g.*, 3 U.S.C. § 5(a)(1) provides a deadline for issuing certificates of ascertainment of appointment of electors, which contemplates state completing counting by that date.

selection'—some isolated 'act in law or fact'—to occur on Election Day."[13] ISBE 31. But the Fifth, Sixth, and Nineth Circuits all relied on *Foster*'s reading of "the election" to uphold early voting in several states. *Voting Integrity Project, Inc. v. Keisling*, 259 F.3d. 1169 (9th Cir. 2001); *Millsaps v. Thompson*, 259 F.3d. 535 (6th Cir. 2001); *Voting Integrity Project, Inc. v. Bomer*, 199 F.3d. 773 (5th Cir. 2000).[14] All three found "final act of selection" controlling with respect to the meaning of "the election," and none suggested, as Defendants argue here, that it was merely a "tacit acknowledgment" of one or another aspect of States' regulatory authority.[15]

Defendants then argue that even if *Foster* applies, ballot transmission, not receipt, is the final act of selection in Illinois. ISBE 32. But if that were true, then the final act of selection under *Foster* needs to be completed by Election Day, and in Illinois it lasts as many as fourteen days beyond Election Day. In any case Defendants offer no historical support for this new argument, let alone explain how the public could have interpreted the transmission of ballots in 1845 or 1872 to mean "the election." If Defendants are correct, then there is no limit to post-election receipt, especially if, per Defendants' other arguments, federal Election Day statutes do not regulate "when" ballots should be counted. A "reasonable election deadline" does "not disenfranchise voters who are capable of meeting the deadline but fail to do so." *Democratic Nat'l Comm. v. Wis. State Legis.*, 141 S. Ct. 28, 35 (2020) (Kavanaugh, J., concurring) (citing *Rosario v. Rockefeller*, 410 U. S. 752, 757-58 (1973)).

---

[13] Plaintiffs disagree with Defendants' interpretation, but even if it were correct, Plaintiffs contend that ballot receipt is *the* "act in law or fact" that must occur on or before Election Day. The final act of selection can no more conclude fourteen days *after* Election Day than it can fourteen days *before*.

[14] The *Millsaps* court noted the long history related to absentee voting. 259 F.3d. at 547-49. It determined early voting was indistinguishable from absentee voting and, thus, the long history was applicable to that case. *Id.* There is no comparable long history of post-election ballot receipt here.

[15] Indeed, *Keisling* emphasized the final act of selection, noting that unlike *Foster* there was still "a residual ritual of in person voting at central election offices still to take place on [Election Day]." 259 F.3d. at 1174. That residual ritual involved state officials receiving in-person ballots on Election Day. *Id.* Here, ballots are still being received as many as fourteen days *after* the "residual ritual" identified in *Keisling*.

Defendants argue that the Receipt Deadline is a permissible state Manner regulation under the Elections and Electors Clauses. ISBE 23 ("simply governs *how* eligible voters can vote"); *see also* US 6. Louisiana made this very argument in *Foster*, which the Court rejected. 522 U.S. at 72-73. "The regulations made by Congress are paramount to those made by the State legislature; and if they conflict therewith, the latter, so far as the conflict extends, ceases to be operative." *Id.* at 69 (citing *Ex parte Siebold*, 100 U.S. 371, 384 (1880)). And this Court has clearly said that regulations such as those under 2 U.S.C.§ 7 are *timing* regulations. *See Edgar*, 56 F.3d. at 794.

### B. Plaintiffs' Claims Do Not Impede UOCAVA Compliance or Enforcement.

UOCAVA, as amended, requires states to transmit absentee ballots to covered overseas voters at least 45 days before a federal election if timely requested.[16] 52 U.S.C. § 20302. It does not extend ballot receipt deadlines or allow states to do the same. Plaintiffs agree that extensions have been used by federal courts as a *remedy* for UOCAVA violations and that since Congress amended UOCAVA in 2009 to provide the hard 45-day deadline, the United States has remedied violations by extending ballot receipt deadlines for a period equal to the delay.[17] US 27. Plaintiffs' lawsuit accounts for remedial extensions. None of the relief requested herein changes that. This case is about *state* authority to extend receipt deadlines, not that of Congress or the federal judiciary. Congress can amend federal Election Day statutes at will and otherwise make specific carve-outs as needed.[18]

---

[16]     52 U.S.C. §§ 20301 to 20311, as amended by the Military and Overseas Voter Empowerment Act of 2009, Pub L. No. 111 84, Subtitle H, §§ 575 589, 123 Stat. 2190, 2318 2335 ("MOVE Act").

[17]     "The Attorney General may bring a civil action in an appropriate district court for such declaratory or injunctive relief as may be necessary to carry out [the UOCAVA] chapter." 52 U.S.C. § 20307. The Attorney General has no specific enforcement authority related to 2 U.S.C. § 7 or 3 U.S.C. § 1.

[18]     Indeed, Congress considered and rejected recommendations that it also extend the time in which states may *receive* ballots overseas voters. *The Overseas Citizens Voting Rights Act of 1975 and S. 703 Before S. Comm. on Rules and Admin.*, 95th Cong. pp. 13, 34, 59, 67, 84, and 94 (1977) (available at https://bit.ly/38z9zU9); *see generally* Robert T. Reagan, Fed. Jud. Ctr., *Overseas Voting: The Uniformed*

**C.      ISBE's New Arguments Do Not Change the Historical Record That Shows that *Foster's* Final Act of Selection Is Ballot Receipt.**

Since *Foster*, the Supreme Court has directed lower courts to look to the original public meaning of statutory terms. *Bostock v. Clayton Cnty.*, 140 S. Ct. 1731 (2020). No such analysis occurred in the district court. Indeed, until their most recent brief, Defendants never directly responded to Plaintiffs' historical arguments about the original public meaning of the Election Day statutes. To be sure, this case is about whether Illinois' Ballot Receipt Deadline complies with "the election" based on the original public meaning of that term and *Foster*. It is not about absentee or proxy voting. But those and other historical electoral practices under the common law and during Colonial, early Republic,[19] Civil War, and Reconstruction eras, none of which allowed post-election receipt, provide the best evidence of the common public meaning of "the election" at the time of enactment.[20] It is not just that post-election receipt was not permitted based on the historical record, but that it was not possible during most of the relevant time. From the Colonial era through

---

*and Overseas Citizens Absentee Voting Act*, at pp. 1-3 (summarizing federal legislation regarding military and overseas voters from 1942-2014) (available at https://bit.ly/3QapF67 ). Before then, Congress also considered and rejected requests to make the designated day for national elections a multiday event for all voters. Cong. Globe, 42 Cong., 2d Sess. 676 (1872); *see also Keisling*, 259 F.3d at 1172-74.

[19]      Defendants argue that voting practices from the Colonial and early Republic eras are temporally irrelevant. The parties, however, agree that those eras did not permit absentee voting. ISBE 35-36. *Amici* disagree. US 18; DC 5. In doing so, *Amici* cite directly or indirectly to Alex Keyssar, *The Right to Vote: The Contested History of Democracy in the United States*, 121 (2000), https://bit.ly/486VZjQ. Without citing a source, Mr. Keyssar wrote that in the 17th century Massachusetts allowed those whose homes were vulnerable to Indian attacks "to vote without leaving their abodes." *Id.* Plaintiffs submit this is a reference to proxy voting, which other authorities agree occurred. *See, e.g.,* Cortland F. Bishop, HISTORY OF ELECTIONS IN THE AMERICAN COLONIES 4 and 127-40 (1893), https://bit.ly/3yso7xC; Albert Edward McKinley, THE SUFFRAGE FRANCHISE IN THE THIRTEEN ENGLISH COLONIES IN AMERICA 311 (1905) (explaining proxy voting as due to the "great danger & damage that may accrue" if freeman left their homes), https://bit.ly/486VR3Q.

[20]      The inquiry into determining the original public meaning of a statute often looks to the development and evolution of the common law definition. *New Prime Inc. v. Oliveira*, 139 S. Ct. 532, 539 (2019) (citation omitted); *see also N.Y. State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111 (2022) (considering Colonial and early Republic eras). Indeed, the fact there was no applicable common law mailbox rule says a lot about whether the public would have believed states can now create a Manner regulation extending a Congressional Time for Election Day several weeks after the deadline. Bost 35 n. 20.

1845 and 1872, it was physically impossible for votes to be received after Election Day. *See* Bost 33-34 (discussing voting *viva voce*, voting by dropping beans or balls into a bowl, ticket voting). That is why the public would have affirmatively understood "the election" as the deadline by which all qualified voters' ballots must be received by election officials. Rather than address the historical record regarding election regulations and how they influenced the original public meaning in 1845 or 1872, Defendants dismiss Plaintiffs' arguments and authorities as unsupported. ISBE 36.

The historical record *supporting* post-election receipt is threadbare. Defendants finally attempt to address this absence for the first time in these proceedings at the end of their merits analysis, citing North Carolina's 1862 practice of allowing post-election receipt. ISBE 36. Plaintiffs do not dispute this practice, but it hardly seems relevant given that North Carolina was then part of the Confederacy and would not have held Union elections under 3 U.S.C. § 1.[21] Defendants also cite a provision in Maryland's temporary Civil War constitution that allowed soldiers to vote up to five days after Election Day. ISBE 36. The history of the adoption of Maryland's 1864 constitution, including the extraordinary tactics President Lincoln employed to keep Maryland from seceding, do not suggest adherence to ordinary constitutional norms.[22] The 1864 constitution took effect seven days before the presidential election in 1864. Benton at 223. This was the lone federal election administered under a federal election day statute, before Maryland's temporary constitution and the post-election receipt provision were repealed in 1867. *Id.*

---

[21]     The predecessor to 2 U.S.C. § 7 had not yet been enacted. *See* 17 Stat. 28. (1872).

[22]     In addition to imposing martial law, President Lincoln suspended habeas corpus to detain secessionist legislators. James M. McPherson, BATTLE CRY OF FREEDOM: THE CIVIL WAR ERA 284-89 (1988). Maryland was so evenly divided regarding whether to leave the Union—which would have left Washington, D.C. surrounded by the Confederacy—that Maryland soldiers voting in the field decided many important elections. Josiah Henry Benton, VOTING IN THE FIELD 223 (1915), available at https://bit.ly/3p4OQaq.

Defendants reject as "legal fiction" state efforts to ensure election day ballot receipt during the Civil War and, for the first time, suggest that postal carriers in Illinois today should be understood in the "same manner" as state militia soldiers and officers serving *ex officio* as state election workers during the Civil War. ISBE 37. Defendants, of course, cite nothing in the record nor any authority to support its suggestion that today's postal carriers are factually or legally analogous. Certainly, the legal relationship between postal carriers and state executives is not analogous to that between state executives and state militias, which are part of state executive branch. U.S. Const. art. I, § 8, cls. 15, 16; *see generally Abbott v. Biden*, 70 F.4th 817, 828 (5th Cir. 2023). It is impossible to overstate the legal and factual differences between today's vote-by-mail rules in Illinois, and the Civil War practice of establishing physical poll sites in the field operated by officers and members of state militias, who were deputized under oath as state election "constables, supervisors, *etc*., as the laws of the State might designate" to accept ballots by Election Day on behalf of their states. ISBE 37; *see* Benton at 13, 17, and 43.

More broadly, Defendants and *Amici* repeatedly emphasize that other states currently allow post-election receipt.[23] ISBE 5 and 29. Plaintiffs agree, but this fact sheds little light on either the validity of the practice or on the original public meaning of the term, "the election." It also fails to acknowledge that most of these are newly-enacted practices.[24] Section 302 of the Help America

---

[23]     *See* ISBE 5 n.2; and DC 8-12. Notably, at least five state *Amici* require election day receipt for all ballots.  *See* Tbl. 11: Receipt and Postmark Deadlines for Absentee/Mail Ballots, Nat'l Conf. of State Legis., available at https://bit.ly/3vRBB5G (Connecticut, Delaware, Hawaii, Minnesota, and Vermont).

[24]     Indeed, it appears the overwhelming majority of state post-election receipt regulations were only enacted after HAVA created a resolution period related to provisional voter eligibility. *See* ISBE 5 n.2; *see, e.g.,* Cal. Elec. Code. § 3020 (2014); D.C. Code § 1-10001.05(a)(10A) (2019); 10 ILCS 5/19-8 (2005); Kan. Stat. Ann. § 25-1132 (2017); Md. Code Regs. 33.11.03.08 (2004); Mass. Gen. Laws ch. 54, § 93 (2021); Miss. Code. Ann. § 23-15-637 (2020); Nev. Rev. Stat. § 293.269921(2021); N.J. Stat. Ann. § 19:63-22 (2018); N.Y. Elec. Law § 8-412 (1994); Or. Rev. Stat. § 253.070(3) (2021); Tex. Elec. Code Ann. § 86.007 (1997); Utah Code Ann. § 20A-3a-204 (2020); Va. Code Ann. § 24.2-709(B) (2010); W. Va. Code §§ 3-3-5(g)(2), 3-5-17(1993); Ala. Code § 17-11-18(b) (2014); Ark. Code. Ann. § 7-5-411(a)(1)(A) (2001);

Vote Act of 2002 ("HAVA") required states to adopt a provisional ballot process for federal elections. 52 U.S.C. § 21082; *see* Bost 33 n.16. Section 302 emphasizes Election Day receipt, providing that such ballots from such voters are provisionally cast and "received" at "polling places" on Election Day pending resolution of the eligibility question. 52 U.S.C. § 21082(a). After this federal mandate, many voting advocates viewed the period for resolving eligibility questions as an opportunity to allow post-election receipt of absentee ballots.[25]

The question of the original public meaning of "the election" arises recently because of the success of recent efforts to promote universal vote by mail. Following the 2000 election, two competing election visions of electoral reform arose. *See* John C. Fortier & Norman J. Ornstein, *Symposium, Election Reform: The Absentee Ballot and the Secret Ballot: Challenges For Election Reform,* 36 U. MICH. J.L. REFORM 483, 484 (2003). One vision sought to improve poll sites, while the other sought to discourage the use of poll sites and promote voting by mail. Until that time absentee voting had been *de minimis*, but the recent explosive growth in vote-by-mail and post-election receipt necessitates resolving the original public meaning of the Election Day statutes, and determining whether this new trend to extend post-election receipt comports with 2 U.S.C. § 7 and 3 U.S.C. § 1.[26]

---

Ind. Code § 3-12-1-17(b) (2006); Fla. Stat. § 101.6952(5) (2013); Ga. Code Ann. § 21-2-386(a)(1)(G) (2005); Mich. Comp. Laws § 168.759a (2012); Mo. Rev. Stat. § 115.920(1) (2013); 25 Pa. Cons. Stat. § 3511(a) (2012); R.I. Gen Laws § 17-20-16 (2019); and S.C. Code Ann. §§ 7-15-700(a), 7-17-10 (2015).

[25] The United States, for example, acknowledges that the recent introduction of post-election receipt in Illinois is "tethered" to provisional ballots required under HAVA. US 12-13.

[26] Vote-by-mail ballots constituted 46% of total ballots cast in 2020, by far the primary means by which votes were cast in the United States. From 1920-30, absentee ballots were estimated to account for less than .5% of total votes. J. Harris, ELECTION ADMINISTRATION IN THE UNITED STATES, 293 (1934) available at https://bit.ly/3cdio7zv. In 2000, 10% of voters nationwide voted by mail. *See* Charles Stewart III, *How We Voted in 2020: A First Look at the Survey of the Performance of American Elections*, MIT Election Data + Science Lab, (Dec. 15, 2020), available at https://bit.ly/39WCp0H. That number doubled to 21% by 2016 before doubling yet again to 46% in 2020. Voting by mail is now the predominant voting method over early voting and Election Day voting. *See also* DC 13 (noting that 31.9% of federal ballots in 2022 were cast by mail).

### D. Plaintiffs Have Alleged Sufficient Facts to Show a Plausible Constitutional Violation Under 42 U.S.C. § 1983.

Throughout Plaintiffs' Complaint and in their sworn declarations, Plaintiffs alleged sufficient facts to show the Illinois Ballot Receipt Deadline infringes on their constitutional First and Fourteenth Amendment rights to vote and to stand for federal office under 42 U.S.C. § 1983. *See* Dkt. 1 ¶ 42, A.8 ("By counting untimely and illegal ballots received after Election Day and diluting Plaintiffs' timely cast and received ballots, Defendants, acting under color of Illinois law, have deprived and are depriving Plaintiffs of rights protected under the First Amendment and 14th Amendment … in violation of 42 U.S.C. § 1983."); *id.* ¶ 46, A.8 ("Defendants, acting under color of Illinois law, have deprived and are depriving Plaintiffs of rights protected under the First and Fourteenth Amendment … in violation of 42 U.S.C. § 1983 by … forcing Plaintiffs to spend money, devote time, and otherwise injuriously rely on unlawful provisions of state law[.]")

Defendants are simply incorrect that Plaintiffs' constitutional claims are "conclusory" and that Plaintiffs "now advance no argument on appeal as to why the statute violates their constitutional rights beyond their view that it is preempted." ISBE 39. The unlawful receipt and counting of ballots post-Election Day *is* the constitutional claim for which Plaintiffs allege a deprivation of rights, under color of state law, to vote and to stand for office. In other words, enforcement of the preempted state law by Defendants infringes Plaintiffs' First and Fourteenth Amendment rights in violation of 42 U.S.C. § 1983. That is precisely the vehicle used by plaintiffs in *Foster v. Love* and the three circuit court decisions that involved violations of the Election Day statutes. *Love v. Foster*, 90 F.3d 1026, 1028 (5th Cir. 1996); *Keisling*, 259 F.3d at 1170 n.2; *Millsaps*, 259 F.3d at 536; *Voter Integrity Project, Inc. v. Bomer*, 61 F. Supp. 2d 600, 602 (S.D. Tex. 1999). All of these cases alleged constitutional and civil rights deprivations under 42 U.S.C. § 1983 and the circuit courts followed a straight preemption-type analysis in determining whether constitutional rights were

violated.

Defendants offer no persuasive reason why this Court should not follow the same standard the Fifth, Sixth, and Ninth Circuits all adopted and that the U.S. Supreme Court did not disturb in *Foster*. Accordingly, Plaintiffs have alleged plausible claims under 42 U.S.C. § 1983.

## CONCLUSION

For the foregoing reasons, the district court's order granting Defendant's motion to dismiss should be reversed.

December 22, 2023

Respectfully submitted,

*s/ Russ Nobile*
T. Russell Nobile
   *Counsel of Record*
**JUDICIAL WATCH, INC**
P.O. Box 6592
Gulfport, MS 39506
(202) 527-9866
Rnobile@judicialwatch.org

Christine Svenson, Esq.
**SVENSON LAW OFFICES**
345 N. Eric Drive
Palatine, IL 60067
(312) 467-2900

Eric W. Lee
**JUDICIAL WATCH, INC.**
425 Third Street SW
Suite 800
Washington, D.C. 20024

**CERTIFICATE OF COMPLIANCE**

Pursuant to Federal Rule of Appellate Procedure 32(a)(7)(B), I hereby certify that this brief is proportionally spaced, 12-point Times New Roman font for the body of the brief and 11-point Times New Roman font for footnotes. Pursuant to Federal Rule of Appellate Procedure 32(g)(1) and by order of this Court granting Plaintiffs' motion to enlarge (ECF 32), the brief is within the word limit at 7,562 words excluding tables and certificates.

December 22, 2023                                    *s/ Russ Nobile*

**CERTIFICATE OF SERVICE**

I hereby certify, pursuant to Fed. R. App. P. 25(d)(2), that I electronically filed the foregoing with the Clerk of the United States Court of Appeals for the Seventh Circuit using the appellate CM/ECF system. I certify that the parties in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF service.

December 22, 2023                                        *s/ Russ Nobile*