

July 29, 2024

Christopher G. Conway
Clerk of the Court
United States Court of Appeals
    for the Seventh Circuit
219 South Dearborn Street
27th Floor
Chicago, Illinois 60604

      Re:    *Bost v. Illinois State Board of Elections*, No. 23-2644

Dear Mr. Conway:

      Pursuant to Fed. R. App. P. 28(j), defendants-appellees the Illinois State Board of Elections and Bernadette Matthews write to notify the Court of a recent opinion relevant to the above-captioned appeal: the opinion in *RNC v. Wetzel*, No. 1:24-cv-25 (S.D. Miss. July 28, 2024), a copy of which is attached to this letter. *Wetzel* supports our argument that plaintiffs' claims fail on the merits. *See* AE Br. 24-40.

      *Wetzel* is substantively identical to this action. The plaintiffs in that case — political candidates and voters — brought suit to challenge a Mississippi statute that directs election authorities to count mail-in ballots that are received up to five days after Election Day as long as they were mailed on or before Election Day. Slip op. at 1. Plaintiffs in *Wetzel*, like plaintiffs here, argue that the Mississippi deadline statute is preempted by federal statutes establishing a uniform national Election Day. *Id.* at 2.

      The district court granted Mississippi's motion for summary judgment on the ground that plaintiffs' claims failed on the merits. *Id.* at 12. The court rejected plaintiffs' argument that the Mississippi statute conflicted with the federal Election Day statutes, explaining that, under the Mississippi statute, "no 'final selection' is made *after* the federal election day"; rather, "[a]ll that occurs after election day is the

500 South 2nd Street
Springfield, Illinois 62701
(217) 782-1090 • Fax: (217) 782-7046

115 South LaSalle Street
Chicago, Illinois 60603
(312) 814-3000 • Fax: (312) 814-3806

1745 Innovation Drive, Suite C
Carbondale, Illinois 62903
(618) 529-6400 • Fax: (618) 529-6416

Individuals with hearing or speech disabilities can reach us by using the 7-1-1 relay service.

www.IllinoisAttorneyGeneral.gov

delivery and counting of ballots cast on or before election day." *Id.* at 19. And the court expressly adopted Judge Kness's analysis in this case (characterizing the state statute and the federal statutes as "facially compatible"), labeling it "persuasive." *Id.* at 21.

The district court's separate conclusion that plaintiffs there had standing, *id.* at 3-12, is both distinguishable and wrong. The district court relied on declarations filed by plaintiffs that described in detail the tradeoffs that plaintiffs had to make as a result of the Mississippi deadline statute — declarations not present in this record. *Id.* at 7-11. And it did not cite *Clapper v. Amnesty Int'l USA*, 568 U.S. 398 (2013), or explain why plaintiffs' expenditure of resources there was distinguishable from the expenditure deemed insufficient in *Clapper* to establish standing.

Respectfully submitted,

/s/ Alex Hemmer
ALEX HEMMER
Deputy Solicitor General
115 South LaSalle Street
Chicago, Illinois 60603
(312) 814-5526
Alex.Hemmer@ilag.gov

**CERTIFICATE OF COMPLIANCE**

I hereby certify that this letter complies with the word limitation set forth in Fed. R. App. P. 28(j) in that the body of the letter is 344 words.

/s/ Alex Hemmer
ALEX HEMMER

July 29, 2024

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
SOUTHERN DIVISION

| | |
|---|---|
| **REPUBLICAN NATIONAL COMMITTEE; MISSISSIPPI REPUBLICAN PARTY; JAMES PERRY; and MATTHEW LAMB** | **PLAINTIFFS** |
| **v.** | **CAUSE NO. 1:24cv25-LG-RPM** |
| **JUSTIN WETZEL, in his official capacity as the clerk and register of the Circuit Court of Harrison County, et al.** | **DEFENDANTS** |

*consolidated with*

| | |
|---|---|
| **LIBERTARIAN PARTY OF MISSISSIPPI** | **PLAINTIFF** |
| **v.** | **CAUSE NO. 1:24cv37-LG-RPM** |
| **JUSTIN WETZEL, in his official capacity as the clerk and register of the Circuit Court of Harrison County, et al.** | **DEFENDANTS** |

## MEMORANDUM OPINION AND ORDER

**BEFORE THE COURT** in these consolidated cases is a challenge to a portion of Mississippi's absentee-balloting procedures. At issue is Mississippi Code Ann. § 23-15-637(1)(a) which provides in part for the counting of absentee ballots postmarked on or before the date of the election and received by mail no more than five business days after the election. Plaintiffs contend that Mississippi law conflicts with federal statutes establishing a national uniform "election day."

Defendants argue that Plaintiffs lack standing and that Mississippi law is in harmony with federal statutes and the Constitution.  In the opinion of the Court Plaintiffs have Article III standing to proceed.  However, for the reasons stated below the Court finds that Defendants are entitled to judgment as a matter of law on the merits of Plaintiffs' claims.

BACKGROUND

In cause number 1:24cv25-LG-RPM, the Republican Plaintiffs — the Republican National Committee ("RNC"), the Mississippi Republican Party, James "Pete" Perry, and Matthew Lamb[1] — filed a Complaint for declaratory and injunctive relief against the Mississippi Secretary of State, Michael Watson; Justin Wetzel, the clerk and registrar of the Circuit Court of Harrison County, Mississippi; and the members of the Harrison County Election Commission.  Plaintiffs allege that Miss. Code Ann. § 23-15-637(1)(a) violates federal law.  They assert these claims:

> (1) violation of 3 U.S.C. § 1, 2 U.S.C. § 1, and 2 U.S.C. § 7, which designate the election day for the offices of President and Vice President, seats in the Senate, and seats in the House of Representatives, respectively.
>
> (2) a 42 U.S.C. § 1983 claim for violation of the right to stand for office; and
>
> (3) a 42 U.S.C. § 1983 claim for violation of the right to vote.

---

[1] Mr. Perry is the former chair of the Hinds County Republican Party and a current member of the Mississippi Republican Party's executive committee and the Hinds County Republican Executive Committee.  Compl. ¶ 16.  Mr. Lamb is the District 4 Commissioner for the George County Election Commission.  *Id.* ¶ 17.

The Libertarian Party of Mississippi in cause number 1:24cv37-LG-RPM makes essentially the same claims. The Court consolidated the two cases and granted Vet Voice Foundation and Mississippi Alliance for Retired Americans' Motion for Permission to Intervene as Defendants.[2]

The Mississippi Secretary of State has moved for summary judgment separately against [51] the Republican Plaintiffs and [53] the Libertarian Party, and both sets of Plaintiffs have filed their own [55, 58] motions for summary judgment. The individual Defendants have [63, 64] adopted the secretary's briefs, and the intervenor Defendants have [61] filed their own separate Rule 56 motion.

## DISCUSSION

### I.   STANDING

The Constitution gives federal courts the power to adjudicate only genuine "cases" and "controversies." Art. III, § 2. "For there to be a case or controversy under Article III, the plaintiff must have a personal stake in the case — in other words, standing." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021) (internal quotation marks & citation omitted).

"To prove Article III standing, a plaintiff must show that he or she 'h[as] (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision.'"

---

[2] The Court [47] denied Motions for Permission to Intervene as Defendants that were filed by Disability Rights of Mississippi, the League of Women Voters, and the Democratic National Committee, but granted them leave to file amicus curiae briefs. The United States also filed a [84] Statement of Interest in support of the statute.

*Ortiz v. Am. Airlines, Inc.*, 5 F.4th 622, 628 (5th Cir. 2021) (quoting *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016)).  At the summary-judgment stage, a plaintiff can establish standing only by "setting forth by affidavit or other evidence specific facts, which, taken as true, support each element" of the standing analysis.  *Id.* (quoting *Texas v. Rettig*, 987 F.3d 518, 527–28 (5th Cir. 2021)) (cleaned up).  In other words, [a] plaintiff "must point to specific summary judgment evidence showing that it was 'directly affected' by" the Mississippi statute.  *Texas State LULAC v. Elfant*, 52 F.4th 248, 255 (5th Cir. 2022) (citation omitted).

Every plaintiff need not demonstrate standing in this case.  *Texas v. United States*, 809 F.3d 134, 151 (5th Cir. 2015) (holding only one plaintiff need succeed because one party with standing satisfies Article III's case-or-controversy requirement); *Tex. Democratic Party v. Abbott*, 978 F.3d 168, 178 (5th Cir. 2020) ("[I]n the context of injunctive relief, one plaintiff's successful demonstration of standing is sufficient to satisfy Article III's case-or-controversy requirement.") (cleaned up).

Groups like the RNC, the Republican Party, and the Libertarian Party can satisfy the injury-in-fact requirement by demonstrating organizational standing, sometimes also called direct standing.  *See OCA-Greater Hous. v. Texas*, 867 F.3d 604, 610 (5th Cir. 2017); *Tex. Democratic Party v. Benkiser*, 459 F.3d 582, 586 (5th Cir. 2006).  This form of standing applies when the "defendant's actions perceptibly impair the organization's activities and consequently drain the organization's resources."  *Vote.org v. Callanen*, 89 F.4th 459, 470 (5th Cir. 2023) (cleaned up).

However, a "setback to an organization's abstract social interests is insufficient." *Id.* (alterations omitted).

A political party's "need to raise and expend additional funds and resources" satisfies the injury-in-fact requirement of organizational standing because "economic injury is a quintessential injury upon which to base standing." *Benkiser*, 459 F.3d at 586 (citations omitted).[3] An organization's diversion of "significant resources to counteract the defendant's conduct" will also satisfy this requirement, *Vote.org*, 89 F.4th at 470 (quoting *N.A.A.C.P. v. City of Kyle*, 626 F.3d 233, 238 (5th Cir. 2010)), as long as the organization "identifie[s] any specific projects that [it] had to put on hold or otherwise curtail in order to respond" to the defendant's actions. *City of Kyle*, 626 F.3d at 238.  Vague assertions and speculation that the organization could have spent the funds elsewhere are insufficient.  *Id.*  For example, in *City of Kyle*, the Fifth Circuit held that a plaintiff organization's conjecture that resources would need to be diverted in response to city ordinance could not establish an injury in fact.  *Id.* at 238–39.  The organization did not identify any specific projects that it had to put on hold or curtail, and it cited activities that did not "differ from its routine lobbying activities."  *Id.* at 239.  The

---

[3] Defendants argue that *Benkiser* is inapplicable because it pertained to competitive standing, which is means "a candidate or his political party has standing to challenge the inclusion of an allegedly ineligible rival on the ballot, on the theory that doing so hurts the candidate's or party's own chances of prevailing in the election." *Townley v. Miller*, 722 F.3d 1128, 1135 (9th Cir. 2013) (citation omitted). But competitive standing was an alternative finding in *Benkiser*, separate from its finding of economic loss.  459 F.3d at 586 ("A *second* basis for the TDP's direct standing is harm to its election prospects.") (emphasis added).

court contrasted the vague assertions of the *City of Kyle* plaintiff with the following

proof submitted by an organization in an Eleventh Circuit case, *Florida State*

*Conference of the NAACP v. Browning*:[4]

> The organizations reasonably anticipate[d] that they [would] have to divert personnel and time to educating volunteers and voters on compliance with [a state statute] and to resolving the problem of voters left off the registration rolls on election day.  These resources would otherwise be spent on registration drives and election-day education and monitoring.  SVREP anticipates that it will expend many more hours than it otherwise would have conducting follow-up work with registration applicants because voters will have their applications denied due to matching failures.  In HAGC's case, compensating for the new obstacles created by [the statute] would divert substantial resources away from helping voters who may need language-translation assistance on election day.

522 F.3d 1153, 1165–66 (11th Cir. 2008), *cited with approval in City of Kyle*, 626

F.3d at 238.

The Fifth Circuit has provided helpful analysis distinguishing the *City of*

*Kyle* case from a subsequent case, *OCA-Greater Houston v. Texas*:

> The *City of Kyle* plaintiffs were dedicated lobbying groups who claimed their lobbying and litigation-related expenses as their injury.  It is fundamental that no plaintiff may claim as injury the expense of preparing for litigation, for then the injury-in-fact requirement would pose no barrier.  The key fact in *City of Kyle* was that every claimed "injury" either was undertaken to prepare for litigation (such as the commissioning of a $15,000 study on the impact of the ordinances—a study that the plaintiffs then  relied on at trial to demonstrate disparate impact) or was no different from the plaintiffs' daily operations (such as the vice president's spending time reviewing ordinances).
> Here, by contrast, OCA is not a lobbying group.  It went out of its way to counteract the effect of Texas' allegedly unlawful voter-

---

[4] In *Browning*, the plaintiff organizations challenged a Florida statute that established a new verification process for first-time voter registrants.  522 F.3d at 1158.

interpreter restriction — not with a view toward litigation, but toward mitigating its real-world impact on OCA's members and the public. For instance, it undertook to educate voters about Texas's assistor-versus-interpreter distinction to reduce the chance that other voters would be denied their choice of interpreter . . .[,] an undertaking that consumed its time and resources in a way they would not have been spent absent the Texas law.  Hence, the Texas statutes at issue "perceptibly impaired" OCA's ability to "get out the vote" among its members.

867 F.3d at 611–12 (footnote omitted).

RNC Political Director James Blair maintains that Mississippi's acceptance of ballots five days after election day "forces the RNC to spend more money on ballot-chase programs and poll-watching activities." (Resp., Ex. A ¶ 3, ECF No. 75-1).[5]  He further testifies by declaration:

Specifically, Mississippi's post-election deadline for the receipt of mail-in ballots requires the RNC to divert more resources toward a longer period of ballot chasing.  Absentee-ballot chasing requires establishing and executing a separate, parallel get-out-the-vote effort supported by training, voter education, and voter outreach.  Those activities require the RNC to divert resources away from traditional get-out-the-vote operations such as encouraging and assisting people [to] vote in person.  But for Mississippi's post-election receipt of mail-in ballots, the RNC would spend more money on traditional get-out-the-vote operations.

---

[5] In a separate declaration, the RNC's Deputy Political Director, Ashley Walukevich, testifies that ballot chasing is a "labor[-]intensive" program "whereby [the party] contacts voters, educates them about the mail-in voting process, informs them of key deadlines and rules, reminds them to return their mail-in ballots in a timely manner, and encourages them to cure any defects . . . ." (Motion, Ex. A ¶ 11, ECF No. 58-1).  She adds that this program is more costly due to Mississippi's counting of ballots received by mail after election day and that the RNC must engage in this program in order to "protect its electoral interests and maintain competitive parity with other political parties.  (*Id.* ¶ 12).

(*Id.* ¶ 5).  He claims that this required diversion of resources "directly harms the RNC's mission" because "[t]raditional get-out-the-vote operations are critical to the RNC's mission to represent the interests of the Republican Party and secure the election of Republican candidates."  (*Id.* ¶¶ 6, 8).  He further explains that more resources must be devoted to "additional poll-watcher coverage," including training of poll watchers, "preparation of relevant materials, payment to attorneys for review, and securing additional volunteer time."  (*Id.* ¶ 7).  These efforts and expenditures, he claims, divert resources "away from other election integrity efforts to educate voters, monitor state and local compliance with election laws, and increase confidence in the election."  (*Id.*).

Frank Bordeaux, chair of the Mississippi Republican Party, has also submitted a declaration concerning the effect of the Mississippi statute on its mission.  (Pls.' Resp., Ex. B, ECF No. 75-2).  He testifies that "[t]he MSGOP can afford to expend resources on ballot-chase programs and poll-watching activities in response to Mississippi's mail-in ballot deadline only by diverting them from the pursuit of its mission in other areas."  (*Id.* ¶ 4).  These "other areas" include "efforts to facilitate voter registration, increase in-person turnout, promote and secure election integrity," and "educate voters, among other activities."  (*Id.* ¶ 5)  Mr. Bordeaux states:  "These activities are critical to the MSGOP's mission to represent the interests of the Republican Party and secure the election of Republican candidates for state and federal office in Mississippi."  (*Id.*).  He explains, "[i]f not for Mississippi's late-ballot-receipt deadline, the MSGOP would spend more money

-8-

registering Republican voters" and "increasing in-person voter turnout in Mississippi." (*Id.* ¶¶ 6–7).[6]

Along with providing evidence of economic loss, these Plaintiffs allege that the Mississippi statute will cause them to curtail and divert resources away from specific activities and projects — registration of Republican voters and efforts to increase in-person turnout — in order to perform more extensive and expensive ballot-chasing and poll-watching efforts necessitated by the acceptance of absentee ballots received after election day. *See Browning*, 522 F.3d at 1165–66; *see also Martin v. Kemp*, 341 F. Supp. 3d 1326, 1335 (N.D. Ga. 2018) (holding that political organizations had established standing by showing they would have to divert resources from "phone banking, finding canvassing volunteers, in-person and written 'get-out-the-vote' efforts" to cautioning voters about rejection of absentee-ballot applications and ballots). This diversion of resources frustrates and impedes the Republican Party's mission of "represent[ing] the interests of the Republican Party and secur[ing] the election of Republican candidates for state and federal office in Mississippi." *See Democratic Cong. Campaign Comm. v. Kosinski*, 614 F. Supp. 3d 20, 45 (S.D.N.Y. 2022) (collecting cases and holding that diversion of resources away from "engaging and mobilizing voters" to educate them about ballot-rejection practices and "mobilize volunteers to assist those [voters]" frustrated a Democratic committee's mission of electing Democratic candidates). Since

---

[6] In analyzing standing, the Court must assume that the testimony given in these declarations is truthful. *See Ortiz*, 5 F.4th at 628.

"[a]bsentee-ballot chasing requires establishing and executing a separate, parallel get-out-the-vote effort supported by training, voter education, and voter outreach" according to Mr. Blair, these are not the types of routine activities that the Fifth Circuit warned about in *City of Kyle*.  *See* 626 F.3d at 238-29.

The Libertarian Party has submitted a declaration signed by Vicky Hanson, who is a lifetime member, the Membership Committee Chairperson, and "the most recent past Secretary of the Libertarian Party of Mississippi."  (Libertarian Mot., Ex. 3 ¶¶ 2, 12, ECF No. 55-3).  She testifies that "[t]he receipt of absentee ballots after Election Day inhibits [the] Party's ability to monitor counties' receipt of those ballots, as it must sparingly use limited resources during the post-election certification process."  (*Id.* ¶ 22).  She also states:

> In 2020, due to the change in Mississippi's election code allowing an additional five business days to receive absentee ballots, the Party's ability to monitor the canvassing of ballots diminished.  The Party didn't field monitors for all five extra business days in any election held after the law changed, and it is very unlikely it will be able to do so in the near future.  The Democrat[ic] and Republican parties, by contrast, can afford to do this extra monitoring, so the Libertarian Party is now in an even worse position compared to them.

(*Id.* ¶ 26).  In a supplemental declaration, she testifies:

> . . . Mississippi's Receipt Deadline adds time and duties to our campaigns[,] and we are going to have to use the existing level of volunteer hours to try to fill them.  Our other option is to drop the ball — that is, to not do — either post-election canvassing, or some other campaign[-]related task.

(Libertarian Resp., Ex. 1 ¶ 4, ECF No. 79-1).

Additionally, as the Libertarian Party noted in its Memorandum:

>   Whatever tasks a Mississippi political party or candidate performs
>   during the course of a campaign, and however much time is devoted to
>   them, the Receipt Deadline increases those tasks and that time by five
>   business days.  Staffing a campaign for an additional five business
>   days necessarily costs more than not doing so.  This cost constitutes
>   economic harm that confers standing. . . .  If, in the alternative,
>   Plaintiff must forgo this monitoring because it simply cannot afford it,
>   Plaintiff is also harmed.

(Pl.'s Mem. at 6–7, ECF No. 80).

The RNC and the Mississippi Republican Party have established that they suffered concrete injuries in the form of economic loss and diversion of resources. (Resp., Ex. A at 2, ECF No. 75-1).  Their injuries are not "generalized grievances" because the general population will not experience these losses.  *See Lujan*, 504 U.S. at 575; *see also McMahon v. Fenves*, 946 F.3d 266, 271 (5th Cir. 2020) ("An injury is particularized if it affects the plaintiff in a personal and individual way.").  The injuries are also imminent as the statute currently requires five more business days for receipt, processing, and counting of absentee ballots following the next election in November.  The Libertarian Party has shown through declarants that the Mississippi statute has harmed its mission to secure votes for its candidates.  According to the testimony, it has already significantly curtailed efforts to monitor the counting of absentee ballots, and at the next election, the Libertarian Party will need to choose between post-election canvassing for additional days and other tasks such as getting out its vote on election day.[7]   The injuries alleged by the political

---

[7] Though the injuries to the Libertarian Party are somewhat different, the Court finds that the analysis it applied to the Republican Plaintiffs also applies to the Libertarian Party.

parties — economic injury as well as diversion of resources — in this case are specific to each party, such that these parties have shown they have a direct stake in the outcome of this lawsuit. *See also Voice of the Experienced v. Ardoin*, 2024 WL 2142991 (M.D. La. May 13, 2024) (holding that plaintiffs' alleged diversion of resources adequately to satisfy injury in fact). The injuries threatened to Plaintiffs are fairly traceable to the Mississippi statute's five-day receipt requirement for absentee ballots, and a decision from this Court granting Plaintiffs' requests for declaratory and injunctive relief would redress these injuries by overturning the portion of the statute that will cause Plaintiffs injury at the next election. Plaintiffs have sufficiently alleged standing, and the Court has federal-question jurisdiction to hear this suit.

## II. DOES MISSISSIPPI'S ABSENTEE VOTING STATUTE CONFLICT WITH FEDERAL LAW?

Both sides have filed motions for summary judgment, indicating that they discern no material questions of fact to be resolved on the merits. The Court agrees. "Summary judgment is appropriate where the only issue before the court is a pure question of law." *Sheline v. Dun & Bradstreet Corp.*, 948 F.2d 174, 176 (5th Cir. 1991).

The Electors Clause of the United States Constitution states that Congress can "determine the Time of chusing the Electors [for President and Vice President], and the Day on which they shall give their Votes; which Day shall be the same throughout the United States." Art. II, § 1, cl. 4. The Elections Clause provides: "The Times, Places and Manner of holding Elections for Senators and

Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations, except as to the Places of chusing Senators." *Id*. art. I, § 4, cl. 1. Thus, the Elections "Clause empowers Congress to pre-empt state regulations governing the 'Times, Places and Manner' of holding congressional elections." *Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 8 (2013). "The Clause's substantive scope is broad," because "Times, Places, and Manner" are "comprehensive words, which embrace authority to provide a complete code for congressional elections." *Id.* at 8–9. The Clause "invests the States with responsibility for the mechanics of congressional elections, but only so far as Congress declines to pre-empt state legislative choices." *Id.* at 9 (quoting *Foster v. Love*, 522 U.S. 67, 69 (1997)).

Congress's power over the time, place, and manner of elections is "paramount, and may be exercised at any time, and to any extent which it deems expedient; and so far as it is exercised, and no farther, the regulations effected supersede those of the State which are inconsistent therewith." *Inter Tribal*, 570 U.S. at 9 (quoting U.S. Const. art. I, § 4, cl. 1). Pursuant to this very power, Congress enacted three statutes establishing a single election day for federal elections: 3 U.S.C. § 1, 2 U.S.C. § 1, and 2 U.S.C. § 7. The statute establishing an election day for the offices of President and Vice President provides that "[t]he electors of President and Vice President shall be appointed, in each State, on election day, in accordance with the laws of the State enacted prior to election day." 3 U.S.C. § 1. Congress later defined "election day" in that statute to mean "the

Tuesday next after the first Monday in November, in every fourth year succeeding every election of a President and Vice President held in each State . . . ."  *Id.* § 21(1).

Likewise, the statute applicable to selection of members of the House of Representatives provides:  "The Tuesday next after the 1st Monday in November, in every even numbered year, is established as the day for the election, in each of the States and Territories of the United States, of Representatives and Delegates to the Congress commencing on the 3d day of January next thereafter."  2 U.S.C. § 7.  Finally, the statute pertaining to Senate elections provides:

> At the regular election held in any State next preceding the expiration of the term for which any Senator was elected to represent such State in Congress, at which election a Representative to Congress is regularly by law to be chosen, a United States Senator from said State shall be elected by the people thereof for the term commencing on the 3d day of January next thereafter.

*Id.* § 1.[8]

The legislative history "indicates that Congress wanted a uniform election day to prevent earlier elections in some states unduly influencing the later voters, to prevent fraudulent voting in multiple state elections, and to remove the burden of voting in more than one federal election in a given year."  *Love v. Foster*, 90 F.3d 1026, 1029 (5th Cir. 1996) (citing *Cong. Globe*, 42d Cong., 2d Sess. 112 (1871)), *aff'd*, 522 U.S. 67 (1997).[9]  "By establishing a particular day as 'the day' on which these

---

[8] A discussion of the Framers' intent behind the Elections Clause can be found in the Supreme Court's opinion in *U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779, 832–34 (1995), and the Sixth Circuit's opinion in *Millsaps v. Thompson*, 259 F.3d 535, 539–40 (6th Cir. 2001).

[9] In a separate statute, Congress created two exceptions to the election-day requirement:  (1) in states that required a majority vote for election, a runoff could

actions must take place, the statutes simply regulate the time of the election, a matter on which the Constitution explicitly gives Congress the final say." *Foster*, 522 U.S. at 71–72.

Plaintiffs maintain that Miss. Code Ann. § 23-15-637(1)(a) violates these statutes because it permits receipt of absentee ballots by mail for up to five business days after the election day established by the federal statutes.  Defendants respond that the federal statutes merely require that a vote be cast, not received, on or before election day.  The Mississippi statute provides:

> Absentee *ballots and applications received by mail,* except for fax or electronically transmitted ballots as otherwise provided by Section 23-15-699 for UOCAVA ballots, or common carrier, such as United Parcel Service or FedEx Corporation, *must be postmarked on or before the date of the election and received by the registrar no more than five (5) business days after the election; any received after such time shall be handled as provided in Section 23-15-647 and shall not be counted.*

Miss. Code Ann. § 23-15-637 (emphasis added).[10]

The Fifth Circuit has yet to consider whether ballots received after election day may be counted, but it has held that "[a]llowing some voters to cast votes *before* election day does not contravene the federal election statutes because the final selection is not made before the federal election day."  *Voting Integrity Project, Inc.*

---

be held between the federal election day and the January when officials take office; and (2) an election could be held on a different date if a vacancy occurred in the office.  2 U.S.C. § 8.

[10] The statute references "UOCAVA," the Uniformed and Overseas Citizens Absentee Voting Act of 1986, which requires states to accept absentee ballots in federal elections from absent uniformed-services voters and overseas voters.  52 U.S.C. § 20302(a)(1).  States must send validly requested absentee ballots to these voters at least forty-five days before a federal election in order to provide them enough time to vote.  *Id*. § 20302(a)(8), (g)(1)(A).

*v. Bomer*, 199 F.3d 773, 776 (5th Cir. 2000) (emphasis added), *cert. denied*, 530 U.S. 1230 (2000).  In *Bomer*, while addressing Texas's early-voting system, the court explained that "[s]tates are given a wide discretion in the formulation of a system for the choice by the people of representatives in Congress."  *Id.* at 775.  The court said it could not "conceive that Congress intended the federal election day statutes to have the effect of impeding citizens in exercising their right to vote."  *Id.* at 777.  Thus, the court held that "a state's discretion and flexibility in establishing the time, place and manner of electing its federal representatives has only one limitation:  the state system cannot *directly conflict* with federal election laws on the subject."  *Id.* at 775 (emphasis added).  "Because the election of federal representatives in Texas [was] not decided or consummated before federal election day, the Texas scheme [was] not inconsistent with the federal election statutes."  *Id.* at 776.

Defendants argue that, under *Bomer*, the Mississippi statute is not preempted by federal law because it does not "directly conflict" with the election-day statutes.  *See id.* at 775.  Plaintiffs counter that the appropriate standard — as set forth in the later Supreme Court case *Inter Tribal* — is whether the state statute is "inconsistent" with the federal statutes.  *See* 570 U.S. at 9.  According to Plaintiffs, the *Inter Tribal* standard "is a less demanding preemption standard than the 'directly conflict' standard" because it "does not require a textual or 'facial

-16-

conflict.'"[11]   (Reply at 6, ECF No. 91).   Thus, Defendants argue that the Mississippi statute is not preempted because the federal statutes do not directly address whether ballots must be received on or before election day, while Plaintiffs claim that Congress's decision to legislate the time of election "*necessarily* displaces some element of a pre-existing legal regime erected by the States." (*Id.* at 8) (quoting *Inter Tribal*, 570 U.S. at 14).   Plaintiffs assert that the Mississippi statute must "give way" because it is inconsistent with the election-day statutes.   (*Id.*).

Before this Court can determine whether the Mississippi statute conflicts with, or is inconsistent with, the federal election-day statutes, the Court must consider the meaning of the word "election" in those statutes.   "[E]very statute's meaning is fixed at the time of enactment." *Wisc. Cent. Ltd v. United States*, 585 U.S. 274, 284 (2018) (emphasis omitted).   Therefore, this Court must interpret the word "election" "consistent with [its] ordinary meaning . . . at the time Congress enacted the statute[s]." *Id.* at 277 (internal quotation marks & citation omitted).

---

[11] Plaintiffs cite no authority that distinguishes between "direct conflict" and "inconsistency."   It appears that the Fifth Circuit does not view the standards set forth in *Inter Tribal* and *Bomer* as conflicting because it cited both standards in *Voting for America, Inc. v. Steen*, 732 F.3d 382 (5th Cir. 2013).   First, the Fifth Circuit cited *Voting for America v. Andrade*, 488 F. App'x 890, 896 (5th Cir. 2012), and *Bomer* for the proposition the "state election laws cannot 'directly conflict' with federal election laws on the subject." *Id.* at 399.   Later on in the same opinion, the Fifth Circuit cited the holding in *Inter Tribal* and found its facts distinguishable because "the laws do not conflict." *Id.* at 400.   Therefore, "inconsistency" and "direct conflict" are essentially synonymous and do not appear to be different standards under Fifth Circuit precedent.   In fact, having quoted the "inconsistent" standard from a prior case, *Inter Tribal* then goes on to say that the "straightforward textual question here is whether" the challenged statute "conflicts with" federal law.   570 U.S. at 9.

In 1921, the Supreme Court noted that the word "election" still had "the same general significance as it did when the Constitution came into existence — *final choice of an officer by the duly qualified electors*." *Newberry v. United States*, 256 U.S. 232, 250 (1921) (emphasis added).  More recently, while considering the election-day statutes, the Supreme Court held that "election" "refer[s] to the combined actions of voters and officials meant to make *a final selection* of an officeholder." *Foster*, 522 U.S. at 71 (emphasis added).  Plaintiffs seize upon the unspecified "actions" of "officials" to argue that no vote is cast until it is received by election officials.  (Mem. at 7–8, ECF No. 60).  However, the *Foster* Court explained that "there is room for argument about just what may constitute the final act of selection within the meaning of the law," and it found it unnecessary to "isolat[e] precisely what acts a State must cause to be done on federal election day . . . in order to satisfy the statute." 522 U.S. at 72.  The Court expressly limited its holding to the single issue of Louisiana's practice of electing most members of Congress in an open primary held before election day:  "We hold today only that if an election does take place, it may not be consummated prior to federal election day." *Id*. at 72 n.4.

In *Bomer*, the Fifth Circuit provided the following analysis of the *Foster* decision:

> [T]he plain language of the statute does not require all voting to occur on federal election day.  All the statute requires is that the election be held that day. . . .  Allowing some voters to cast votes before election day does not contravene the federal election statutes because the final selection is not made before the federal election day. . . .  [T]his conclusion is consistent with the [*Foster*] Court's refusal to give a

> hyper-technical meaning to "election" and its refusal to "[pare] the
> term 'election' in § 7 down to the definitional bone."

199 F.3d at 776 (citations omitted).  Likewise, no "final selection" is made *after* the

federal election day under Mississippi's law.  All that occurs after election day is the

delivery and counting of ballots cast on or before election day.  Plaintiffs argue that

no ballots are "cast" until they are in the custody of election officials, but their only

authority for this proposition is a Montana state-court decision from 1944.  (Mem.

at 9, ECF No. 60; Mem. at 7, ECF No. 56).

Several lower courts have taken a similar approach to that of the *Bomer*

court in considering whether a conflict exists between the election-day statutes and

state laws permitting receipt of ballots postmarked on or before election day.  For

example, in *Bost v. Illinois State Board of Elections*, 684 F. Supp. 3d 720 (N.D. Ill.

2023), a district court recently considered a challenge to an Illinois statute that

permitted ballots postmarked or certified on or before election day to be received

and counted for up to fourteen days after election day.  First, the court noted:

> There is a notable lack of federal law governing the timeliness of
> mail-in ballots.  In general, the Elections Clause delegates the
> authority to prescribe procedural rules for federal elections to the
> states.  If the states' regulations operate harmoniously with federal
> statutes, Congress typically does not exercise its power to alter state
> election regulations.

*Id.* at 736 (citations omitted).  The court found that the statute "operates

harmoniously" and is "facially compatible" with the federal statutes because only

ballots postmarked no later than election day are counted under the Illinois statute.

*Id.*  It reasoned that many states had enacted similar statutes that had been in

place for many years, but Congress "has never stepped in and altered the rules." *Id.* The court also recognized that Congress's enactment of UOCAVA and the United States Attorney General's repeated efforts in seeking court-ordered extensions of ballot-receipt deadlines for military voters "strongly suggest that statutes like the one at issue here are compatible with the Elections Clause." *Id.* at 737. As a result, the court found that the plaintiffs had "failed to state a viable challenge to the [s]tatute based on federal law." *Id.*

Plaintiffs object that one cannot infer from Congress's enacting supplemental election statutes that state statutes doing similar things are in harmony with federal law, because Congress can amend federal law but states can't. (Resp. at 28, ECF No. 75). But courts must strongly presume that acts of Congress addressing the same topics are in harmony rather than one statute's impliedly repealing the other in whole or part. *Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 510 (2018). So if one federal statute implicitly allows post-election receipt of overseas ballots mailed by election day, that statute is presumed not to offend against the election-day statutes, from which one may infer that the similar Mississippi statute on post-election receipt is likewise inoffensive.

Much like in *Bost*, another court explained:

[O]verseas absentee voters, like all the rest of the voters, cast their votes on election day. The only difference is when those votes are counted. Thus, this case comes down to having very little difference from the typical voting and vote-counting scenario. Routinely, in every election, hundreds of thousands of votes are cast on election day but are not counted until the next day or beyond.

*Harris v. Fla. Elections Canvassing Comm'n*, 122 F. Supp. 2d 1317, 1325 (N.D. Fla.), *aff'd sub nom. Harris v. Fla. Elections Comm'n*, 235 F.3d 578 (11th Cir. 2000). The court likewise noted that the federal government was surely aware that several states had similar practices of accepting ballots received after election day, but it had not sued any state to challenge that practice. *Id.* This, the court held,

> lends further support to the notion that Congress did not intend 3 U.S.C. § 1 to impose irrational scheduling rules on state and local canvassing officials, and certainly did not intend to disenfranchise voters whose only reason for not being able to have their ballots arrive by the close of election day is that they were serving their country overseas.

*Id.*

In another opinion (later vacated as moot by the Supreme Court), the Third Circuit upheld a three-day extension of the ballot-receipt deadline granted by the Pennsylvania Supreme Court in response to the Covid-19 pandemic and delays in mail delivery. *Bognet v. Sec'y Commonwealth of Penn.*, 980 F.3d 336, 344 (3d Cir. 2020), *cert. granted, judgment vacated sub nom. Bognet v. Degraffenreid*, 141 S. Ct. 2508 (2021). The court explained that "Congress exercises its power to 'alter' state election regulations only if the state regime cannot 'operate harmoniously' with federal election laws 'in a single procedural scheme.'" *Id.* at 353 (quoting *Gonzalez v. Arizona*, 677 F.3d 383, 394 (9th Cir. 2012), *aff'd sub nom. Inter Tribal*, 570 U.S. 1).

The analysis in these opinions is persuasive. "The legislative history of the [election-day] statutes reflects Congress's concern that citizens be able to exercise their right to vote." *Bomer*, 199 F.3d at 777 (citing *Cong. Globe*, 42d Cong., 2d Sess.

-21-

3407–08 (1872)).  According to *Foster*, Congress set a national election day to avoid the "evils" of burdening citizens with multiple election days and of risking undue influence upon voters in one state from the announced tallies in states voting earlier.  522 U.S. at 73–74.  Neither of those concerns is raised by allowing a reasonable interval for ballots cast and postmarked by election day to arrive by mail.  Moreover, as the Fifth Circuit has noted, it is difficult to "conceive that Congress intended the federal election day statutes to have the effect of impeding citizens in exercising their right to vote."  *Bomer*, 199 F.3d at 777.

After hearing oral arguments and considering the seven sets of motions, responses, and replies submitted by the parties as well as the three amici briefs, the Court finds that case authority as well as the legislative history, combined with the Framers' intention in drafting the Elections and Electors Clauses, Supreme Court precedent, and Congress's enactment of UOCAVA support a finding that Mississippi's statute operates consistently with and does not conflict with the Electors Clause or the election-day statutes.

III.   DOES THE MISSISSIPPI STATUTE VIOLATE PLAINTIFFS' CONSTITUTIONAL RIGHTS?

Counts Two and Three of the Complaint allege violations of the rights to vote and to stand for public office.  But neither the Republican Plaintiffs nor the Libertarian Party rebutted Defendants' motions for summary judgment in their responses.  The former did however address those issues in supporting their own

Rule 56 motion.  (Mem. at 18–19, ECF No. 60; Reply at 18–19, ECF No. 90).  The Court will construe that discussion as also rebutting Defendants' arguments.

Essentially, both counts stand or fall on whether the Mississippi absentee-ballots statute conflicts with federal law, in which case Plaintiffs say their rights would be violated.  Because the Court finds no such conflict, it finds no such violations.  Summary judgment is properly granted to Defendants on Counts Two and Three and is denied as to Plaintiffs.

## CONCLUSION

The Elections Clause has two functions.  Upon the States it imposes the duty ("*shall* be prescribed") to prescribe the time, place, and manner of electing Representatives and Senators; upon Congress it confers the power to alter those regulations or supplant them altogether. *Inter Tribal*, 570 U.S. at 8.  In the absence of federal law regulating absentee mail-in ballot procedures, states retain the authority and the constitutional charge to establish their lawful time, place, and manner boundaries.

The Court finds that the RNC, the Mississippi Republican Party, and the Libertarian Party each have standing to proceed with these lawsuits.  They have sufficiently alleged negative consequences they suffer because of Mississippi's statute allowing post-election receipt of ballots mailed by election day.  However, the Court also finds that Defendants are entitled to summary judgment as to all of Plaintiffs' claims.  Mississippi's statutory procedure for counting lawfully cast absentee ballots, postmarked on or before election day, and received no more than

five business days after election day is consistent with federal law and does not conflict with the Elections Clause, the Electors' Clause, or the election-day statutes.

**IT IS THEREFORE ORDERED AND ADJUDGED** that the [51] Motion for Summary Judgment in Consolidated Republican Party Case filed by Secretary of State Michael Watson, the [53] Motion for Summary Judgment in Consolidated Libertarian Case filed by the secretary, the [61] Motion for Summary Judgment filed by Intervenor Defendants Alliance for Retired Americans and Vet Voice Foundation, the [63] Motion for Summary Judgment in the Consolidated Republican Case filed by Christene Brice, Toni Jo Diaz, Carolyn Handler, Barbara Kimball, Becky Payne, and Justin Wetzel, and the [64] Motion for Summary Judgment in the Consolidated Libertarian Case filed by the same movants, are **GRANTED**.  The Court will enter a separate judgment as required by Fed. R. Civ. P. 58(a).

**IT IS FURTHER ORDERED AND ADJUDGED** that the [55] Motion for Summary Judgment filed by the Libertarian Party of Mississippi and the [58] Cross Motion for Summary Judgment filed by Matthew Lamb, the Mississippi Republican Party, James Perry, and the Republican National Committee are **DENIED**.

**SO ORDERED AND ADJUDGED** this the 28th day of July, 2024.

s/ *Louis Guirola, Jr.*

LOUIS GUIROLA, JR.
UNITED STATES DISTRICT JUDGE

**CERTIFICATE OF SERVICE**

I hereby certify that on July 29, 2024, I electronically filed the foregoing letter with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system.

All participants in the case are registered CM/EF users and service will be accomplished by the CM/ECF system.

/s/ Alex Hemmer
ALEX HEMMER