In the

# United States Court of Appeals

## For the Seventh Circuit

———————————

No. 23-2644

MICHAEL J. BOST, *et al.*,

*Plaintiffs-Appellants*,

*v.*

ILLINOIS STATE BOARD OF ELECTIONS and BERNADETTE MATTHEWS, in her capacity as the Executive Director of the Illinois State Board of Elections,

*Defendants-Appellees.*

———————————

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:22-cv-02754 — **John F. Kness**, *Judge.*

———————————

ARGUED MARCH 28, 2024 — DECIDED AUGUST 21, 2024

———————————

Before BRENNAN, SCUDDER, and LEE, *Circuit Judges*.

LEE, *Circuit Judge*. In Illinois, voters can cast their ballots by mail in any election. And election officials can receive and count these ballots for up to two weeks after the date of the election so long as the ballots are postmarked or certified by that date. Plaintiffs, comprised of Illinois voters and political candidates, challenged this procedure, arguing that it

impermissibly expands the time in which residents can vote. The district court dismissed their claims, ruling that Plaintiffs lacked standing to sue. The court also rejected the claims on the merits for good measure. Because Plaintiffs have not alleged an adequate injury, we agree that they lack standing to bring this suit and affirm the district court's dismissal of the case on jurisdictional grounds.

## I. Background

### A. Legal Background

James Madison observed that the regulation of elections in the United States is "a task of peculiar delicacy" that requires involvement from both Congress and state legislatures. 5 Documentary History of the Constitution of the United States of America 441–43 (1905). The Elections Clause of the Constitution provides that "[t]he Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations." U.S. Const. art. I, § 4, cl. 1.

This clause is a "default provision," meaning it "invests the States with the responsibility for the mechanics of congressional elections, but only so far as Congress declines to preempt state legislative choices." *Foster v. Love*, 522 U.S. 67, 69 (1997). As long as a state's election procedures do not conflict with federal provisions, states "are given, and in fact exercise a wide discretion in the formulation of a system for the choice by the people of representatives in Congress." *United States v. Classic*, 313 U.S. 299, 311 (1941).

Two federal statutes are relevant here. The first establishes the "day of the election" for selecting members of the House

of Representatives as the "Tuesday next after the 1st Monday in November, in every even numbered year" ("Election Day"). 2 U.S.C. § 7. The second provides that electors of the President and Vice President are to "be appointed, in each State, on election day, in accordance with the laws of the State enacted prior to election day." 3 U.S.C. § 1.

Illinois has enacted a statutory scheme that governs its federal and state elections. *See* 10 ILCS 5/1-1 *et seq.* Relevant here, Illinois allows voters to cast their ballots by mail in any election held in the state if the ballot is postmarked on or before the day of the election. *Id.* §§ 5/19-1; 5/19-8(c). If the mailed ballot bears no postmark, the voter must have signed and dated a certification accompanying the ballot within the same timeframe. *Id.* § 5/19-8(c). Moreover, any mail-in ballot that meets these requirements must be received by election authorities "before the close of the period for counting provisional ballots," *id.*, which is defined as fourteen calendar days from the election date. *Id.* § 5/18A-15(a).[1] These provisions create a two-week period after Election Day where Illinois officials can receive and count valid ballots that are postmarked or certified on or before Election Day.

**B.  Procedural History**

Each Plaintiff in this case is a registered voter in Illinois and a candidate for political office. Michael Bost is a multi-term member of the United States House of Representatives. Laura Pollatrini and Susan Sweeney are political activists who served as presidential electors during the 2020 election. In May 2022, they filed this suit against the Illinois State Board

---

[1] For convenience's sake, we will refer to these statutes collectively as the Illinois "ballot receipt procedure."

of Elections ("Board") and Bernadette Matthews in her official capacity as the Executive Director of the Board (collectively, "Defendants").

Plaintiffs allege that the Illinois ballot receipt procedure impermissibly extends Election Day, violating 2 U.S.C. § 7 and 3 U.S.C. § 1. As they see it, the fourteen-day post-election period for the receipt and counting of mail-in ballots increases the number of total votes cast in Illinois by counting "untimely" ballots. This in turn, Plaintiffs assert, dilutes their own votes in violation of the First and Fourteenth Amendments to the Constitution. Plaintiffs also claim that the ballot receipt procedure forces them to spend additional time and money operating their campaign organizations beyond Election Day (for example, to oversee the counting of mail-in ballots), which impermissibly impairs their constitutionally protected right to run for office.

Defendants filed a motion, asking the district court to dismiss the complaint under Federal Rule of Civil Procedure 12(b)(1) and 12(b)(6). They argued, among other things, that Plaintiffs lacked Article III standing to challenge the Illinois ballot receipt procedure, that Plaintiffs failed to adequately state a violation of federal law or the Constitution, and that the Board was entitled to sovereign immunity under the Eleventh Amendment. Plaintiffs subsequently moved for partial summary judgment under Rule 56 on the claims that the ballot receipt procedure violated their rights to vote and stand for office. In the end, the district court granted Defendants' motion to dismiss, concluding that Plaintiffs lacked standing. The court also determined that Plaintiffs had failed to state a legally viable claim. This appeal followed.

## II. Analysis

Because the Constitution gives federal courts the power only to resolve "Cases" and "Controversies," our initial inquiry is whether Plaintiffs have standing to challenge the ballot receipt procedure. U.S. Const. art. III, § 2. We review *de novo* the district court's ruling that they did not. *See Perry v. Sheahan*, 222 F.3d 309, 313 (7th Cir. 2000).

To establish the "irreducible constitutional minimum" of standing, a plaintiff must allege she suffered (1) an injury in fact, (2) that is fairly traceable to the defendant, and (3) that is likely to be redressed by a favorable judicial decision. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992). At the pleading stage, a plaintiff must allege facts demonstrating each of these elements. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). We take these factual allegations as true and draw reasonable inferences in the favor of the plaintiff. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

This case hinges on whether Plaintiffs adequately allege a sufficient injury in fact. An injury in fact is one that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." *Lujan*, 504 U.S. at 560. To be considered "concrete," an injury must be "real, and not abstract," meaning it "must actually exist." *Spokeo*, 578 U.S. at 340. A concrete harm is usually physical or monetary but can also include various intangible harms. *See TransUnion v. Ramirez*, 594 U.S. 413, 425 (2021).

For an injury to be "particularized," it must affect the plaintiff "in a personal and individual way." *Spokeo*, 578 U.S. at 339. As the Supreme Court has explained, such an injury must be personal, individual, and distinct, not general and

undifferentiated. *See, e.g.*, *Whitmore v. Arkansas*, 495 U.S. 149, 155 (1990) ("The complainant must allege an injury to himself that is distinct and palpable.") (internal citations omitted); *United States v. Richardson*, 418 U.S. 166, 176–78 (1974) (declining to find standing for a "generalized grievance" when it is "plainly undifferentiated and common to all members of the public") (internal citations omitted).

Plaintiffs argue they were injured by the Illinois ballot receipt procedure both as voters in Illinois and as political candidates. We consider each of these propositions in turn.

## A.  Standing as Voters

Plaintiffs first assert that the strength of their votes will be diluted in the upcoming election by the many purportedly "untimely" mail-in ballots that state election officials will receive and count after Election Day. In their view, the late-arriving ballots will diminish the extent to which their ballots help choose the victor in the election. They recount that, in 2020, approximately 4.4% of the ballots cast in Illinois were received after Election Day, which diluted the value of their own votes.

But, even if we were to accept Plaintiffs' premise that inclusion of these ballots would cause vote dilution, their votes would be diluted in the same way that every other vote cast in Illinois prior to Election Day would be diluted. Thus, to the extent Plaintiffs would suffer any injury, it would be in a generalized manner and not "personal and individual" to Plaintiffs, as the Supreme Court requires. *Spokeo*, 578 U.S. at 339 ("For an injury to be particularized, it must affect the plaintiff in a personal and individual way.") (internal quotation and citation omitted); *see also Lujan*, 504 U.S. at 575 (noting that a

generalized grievance is one that is "undifferentiated and common to all members of the public"). Indeed, at its core, Plaintiffs' complaint is that Illinois is disobeying federal election law. But an injury to an individual's right to have the government follow the law, without more, is a generalized grievance that cannot support standing "no matter how sincere." *Hollingsworth v. Perry*, 570 U.S. 693, 706 (2013); *see Lance v. Coffman*, 549 U.S. 437, 442 (2007) (noting that injury alleged by plaintiffs, who claim that Colorado constitutional provision violated the Election Clause, "is precisely the kind of undifferentiated, generalized grievance about the conduct of government that we have refused to countenance in the past").

By way of contrast, consider racial gerrymandering cases. There, the Supreme Court has held that voters in a racially gerrymandered district have standing because they are "personally subject to a racial classification." *Ala. Legis. Black Caucus v. Alabama*, 575 U.S. 254, 263 (2015) (cleaned up). Because these voters have the strength of their votes diminished compared to voters of another race, the harm is sufficiently individualized.

Malapportionment cases are another example. There, voters have standing to challenge the apportionment of congressional seats because their votes are diminished compared to voters in other congressional districts. *See Baker v. Carr*, 369 U.S. 186, 206 (1962). As the Supreme Court observed, the plaintiffs in *Baker* were "in a position of constitutionally unjustifiable inequality vis-à-vis voters in irrationally favored" groups. *Id.* at 207–08. Here, Plaintiffs have not and will not suffer the same kind of unequal treatment recognized in *Baker* and *Alabama Legislative Black Caucus*.

The Eleventh Circuit arrived at the same conclusion in a similar case involving statewide voting procedures. In *Wood v. Raffensperger*, the plaintiff challenged Florida's recount procedures, contending that they diluted his vote by allowing "unlawful" ballots. 981 F.3d 1307, 1314 (11th Cir. 2020). But the claimant had no standing, the Eleventh Circuit concluded, because "vote dilution in this context is a paradigmatic generalized grievance that cannot support standing." *Id.* (cleaned up).

This rationale also informed the Supreme Court's holding in *Gill v. Whitford*, 585 U.S. 48, 64 (2018). That case involved a challenge to a redistricting plan in Wisconsin. In determining that the plaintiffs lacked standing, the Supreme Court distinguished the allegations in *Baker*, 369 U.S. 186, and *Reynolds v. Sims*, 377 U.S. 533, 561 (1964), noting that "the injuries giving rise to those claims were individual and personal in nature, because the claims were brought by voters who alleged facts showing disadvantage to themselves as individuals." *Gill*, 585 U.S. at 67. Just as in *Gill*, Plaintiffs here only claim a generalized grievance affecting all Illinois voters; therefore, they have not alleged a sufficiently concrete and particularized injury in fact to support Article III standing.

## B.  Standing as Candidates

Plaintiffs next contend that they suffered tangible and intangible harms as political candidates. As an initial matter, the parties dispute whether, in reviewing the district court's grant of Defendants' motion to dismiss, we can consider the affidavits Plaintiffs filed detailing the harms they purportedly suffered due to the ballot receipt procedure. Plaintiffs believe we can, relying on *United States ex rel. Hanna v. City of Chicago*, 834 F.3d 775, 779 (7th Cir. 2016). There, we remarked that "[t]he

party defending the adequacy of a complaint may point to facts in a brief or affidavit 'in order to show that there is a state of facts within the scope of the complaint that if proved (a matter for trial) would entitle him to judgment.'" *Id.* (quoting *Early v. Bankers Life & Cas. Co.*, 959 F.2d 75, 79 (7th Cir. 1992)). But *Hanna* and *Early* dealt with motions under Rule 12(b)(6) for failure to state a claim. Here, we are considering jurisdiction under Rule 12(b)(1), and the Supreme Court has unequivocally held that "[w]here, as here, a case is at the pleading stage, the plaintiff," as the party invoking federal jurisdiction, bears the burden to "clearly allege facts demonstrating each element" of standing. *Spokeo*, 578 U.S. at 338 (cleaned up).

Be that as it may, even with their affidavits, Plaintiffs cannot establish the injury in fact necessary for Article III standing. Plaintiffs say that the challenged policy imposed tangible monetary harms by forcing them to use resources to contest ballots that arrived after Election Day. For example, Congressman Bost attests that he must continue to fund his campaign for two additional weeks after Election Day to contest any objectionable ballots. Furthermore, he needs to send poll watchers to each of the thirty-four counties in his district to monitor the counting of the votes after Election Day to ensure that any discrepancies are cured. In Plaintiffs' view, the money and organization required to facilitate this operation is a tangible harm sufficient to confer standing.

We disagree. Recall that, to confer Article III standing, a plaintiff's injury must not only be "concrete and particularized" but also "actual or imminent." *Lujan*, 504 U.S. at 560. The latter requirement for standing "ensure[s] that the alleged injury is not too speculative for Article III purposes." *Id.* at 564 n.2. Thus, when a claimant premises standing on a future

harm, the harm must be more than just "possible"—the allegedly threatened injury must be "certainly impending." *Whitmore*, 495 U.S. at 158.

The Supreme Court's holding in *Clapper v. Amnesty International, USA*, 568 U.S. 398 (2013), is instructive. There, the plaintiffs challenged certain amendments to the Foreign Intelligence Surveillance Act that allowed government surveillance of communications to and from persons in foreign countries under certain circumstances. To establish standing, the plaintiffs argued that the law required them to undertake costly measures to ensure the confidentiality of legitimate communications with persons abroad to avoid detection. The Court was unconvinced, finding such injuries too speculative:

> Respondents' contention that they have standing because they incurred certain costs as a reasonable reaction to a risk of harm is unavailing—because the harm respondents seek to avoid is not certainly impending. In other words, respondents cannot manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending.

*Id.* at 416.

In much the same way, the Illinois ballot receipt procedure does not impose a "certainly impending" injury on Plaintiffs. Rather, it was Plaintiffs' choice to expend resources to avoid a hypothetical future harm—an election defeat. But whether the counting of ballots received after Election Day would cause them to lose the election is speculative at best. Indeed, Congressman Bost, for example, won the last election with

seventy-five percent of the vote. *See* Ill. State Bd. of Elections, *Election Results, 2022 General Election*, https://www.elections.il.gov/electionoperations/ElectionVoteTotals.aspx.[2] And Plaintiffs cannot manufacture standing by choosing to spend money to mitigate such conjectural risks.

Resisting this conclusion, Plaintiffs contend that being compelled to expend resources as a result of the Illinois ballot receipt procedures is in itself sufficient for Article III standing. For this proposition, they cite two cases—*Krislov v. Renour*, 226 F.3d 851 (7th Cir. 2000), and *Libertarian Party of Ill. v. Scholz*, 872 F.3d 518 (7th Cir. 2017). Neither is helpful.

In *Krislov*, we considered a challenge to an Illinois law that required candidates to collect a certain number of signatures to appear on the ballot. 226 F.3d at 856. This regulation mandated that the signatures had to be collected by voters who lived in the district where the election took place. *Id.* We determined that a candidate had standing to challenge the constitutionality of the law when he used significant campaign resources to collect the requisite number of signatures after some of the signatures were initially collected by individuals who lived outside of the district. *Id.* at 857–58.

In *Scholz*, we held that a political party had standing to challenge a law that required the party to field candidates for

---

[2] We take judicial notice of the official election results from the Illinois State Board of Elections website. *See* Fed. R. Evid. 201(b)(2), (d) (explaining that courts may take judicial notice, "at any stage of the proceeding," of a fact "not subject to reasonable dispute because it ... can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned"); *see, e.g.*, *Mont. Green Party v. Jacobsen*, 17 F.4th 919, 927 (9th Cir. 2021) (taking judicial notice of official election results from the Montana Department of State website).

every office in the political subdivision in which the party wished to compete. 872 F.3d at 523. In doing so, we observed that the law imposed a "burdensome condition" on the Libertarian Party and that the full-slate requirement stood as an "ongoing obstacle" to ballot access. *Id.* at 522–23.

Both cases are readily distinguishable—the laws at issue there imposed a direct affirmative obligation on the candidates or political parties. By contrast, here, Plaintiffs are not spending resources to comply with the Illinois ballot receipt procedure or to satisfy some obligation it imposes on them. Rather, they are electing to undertake expenditures to insure against a result that may or may not come. Such expenditures are not "fairly traceable" to the Illinois ballot receipt procedure. *Clapper*, 568 U.S. at 416.

Undeterred, Plaintiffs also argue that the ballot receipt procedure imposes an intangible "competitive injury." This theory posits that allowing votes to be received and counted after Election Day could decrease their margin of victory, which, in turn, could impact their reputations and decrease their fundraising. We have recognized similar types of injuries involving politicians in other circumstances. *See, e.g.*, *Fulani v. Hogsett*, 917 F.2d 1028, 1030 (7th Cir. 1990) (holding that a third party and its candidates faced the injury of "increased competition" when the defendants allegedly improperly placed major-party candidates on the ballot). The problem is that Plaintiffs do not (and cannot) allege that the majority of the votes that will be received and counted after Election Day will break against them, only highlighting the speculative nature of the purported harm.

Finally, Plaintiffs contend that they have an interest in ensuring that the final official vote tally reflects only legally

valid votes. In support, they cite *Carson v. Simon*, 978 F.3d 1051, 1056 (8th Cir. 2020). There, the plaintiffs, who had been nominated as electors in the 2020 presidential election, challenged a state court consent decree that required the Minnesota Secretary of State to receive and count for up to five days after Election Day absentee ballots that were postmarked on or before election day. The Eighth Circuit heard the appeal six days before the presidential election and well after voters had begun receiving their absentee ballots. The court found that the two electors had standing to sue, reasoning that "[a]n inaccurate vote tally is a concrete and particularized injury to candidates." *Id.* at 1058.

Upon first blush, we question whether the Eighth Circuit's brief treatment of this issue without citation to any authority is consistent with the Supreme Court's holding in *Lance*. *See Carson*, 978 F.3d at 1063 (Kelly, J., dissenting) (noting that the claimed injury "appears to be 'precisely the kind of undifferentiated, generalized grievance about the conduct of government' that the Supreme Court has long considered inadequate for standing") (quoting *Lance*, 549 U.S. at 442). But, even if consistent with *Lance*, we find the facts in *Carson* markedly different from those here.

In *Carson*, over one million voters had already requested mail-in ballots for the presidential election as of September 29, 2020. 978 F.3d at 1056. Given that there were only 3,588,299 preregistered voters in Minnesota at the time, whether and how the absentee ballots were counted would likely have had a material effect in "ensuring that the final vote tally accurately reflects the legally valid votes cast." *Id.* at 1058; *see* Fed. R. Evid. 201(b)(2), (d); Off. of the Minn. Sec. of State, 2020 Election Statistics, https://www.sos.state.mn.us/elections-

voting/election-results/2020/2020-general-election-re-
sults/2020-election-statistics. By contrast, here, the election is
months away and the voting process has not even started,
making any threat of an inaccurate vote tally far more specu-
lative than in *Carson.* So again, Plaintiffs have failed to allege
a certainly impending injury.

### III.  Conclusion

Because Plaintiffs do not have standing to challenge the
Illinois ballot receipt procedure, we AFFIRM the district
court's dismissal of the case for lack of jurisdiction.

SCUDDER, *Circuit Judge*, dissenting in part. I join my colleagues in rejecting the plaintiffs' voter-dilution and competitive-injury theories of standing. I also agree that plaintiffs Laura Pollatrini and Susan Sweeney have failed to adequately explain how Illinois's ballot-receipt procedure would tangibly harm them as candidates. In my view, however, the same cannot be said for Congressman Michael Bost. Because Illinois's extended deadline for receiving mail-in ballots will increase Bost's campaign costs this November—a fact that gives Bost a concrete stake in the resolution of this lawsuit—I respectfully dissent.

## I

Michael Bost has run successfully in 15 electoral races in Illinois—first as a longstanding member of the Illinois House of Representatives and then as a U.S. Representative of House District 12. Like many candidates, Congressman Bost dispatches poll watchers on Election Day to monitor the counting of ballots at each precinct in his district and report any irregularities. Bost has used watchers in past elections and intends to do the same in 2024.

In 2013 Illinois extended its deadline before which mail-in ballots must be received. The new law directed state officials to count any mail-in ballot postmarked by Election Day and received up to fourteen days later. This change in law had an immediate impact on candidates' election-monitoring operations. To ensure that all mail-in ballots were accurately tallied, Congressman Bost had to recruit, train, assign, and coordinate poll watchers and keep his headquarters open for an additional two weeks. This took substantial time, money, and resources, as Bost explained in his complaint and sworn declaration.

In my view, the costs Congressman Bost will incur to monitor ballots after Election Day gives him "a personal stake in th[is] dispute" and a basis to proceed in federal court. *FDA v. Alliance for Hippocratic Medicine*, 602 U.S. 367, 379 (2024) (internal quotation marks omitted). Campaign expenses readily qualify as both "concrete" and "particularized"—the first two prongs of Article III standing. See *TransUnion LLC v. Ramirez*, 594 U.S. 413, 424–25 (2021) (emphasizing that tangible monetary harms are quintessential "concrete injuries"); *Mack v. Resurgent Cap. Servs., L.P.*, 70 F.4th 395, 406 (7th Cir. 2023) ("[M]oney damages are almost always found to be concrete harm."); see also *Trump v. Wisconsin Elections Comm'n*, 983 F.3d 919, 924 (7th Cir. 2020) ("An inaccurate vote tally is a concrete and particularized injury to candidates." (quoting *Carson v. Simon*, 978 F.3d 1051, 1058 (8th Cir. 2020))).

The monitoring costs are also "imminent." Congressman Bost has declared, in no uncertain terms, that he *will* send poll watchers to monitor vote processing and counting for two weeks after Election Day this November. As night follows day, he will incur campaign expenses to do so. Political campaigns cost money, including in the form of staffing; none of this is free. The guaranteed prospect of higher campaign costs is more than just a "possible future injury." *Clapper v. Amnesty Intern. USA*, 568 U.S. 398, 409 (2013) (cleaned up). Such costs are "certainly impending." *Id.*

Congressman Bost's increased monitoring expenses are also "fairly traceable" to Illinois's ballot-receipt procedure and "redressable by a favorable ruling." See *Monsanto Co. Geerston Seed Farms,* 561 U.S. 139, 149 (2010); see also *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992). The only reason he continues to monitor polls after Election Day is because

Illinois law allows ballots to be received and counted. Before
Illinois decided to accept and count such ballots, he had no
need for such extended operations. Bost's decision to con-
tinue running his campaign for two weeks after Election Day
is thus a direct response to Illinois's decision to extend its
deadline for mail-in ballots. We should not hesitate to hold
that Congressman Bost meets all the requirements of Arti-
cle III standing.

## II

Resisting this conclusion, the Panel majority describes
Bost's costs as somehow entirely self-inflicted. Nothing in Il-
linois law, the Panel emphasizes, forces Bost to monitor the
ballot count after Election Day. According to the Panel, Bost's
protracted poll watching is not a strategic necessity but in-
stead an overreaction to a hypothetical possibility that is
"speculative at best": electoral defeat due to ballots received
after Election Day that were improperly counted. Op. at 11.
Such conjectural risks, in the majority's view, are not suffi-
ciently "imminent" to confer standing. See *Clapper*, 568 U.S. at
409. Nor, the Panel reasons, are the expected costs of precau-
tionary measures taken to avoid those risks. See Op. at 11–12.

I disagree. For starters, the Panel goes too far in saying that
the risk of ballots swaying the upcoming District 12 election
after Election Day is only speculative. Nothing in Congress-
man Bost's complaint or sworn declaration supports that
view. Perhaps realizing the shortfall in its reasoning, the ma-
jority opinion resorts to taking judicial notice of the fact that
Congressman Bost won reelection last cycle by a vast margin.
See Op. 11 & n.3. But past is not prologue for political candi-
dates, including an incumbent like Congressman Bost. In no
way is any outcome guaranteed in November.

Regardless, a candidate's past margin of victory says nothing about the relative weight of mail-in ballots received after Election Day—and thus the strategic importance of extended poll-watching operations. Even if Congressman Bost had won reelection by 99% in 2022, he would have been more than justified in monitoring the count after Election Day if a significant enough portion of ballots remained outstanding at that point. He is far from alone in believing that the risk of ballot irregularities justifies funding poll-watching operations. In recent years, poll watching has become commonplace among major candidates, with all 50 states permitting campaign representatives to monitor vote tallies. See National Conference of State Legislatures, Poll Watchers and Challengers (May 28, 2024). In light of this reality, federal courts should be wary of labelling such practices speculative, particularly when included in the longstanding and successful election strategy of a sitting member of Congress.

In characterizing Congressman Bost's poll-watching strategy as anchored in speculation, the Panel also fails to accept his factual allegations as true for purposes of evaluating standing at the motion-to-dismiss phase. See *Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656, 668–69 (1993). The Panel acknowledges this principle in theory, asserting that Bost would lack standing even if all the claims in his complaint and sworn affidavit were true. See Op. at 5, 10. In practice, however, the Panel disregards several claims made by Bost that directly undermine its conclusions. Congressman Bost has asserted, for instance, that the number of ballots received after Election Day has increased consistently every election, and that "many of these late-arriving ballots have discrepancies (e.g., insufficient information, missing signatures, dates, or postmarks) that need to be resolved."

Those statements undercut the Panel's view that the need for extended monitoring is purely speculative. At this phase of litigation, we must credit the former.

The Panel decision also suffers from a deeper flaw. Even if we assume that Congressman Bost's concern about delayed ballots altering the course of his election is speculative, that alone should not bar his lawsuit. Plaintiffs who take precautionary measures to avoid speculative harms are ubiquitous in federal courts. Consider, for instance, people seeking to purchase a firearm for self-defense. By doing so, they seek to take a precautionary measure to mitigate a risk of harm (an act of violence). That risk is entirely speculative and may never materialize. But even so, courts have overwhelmingly held that prospective gun owners have standing to challenge government policies that prevent, restrict, or otherwise tax the preventative measure they seek to take. See, *e.g.*, *Parker v. District of Columbia*, 478 F.3d 370, 376 (D.C. Cir. 2007), *aff'd sub nom.*, *District of Columbia v. Heller*, 554 U.S. 570 (2008) (holding that it is "not a new proposition" that a plaintiff had standing to challenge the denial of a gun licensing permit). By dismissing Bost's expected campaign costs as a self-imposed, preventative measure designed to avoid a speculative harm, the Panel fails to see this as a straightforward application of settled principles of standing.

Where the majority opinion most misses the mark is in viewing this case as on all-fours with Supreme Court's 2013 decision in *Clapper v. Amnesty International*, 568 U.S. 398. There the Court declined to enjoin provisions of the Foreign Intelligence Surveillance Act authorizing the surveillance of phone conversations with persons outside the United States. See *id.* at 401–02. The Court concluded that the plaintiffs (attorneys,

human-rights advocates, and NGOs) lacked standing because they had no reason to believe that the government would "imminently" target their specific phone conversations under the Act. See *id.* at 412. Because any risk of enforcement was purely speculative, the Court concluded that the preventative costs that the plaintiffs had undertaken to avoid potential surveillance did not constitute an "injury in fact" that was "fairly traceable" to the Act. See *id.* at 410–12. Plaintiffs, the Court concluded, "cannot manufacture standing by choosing to make expenditures based on hypothetical future harm that is not certainly impending." *Id.* at 402.

The majority concludes that Bost is seeking to do what *Clapper* prohibited: transform a purely speculative injury into an actual one by taking costly measures in an attempt to prevent it. *Clapper* and its progeny teach that when the very application of a challenged government restriction to the plaintiffs is uncertain, preventative measures taken to avoid that application cannot create standing. See *id.* at 402; see also *Murthy v. Missouri*, 144 S. Ct. 1972, 1994–96 (2024) (holding that plaintiffs lacked standing to challenge government actions that allegedly encouraged social-media censorship because it was "no more than conjecture" that the plaintiffs would be subject to government-induced content moderation (internal quotation marks omitted)).

But Congressman Bost's claim is distinct. In *Clapper*, the *only* reason the plaintiffs had for incurring costs was to guard against the specter of a surveillance action that may never come. See *FEC v. Cruz*, 596 U.S. 289, 297 (2022) (clarifying that the "problem" that *Clapper* addressed "was that the [ plaintiffs] could not show that they had been or were likely to be subjected to th[e] policy in any event"). Here, however,

Congressman Bost's poll-monitoring efforts are not aimed at shielding against the speculative possibility of government action. In direct contrast to *Clapper*, the application of the challenged government restriction in this case is a near certainty. There will be an election this November, Congressman Bost will incur staffing costs to monitor the full and complete ballot count, and Illinois law will require that that count extend for an additional two weeks after Election Day.

What is speculative in Bost's case is not the application of the challenged statute but a risk unrelated to its enforcement: the risk of ballot irregularities swaying an election. But *Clapper* is fully consistent with accepting at face value a plaintiff's judgment that the risk of some external harm unrelated to enforcement warrants mitigation. When the government creates obstacles to such mitigation efforts—here, as in the gun example and countless others—plaintiffs have standing to challenge them in federal court.

Congressman Bost has asserted injuries sufficient to confer Article III standing by alleging that his longstanding election-monitoring efforts will incur extra financial costs this November due to Illinois's extended ballot-receipt deadline. As a sitting member of Congress in the midst of an ongoing reelection campaign, he is nothing close to a "mere bystander" to the upcoming election or the allegation at the heart of this lawsuit. See *Alliance for Hippocratic Medicine*, 602 U.S. at 379. He is an active stakeholder who ought to be permitted to raise his claim in federal court.